PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

FILED

NOV 27 2007

Name ___COLLIER_____TREMAYNE_____J._____
       (Last)                  (First)            (Initial)

Prison Number ___V-60930_____

Institutional Address ___H.D.S.P. B1-130, P.O.Box 3030, Susanville, CA 96127___

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CW

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CV 07    5964

TREMAYNE J. COLLIER
_____
Full Name of Petitioner

     vs.

TOM FELKER, Warden,
_____
Name of Respondent
(Warden or jailor)

Case No. _____
(To be supplied by the Clerk,
U.S. District Court)

(PR)

PETITION FOR WRIT OF HABEAS CORPUS

## Read Comments Carefully Before Filling In

### When and Where to File

    You should file in the Northern District if you were convicted and
sentenced in one of these counties: Alameda, Contra Costa, Del Norte,
Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa
Clara, Santa Cruz, San Francisco, San Mateo, and Sonoma.

    If you file in the Northern District because you are now in a prison
in this District but you were **not** convicted and sentenced in one of the
above-named fifteen counties, your petition will likely be transferred
to the United States District Court in which is located the State Court
which convicted and sentenced you. The Federal District Courts in
California prefer that a petition should be considered in the district
of conviction and sentencing. The records can be more easily consulted
and witnesses are available if a hearing is necessary.

1

## Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county, or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the State judgment against which you seek relief but may be subject to such custody in the future (e.g. detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the State in which the judgment you seek to attack was entered.

## PART A - JURISDICTION

The federal district court can only consider your petition if you satisfy certain jurisdictional requirements. The information below will allow the court to determine whether those requirements are met.

1. For what crime were you sentenced? (If you seek habeas corpus based upon a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are seeking habeas corpus as to more than one sentence, a different petition should be filed for each sentence.)

First degree murder, two counts of robbery, gun use, Penal Code

sections 187, 212.5, 12022.53 (d), 667.5.

2. The sentence from which you seek relief is as follows:

    (a) Name and location of court which imposed sentence (for example; Alameda County Superior Court, Oakland):

San Francisco Superior Court Hall of Justice <u>850 Bryant St. SF CA 94107</u>
        Court                                                    Location

    (b) Case number, if known  <u>182125-02</u>

    (c) Date and terms of sentence  <u>12/10/04, 51-year to life and 13-year.</u>

    (d) Are you now in custody serving this term?   Yes <u>X</u>    No ____

(Custody means being in jail, on parole or probation. You are not in custody if you are released on bail, on your own recognizance or if there is a stay of execution of sentence.)

Where? <u>H.D.S.P.  Susanville, CA 96127</u>
              (Name of Institution)              (Address)

2

3.  What post-conviction relief have you sought?

**APPEAL**

(a)  Did you **take** an appeal from your conviction?    Yes  X    No _____

(b)  To what court(s)?    Check

Court of Appeal    Yes  X    No A108751   August 30, 2006 denied
                                          (Give year)      (Result)

Supreme Court of    Yes  X    No S147017  12/13/06 denied
California                                 (Give year)      (Result)

Any other court    Yes _____    No _____
                                          (Give year)      (Result)

(c)  If you appealed, were the grounds the same as those which will be set forth in this petition?    Yes _____    No  X

(d)  Was any opinion rendered?    Yes  X    No _____

(e)  If you did not appeal, what were your reasons?

_____

_____

_____

(f)  Did you seek permission to file a late appeal under Rule 31(a)?
     Yes _____    No _____

If you answered "Yes" give _____
                                    (Name of Court)

_____
                    (and result)

**OTHER POST-CONVICTION REVIEW**

(g)  Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes  X    No _____

(h)  If you answered "Yes" give the following information about each proceeding.

3

I.    **Name of Court** _San Francisco County Superior Court_

**Type of Proceeding** _Petition for writ of habeas corpus_

**Grounds raised (Be brief and specific):**

a. _See Ground One through ground six below_

b. _____

c. _____

d. _____

e. _____

**Result** _denied_          **Date of Result** _July 23, 2007_

**Citation of opinion, if any and known** _5604_

II.    **Name of Court** _Court of Appeal Fourth Appellate District._

**Grounds raised (Be brief and specific):**

a. _See ground one through ground six below._

b. _____

c. _____

d. _____

e. _____

**Result** _denied_          **Date of Result** _Sept. 6, 2007_

**Citation of opinion, if any and known** _A118903_

III.    **Name of Court** _California Supreme Court_

**Grounds raised (Be brief and specific):**

a. _See ground one through six below._

b. _____

c. _____

d. _____

e. _____

4

Result ___denied_____     Date of Result _____

Citation of opinion, if any and known _____
(Use back side of this page if you need more space.  Fill in the same
questions for each.)

(i)  If you answered "No" explain briefly why you have not sought any
post-conviction review?

_____

_____

(j)  Is any petition or other post-conviction proceeding now pending in
any court?  Yes _____   No _X_

_____
(Name and location of Court)

## PART B - TRIAL INFORMATION

4.  Check if any of the following were held in your case:

Arraignment: Yes _X_  No _____     Preliminary Hearing:  Yes _____  No _X_
(grand jury)
Motion to Suppress: Yes _X_   No _____

5.  Check whether a finding of guilty was made after a plea of

Guilty _____          Not Guilty _X_          Nolo Contendere _____

Any other plea _____
(Specify)

6.  Check kind of trial:

Jury _X_               Judge alone _____

Judge alone on a transcript _____

7.  Did you testify at your trial?    Yes _____          No _X_

## PART C - GROUNDS FOR RELIEF FROM CONVICTION

State briefly and concisely every ground which you believe supports your
claim that you are being held in unlawful confinement.  This means
telling the court the facts upon which you rely.  You should avoid legal
arguments with numerous case citations.  Thus, what legal right or
privilege were you deprived of in your case?  What happened to deprive
you of this right?  Who made the error of which you complain?  What did
he do wrong?  When did he do it?  If you lack space to state all your
grounds, use the back side of the page.

NOTE WELL:  You must present ALL of your claims in your first federal
habeas petition.  Subsequent petitions are subject to dismissal without
review on the merits for abuse of the writ.  McCleskey v. Zant, 111
S.Ct. 1454 (1991), 113 L.Ed. 2d 517, 59 U.S.L.W. 4288.

8.  Grounds for Relief

(a)  Ground One:  SEE ATTACHED PAGE 6a

Supporting Facts:  SEE ATTACHED PAGE 6a

(b)  Ground Two:  SEE ATTACHED PAGE

Supporting Facts:  SEE ATTACHED PAGE

(c)  Ground Three:  SEE ATTACHED PAGE

Supporting Facts:  SEE ATTACHED PAGE

9.  If any of the grounds listed were not previously presented to any
other court, state briefly which grounds were not so presented and why:

All the below grounds were presented in the state courts system.

I.

PETITIONER'S CONVICTIONS OF FIRST DEGREE MURDER,
THE GUN, AND THE TWO ROBBERIES WERE BASED ON
INSUFFICIENT EVIDENCE.

Santese Edwards entered a plea bargain with the District
Attorney in San Francisco. (RT 1852.) Edwards was facing life
without parole for being in the car and engaging in all the
activities on May 25, 26, 1999. (RT 1853.) Edwards pled guilty
to grand theft in exchange for his testimony against Daniel
Mooring and Tremayne Collier (petitioner). (RT 1854.)

Edwards pled guilty to the violation of Penal Code section
487 which is grand theft. (RT 1945-1946, 1948.) The maximum
exposure for the grand theft and admitting that someone was
armed with a firearm was four years. (RT 1946.) Three years
for the grand theft and one year for the gun. (Ibid.) Defendant's
Exhibit # ZZ is the transcript of Edwards's plea of guilty.
(RT 1948.) Edwards pled guilty on June 25, 2002. (RT 1950.)

When the residence of Edwards's grandmother was searched, a
photo was taken. In the photo was Edwards, Willie Kennedy and
Daniel Mooring. Petitioner's was no in the photo. (RT 1859.)

Before May 25, 1999, Edwards testified that he knew petitioner
for a few months. (RT 1863, 1921.) Willie Kennedy made a phone
call to Edwards in February 2000. Wynkoop and Cashen asked
Kennedy to call Edwards  Kennedy asked  Edwards if he had
spoken with petitioner, Edwards said, "I don't even know that
nigger," (RT 1863-1864, 1921.)

Edwards explicitly told Mr. Ahern and Mr. Andriola that he
was with his girlfriend the whole night of May 25, 1999, Edwards

1  said to the Agents that he had an alibi.  (RT 1899.)  Edwards

2  urged the agents to go to speak with his girlfriend.  (RT 1900.)

3    Inspectors Wynkoop and Cashen showed to Edwards a photo of

4  petitioner.  Edwards said that he did not know petitioner.  (RT

5  1921.)

6    Miss Pam Olsen is the investigator of Edwards's Attorney.

7  The questions of Pam Olsen came from the district attorney, becau-

8  se the district attorney want to know what Edwards's answers

9  were going to be.  (RT 1935.)  Edwards told Miss Olsen that he

10  drove the car to the Marina.  (RT 1937.)  Edwards told Miss Olsen

11  that he smoke weed and had done some coke in that car which

12  bolstered his courage.  (RT 1938.)  Santese Edwards drove the car

13  all the time because petitioner was under the influence of drugs.

14    Mr. Arthur Wachtel:  (trial counsel for petitioner) asked

15  Edwards: "Collier drove to where Golden Gate crosses Market and

16  turns into 6th Street.  He parked the car right before the street

17  takes the bend and crosses Market.  Collier and Kennedy both in

18  the front seat got out of the car.  Kennedy took the gun, a .22

19  rifle.  They walked around the bend and Santese Edwards got into

20  the driver's seat.  He could't see anything, but heard the

21  victim screaming.  Kennedy and Collier panicked and ran back to

22  the car.  They didn't get anything from the victim.  Santese

23  Edwards states the victim was a black man named Pippen," P-I-P-P-

24  E-N, "who hangs around 8th and Market.  Santese Edwards states

25  that Pippen is not the type to report something like this to

26  the police.  Santese Edwards states that he ran into Pippen

27  some time later and Pippen told Santese Edwards what happened.

28  That was his answer to Olsen said Edwards.  (RT 1936.)

1    Santese Edwards told Mr. Barry Simon, who was an investigator

2  working for Mr. Mooring, "They rode a little ways near 6th and

3  Golden Gate, Kennedy called out to stop the car, exclaiming,

4  'that's the guy who tried to rob me.' Edwards is certain that

5  Kennedy had taken the .22 out of the backpack and hid it inside

6  his leather jacket as he got out of the car. Edwards said that

7  he heard someone scream 'no' and Kennedy and Collier ran back

8  to the car. He believe that Collier grabbed Kennedy and said:

9  Let him go." Trial counsel for petitioner asked Edwards if he

10  said the above, and Edwards said, "I guess so." (RT 1936-1937.)

11    Trial counsel asked Edwards: "After the attempted robbery

12  downtown, Santese Edwards drove the Mustang around for about 30

13  minutes with no destination in mind. Collier was in the front

14  passenger seat and Mooring and Kennedy were in the back. There

15  was never any discussion, per se, about where they were going

16  or what they were doing. No one said they did't want to be

17  involved, no one objected. They drove by a man in the Marina,

18  circled the block. Santese Edwards and Mooring got out and

19  Collier assumed the driver's position. Santese Edwards states

20  he was a little nervous, but they smoked weed and had done some

21  coke in the car which bolstered his courage." Edwards said the

22  above to Miss Olsen. (RT 1938.)

23    Trial counsel asked Mr. Edwards: "When Mooring and Collier

24  got in the car, Santese Edwards asked 'what did you do?' No one

25  responded at first. Then Mooring said the shooting was an

26  accident, that he did't mean to do it. Santese Edwards could

27  turn around and look at Mooring, who was seated in the right back

28  seat. Mooring looked shocked. And Santese Edwards says he was

1  remorseful for what had happened.  Collier was directly behind

2  Santese Edwards in the left back seat and Santese Edwards couldn't

3  get a look at his expression.  He recalls Collier said to Mooring

4  'you didn't have to do it.'"  Trial counsel for petitioner asked

5  Edwards if he had said the above to Miss Olsen, and he said yes.

6  (RT 1939-1940.)

7      Edwards told Miss Olsen that after the shooting of Shayne

8  Worcester, "Kennedy was going through the wallet (of Mr. Shayne

9  Worcester) and throwing papers, maybe business cards, out the

10  window."  Trial counsel asked Edwards if he was sure that Kennedy

11  was doing the above,  And Edawards said that he was sure.  (RT

12  1940.)

13      Edwards said that Mooring had the gun when he got out of the

14  car and when he got back in the car."  (RT 1941.)

15      Defendant's Exhibit YY is the agreement that Edwards signed

16  that reflects the contract between him and the prosecutor.

17  Edwards, his attorney and the Supervising District Attorney of

18  the homicide unit signed.  (RT 1944.)

19      Edwards got out of jail on January 17, 2003 after his promising

20  to testify against petitioner.  (RT 1952.)  Edwards heard that

21  Willie Kennedy committed a home-invasion robbery.  Edwards told

22  his lawyer, "they got to let me out of jail now, now they really

23  need me"?  Trial counsel asked Edwards, "What's your understanding

24  of the requirement when you're out of custody?  Do you have to

25  lead a law-abiding life?"  Edwards said, "Yes."  (RT 1952.)

26      Defendant's Exhibit BBB is a witness protection agreement.

27  Edwards signed in this case.  The requirement of receiving benefits

28  and being in the program he lead a law-abiding life.  (RT 1953.)

6d

1    Trial counsel asked Edwards if he was arrested in San Joaquin
2  County, he said that he was going to plea the fifth.   The Court
3  ordered Edwards to answer, and he said that he was arrested for
4  grand theft on January 15, 2004.  (RT 1954.)  Edwards had a
5  court appearance on January 22, 2004 in Stockton, he missed it.
6  (RT 1955.)  When Edwards testified a day before, he thought that
7  the prosecution did not know what was going on in Stockton.
8  Edwards was in a scheme to defraud Sears Department Store with
9  Miss Veronica Rivera.   When Edwards left the store at Sears in
10  Stockton, he have a type of tussle with the security guard.
11  (RT 1956-1957.)  Defendant's Exhibit CCC is a plea of no contest.
12  It was dropped because Edwards picked up another case that was
13  more serious than the Sears case.  (RT 1958.)  When Edwards
14  picked up the second case in San Joaquin County, there was an
15  outstanding warrant for his arrest for the Sears case.   (RT 1958.)
16  Edwards was arrested in San Joaquin County on May 20, 2004 for
17  a traffic stop, Edwards had a gun in the car.  Edwards said to
18  the police that the gun belonged to a family member.  (RT 1958.)
19  The gun was a .25 Beretta.  (RT 1959.)  Defendant's Exhibit DDD
20  is the plea which Edwards entered for possession of the gun.
21  Edwards pled guilty in Stockton.  Edwards got a 30-day sentence
22  which is a misdemeanor for the gun.  Edwards pled guilty to con-
23  cealed and loaded weapon in Stockton on May 20, 2004.  (RT 1958,
24  1960-1961.)

25    When Edward saw the gun in the car, he thought that it was
26  to be used on the dude that robbed Kennedy.  (RT 1967.)

27    The prosecutor asked Edwards if before May 25, 1999, when
28  him, petitioner, Milo, and Kennedy get together was a gun

1  in the house of Willie Kennedy in Richmond?  Edwards said that he

2  saw a gun.  (RT 1966.)

3      Willie Kennedy testified that he born on 6/7/80.  (RT 1975.)

4  When Willie Kennedy testified, he said that he  was living in a

5  drug rehabilitation program for 10 to 11 months.  (RT 2096.)   He

6  had marijuana, alcohol and cocaine problems.  (Ibid.)  Kennedy

7  said that he was a cocaine dealer.  Kennedy testified  during

8  the grand jury and Mooring's trial that he was dealing drugs

9  before and during the incident happened.  On September 4, 1994,

10 Kennedy was arrested for attempted robbery of a West America Bank

11 in Sausalito, California.  (RT 2097.)  In the attempted bank

12 robbery, in Sausalito, Kennedy had a silver handgun. He was with

13 Mr. Lamont Hall.  (RT (Ibid.)  On September 9, 1997, Kennedy was

14 pulled over for a traffic stop.  His car was searched and the

15 police found stolen cellphones in the car.  Kennedy was with

16 Jermaine Harris when he was pulled over.  Kennedy said to the

17 police that the phones belonged to William Curry, junior.  On

18 February 13, 1998, Kennedy was 18 years old, almost 19.  When

19 Kennedy and Jermaine Harris were cut with the telephones, both

20 men were armed.  The serial numbers of their guns were shaved off,

21 that way those firearms could not be traced.  The guns were .390

22 caliber.  (RT 2097,2098, 2099.)

23     In may 1999, Kennedy possessed a .22, 44 magnum, and a 9

24 millimeter.  (RT 2100.)  Kennedy fired the .44 magnum in the

25 presence of Daniel Mooring both men had fired the gun.  Kennedy

26 had fired the .22 rifle in the air.  (RT 2101.)  The .22 gun

27 carry nine to 10 bullets.  Kennedy had a connection with Daniel

28 Mooring, Santese Edwards, through Leslie Duvlin who was a prosti-

1   tute.  (RT 2104.)  Leslie Duvlin was living in a hotel, on

2   Lombart Street in San Francisco by the Golden Gate Bridge.

3   Kennedy had intimate relationship with Miss Duvlin.  Kennedy and

4   Mooring had the same tattoos that says FTW, which means Fuck The

5   World.  (RT 2105.)

6       On November 22, 1999, Kennedy was living in San Rafael, in

7   his aunt's house.  It was searched and items were taken.  (RT

8   2106.)  On November 22, 1999, when the Inspectors talked with

9   Kennedy in San Francisco he refused to talk, and requested a

10   lawyer.  (RT 2106-2107.)  After Kennedy was interviewed by the

11   inspectors Wynkoop and Cashen in San Francisco.  He returned to

12   Marin County, and spoke with Ms. Prudence Wesson.  Ms. Wesson

13   told Kennedy that she knew Sergeant Michael Ridgway in the

14   Marin County Sheriff's Department.  (RT 2113.)  Kennedy knew

15   Sergeant Ridgway too because Ridgway had arrested Kennedy before,

16   and had searched the house of Kennedy's mother Ms. Renee Williams.

17   After Inspectors Wynkoop and Cashen spoke with Kennedy, He

18   called Ms. Pruduce Wesson 50 times.  Ms. Wesson suggested Kennedy

19   to have a meeting with Sergeant Ridgway.  (RT 2114, 2116-2117.)

20   Sergeant Ridgway asked Kennedy, "where did the gun go"?  Kennedy

21   said, "in the water"?  Kennedy said that that was a lie.

22   Sergeant Ridgway asked Kennedy, "who got rid of the gun"?  Kennedy

23   said "Milo"  that was a lie said Kennedy.  Sergeant Ridgway

24   asked Kennedy, "did you ever get out of the car"?  Kennedy said

25   that that was true.  (RT 2120.)  Kennedy said that when he gave

26   the interview with Sergeant Ridgway he was the one that owned

27   the murder weapon.  Kenney knew that he was the one who brought

28   the murder weapon to San Francisco.  Kennedy brought the murder

1 | weapon to his house.  Kennedy said that before the incident at

2 | the Marina, he and the other went to a strip club on Market and

3 | he got out of the car with the gun and tried to commit a robbery.

4 | Kennedy did not say anything of the above to the grand jury.

5 | The first time he revealed been in the strip club and tried to

6 | commit the robbery was during Mooring's trial.  (RT 2121.)  When

7 | Kennedy left Richmond, he was wearing a leather coat of at least

8 | knee length.  The coat was capable of concealing a rifle when he

9 | is walking.  On Market Street Kennedy saw Pippen who Kennedy

10 | had a beef.  (RT  2122.)  Trial counsel asked Mr. Kennedy: Q:

11 | Why did you get out of the car?  A:  It wasn't even him (Pippen)

12 | that I had a beef with, it was somebody else that was present.

13 | Q:  Isn't it true, sir, Mr. Collier grabbed you and prevented

14 | you from doing anything and dragged you back to the car by the

15 | scruff of your neck?  A:  Not the I remember.  (RT 2123.)  However,

16 | Santese Edwards testified that Kennedy got out of the car on

17 | Market Street with the gun when Kennedy saw Pippen,  and Collier

18 | grabbed Kennedy to prevent that Kennedy shoot at Pippen.  See

19 | (RT 1936-1937.)

20 | On November 24, 1999, Kennedy spoke with Wynkoop and Cashen.

21 | Defendant's Exhibit Y-1 is the transcript of the interview of

22 | Kennedy by Inspectors Wynkoop and Cashen.  The transcript starts

23 | out by Ms. Prudence Wesson saying, "you guys just went to the

24 | city to go and watch strippers, whatever."  Trial counsel asked

25 | Kennedy if he remember being in a small interview room on Novem-

26 | ber 24, in the Marin County Sheriff's Office?  And Kennedy said

27 | yes. kennedy said that Ms. Prudence Wesson might have been in

28 | the room before the inspectors entered the room.  (RT 2125.)

6h

1   Kennedy told police that Mooring and Edwards were committing

2   robberies together.  (RT 2129.)  Kennedy was told by Wynkoop and

3   Cashen, and the district attorney that pleading to an accessory

4   for one day in jail, covered all of Kennedy's activities for the

5   night of May 25 and the early morning hours of May 26, 1999.)

6   (RT 2132-2133.)  Kennedy understood that once he pled guilty and

7   was sentenced, he could not be prosecuted for any robbery or any

8   murder in exchange for truthful testimony.  Kennedy was told that

9   if he was prosecuted for murder he could be facing potentially a

10  life sentence or a capital charge.  (RT 2132.)  People v. Kennedy,

11  Number 1980362 is the plea guilty and the sentenced which was

12  implemented the same day.  See Defendant's Ex. FFF.  (RT 2133.)

13  Kennedy was placed on probation, which mean he is not going to go

14  to prison, but instead be released into the community, he said.

15  Kennedy was sentenced to a day, and gave credit for one day already

16  served.  (RT 2133.)  The condition of the probation was that

17  Kennedy obeyed all laws and to testify truthfully during the

18  grand jury and any proceeding.  (RT 2134.)  In the Mooring's

19  trial, Kennedy said that he brought the gun to San Francisco on

20  May 25, 1999.  Kennedy admitted that he shot the jacket of Santese

21  Edwards.  Kennedy put a hole in the jacket with his .44 Bullgod.

22  (RT 2139-2140.)  Kennedy received from the Witness Protection

23  Program about $10,000.  Before Kennedy was in the Witness Protec-

24  tion Program he was a drug dealer.  Around November of 2002,

25  Kennedy did not receive  anymore benefits from the Witness Protec-

26  tion Program, so he started to sell drugs again.  (RT 2145.)

27  Inspectors Wynkoop and Cashen told Kennedy, "Seems like you're

28  telling us the true.  We are not going to arrest you," Kennedy

1   said, "I'm just going to go back to school, keep working.   RT

2   2146.)  However, On November 9, 2003 Kennedy committed a home-in-

3   vasion robbery.   Kennedy and three other people were involved in

4   the home-invasion robbery.   There were three people in the home.

5   Mr. Anderson was one of the victim,  he was awoke when Kennedy

6   put his pellet gun in his (Anderson's) head.   Kennedy's friends

7   bought marijuana from Mr. Anderson, then Kennedy went into the

8   house of Mr. Anderson to rip-off a pound of marijuana.   The home-

9   invasion robbery occurred at 4:15 a.m.   (RT 2146-2147, 2148, 2412-

10  2416.)  Kennedy took watches, credit cards, checks, cell phones,

11  and play stations from the house of Mr. Anderson.   Mr. Scharfe

12  was living in the house of Mr. Anderson, Mr. Scharfe told the

13  Probation Officer that when he opened the shower's door, kennedy

14  put a gun to his head and said that if he didn't cooperate,

15  Kennedy would kill him.   (RT 2149, 2412.)   Kennedy and his three

16  friends were arrested by the Twin Cities Police Department, and

17  were identified immediately after the home-invasion robbery.

18  Kennedy was represent by Attorney Horngrad during the proceeding

19  of the home-invasion robbery.   Kennedy pled guilty to the home-

20  invasion robbery, and he was sentenced to four years.   When

21  Kennedy was arrested for the home-invasion robbery, he did not

22  inform   the District Attorney's Office in San Francisco.

23  Kennedy was in the Marin County Jail for six months for the home-

24  invasion robbery.   During the six months of incarceration,

25  Kennedy did not inform the District Attorney's Office in San

26  Francisco or the Witness Protection Program.   When Kennedy pled

27  guilty for the home-invasion robbery, his case was **referred to**

28  the Marin  County Probation.   The sentencing Judge was Miss Verna

Adams.  The probation report does not mention that Kennedy was

convicted in San Francisco for being an accessory to a murder.

Because Kennedy lied to the Probation Officer.  (RT 2149, 2150,

2151.)   The reason Kennedy got probation in Marin County was

because Kennedy tricked the probation department into believing

he had no adult criminal history.  (RT 2151-2152.)

Defendant's Exhibit HHH is a "Probation Officer's Presentence

Report, Willie Elmore Kennedy Junior." Marin County Number

SC127790A.  Defendant's Exhibit III is a copy of the Marin County

Probation Report that was submitted to Judge Adams when Kennedy

was sentenced on the home-invasion robbery.  In July of 2003,

Kennedy was placed on probation and released from the Marin County

jail.  RT 2152-2153.)  The probation report said "prior record"

it does not list  any adult criminal history.  It did not list

any of Kennedy's conviction in San Francisco which Kennedy already

had as part of an adult criminal history.  The probation report

said "performance of probation."  At the time the report was

prepared, Kennedy was on probation in San Francisco.  The box that

was checked on the form on page three under "performance of proba-

tion," parole is not applicable, which meant to Kennedy that he

was not on probation.  The Marin County Probation Department  and

Judge Adams thought there was no probation that Kennedy was on

that they could evaluate. The Probation Department Staffing said,

"Circumstances in mitigation: the defendant has only one insignifi-

cant  record of criminal conduct.  The defendant has only one

misdemeanor entry in his juvenile record."  The report does not

say anything about Kennedy's adult criminal history in San Francis-

co.  RT 2154,2155.)  The probation report said, "The instant

1   offense appears to represent a single instance of aberrant atypi-

2   cal behavior, particularly in light of the lack of a significant

3   prior record." Kennedy wrote a letter to the probation officer,

4   and it would be forwarded to the judge. Kennedy said in the

5   letter, "If I'm granted probation and county jail time, because

6   I haven't a supervised probation before, I know I can meet the

7   demands of probation." And then on the bottom of the letter, "If

8   I was given a second chance, you would not regret it bacause the

9   plans and goals I have set are easy for me to execute?" Defense

10  counsel asked Kennedy. Q: As a result of your conviction in

11  Marin County, for the home-invasion robbery, the San Francisco

12  District Attorney never took an action against your probation

13  here in San Francisco? A: No. (RT 2156-2157, 2159.) The

14  daughter of Prudence Wesson was the girlfriend of Kennedy. (RT

15  2158.) When Kennedy relied he was in trouble, he contacted

16  Prudence Wesson because she knew Sergeant Michael Ridgway. (RT

17  2159.)

18      Mr. Charles Schultz is a Deputy District Attorney in San

19  Joaquin County. He testified that he was the district attorney

20  in the case of Santese Edwards. He said that on May 25, 2004,

21  Edwards pled guilty to carrying a concealed firearm that is Penal

22  Code section 12022.5. He got 30 days in county jail. He also

23  pled guilty to a misdemeanor grand theft he got 10 days consecu-

24  tive to the 30 days that he got for the weapon. (RT 2215, 2216,

25  2217.) Miss Doran Berg was the attorney for Santese Edwards in

26  the above cases. (RT 2217.) Before Mr. Schultz resolved Santese

27  Edwards's case, he did not call the San Francisco DA's Office or

28  the SFPD or the San Francisco Bay area Defense Lawyer Douglas

61

1   Schmidt.  (RT 2218, 2226.)  The rap sheet of Santese Edwards,

2   shows: as of May 28, 2004, Edwards was arrested and released in

3   San Francisco for disturbing the peace. He was not formally

4   charge with it.  There was a bench warrant for a 187 in 2000 or

5   2001.  In 2003 Edwards had an application of police, there was

6   a warrant from San Joaquin County for misdemeanor 487, and then

7   there was his arrest on the case that was before Mr. Schultz.

8   That was all on his rap sheet said Mr. Schultz.  (RT 2220.)

9       Defendant's Exhibit CCC and DDD are the two complaints

10  pertaining to the two cases that Mr. Schultz had with respect to

11  Edwards.  One complaint is for grand theft and the other for gun

12  charge.  (RT 2221.)  Edwards committed the grand theft on January

13  15, 2004.  On January 22, 2004, Edwards was supposed to appear in

14  the court for the grand theft.  He failed to appear and a warrant

15  was issued.  On January 21, 2004, Edwards called the court and

16  said he could not make in court.  (RT 2222-2223.)  On January 20,

17  2004, Edwards was arrested for traffic stop, the police found

18  that he had a warrant, the car was searched and the police found

19  a weapon and then he was arrested.  Edwards was driving a BMW.

20  (RT 2224.)

21      Defendant's Exhibit JJJ is the rap sheet of Edward in San

22  Francisco.  The rap sheet had an entry showing 187 in San Francisco.

23  It did not show any disposition of the murder case from San Fran-

24  cisco.  It did not show an arrest.  (RT 2226.)

25      Only an hour before Mr. Schultz's testimony, he learned that

26  Edwards had pled guilty to an offense arising out of the murder

27  case, and that Edwards had been convicted of a felony 487 grand

28  theft.  (RT 2227.)  Edwards and his attorney did not volunteer

1  the fact that he was a convicted felon.  (RT 2227-2228.)

2      Edwards committed the grand theft in Stockton, California.

3  The charge of the weapon was cencealed weapon because the police

4  found the gun after Edwards was in the police station.  (RT 2228-

5  2229.)

6      Mr. Jerry Coleman was the District Attorney in the grand jury.

7  He said that on April 16, 2001, Willie Kennedy pled guilty and

8  sentenced on the felony charge.  That way he could be available

9  as a grand jury witness.  (RT 2236.)

10     Doug Horngrad represented Willie kennedy when he pled guilty.

11 Honorable Philip Moscone was the presiding Judge when Kennedy

12 pled guilty on April 16, 2001.  Kennedy pled guilty to accessory

13 after the fact a violation of California Penal Code section 32.

14 (RT 2230, 2236,2238-2239.)  Willied Kennedy pled guilty in Depart-

15 ment 22, which is the master calendar courtroom in the San Francis-

16 co Superior Court.  (RT 2236.)

17     Defendant's Exhibit FFF is nine pages of Kennedy's plea.

18 The punishment for accessory to the fact is three years in prison

19 or up to three years suspended.  (RT 2238, 2240.)  Kennedy was

20 sentenced to suspended sentenced, and placed on three years

21 probation.  Kennedy was credited to a day for one day served and

22 released (RT 2247.)  Kennedy pled and was sentenced on the same

23 day which was April 16, 2001.  (RT 2241.)

24     Kennedy testified on April 17, 2001, before the grand jury.

25 After his testimony he was placed on the Witness Protection

26 Program.  (RT 2241.)

27     Willie kennedy testified that he and petitioner used cocaine

28 powder.  Kennedy said that he provided the cocaine. (RT 1982.)

1    Kennedy testified that after the Marina incident, they went to

2    a club. Kennedy did not remember the name of it. Kennedy did not

3    remember if petitioner went into the club. Kennedy said that

4    around the area of the club they stopped tha car. Kennedy said

5    that after the car stopped, everybody got out of the car. Kennedy

6    said that they were around the area of the club for about ten to

7    twenty minutes. Kennedy said that he did not remember if anybody

8    smoke weed, drink beer, or snort cocaine. (RT 2047-2048.) However,

9    Santese Edwards testified that they smoked weed and snort cocaine,

10    and that bolstered his courage. (RT 1938.)

11    LaShonta Bateast testified that she was in the living room

12    at the end of May. That day the TV had the news, Daniel Mooring

13    said, "Tae, did you see the news?" Bateast said "no." Then

14    Mooring said, "the tourists was on the news." Mooring said, "Tae,

15    I did it," Bateast said, "Did what?" Mooring said, "I killed

16    one of the tourists," and Mooring was like laughing, playing.

17    Bateast thought Mooring was just joking around. Bateast said

18    that when Mooring was telling what happened, the other man had

19    "a smirk on his face." Bateast said that the man who was with

20    Mooring was sat on the coach watching TV. (RT 2297-2399, 2300-

21    2302.)

22    The prosecution asked Miss Bateast. Q: Do you see in this

23    courtroom right now the man who was with Daniel in your home

24    at the end of May 1999 when Daniel was talking. A: No. (RT 2307.)

25    Because Willie Kennedy and Santese Edwards said the above,

26    petitioner was convicted of first degree murder, used of gun and

27    with two counts of robbery. Petitioner does not deny  being in

28    the car with Mooring, Edwards and Willie, what petitioner denies

1   is being out of the car with Mooring when Mooring shot at Mr.

2   Shayne Worcester.  Petitioner never got out of the car when Mr.

3   Worcester was killed because he was sleeping in the car due to

4   the marijuana and cocaine consumption before the incident.  The

5   testimony of Edwards and Kennedy cannot be believed because they

6   said that petitioner got out of the car with Mooring when Mr.

7   Worcester was shot  that was not true.

8         Inter alia, the government will claim that a jury trial with

9   twelve people believed Edwards and Kennedy.  The jury might no had

10   convicted petitioner based on what they said, it might had convic-

11   ted petitioner because the prosecutor told the jury that petitioner

12   was incarcerated.  Also petitioner thinks that the jury convicted

13   him because juror 11, Ms. 674749 before her deliberation had

14   formed the idea to convict petitioner because she was intimidated

15   when she saw the black lady and two other black men on the hall-

16   way of the court.  See ground Two below.  Also juror 11 was

17   influenced to convict petitioner by her boss.  See the ground two

18   infra.

19         In In re Winship, (1970) 90 S.Ct. 1068, the U.S. S. Court said,

20   the requirement that guilt of a criminal charge be established

21   by proof beyond a reasonable doubt dates at least from our early

22   years as a Nation.  The "demand for higher degree of persuation

23   in criminal cases was recurrently expressed from ancient times,

24   [though] its crystallization into the formula 'beyond a reasonable

25   doubt' seems to have occurred as late as 1798.  Its now accepted

26   in common law jurisdictions as the measure of persuasion by which

27   the prosecution must convince the trier of all the essential

28   elements of guilt."  C. McCormick, Evidence section 321, pp. 681-

682 (1954); see also 9 J. Wigmore, Evidence, Section 2497 (3d ed.
1940).    Although virtually unanimous adherence to the reasonable-
doubt standard in common law jurisdictions may not conclusively
establish it as a requirement of due process, such adherence
does "reflect a profound judgment about the way in which law
should be enforced and justice administered."  Duncan v. Louisiana,
391 U.S. 145, 155, 88 S.Ct. 1444,1451, 20 L.Ed.2d 491 (1968).

Petitioner's convictions for first degree murder, the gun
use allegation, and the two counts of robbery  should be reversed
because the evidence was insufficient to prove them.  Petitioner's
rights under the Fourteenth Amendment to the United States
Constition had been violated.

1                                    II.

2      PETITIONER WAS DENIED A FAIR TRIAL BECAUSE JUROR
3      11, MS. 674749 WAS TAMPERED.

4      The judge and Juror 11, Ms. 674749 had the following exchanges:

5      The Court:  Good afternoon.  We are in Chambers with juror number

6      11, Ms. 674749.  Ms. 674749, my clerk brought to my attention at,

7      I think at the lunch hour, if I recall correctly, a concern that

8      you expressed to him about an exchange that happened to you in

9      the hallway of the Hall of justice today, and I'd like to ask

10     if you could tell us, please, what was it that you experienced

11     so we can know that.

12     Juror:  It was not an exchange that I experienced, it was just

13     something that somebody had said that I felt -- that said as we

14     passed each other in the Hallway that I felt was directed to me.

15     The Court:  And what was that?

16     Juror:  Her words were  "And there's juror number 11, as we

17     speak."

18     The Court:  And was this one person or several people who

19     were together, or was the scenario and where did it occur?

20     Juror:  It occurred on the third floor as I got off the

21     elevator, and then there's s short hallway and then there's the

22     main hallway.

23     The Court:  Were you going back to the jury assembly room?

24     Juror:  Yes, exactly.  I was going to have my lunch there.

25     The Court:  Okay.

26     Juror:  And it was shortly after turning the corner in the

27     main hallway, and there was a small group of people.  Initially

28     there was a young man that, because of the way I was turning and

                                    6r

1    where he was standing, we looked right at each other, and then

2    there were two other people that appeared to be -- it seemed

3    like he was kind of waiting for them and they were moving up

4    from the hallway.  This would have been right near the women's

5    restroom there.

6        The Court:  Okay.

7        Juror:  And there was this fellow that appeared to be young,

8    youngish, to me, and a woman I had no idea what her age might

9    be, but she was quite tall, and there was another person and

10   oh, I wan't looking at anybody except the guy, because -- just

11   because of the way we were moving.  And she was walking and I

12   passed her and passed quite close to each other, and she made

13   the remark very clearly.

14       The Court:  What race was this woman?

15       Juror:  Black.  (RT 487, 488, 489.)

16       The Court:  What was the race of the two men or the two

17   other persons?

18       Juror:  One I don't know.  And the one that appeared to me

19   to be the young one, the first person of this group that I saw,

20   looked to me also to be black.  (RT 490.)

21       The Court:  How, if at all, did you feel affected by this,

22   what you heard?

23       Juror:  Well, I was a little startled, and then after it

24   kind of sunk in.  I thought:  Well, that's something I should

25   report; could be important.  **And I did feel a little bit of**

26   **threat.  I did feel a little threatened.  It was in the tone**

27   **of her voice.**

28       The Court:  How would you describe the tone of voice,

6s

1    if you could.

2        Juror:  Threatened, but not overtly and not directly.  And

3    like she didn't stop and confront me, it was just in passing,

4    sort of like she just wanted me to hear this.  And I thought:

5    well, you know, it seems strange.  It could be a coincidence,

6    but it would be a pretty strange concidence.  (RT 491.)

7        Juror 11, Ms. 674749 indicated that she did not tell the

8    other jurors what happened.  (RT 492.)

9        Juror 11 said that she was going to be a little cautious,

10   on the way home.  (RT 493.)

11       Arthur Wachtel (Defense Counsel) moved for the discharging

12   of juror 11.  (RT 502, 504.)

13       Trial counsel's motion to discharge juror 11 was denied

14   without prejudice.  (RT 505.)

15       After the verdict was rendered, juror 11 said that the

16   finding of guilty of petitioner was her true and correct verdict.

17   (RT 2848.)

18       The record is silent about juror 11 been discharging.

19       In United States v. Angulo, 4 F.3d 843 (9th Cir. 1993) (alle-

20   gation of jury tampering requires evidentiary hearing)  During

21   the course of the trial, a juror received a strange phone call

22   at home in which the caller told the juror, "I know where you

23   live."  The next day, the juror asked if any fellow jurors had

24   received similar calls, then brought the matter to the attention

25   of the judge.  The judge interviewed her in chambers, without

26   the attorneys, and excused her when she told him the call had

27   scared her, and could affect her ability to deliberate.  The

28   other jurors were given no explanation of the juror's sudden

6t

absence, were not questioned regarding bias, not were they given

a curative instruction.  Court held that the trial court abused

its discretion in failing to hold a hearing under the facts

presented.  There was a clear possibility that the remaining

jurors may have believed defendants were responsible for the

threat to the juror, and the judge should have examined them on

this.

Juror 11 not only was biased by the comments of the black

people she encountered.  Juror 11 also was prejudiced toward

petitioner because her boss encouraged her directly or indirectly

to convict petitioner, for example, juror 11 told  to the judge

that her boss told her, "burn him" as soon she entered in the

room where she worked.  (RT 879.)  Juror 11 said that she was

confused.  (Ibid.)  Juror 11, Ms, 674749 supervisor  said

to juror 11, while she was in her cubicle, "Well, shall we call

you 'Em High'?  Juror 674749 said, "What?" and she repeated,

"shall we call you 'Hang 'Em High'?"  (RT 880.)

The matter of juror 11, Ms. 674749 was conducted in a side bar

conference but not reported.  (RT 885.)

Petitioner REQUESTS AN EVIDENTIARY HEARING IN HIS CASE TO

DETERMINE IF JUROR 11 WAS DISCHARGED OR NOT.  If juror 11 was

among the twelve persons that rendered the guilty verdict in this

case, petitioner's conviction should be reversed because juror

11 was biased toward petitioner.  If juror 11 served in the

deliberation, then petitioner's rights under the Sixth Amendment

to the United States Constitution has been violated.

III.

## THE PROSECUTOR COMMITTED MISCONDUCT BY ELICITING FROM WITNESS THAT PETITIONER WAS INCARCERATED BEFORE AND DURING HIS TRIAL.

On direct examination of Mr. Santese Edwards, the prosecution asked him the following questions:

Q:  When you went to the gym while in custody, did you have a chance to speak with Tremayne Collier?

A:  No.  (RT 1820.)

Q:  While you were in custody, did you talk with Mr. Collier about your case?

A:  Only when we were in the holding cells.

Q:  What conversation did you have with Tremayne Collier? When you say "in the holding cell," What are we talking about?

A:  Where they have us before we come into court.

Q:  When you were waiting for a court appearance, sometimes would Mr. Collier be with you in the holding cell?

A:  Yes.

Q:  When you and Mr. Collier where waiting in the holding cell for a court appearance, was Mr. Mooring with you?

A:  Sometimes yes.

Q:  Sometimes when the three of you were together in the holding cell, would the three of you talk about your case?

A:  I'm sure we did.

Q:  Do you remember specific conversations when the three of you were in the holding cell waiting to go to court?

A:  No, I don't.

Q:  Was there ever a time when just you and Mr. Collier were

1  in a holding cell waiting to go to court and Mr. Mooring was not

2  present?

3  A:  Yes.

4  Q:  When just you and collier were in a holding cell, would the

5  two of you have words about your case?

6  A:  Yes.

7  Q:  What would you and Collier say?  What did you and Collier

8  say in the holding cell when Mooring was not present about your

9  case?

10  A:  I don't remember.

11  Q:  What was your feeling toward Mr. Collier while you were

12  in custody together?

13  A:  None.

14  Q:  In early 2002, Mr. Edwards, were you still in custody for

15  this case?

16  A:  Yes, I was.

17  Q:  Was Mr. Collier still in custody for this case?

18  A:  Yes, he was.

19  Q:  Sometimes in early 2002, were you in a holding cell waiting

20  for a court appearance with Tremayne Collier?

21  A:  Yes, I was.

22  Q:  Did Mr. Collier, while you were in the holding cell together,

23  give you something?

24  A:  Yes.

25  Q:  What did he give you?

26  A:  A letter.

27  Q:  Where were you when he gave it to you?

28  A:  In the holding cell.  (RT 1821,1824, 1825, 1826, 1827, 1837.)

1  In the final statement the prosecutor told the jury that

2  petitioner wrote the letter when he was in jail. (2748,2750-51,2845.)

3  In <u>Duran v. Thurman</u>, 106 F.3d 407 (9th Cir. 1997), the United

4  States Court of Appeals for the Ninth Circuit indicated, Duran

5  argues that these questions and statement by the prosecutor

6  constituted prosecutorial misconduct in that they informed the

7  jury that Duran was incarcerated prior to trial and created an

8  inference that Duran was probably guilty of the offense or was

9  a violent person who needed to be incarcerated.  We agree and

10  hold that the prosecution's reference to Duran's incarceration

11  constituted prosecutorial misconduct.  Id. at 407.

12  Petitioner's right under the Sixth Amendment to the United

13  States Constitution had been violated.  Therefore his conviction

14  should be reversed.  Because the prosecution informed the jury

15  that petitioner was incarcerated before and during his trial.

16

17  **A.  Comment on Petitioner Failure to Testify.**

18  During the prosecution's closing statement, he indicated

19  the following:

20  Pam Hofsass, the gun shot residue expert, testify, never

21  challenge.  Unique GSR on his right  sleeve. (RT 2740.)

22  The four men knew each other well before May 25 and 26 you

23  know that.  There is no evidence to challenge that.  (RT 2747.)

24  This is not Dorfman's incompetent fabrication.  I'm looking

25  at what the fedendant had to say and making an argument to you.

26  (RT 2811.)

27  When the Prosecution said (1) never challenge; (2) there is no

28  evidence to challenge that and (3) I'm looking at what the defen-

1   dant had to say and making an argument to you.  The prosecution

2   told the jury that petitioner failed to testify.

3       In United States v. Cotnam, 88 F.3d 487, 493 (7th Cir. 1996),

4   the United States Court of Appeals for the Seventh Circuit indi-

5   cated.  During the government's closing argument, various state-

6   ments were made by the prosecutor that Zadurski now challenges

7   as being unconstitutional commentary on his failure to testify.

8   The prosecutor twice referred to the government's case generally

9   as "uncontroverted" and four times referred specifically to the

10  testimony of David Martin as "uncontroverted."  In particular,

11  the prosecutor urged the jury to find Martin credible because

12  his testimony was uncontroverted.  He stated, "Now, the defendant

13  will argue that Martin is not credible, although the evidence

14  I just discussed is basically uncontroverted."  The prosecutor

15  also referred to the specific detail of Martin's testimony and

16  stated:  "Those are specifics that only a credible witness

17  could give.  Again uncontroverted Mr. Martin on [the] specific

18  of the conspiracy?"

19      Trial counsel requested a mistrial because the prosecution

20  elicited from Lieutenant Michael Ridgway an opinion that Mr.

21  Kennedy had shown no deception at all up until the point of

22  time Mr. Kennedy started to talk about the gun, and I think

23  it's Horbook Law that neither the prosecutor nor law enforcement

24  can vouch for the credibility of the witness.  He is a start

25  witness in the case and, on that basis, I'm going to move for

26  a mistrial.  (RT 2575-2576.)

27      The Court read some part that Lieutenant Ridgway said, and

28  it indicated, "looked like vouching for Willie Kennedy."

6y

1   (RT 2579.)  However, the court denied the motion for a mistrial.

2   (RT 2582.)

3       Trial counsel indicated that the prosecution had violated the

4   discovered rules and now that Lieutenant Ridgway testified, the

5   prosecutor is taking advantage of the situation.  (RT 2580.)

6       The prosecution in his closing argument repeatedly vouched

7   for the strength of the government's case.  United States v. Cotnam,

8   supra, 88 F.3d at 493.

9       Petitioner's conviction should be reversed, because his right

10  under the Sixth Amendment to the United States Constitution had

11  been violated.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IV.

## PETITIONER'S CONVICTIONS AND SENTENCES
## VIOLATED THE EIGHT AMENDMENT.

Mr. Santese Edwards was driving the car on May 25, and in the early hour of May 26, 1999, because petitioner could not drive his car due to the fact that he was sleeping in the car because he was under the influence of marijuana and cocaine. Petitioner did not know what the other companions were doing. Petitioner did not have the capacity to react to anything of what the other people were doing. Petitioner was really incapacitated in the car due to the marijuana and cocaine that he had consumed. Mr. Edwards admitted to Miss Pam Olsen that we smoked weed and snorted cocaine before Mr. Shayne Worcester was killed. See (RT 1938.) During the trial, Edwards, Kennedy, and other people said that petitioner got out of the car with Mr. Daniel Mooring and killed Mr. Worcester. Is true that Mooring killed Mr. Worcester, but petitioner was in the car at that moment sleeping and just enjoying his drugs. Thus, petitioner did not have the capacity to participate in an aiding and abetting and in a conspiracy to the killing of Mr. Worcester.

In Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed. 2d 144 (2003), Edwing v. California, 538 U.S. 11, 123 S.Ct 1179, 155 L.Ed.2d 108 (2003), the United States Supreme Court indicated that it allowed for the remote possibility of finding a statutory punishment unconstitutional when it is "grossly disproportionate." Andrade, 538 U.S. at 73, 123 S.Ct. 1166; see also Ewing, U.S. at 23, 123 S.Ct. 1179 (noting that the Eight Amendment contains a narrow "proportionality principle that applies to noncapital

6aa

1  sentencing") (internal quotations and citations omitted).   The

2  Court did not elaborate what types of violations this exception

3  might encompass, but warned that "it is applicable 'only in the

4  exceedingly rare and extreme case.'" (quoting Reyes v. Brown,

5  399 F.3d 964, 970 (9th Cir. 2005).

6  Petitioner was convicted for first degree murder, use of gun,

7  and two counts of robberies.  He was sentenced to 51 years to

8  life for the murder and use of gun.  For the two counts of

9  robbery, petitioner was convicted to 13 year determinate sentence.

10 for the reasons stated supra, petitioner's convictions and

11 sentences violated the Eight Amendment prohibition on cruel and

12 unusual punishment.  His conviction should be reversed.

V.

### TRIAL COUNSEL RENDERED INEFFECTIVE
### ASSISTANCE BY FAILING TO INVESTIGATE

Trial counsel rendered ineffective assistance by failing to investigate the whereabout of Miss Leslie Duvlin. If trial counsel would have contact Miss Duvlin, she would have testified that she had knowledge that when the Ray Labonte's robbery and the shooting of Shayne Worcester occurred, Willie Kenedy, Santese Edwards, Daniel Mooring, and Tremayne Collier were under the influence of marijuana, cocaine, alcohol, and heroin. See (CT 769-784, 829.)

Inspector Edward Wynkoop filed an affidavit, in it he indica-ted that Miss Leslie Ann Duvlin told him that Kennedy told her that when the robbery of Ray Labonte, and Shayne Worcester's shooting and robbery occurred, all the suspects were under the influence of marijuana and cocaine. (CT 769, 784, 829.)

Miss Leslie Ann Duvlin also indicated that Kennedy told her that Santese Edwards was the driver during the two incidents. (CT 810-811, 815-816.) Miss Duvlin also said to the Inspectors that Santese Edwards was the driver, JR was in the front seat, Collier and Mooring were in the back seat. (Id.)

Mr. Dorfman (the Prosecution) indicated, "At this point, defendant's knowledge, intent and mental state are the major trial issues. (CT 735-736.) The testimony of Miss Duvlin was vital in this case. And the result of the trial would have been different if trial counsel would have looked and placed Miss Duvlin in front of the twelve persons of the jury. Petitioner was prejudiced by the acts of trial counsels.

1    The other person that trial counsel failed to contact was

2  Mr. Tiron Ford.  Mr. Ford filed an affidavit and said, that

3  Tremayne Collier told him, to "get out of there" because Willie

4  Kennedy was looking for him.  (CT 1174-1175.)  The jury did not

5  learn what  Mr. Ford said in the affidavit because trial counsel

6  failed to contact him.  The records also show that Mr. Ford

7  was accosted by Willie Kennedy, and Mr. Collier prevented that

8  Kennedy harmed Mr. Ford.  (CT 1171.)  That occurred before Mr.

9  Ray Labonte was robbed

10    On May 25, 26, 1999, the foursome went to a strip club on

11  Market Street called "Crazy Horse."  The foursome hunged outside

12  of the club for a while and snorted cocaine and smoked weed.

13  Collier snorted heroin.  The other did not used heroin because

14  they did not like.  In sure, petitioner smoked, marijuana, snorted

15  co aine, and heroin.  Petitioner had used water to disolve the

16  heroin.  Petitioner barely heard that Daniel Mooring said that

17  he was going to look for cocaine because it ran out.  Petitioner's

18  state of mind was clouded due to the heroin he ingested.  Petitio-

19  ner did not know what was taking place in the car.  Petitioner

20  barely remember that shadows were leaving and entered in the

21  car.  Petitioner barely felt that the car was stopping and

22  moving.  Willie Kennedy told Lieutenant Michael Ridgway that

23  petitioner was driving erratic.  (CT 584.)  Kennedy said that

24  because Collier was driving erratic, Santese Edwards took the

25  driving duties.  The reason petitioner was driving erratic, was

26  because he was under the above mentioned drugs.  Petitioner did

27  not drive erratic because he did not know the area.

28    In Lambright v. Schriro, (No. 04-99010 Ninth Circuit ) D.A.R.

6dd

1 | 6713, Tuesday, May 15, 2007,  the United States court of Appeals

2 | for the Ninth Circuit stated:  Attorney's failure to adequately

3 | investigate and present mitigating evidence during capital

4 | sentencing phase amounted to ineffective assistance of counsel.

5 | **EVIDENTIARY HEARING REQUESTED.**  Petitioner's conviction should

6 | be reversed because his right under the Sixth Amendment to the

7 | United States Constitution has been violated.

8 |

9 | **A.   Failure to Obtain an Expert**

10 | There is no doubt that petitioner was under the influence of

11 | alcohol, marijuana and  heroin when the Ray Labonte's robbery

12 | took place and when Mr. Shayne Worcester was killed and robbed.

13 | At those times, petitioner's mind was cl uded, and/or petitioner

14 | was almost asleep.  An expert would have told the jury that

15 | petitioner would not have the capacity to aiding  and  abetting

16 | and conspiring  with Willie Kennedy, Daniel Mooring and Willie

17 | Kennedy to commit the robberies and the killing in this case.

18 | Petitioner's state of mind was not capable to aiding and abetting,

19 | and conspiring  with the above threesome.  The expert would have

20 | helped the jury to properly determined this case.

21 | Miss Pamela Olsen was the investigator of Dougls R. Schmidt.

22 | Mr. Schmidt was the trial counsel for Santese Edwards.  Mr. Edwards

23 | told Miss Olsen the followings:  After the attempted robbery

24 | downtown, he drove the mustang around for about 30 minutes with

25 | no destination in mind.  Collier was in the front passenger seat

26 | and Mooring and Kennedy were in the back.  There was never any

27 | discussion per se about where they were going or what they were

28 | doing.  Noone said they did not want to be involved, no one objected

1  objected.  They drove by a man in the Marina, circled the block.

2  he and Mooring got out, and Collier  assumed the driver's posi-

3  tion.  Santese Edwards stated he was a little nevous, **but they**

4  **had smoked weed and done some coke in the car which bolstered**

5  **his courage.  (CT 1655.)**

6      Is interesting when Edwards said that, "There was never  any

7  discussion per se about where they were going or what they were

8  doing.  No one said they did not want to be involved." Petitioner

9  was incapacitated to objected what the other men were about to

10  do due to the consumption of alcohol, marijuana, and heroin.

11      Miss Leslie Ann Duvlin said that Willie Kennedy told her

12  that he and the other companions  were under the influence of

13  alcohol, marijuana and heroin when the robberies and the killing

14  took place.  (CT 769, 784, 829.)

15      The records had ample evidence that petitioner's mind was

16  clouded when the robberies and killing occurred.  Trial counsels

17  were ineffective by failing to obtain an expert.

18      In Thompson v. Calderon, 122 F.3d 28 (9th Cir. 1997) (cert.

19  granted).  (Counsel's ineffectiveness results, in new trial)

20  In an eleventh hour writ of habeas corpus in a capital case, the

21  Court of Appeals vacated a rape conviction, a rape special

22  circumstance allegation, and the death penalty.  The court based

23  its ruling partially on the finding of ineffective assistance

24  of trial counsel.  Counsel had failed to investigate, develop,

25  and present evidence rebutting the state's forensic evidence

26  of rape.  Counsel chose to fight the rape charge solely on the

27  basis that the co-defendant had committed a rape, and ignored

28  evidence that no rape ever occurred.  Second, counsel failed

to adequate impeach a jail-house informant by bringing up his
extensive history as an informant, the numerous favors he had
received from law enforcement, and his reputation among law
enforcement as being unreliable and a con artist.

**EVIDENTIARY HEARING REQUESTED.** Petitioner's conviction should
be reversed because it violated the Sixth Amendment to the United
States Constitution.

VI.

## APPELLATE COUNSEL RENDERED
## INEFFECTIVE ASSISTANCE

Appellate counsel was ineffective by failing to raising the above issues and subissues.  If this  Court rules that any of the above issues or subissues have merits, then it should rule that appellate counsel rendered ineffective assistance by failing to raising the meritorious issue or subissue that this Court might rule that have merits.

Under Smith v. Robbins, 528 U.S. 259 (2000); Strickland v. Washington, 466 U.S. 668 (1984), Appellate counsel was ineffective.

A showing that a defendant received ineffective assistance of counsel will establish cause excusing a procedural default. Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 379 (1986) quoting Ellis v. Hargett, 303 F.3d 1183, 1186 (10th Cir. 2002.

Petitioner's conviction should be reversed because his Sixth and Fourteenth Amendments had been violated.

VII.

## THE COURT VIOLATED APPELLANT'S DUE PROCESS RIGHTS WHEN IT PERMITTED THE PROSECUTION TO INTRODUCE OTHER CRIMES EVIDENCE WHICH HAD NO TENDENCY IN REASON TO ESTABLISH INTENT OR KNOWLEDGE.

### A.    Introduction

Over defense objection after extensive pretrial litigation, the court admitted evidence of a robbery at an ATM which occurred in Marin County three weeks after the charged crimes, at an ATM in San Rafael.   The prosecution theory of admissibility under Evidence Code section 1101 changed during this litigation.

The defense argued that the later robbery was not sufficiently similar to be admissible as common scheme evidence;  that appellant's conduct over a month later did not have a tendency to prove his knowledge and intent on the night in question, and that the evidence was overly prejudicial under Evidence Code section 352 because of the likelihood that the jury would simply use it as evidence of appellant's violent nature.

The court rejected some of the prosecution's theories of admissibility, but admitted the evidence to prove intent and knowledge to support the theory that appellant aided and abetted these robberies and the resulting homicide; to show knowledge of firearms and to refute any claim of absence of lack of intent, mistake or accident.

Prior to the testimony of the victim of the ATM robbery, the court instructed the jury that the evidence of the five prosecution witnesses on this issue was being admitted only to show appellant's  intent in the charged

crimes and not as evidence of his character. (RT 1458.)

Caiazzo was unable to identify appellant in court but identified a photograph he had selected from a lineup several months after the incident. (RT 1476-8.) The prosecutor introduced photographs taken by the bank security system (RT 1490-1.) The prosecution also introduced testimony that appellant had admitted during an "official proceeding" that he was the man in the photographs but that he was holding an ax handle. (RT 1697-1700.) Caiazzo had informed officers that night that the man had a pellet gun. (RT 1479, 1486.) A firearms expert testified that the item the assailant was holding in the photos could be a rifle, but was also consistent with an ax handle. (RT 1551-54.)

The court instructed the jury with CALJIC Nos. 2.50, permitting them to consider this evidence on intent or knowledge necessary for the commission of the crime charged, 2.50.1 and 2.50.2. (CT 992-4, RT 2677-8.)

The prosecutor relied on this evidence several times during his argument to the jury urging them to use it to find that this other crimes evidence proved that appellant knew what his friends would do on the night of the robberies in this case and intended for them to do it.

Appellant argued below that this evidence was improperly admitted because it was irrelevant to the issues on which it was admitted and could only have been used by the jury as character evidence. He argued that this was only explanation for *how* the jury could infer that the act of June 19 proved anything about appellant's intent and knowledge on the earlier date.

The Court of Appeal found sufficient similarities between the crimes to make the ATM robbery relevant on the issue of intent because, it held, the

fact that appellant perpetrated the ATM robbery with a similar weapon "made it more likely that he was harboring a criminal intent to participate in and facilitate armed robberies" on the night in question. (Slip op., 15-16.)

Appellant submits that review should be granted to protect the due process rights of a defendant to be tried only upon relevant evidence and not on evidence such as this which impugned his character so powerfully that even the court's limiting instruction would not have protected him from improper consideration of such powerfully prejudicial evidence.

**B.    This Evidence Did Not Meet the Ewoldt Standards on the Theories on Which it Was Admitted.**

Evidence Code section 1101, subdivision (a) prohibits the use of prior bad acts of a defendant to prove his propensity to commit the charged crime. However, "Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity.' [Citations.]" ( *People v. Tapia* (1994) 25 Cal.App.4th 984, 1020.)  To be relevant, the evidence must tend to prove either an ultimate fact or an intermediate fact from which the ultimate fact may be presumed or inferred. (*People v. Thompson* (1980) 27 Cal.3d 303, 315.)

"In determining relevance, the trial court *must look behind the label* describing the kind of similarity or relation between the other offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong." (*People v. Schader* (1969) 71 Cal.2d 761,

6kk

775, fn. omitted, emphasis added; accord *People v. Thompson, supra,* 27 Cal.3d at 316.)

The controlling case on the requirements for admitting evidence under 1101(b) is *People v. Ewoldt* (1994) 7 Cal.4th 380.

> To be relevant on the issue of intent, the uncharged offense must be "sufficiently similar [to the charged offenses] to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' ( *People v. Kipp* (1998) 18 Cal.4th 349, 371.)

(*Id.* at 403.) A lesser degree of similarity is required when prior bad acts are offered to show intent or motive than when offered to show identity or common plan. However, even when offered for intent or motive, the conduct of the prior bad act must be sufficiently similar to show the same intent in the charged crime. (*People v. Robbins* (1988) 45 Cal.3d 867, 880.)

Appellant submits that the Court of Appeal analysis about the similarities of these crimes fails to follow the standards of      *Ewoldt* and *Robbins*. Aside from the fact that both events involved a robbery, nothing about what appellant did on June 19 proved his intent on May 25-26. The charged events, as the prosecutor argued them,  involved four men riding around in a car selecting victims who were walking down the street at random and conducting quick, run up assaults to get their money. The assailants acted in pairs with one of them holding a gun and they acted fast and then ran away. It was not alleged in the instant crimes that appellant was one of the assailants in the first incident nor that he was armed in the second incident in which Mooring shot Worcester.

In contrast, the June 19 incident involved a lengthy period of social contact with the victim, who met the men at a bar, went to a party with them, and agreed to accompany them in their car to get money and then to

611

purchase drugs. There was only one armed assailant and an apparent plan to convince the victim to withdraw cash from an ATM and then to take it as soon as it was withdrawn. This was thus a more planned attack and one that took a great deal more time than the street robberies charged in this case.

The use of photos of the ATM incident combined with the expert opinion about the item the assailant was holding caused additional prejudice, particularly when the prosecutor asked if the item in the photograph could have been the weapon used in this case. (See CT 1340, People's exhibit number 98.) This was highly prejudicial evidence, based on innuendo to establish propensity for violence and robbery.

Because other bad acts evidence is so damaging, it must be excluded if the connection between the uncharged offense and the ultimate fact in dispute is not clear. *(People v. Daniels* (1991) 52 Cal.3d 815, 856.) Even relevant evidence of this sort is to be received with "extreme caution," and "all doubts regarding its connection to the crime must be resolved in the accused's favor." (*People v. Alcala* (1984) 36 Cal.3d 604, 631.) Such evidence should be admitted with great caution because of its highly inflammatory nature, sometimes described as having "too much" probative value, i.e., showing the defendant's character for criminal acts. (See e.g., *People v. Fitch* (1997) 55 Cal.App.4th 172, 179.)

It is important that the court admit evidence of other crimes only as to a relevant issue at trial because otherwise the evidence is likely to be misused. (*People v. Rogers* (1985) 173 Cal.App.3d 205, 212.) It is a fundamental principle of due process that only relevant evidence is admissible in a criminal trial. (*Ulster County v. Allen* (1979) 442 U.S. 140.) The evidence admitted must have a "tendency in reason to prove or disprove

any disputed fact that is of consequence to the determination of the action." (Evid. Code § 210.) "A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is." (*United States v. Myers* (5th Cir. 1977) 550 F.2d 1036, 1044.)

**C.      The Evidence Was Inadmissible under Evidence Code section 352**

If the court finds other crimes evidence relevant on any theory, it must also balance its probative value against the danger "of undue prejudice, of confusing the issues, or of misleading the jury." (Evid.Code §352.) Admissibility of such evidence is committed to the sound discretion of the trial judge, whose decision will not be reversed on appeal absent clear abuse of discretion. (*People v. DeRango* (1981) 115 Cal.App.3d 583, 590.)

> The admissibility of other-crimes evidence depends on three principal factors: (1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the uncharged crime to prove or disprove the material fact; and (3) the existence of any rule or policy requiring the exclusion of relevant evidence, e.g., Evidence Code section 352. [Citations.]'

(*People v. Brown,* (1993) 17 Cal.App.4th 1389, 1395; see also *People v. Carpenter* (1997) 15 Cal.4th 312, 378-379.)

The Court of Appeal's  analysis finding no error under section 352 misapplied these standards and held that simply because the ATM robbery was not more egregious than those involved in the charged case. It pointed out that the victim did not die and that even though it was violent it would not inflame the jury's  passions.  Appellant disputes this logic in that the photos and Caiazzo's  testimony  described  a frightening attack, with a weapon the prosecutor tried to connect to the murder of Worcester shortly after the charged crimes.  This was inflammatory evidence and the fact that

there were photos produced did not diminish the prejudice but rather increased it as a plain matter of common sense.

This court should grant review to make clear the proper analysis under *Ewoldt* and 352 so that defendants in this state are not deprived of their federal constitutional rights to a fair trial (14th Amend.) based solely on relevant evidence and not on prejudicial and inflammatory evidence casting suspicions on the defendant's character.

VIII.

## THE PROSECUTOR'S LATE DISCLOSURE OF A POLICE MEMORANDUM RELATING TO THE FIRST STATEMENT BY AN IMPORTANT PROSECUTION WITNESS DEPRIVED APPELLANT OF HIS ABILITY TO PREPARE AND ADEQUATELY CROSS EXAMINE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS.

**A.    Introduction**

On the morning of July 21, the day the last defense witnesses were scheduled to testify, the parties disclosed to the court that the night before the prosecution had turned over to the defense a memorandum prepared by Lt. Ridgeway in November, 1999.   After an evidentiary hearing, the information from which is discussed by the Court of Appeal (Slip op., 18-20), court found that there had been a serious discovery violation but denied the defense request to dismiss the case for prosecutorial misconduct. The court denied the motion noting that the defense had the tapes of the statement referred to in this report and informed the defense that the matter could be addressed in instructions.

The defense renewed his objections during trial and in a new trial motion but he was denied.

Appellant argued below that the failure to disclose this report until the last day pf the defense case and after defense counsel had cross examined Kennedy was a violation of *Brady v. Maryland* (1963) 373 U.S. 83 and denied appellant's  Sixth and Fourteenth Amendment rights to confront and cross examine witnesses and to a fair trial.

The Court of Appeal held that , "While the prosecution was derelict in not earlier providing this statement, Collier has failed to demonstrate

reversible error." (Slip op., 18.)  Appellant submits that his court should grant review because the court's analysis and application of well established principles adopted by the United States Supreme Court over 40 years ago were misapplied by the trial and appellate courts.

**B.    The Prosecution Has a Statutory and a Constitutional Duty to Turn over All Potentially Exculpatory Evidence to the Defense in a Timely Fashion.**

The prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant when the evidence is

> "both favorable to the defendant and material on either guilt or punishment.  Evidence is 'favorable' if it hurts the prosecution or helps the defense. Evidence is 'material' only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different."

(*People v. Earp,* (1999) 20 Cal.4th 826, 866 [internal citations omitted]; see also *Brady v. Maryland* (1963) 373 U.S. 83; *Kyles v. Whitley* (1995) 514 U.S. 419.)

Respondent has conceded that the prosecutor violated his obligations under Brady by failing to immediately provide it to defense counsel upon becoming aware of the report during trial. (Slip op., 21.)  Because of this concession this court should grant review to set forth the standard of prejudice to be applied.  Appellant submits that the respondent and the Court of Appeal set forth such a high standard in a case of egregious failure to provide discovery that does not comport with federal constitutional standards.

**C.    The Failure to Provide Timely Discovery Prejudiced Appellant's Rights to Effective Representation, Impeded His Right to Cross Examine Adverse Witnesses and Denied Him a Fair Trial.**

Ridgeway's  most significant role in this investigation was to conduct the first interview with Willie Kennedy, who was the primary prosecution witness at the grand jury proceeding and at both Mooring's  and Collier's trials.    His undisclosed memorandum contained numerous important observations of Kennedy's  demeanor and apparent lack of credibility, as well as additional substantive facts that were available in any other discovery, including that Ridgeway had a significant role in getting Kennedy to talk to San Francisco police, and observations of Kennedy's  demeanor and credibility.  The defense argued that this information was "significant exculpatory evidence" especially because Ridge way stated that Kennedy was lying about his own role in the offenses.  The report also enabled the defense to better understand a poor quality tape and added significant detail that was otherwise unavailable about what was said by Kennedy to Ridgeway in his earliest description of the incident.  (See CT 1104-5.)

The defense new trial motion outlined numerous way in which the defense had been prejudiced, including :

(1) being unable to effectively cross-examine key prosecution witnesses, particularly as to the theory of the case as presented by Kennedy and adopted by SFPD and exacerbated by the refusal to provide the defense with a correct address for Kennedy throughout a large portion of the trial;

(2) being unable to explore Inspector Wynkoop's  misrepresentation about how he came into contact with Kennedy initially.  While Wynkoop testified that he went to San Rafael in response to contact by an informant,

Ridge way's report indicated that in reality Wynkoop and Cashen actively encouraged Ridgeway to pursue Kennedy and to obtain a statement. It is a due process violation for a prosecutor to knowingly use perjured testimony to obtain a conviction. ( *Napue v. Illinois* (1959) 360 U.S. 264, 269.) Under Penal Code section 1473, however, it is not necessary to establish that the false testimony was perjurious, or that the prosecution knew of its falsity in order to obtain relief by a writ of habeas corpus. ( *In re Hall* (1981) 30 Cal. 3d 408, 424 [reversing murder conviction where the identification testimony of eyewitness was proved to be incorrect, although unintentionally so]; *In re Wright,* (1978) 78 Cal. App. 3d 788, 809 at fn 5.

(3) preparation and effective presentation of the defense case was impeded by failure to disclose the report. During the direct examination of Ridgeway, counsel's questioning was narrowly tailored to explore the way in which Kennedy had come forward, Ridgeway's observations about his demeanor, and the specific instances in which Kennedy appeared to be lying. Defense counsel argued that he had insufficient time to review the new discovery prior to examining Ridegway – an " unfriendly" witness for the defense. Defense counsel argued that he was unable to determine how best to examine Ridgeway on the contents of the document without "opening the door" to the introduction of otherwise inadmissible hearsay. The prosecutor took advantage of the ill-timed disclosure and used his cross-examination as an opportunity to read into the record nearly the entire contents of the memorandum, which would have otherwise been inadmissible hearsay.

Ridgeway had been extremely uncooperative in his direct testimony but throughout his cross-examination, he went out of his way to inject irrelevant, inadmissible statements into the record that would support the

prosecution's case.  Under the guise of Evidence Code section 356, the prosecutor elicited through Ridgeway, in the heart of the defense case, an entire recitation of the prosecution theory of the case, and also asked Ridgeway questions concerning Kennedy's apparent veracity  during other points in the interview.  (RT 2573-74.)  Ridgeway attempted to vouch for Kennedy, citing his own training and experience as having taught him to recognize when people tell him the truth.  (See Argument IV, post.)

(4) that the failure to disclose the memorandum precluded the proper resolution of Collier's  motion *in limine* to exclude Kennedy's  testimony on the grounds that he had been subject to coercion through his interactions with Ridgeway, Wynkoop and Cashen.  The suppressed memorandum  would have provided substantial support for the claim that Kennedy's statements were coerced through state action.

(5) that the remedy offered by the court at trial - a continuance and the opportunity to recall the effected witnesses was inadequate to correct the prejudice because the late discovery came after the witnesses had been examined and cross examined and that calling them back to repeat their stories would actually prejudice the defense.

> "To  prevail on a contention made on appeal from a judgment of conviction on the grounds of violation of the pretrial discovery right of a defendant, the defendant must establish that the information not disclosed was exculpatory and that there is a reasonable probability that, had the evidence been disclosed . . ., the result of the proceedings would have been different."(*Kyles v. Whitley, supra*, 514 U.S. 419, 433-434. quoting from *United States v. Bagley* (1985) 473 U.S. 667, 682, 685; *In re Brown* (1998) 17 Cal.4th 873, 886-887.) Evidence is material in the context of review of a discovery violation postconviction if "the  favorable evidence could

reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." ( *Kyles v. Whitley, supra,* at p. 435.) Posttrial, under *Brady* and its progeny, we apply the "reasonable probability of different outcome" test. Such a "reasonable probability" exists where it is probable that the discovery violation is sufficient to undermine confidence in the outcome. *(Kyles v. Whitley, supra*, at pp. 434- 435; accord, *In re Brown, supra,* at pp. 886-887; *In re Williams* (1994) 7 Cal.4th 572, 611-612.)

*(People v. Bohannon* (2000) 82 Cal.App.4th 798, 805-806.)

Because the Court of Appeal failed to properly apply both California and federal standards for discovery of exculpatory material and the degree of prejudice that must be shown, this court should grant review.

IX.

## KENNEDY'S STATEMENT TO POLICE AND TESTIMONY WAS THE PRODUCT OF COERCION AND A PLEA AGREEMENT REQUIRING HIM TO TESTIFY IN A PARTICULAR WAY.

### A.    Introduction

Defense counsel filed a pretrial motion to exclude the trial testimony of Kennedy because it was coerced by impermissible inducements, and because plea offers and agreements made to him were conditioned upon his testimony being consistent with his involuntary statement.   Therefore, his testimony was unreliable and its introduction would violate appellant's Fourteenth Amendment right to a fair trial.

After a 402 hearing on the issue of voluntariness, the defense argued that the officers made promises of leniency, first when Ridgeway essentially invited Kennedy to describe himself as an innocent bystander in order to convince him to implicate the other suspects. Their questioning was conducted in such a way as to force Kennedy to adhere to the version of events he provided to Ridgeway, despite the fact that the statement was not entirely truthful. Kennedy told the officers that the robberies were a product of Mooring and appellant's  independent thinking and that he had no knowledge what was going to occur. He lied that the that others brought the gun. (RT 82.) On April 16, 2001, Kennedy pled guilty to violating PC 32 in exchange for his testimony against the others. (RT 85. Wynkoop learned, when Kennedy testified to the grand jury, that Kennedy was the person who brought the gun[1]. (RT 86-7.)  Wynkoop also learned prior to Mooring's

---

[1] At trial Kennedy admitted that he brought the gun but continued to claim that he did not know why he brought it and that thre was no plan to

trial, that Kennedy had been arrested for a home invasion robbery. No repercussions resulted from this in terms of his probationary status (RT 87-8.)

The court ruled that Kennedy's statement was voluntary and his testimony was admitted against appellant at trial.

Appellant argued below that he had standing to challenge this testimony and the violation of Kennedy's rights because introduction of coerced testimony violated his due process rights.

The Court of Appeal found that appellant had no standing because Kennedy's testimony was not coerced and because he did not testify in a way that showed that he believed that he had to testify in a particular fashion. Review should be granted to correct errors of constitutional interpretation and to protect appellant's right to a fair trial and due process.

**B.     A Defendant Has Standing to Object to the Testimony of a Third Party that Has Been Obtained by Coercive Interrogation Techniques and Other Prosecution Tactics which Raise Questions about the Reliability of the Statement.**

It is well settled that the admission of evidence which renders a trial fundamentally unfair warrants a new trial. (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637. ) The admission at trial of improperly obtained statements which results in a fundamentally unfair trial violates a defendant's due process right to a fair trial. (*See Wilcox v. Ford* (11th Cir., 1987) 813 F.2d 1140, 1148 -1149, and cases cited therein.)

The controlling California case on the admission of coerced testimony

---

commit crimes, although he later admitted that this testimony was also untruthful.

of a third party is *People v. Badgett* (1995) 10 Cal.4th 330.) The defendant must allege a violation of his *own* rights to establish standing. (*Id*, at 343.) When the evidence produced *at trial* is subject to coercion the defendant's due process rights are violated. (*Id*., at 344, see also *People v. Douglas* (1990) 50 Cal.3d 468, 500-503.) The defendant must establish also that the trial testimony was involuntary at the time it was given. (*People v. Badgett, supra,* 10 Cal.4th at 347.) Thus , the court must focus on the evidence to be presented at trial and ask whether that evidence is made unreliable by ongoing coercion. (*Douglas, supra,* 50 Cal.3d at 500. "... [A] defendant must demonstrate that trial testimony following the coercion of a witness was actually tainted thereby." (*Badgett, supra,* 10 Cal.4th at 347.) Appellant submits that the evidence herein meets these standards..

## C.    Kennedy's Statement Was the Product of Improper Promises of Leniency.

A statement by a witness or a suspect is involuntary if induced, among other things, by any promise of benefit or leniency, whether express or implied. (*People v. Sultana* (1988) 204 Cal.App.3d 511, 522; . *In re Walker* (1974) 10 Cal.3d 764, 777; *People v. Lee* (2002) 95 Cal.App.4th 772, 781.) The type of promise of leniency/threat of prosecution (see *People v. Vasila* (1995) 38 Cal.App.4th 865 [recognizing that these types of coercion are often flip sides of a coin used in interrogation and coercion] involved in this case began when the chief of police made the distinction between the guilt of " persons who were involved in the incident who may not have been involved in the actual shooting," encouraging them to "separate yourself from the killers. If not, we will press on and make sure you are prosecuted equally." This is a clear promise of leniency and a material misstatement of the law in

that the four individuals in the car clearly could all have been equally guilty as conspirators or aiders and abettors.. (See *People v. Cahill* (1994) 22 Cal.App.4th 296, 314-15; *People v. Thompson* (1990) 50 Cal.3d 134, 169.)

In *People v. Underwood, supra,* the parties agreed that a witness statement of the defendant's 17 year old cousin implicating the defendant as the perpetrator of a rape, robbery and kidnaping had been coerced by threats to charge him with the crimes of which his cousin was the primary suspect. The court noted that along with the threats the witness was young and had been detained as a potential accomplice. While this is somewhat different from Kennedy at the time he spoke with Ridgeway, he was also young and clearly knew he was a suspect having had his house searched pursuant to a warrant. He was thus susceptible to the implied and direct promises of leniency, combined with the threat to pursue anyone who did not cooperate as a full suspect, made by both the police chief and the officers, as was made clear by his initial reaction to the officers as well as Wesson's descriptions of his concerns which caused him to seek to stay with her to avoid the San Francisco police. (See Ridgeway memo, page 1-2.)

In *People v. Lee, supra,* 95 Cal.App.4th 772, the court found that the police had coerced a statement from witness Saxon when they gave him a polygraph and then threatened to charge him with first degree murder if he did not implicate the other suspect. Although in this case the officers did not tell Kennedy whose name they wanted him to give, they did make clear that it should be one of the other suspects if he wanted the benefit of not being charged with murder, especially considering the police chief's comments early in the investigation. In addition, it appears that Kennedy knew whose houses had been searched at the same time as his, thus making clear whom the police suspected to have been involved.

Ridgeway increased the pressure when he immediately told Kennedy at the beginning of their conversation that they suspected him because they got a search warrant and he should tell them what happened to get on the record that he was not the shooter, "It's important for you to start clean [[inaudible, designated IA]... and then at least if that's what truly happened then you're as [IA] it's on your record and it's not a matter of someone else coming along...". (CT 575-6.)  This was not as express a promise as the Chief of Police's statement, but it clearly played on the same sentiment, and he concluded his interview with reassurance that Kennedy had done the right thing by telling him the story.  (CT 587.)

After Ridgeway contacted SFPD and they came to interview Kennedy again, Cashen began by reassuring him that "what you said and uh we think that's you know very accurate very much the truth... we don't think of you as a suspect in this matter..." and assured him that he was not going to be arrested.  (CT 591.)  Kennedy was so relieved that he offered to "tell you anything - anything you want to know." (CT 591.)  He clearly understands what is expected if he wants to maintain his status as not being a suspect. When Kennedy said that this relieved a lot of pressure on him and on his mom, the officers said, "It's hard enough on yourself and you involve your mom and your other relatives plus the fact that you've got a... a pretty good life going for you here." (CT 591.)  At the end of the conversation the officers also made an implied threat to Kennedy that they were concerned about his safety from the others even though he stated that he was not worried about them.  (CT 603-4.)  They implied that he may need them to protect him when they revealed the information he shared.  This was another type of promise - to keep him safe.  (CT 604-5.)

An improper promise of leniency renders a statement involuntary when,

6zz

given all the circumstances, the promise was a motivating factor in the giving of the statement. (*People v. Vasila, supra,* 38 Cal.App.4th at 874.) Appellant submits that Kennedy's reaction when the officers told him that he was not a suspect shows that his understanding that if he spoke to them and gave information on his colleagues, he would not be prosecuted was a clear motivator, as his relief at their comments establishes.

**D.    The Plea Agreement Conditioned on Kennedy's "Truthful" Testimony Should Be Considered as a Factor in Determining whether Kennedy's Statement was Coerced.**

A cooperation agreement that requires a witness to testify consistently with a previous statement to police is deemed coercive and testimony produced by such an agreement is subject to exclusion from evidence. (*People v. Allen* (1996) 42 Cal.3d 1222, 1251-52.) Further, a "defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." (*People* v. *Medina* (1974) 41 Cal.App.3d 438, 455l; see also *People v. Allen, supra,* 42 Cal.3d at 1251 -1252.)

Even if the cooperation agreement was worded to comply with *Allen,* the reality of the agreement and the clear understanding that Kennedy took away from the interviews should be viewed as a factor in determining the voluntariness of his trial testimony, the voluntariness of which should be viewed in the totality of the circumstances. (*Moran v. Burbine* (1986) 475 U.S. 412, 421.) This court should grant review to correct the Court of Appeal misinterpretation of federal constitutional principles relating to coerced testimony and th protect appellant's due process rights.

6aaa

## X.

# RIDGEWAY GAVE AN IMPROPER OPINION OF KENNEDY'S TRUTHFULNESS AND VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL IN VIOLATION OF THE FOURTEENTH AMENDMENT.

## A.    Introduction

Ridgeway testified on cross examination by the prosecutor that as soon as he asked Kennedy questions about the gun he saw signs of deception and clear changes in Kennedy's demeanor.  The defense objected that this was improper.

Appellant argued below that because Kennedy was a star prosecution witness and his credibility was a central issue, a police officer's vouching for the credibility of portions of his story violated established rules of evidence and was prejudicial thus violating appellant's right to a fair trial, even though the jury was instructed that "Witnesses from law enforcement are not permitted to express an opinion on either the guilt of the accused of the believability of any witness. You will disregard any such testimony." (CT 1003, RT 2680.)  They were not informed that this instruction related to Ridgeway's statements.

The Court of Appeal held that Ridgeway had not drawn "an ultimate inference of untruthfulness, and then held that because the defense had raised the topic the prosecutor was entitled to go into this matter.  This court should grant review to make clear that testimony expressing an opinion about credibility it not proper and when it supports the credibility of such a crucial witness, its admission violates a defendant's right to a fair trial.

**B.    A Lay Witness Cannot Give an Opinion about Witness Credibility**

It is improper for an officer to testify at trial about an opinion he may have concerning the veracity, or lack of veracity, of particular information provided by a witness or a defendant. (*People v. Melton* (1988) 44 Cal.3d 713, 744.)  This court has stated clearly, "Lay opinion about the veracity of particular statements by another is inadmissible on that issue." (*Ibid.*) There are important reasons behind the well established rule that lay opinion about credibility is not admissible:

> With limited exceptions, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence. Qualified experts may express opinions on issues beyond common understanding (Evid. Code, §§ 702, 801, 805), but *lay views on veracity do not meet the standards for admission of expert testimony*. . . . [A] lay opinion about the veracity of particular statements does not constitute properly founded character or reputation evidence (Evid. Code, § 780, subd. (e)), nor does it bear on any of the other matters listed by statute as most commonly affecting credibility ( *id.*, § 780, subds. (a)-(k)). Thus, such an opinion has no "tendency in reason" to disprove the veracity of the statements. (*Id.*, §§ 210, 350.)

(*Ibid.*, citing *People v. Sergill* (1982) 138 Cal.App.3d 34, 39-41.)

In *Sergill*, the trial court permitted two police officers to give their opinions that the victim was telling the truth when she reported being molested by the defendant. The conviction was reversed because this evidence was improper and highly prejudicial.  The Court of Appeal found that police officers are not experts qualified to give opinions on the veracity of witnesses, and because it could not be said that "the veracity of those who report crimes to the police is a matter sufficiently beyond common experience to require the testimony of an expert." (*Ibid.*)

6ccc

The same analysis must be used in this case. By focusing on the point at which Ridgeway suspected Kennedy's statement became untruthful, the prosecutor essentially had him testify that he believed that what Kennedy said before that portion of the interview was the truth. The statements he vouched for included Kennedy's claim that the police already had the one they wanted (RT 2549), that appellant removed the wallet, knocked the victim to the ground and kicked him, (although he did note that this contradicted Kennedy's claim that he was driving around when the robbery/killing occurred (RT 2550-51), and that appellant used the credit card at Denny's. (RT 1552.)

When the prosecutor asked about Kennedy's statement about the gun, Ridge way replied that "Well, up to that question, I thought his – generally in our interaction in the backyard, I thought he was very forthcoming and very open, and I'd been doing this for 19 years and I've had specific training in interrogation and interview and physiological symptoms of deception and I saw none of that present at all. As soon as I asked him about what happened to the gun, I saw numerous signs that he was being deceptive. It was a clear change in his demeanor from our conversation to that point." (RT 2573.)

The obvious impression that this gave as to the credibility of Kennedy's earlier statements which clearly implicated appellant in support of the prosecution theory cannot be ignored. Further, by informing the jury that he had extensive training in how to judge credibility, yet not remembering any of the particular signs that he actually observed, his opinion became basically immune to cross examination, while the aura of his expertise and Kennedy's straightforwardness were enhanced. This was

especially important to the prosecutor's theory because of the miserable performance of Kennedy on the witness stand, his sweetheart deal with the prosecution and his criminal conduct after the deal for which he suffered no consequences. By allowing a police officer to describe him as credible and forthright in his first statement before some of these other problems arose, the testimony gave him an unfair aura of credibility which a general instruction that was not given until the end of the trial could not cure. Appellant's right to a fair trial and was denied because of Kennedy's central place in the prosecutor's case.

Review should be granted to ensure that in trial courts police officers are prohibited from giving improper opinions such as that offered herein and thus defendant's rights to a proper jury determination of witness credibility is ensured.

XI.

## IT WAS REVERSIBLE ERROR TO INSTRUCT THE JURY WITH CALJIC NO. 2.11.5.

**A.    Introduction**

The jury was instructed improperly with CALJIC No. 2.11.5 which informs the jury that is it not to "discuss or give any consideration" why persons other than the defendant who may have been involved in the crime are not being prosecuted along with the defendant.(CT 980, RT 2672, emphasis added.)

Appellant argued below that this instruction was improper under well established law because unjoined perpetrators – Kennedy and Edwards – were prosecution witnesses who testified in exchange for extremely favorable plea bargains. Further, the error was prejudicial because their testimony was the only testimony which described the conduct of each of the individuals and which placed appellant at the scene of the Worcester

The Court of Appeal agreed that the instruction was improper under this court's holding in *People v. Cornwell* (2005) 37 Cal.4th 50, 88, but found it harmless because the instructions as a whole adequately advised the jury how to judge witness credibility. (Slip op., 32-33.) Appellant submits that review should be granted so that the propr use of CALJIC No. 2.11.5 is guaranteed by re-analyzing the harmless error approach from *Cornwell* regarding conflicting instructions.

**B.    Because These Witnesses Were So Crucial to the Prosecution Case this Improper Instruction Cannot Be Held Harmless.**

The import of this instruction is that the jury was told essentially not to even discuss the effect of all the information they were given about these

two witnesses' plea bargains. This is especially so in that the version of the instruction given at trial, which occurred in June 2004, was an older version which did not include the recommended new language adopted by the 2004 revisions. These revisions substituted the language "speculate or guess" in place of "discuss or give any consideration to." While the new language more clearly focuses the jury on the proper restriction on the consideration of the evidence, appellant's jury was told not to give any consideration as to why these men were not prosecuted

In *People v. Williams, supra,* 16 Cal.4th at 226, this Court held that even though the instruction was improperly given it was harmless because the witnesses referred to were not "the mainstays of the prosecution case which depended, in the first instance on eyewitness testimony..." The exact opposite is the case herein.

When conflicting instructions are given, a reviewing court "must determine 'what a reasonable juror could have understood the charge as meaning' [Citation.] While the initial focus is on the specific instruction challenged [citation], we must also review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law. [Citation.]' " (*People v. Cox, supra,* 53 Cal.3d at p. 667.)" (*People v. Fonseca, supra,* 105 Cal.App.4th at 549.; see also *Francis v. Franklin* (1985) 471 U.S. 307.)

The Court of Appeal focused only on the other instructions given and did not analyze the crucial nature of these witnesses' testimony to the prosecution case. The instruction directly steered the jury away from the many relevant aspects of the plea bargains obtained that were so integral to the defense attack on their credibility. Review should be granted.

XII.

# THE ADMISSION OF A PHOTOGRAPH OF THE VICTIM AT WITNESS FARLEY'S WEDDING VIOLATED APPELLANT'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL

## A.    Introduction

Over defense objection, the court allowed the prosecutor to admit into evidence an 8x10 inch color photograph of Worcester taken at witness Farley's wedding. The photo showed the two men standing close to each other and clearly showed their affection. The prosecutor argued that the photo was admissible to prove there was a connection between witness Farley and Worcester and because they were together throughout the incident.    The defense argued that there was no relevance to that relationship, that it was not contested by the defense and that the only real point of the photograph would be to elicit sympathy, especially because it was not a neutral photograph but it was taken at a wedding and that such a setting would elicit a reaction from jurors. The court ruled that while the photograph could come in, it should not be mentioned that Worcester was Farley's best man.

Appellant argued below that the photograph had no tendency to prove any material facts and was likely to invoke sympathy and prejudice the defendant, it was inadmissible under clearly established law. He also argued that its admission violated appellant's rights to due process and a fair trial by encouraging the jury to react from sympathy rather than the evidence. The Court of Appeal held that any error was harmless, even though it recognized that it had slight probative value. This court should grant review

to enforce the clear rule that such photos are inadmissible when not probative of a material issue and to set forth th proper standard for determining prejudice when such evidence implicates a defendant's federal due precess rights.

**B.    This Photograph Was Patently Irrelevant and Prejudicial.**

It is a fundamental aspect of due process that a conviction may only be obtained based upon relevant evidence. (*Ulster County v. Allen, supra,* 442 U.S. 140.) California law also is clear that only relevant evidence is admissible. (Evid. Code §350.) A trial court has no discretion to admit irrelevant evidence. (*People v. Crittenden* (1994) 9 Cal.4th 83, 132; *People v. Babbitt* (1988) 45 Cal.3d 660, 681.)

Live photographs of the victim in a homicide case have a strong potential for causing prejudice, and must be closely scrutinizes for relevance. It is well established that it is error to admit photographs of the victim alive where they are irrelevant to any "contested issue in the case" (*People v. Anderson* (1990) 52 Cal.3d 453, 474.)

The photograph of Worcester at Farley's wedding was not relevant to any contested issue. As the Court of Appeal recognized, "the more obvious purpose of the photograph was to put a face to the victim of the charged crimes, it also tended to support the believability of Farley's testimony" describing the night in question. (Slip op., 35.) The Court of Appeal makes this statement without any analysis and appellant submits that it cannot stand up to review. A photograph adds nothing to the uncontested testimony that Farley had known Worcester his whole life and that Worcester was in San Francisco to visit him and other childhood friends. If anything, this photo makes the tragedy sadder and thus was inflammatory

without adding anything to the prosecution's evidence.

Whether these man had known each other for years was completely irrelevant to the issues at trial. In admitting the photograph the trial court did not state the reasons she found it relevant, and the Court of Appeal determination that a photograph somehow made Farley's testimony more credible is unexplained and illogical. The first test required for the admission of any evidence is relevance. Without relevance to a material issue the evidence should not have come in at all. Further, even if the prosecutor had articulated a credible theory of relevance, the evidence should be excluded if it is unduly prejudicial or inflammatory. The trial court leapfrogged over the relevancy determination and thereby erred.

Since the photograph was irrelevant, and the only inference it could raise was that the jury should sympathize with the victim, or conversely, entertain antipathy towards appellant, the admission of the photographs violated appellant's Fifth and Fourteenth Amendment rights to due process and a fundamentally fair trial. Admission of evidence against a criminal defendant that raises no permissible inferences, but which is highly prejudicial, violates federal due process. (*Estelle v. McGuire*, (1991) 502 U.S. 62 [state law errors that render a trial fundamentally unfair violate federal due process]; *McKinney v. Rees*, (9th Cir. 1993) 993 F.2d 1378 [admission of wholly irrelevant and highly prejudicial evidence violates defendant's federal due process rights]; *Lesko v. Owens* (3rd Cir.1989) 881 F.2d 44, 52 [constitutional error in admitting evidence whose inflammatory nature "plainly exceeds its evidentiary worth"]; compare *Hoxsie v. Kerby* (1997) 108 F.3d 1239, 1242, quoting *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [admission of photographs did not so infect the trial as to violate federal due process because the photographs were relevant and admissible].)

C.    **The Admission of this Evidence Was Prejudicial**

Because the admission of wholly irrelevant but prejudicial evidence violates federal due process, review for prejudice is under *Chapman v. California* (1967) 386 U.S. 18. Reversal is required unless the prosecution can show the error to be harmless beyond a reasonable doubt. The insertion of sympathy such as would be caused by this photograph into this case was extremely prejudicial. The primary prosecution witnesses were two accomplices who had a substantial motive to lie to protect themselves, who had sweetheart deals to avoid essentially any real consequences for their own participation in this incident and who had both shown themselves to be law breakers and thus unworthy of belief in the years between the plea deals they worked out and their testimony.

This was one of many errors which combined to deprive appellant of a fair trial and a reliable verdict. (See e.g., *People v. Holt* (1984) 37 Cal.3d 436; *United States v. Frederick* (9th Cir. 1995) 78 F.3d 1370 [reversed for cumulative error, announcing that "[where [] there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial"].)

This court should grant review to clarify the rules governing the admission of victim photographs and to ensure that murder verdicts are obtained on the basis of relevant and admissible evidence and not out of sympathy and emotional reactions to irrelevant photographs.

10.  Supporting cases, if any.  List by name and citation only, the cases which you think are close factually to yours so that it is an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning of these cases:

SEE THE CASES CITED ABOVE.

## PART D - ATTORNEY INFORMATION

11.  Give the name and address of each attorney who represented you in the following proceedings:

(a)  Arraignment  (grand jury none attorney)

(b)  At preliminary hearing  (grand jury)

(c)  At time of plea  (grand jury)

(d)  At trial  Arthur Wachtel and Miss Maitreya Badami
170 Columbus Ave. Suite 100 San Francisco, CA 94103

(e)  At sentencing  Arthur Wachtel and Miss Maitreya Badami

(f)  On appeal  Janice M. Lagerlof 3929 24th St. San Francisco, CA 94114

(g)  Other post-conviction proceeding  JH/Lawyer  Renato Obando C-63369

H.D.S.P. B4-213, P.O.Box 3030 Susanville, CA 96127

12.  Was the attorney hired by you or your family?  Yes ____   No _x_

     Appointed by the Court?  Yes _x_   No ____

     Are you alleging as one ground for relief that your attorney gave you ineffective legal assistance?  If so, who and at what stage?

Appellate Attorney and trial attorneys were ineffective

13.  If you did not have an attorney represent you, did you represent yourself?  Yes ____   No _x_

     With consent of the Court?  Yes ____   No _x_

14.  Are you represented by an attorney in this petition?
                                              Yes ____  No x ____

7

If you answered "Yes" give name and address of your attorney

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

Executed at + High Desert State Prison        Dated: + November 6th, 2007

Signature of Petitioner

## FORMA PAUPERIS AFFIDAVIT
### (See Instructions Attached to This Form)

I hereby apply for leave to proceed with this habeas corpus petition without prepayment of fees or costs or security therefor. In support of my application, I state that the following facts are true:

(1)   I am the petitioner in said petition, and I believe I am entitled to redress.

(2)   I am unable to pay the costs of said action or give security because:

_____I am indigent_____

_____

_____

Signature of Petitioner
(Sign here only if you seek to proceed without payment of fees)

STATE OF _California_        )

COUNTY OF _Lassen_        )

I declare under penalty of perjury that the foregoing is true and correct.

Signed on _November 6th, 2007_
                (Date)

Signature of Petitioner

8

EXHIBIT "A"

Filed 8/30/06

COPY

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

**F I L E D**

AUG 3 0 2006

Court of Appeal - First App. Dist.
DIANA HERBERT
By_____

| | |
|---|---|
| **THE PEOPLE,** | |
| **Plaintiff and Respondent,** | A108751 |
| **v.** | |
| **TREMAYNE COLLIER,** | **(San Francisco County** |
| **Defendant and Appellant.** | **Super. Ct. No. 182125-02)** |

Tremayne Collier appeals from a judgment of conviction and sentence imposed after a jury found him guilty of first degree murder and two counts of robbery, enhanced by findings of being armed with a firearm. He contends: (1) the trial court erred in permitting evidence of Collier's commission of another armed robbery; (2) the prosecutor withheld material impeachment evidence relating to a key prosecution witness; (3) the court erred in admitting a witness's statement to police and testimony because it was the product of coercion and a plea agreement requiring him to testify in a particular way; (4) a police witness improperly gave his opinion of a witness's truthfulness; (5) the court erred in instructing the jury regarding unjoined perpetrators under CALJIC No. 2.11.5; (6) a photograph of the murder victim while alive should not have been admitted; (7) the court failed to exercise its discretion when it imposed a $10,000 restitution fine under Penal Code section 1202.4, subdivision (b)(1). We will affirm.

## I. FACTS AND PROCEDURAL HISTORY

This matter arises from the robbery and assault of Ray LaBonte and the robbery and murder of Shayne Worcester in May 1999, involving Collier, Daniel Mooring, Santese Edwards, and Willie Kennedy.[1]

Count I of a grand jury indictment charged Collier, Mooring, and Edwards with the felony special circumstance murder of Worcester on May 26, 1999 (Pen. Code, §§ 187, 190.2, subd. (a)(17)(A)).[2] Count II charged them with the robbery of Worcester on that same date (§ 212.5, subd. (c)), and count III alleged they perpetrated the robbery of LaBonte (§ 212.5, subd. (c)) on May 25. With respect to Collier, counts I, II, and III also alleged that one of the principals in each offense was armed with a firearm (§ 12022, subd. (a)(1)). The indictment was amended as to Collier with enhancements for a prior strike (§§ 667, subds. (a), (d) & (e), 1170.12, subd. (c)) and two prior prison terms (§ 667.5, subd. (b)).

Mooring and Collier were granted separate trials. Edwards pled guilty to grand theft and testified for the prosecution at Mooring's and Collier's trials. The fourth accomplice, Kennedy, was never indicted. He pleaded guilty to being an accessory after the fact (§ 32), served one day in jail, and was released on probation on the condition he testify truthfully for the prosecution. The next day, he testified before the grand jury.

A. PROSECUTION EVIDENCE IN THE TRIAL OF COLLIER

1. Robbery of LaBonte

Victim LaBonte left his home in San Francisco around 10:00 p.m. on May 25, 1999, carrying $8 in cash. As he walked towards Alhambra Street, he saw two black males standing in a doorway. One of them ran behind him. The other approached from the front, raised a weapon, and told him to "get down." LaBonte dropped to his knees. The man in front (purportedly Mooring) aimed a long, black, single-barrel gun at him with two hands and demanded his money and wallet. LaBonte threw the $8 from his

---

[1]    Our opinion in the matter of *People v. Mooring* (A106400), involving the same incident, was issued on October 3, 2005.

[2]    Except where otherwise indicated, all statutory references are to the Penal Code.

pocket onto the ground and said he did not have a wallet. The person behind LaBonte (purportedly Edwards) checked LaBonte's back pocket for a wallet and hit him in the back of the head. Mooring then struck LaBonte in his face, probably with the butt of a gun, and LaBonte lost consciousness.

LaBonte recalled that the gunman who approached from the front was about six feet tall and husky. At Mooring's trial he identified this man as Mooring. The other man was lankier and about the same height or a little taller, but he did not see his face. Both assailants had hoods on their heads, wore dark clothing, and were in their mid-20's.

Edwards admitted at trial that he and Mooring were the ones who robbed LaBonte. That evening, Edwards recalled, Collier, Mooring, and Kennedy (also known as "JR") had picked Edwards up in Collier's Mustang. Edwards was wearing a black nylon pullover jacket. Kennedy, wearing a black leather jacket, had a .22-caliber rifle in a bag. Collier, who was driving, wore a black jacket as well.

Collier drove them to Market Street, where Kennedy said he saw someone who had previously robbed him. Kennedy, taking his gun, got out of the car with Collier. Edwards lost sight of them for a short time, heard a man screaming, and then saw Kennedy and Collier returning to the car. Kennedy still had the gun.

After driving to the Marina District, Edwards spotted a man (LaBonte), walking alone, whom they could rob. Collier stopped the car, Edwards and Mooring got out, and Kennedy gave Mooring the .22-caliber rifle. Edwards instructed Collier to meet them at the same location in about three minutes. Collier drove off with Kennedy.

Mooring and Edwards approached LaBonte. Mooring, holding the gun, stood in front of LaBonte, while Edwards circled behind him. After Edwards went through LaBonte's pockets and got his money, Mooring hit LaBonte with the gun. LaBonte let out a gurgling sound and fell to the sidewalk. Mooring and Edwards returned to the drop-off point, where Collier and Kennedy picked them up. Edwards asked Mooring why he hit the victim so hard. By the time of trial, Edwards could not recall Mooring's response.

Kennedy testified to the same effect. On May 25, he recounted, Collier picked him up in Collier's red Mustang. Kennedy, who had his loaded, sawed-off, .22-caliber rifle in a gym bag, was wearing a black leather jacket. Collier wore a black coat. They picked up Edwards, who was also wearing a black coat. Mooring joined them as well.

At some point, Kennedy and Collier got out of the car and tried to rob a man with Kennedy's gun. They then continued on toward the Marina District, discussing "jacking" (robbing) someone. When they got to the Marina District, Kennedy saw a man walking by himself. Someone in the car said, "let's get out and get him." The car stopped, and Edwards and Mooring got out with the sawed-off .22-caliber rifle.

Collier and Kennedy drove around the block and, two or three minutes later, picked up Edwards and Mooring, who still had the gun. Kennedy heard Edwards ask Mooring why he hit the victim so hard. Without denying that he hit the man, Mooring said that "a bullet fell out" of the gun.

San Francisco Police Officer David Garcia testified that he responded to the scene of the LaBonte robbery and found blood on the sidewalk and a .22-caliber slug.

Julia Eyerman testified to her observations on the night of May 25 as well. About 10:00 p.m., she heard loud voices and saw from her window two black men, in dark clothing, getting out of a reddish Mustang or similar vehicle in the middle of the street. One of the men was heavier set, and the other was thinner. The car sped off and the men walked out of her view. About 20 minutes later, Eyerman heard a commotion and saw the two men run from around the corner and get into the Mustang. The car drove off. Eyerman later identified photographs of Collier's car as the Mustang she observed that night.

2. Homicide of Worcester

a. Testimony of Worcester's friend, Farley

Christopher Farley and Worcester, who was visiting San Francisco, had dinner with a group of friends, went to a bar in the Marina District, and left shortly before midnight on May 25, 1999. They walked towards Farley's apartment on Russian Hill. At the corner of Hyde and Vallejo Streets, Farley noticed two black men dressed in dark

4

clothing, standing against a building as he and Worcester walked by. After Worcester and Farley crossed Hyde Street, the men began yelling and running at them. Farley nudged Worcester and started to run. When he looked back, Farley saw Worcester face down on the ground, with the two assailants standing over him. The men demanded Worcester's money or wallet, and Worcester told them it was in his pocket and to take it. At this point Farley noticed that the assailants were wearing dark, hooded jackets, but he could not see their faces. One or both of the assailants went through Worcester's pockets, and it appeared that one of them had Worcester's wallet in his hand. Farley next saw one of the assailants raise his arm and lean towards Worcester; then he heard two or three popping sounds. The robbers ran off. Farley went to Worcester and saw he was covered in blood.

### b. Other percipient witness testimony

Christopher Jung lived at the corner of Hyde and Vallejo. Around 12:15 a.m. on May 26, 1999, he heard two "bangs" that sounded like gunshots. He looked outside and saw a dark-red car with a tan or white convertible top, double-parked on Hyde Street. A gangly man over six feet tall with short cropped hair, wearing a black long-sleeved sweatshirt and black pants was standing alone in the middle of the street near the back of the car. After a minute or two, the man got in the passenger side of the car and the car slowly moved away. Jung called 911.

Kristen Grant heard loud voices outside her home near the intersection of Vallejo and Hyde Streets around 12:15 a.m. on May 26. One man loudly said, "you better run, motherfucker." She heard people running, and then she heard a man say something to the effect of "give me your wallet," and another man replying something like "okay, whatever you want, fine." Three gunshots rang out in close succession, and more than one person ran away. When she looked out her window 15 or 30 seconds later, she observed a man (Worcester) lying face down on the sidewalk. Another man (apparently Farley) stood over him and was asking for someone to call 911. She did.

*c. Testimony of accomplice Kennedy*

Kennedy identified Collier and Mooring as the principal perpetrators of the Worcester murder.

According to Kennedy's account, as Collier drove them around San Francisco after the LaBonte robbery, Kennedy, Mooring, Edwards, and Collier discussed robbing somebody else. In particular, Mooring urged them: "let's go riding and see if we can find some more people."

Observing two men walking down the street, someone in the car said, "there goes two guys right there." Collier and Mooring, carrying Kennedy's gun, got out of the car, and Kennedy and Edwards drove around the block. Kennedy soon heard 2-3 gun shots. About a minute later, Collier and Mooring, who was still carrying the gun, ran back to the car and jumped in. The four drove off. Mooring said he did not know why he shot the victim, while Collier said that he (Collier) had the victim "pinned down." As they left the scene, Collier threw papers from a wallet out the window.[3]

The foursome drove to a gas station, where Collier got out and said he was going to pay for the gas with a credit card. They next dropped off Edwards at his house and drove to a Denny's restaurant in Emeryville. There, they ate with one of Kennedy's high school acquaintances (Elena Bishop) and her friends. Collier paid for the food with a credit card.[4] Collier later dropped Kennedy and Mooring off at Kennedy's house. Kennedy did not know what happened to his gun.

*d. Testimony of accomplice Edwards*

Edwards, like Kennedy, testified that Collier and Mooring were the ones who attacked Worcester and Farley. Edwards explained that, after the LaBonte robbery, they saw two men walking down the street. Edwards said it was Collier's and Kennedy's turn

---

[3]    Worcester's driver's license and other items from his wallet were found near the intersection of Hyde and Lombard streets on the morning of May 26, 1999, and turned in to the police.

[4]    Bishop corroborated Kennedy's account at trial, and specifically identified Collier, who she told police had been wearing a black leather coat. In addition, there was evidence that charges were made on Worcester's Visa card at 12:28 a.m. on May 26, 1999, at a gas station in San Francisco, and at 2:05 a.m. at a Denny's Restaurant in Emeryville.

to commit a robbery. When Kennedy declined to participate, Collier got out of the car with Mooring, who had the gun. Edwards and Kennedy stayed in the car.

Not long after, Edwards heard two or three fire-cracker sounds. About half a minute later, Collier and Mooring ran back to the car and got in. Edwards drove off. He asked Mooring what he just did, but Mooring did not respond. At trial, Edwards did not recall Collier saying anything at the time.[5] As they drove from the scene, Kennedy threw papers from the wallet out the car window.

After stopping for gas, Edwards drove Collier, Mooring, and Kennedy to his house and told them to get rid of the gun. Edwards got out of the car, and the other three drove away.

### e. Coroner's testimony

The coroner determined that Worcester died from multiple gunshots wounds. Two bullets had entered the back of his head and penetrated his brain; both of these wounds were fatal. A third bullet entered his left shoulder. Worcester's wounds were consistent with being shot with a Marlin .22-caliber rifle from three to four feet away while lying face down on the ground.

### 3. Police Investigation

San Francisco homicide Inspectors Edward Wynkoop and Curtis Cashen were assigned to investigate the Worcester case on May 26, 1999. They went to the scene, interviewed several witnesses, and collected evidence. They also learned that the car involved in the shooting matched the description of the car involved in the LaBonte robbery that same night, and that .22-caliber bullets were found at both crime scenes.

In early September 1999, Wynkoop received a tip from a California Highway Patrol officer that a person identified as "Bobbie" had information concerning the involvement of "JR," who was later identified as Kennedy. At a meeting at a San Francisco restaurant on September 8, 1999, "Bobbie" gave Wynkoop a photograph of Mooring and indicated that Edwards and Kennedy were also involved, as was a person

named "Tremayne," who was driving a red convertible Mustang. Wynkoop determined
from DMV records that Tremayne Collier owned a 1991 Ford.

Later in September 1999, Wynkoop met with the victim of an armed robbery at an
ATM in San Rafael in June 1999 (ATM Robbery), about three weeks after the Worcester
shooting. The victim, Frank Caiazzo, identified Collier as a suspect in the ATM Robbery
by selecting his photograph from a photographic line-up.

On November 22, 1999, police officers executed a search warrant at Collier's
home in Richmond. In his bedroom officers found a black down jacket. The police
crime lab determined that distinctive gunshot residue particles on both sleeves of the
jacket were consistent with a man wearing the jacket while standing over a prone victim,
next to a person who shot the victim three times.

Wynkoop spoke with Collier on November 22, 1999, at the Hall of Justice. Their
conversation was tape-recorded and played for the jury. In the interview, Collier denied
involvement in the Worcester shooting. He claimed that he recognized photographs of
Kennedy but not Mooring. He identified pictures of his car, but denied he was the person
depicted in photographs taken by the ATM security system at the time of the Caiazzo
robbery. He told officers, falsely, that he purchased his red Mustang on May 27, 1999.[6]
Collier refused to speak to Wynkoop further.

On that same day, Wynkoop interviewed Mooring, who was in custody. Mooring
denied involvement. Kennedy refused to speak to Wynkoop and requested a lawyer.
Later that afternoon, Kennedy's attorney faxed the officers a letter asserting Kennedy's
right to remain silent and his continued assertion of his right to counsel.

On November 24, 1999, however, Cashen was contacted by Sergeant (now
Lieutenant) Michael Ridgway of the Marin County Sheriff's Department. Ridgway

---

[5]    Defense investigator Pamela Olsen testified that she took a statement from Edwards in
April 2002, during which Edwards told her that Collier said to Mooring, "You didn't have to do
it."

[6]    Rodolfo Gomez, manager of Almaden Auto Sales, testified and produced documents
establishing that he sold a 1991 Ford Mustang to Collier on May 11, 1999.

advised Cashen that he had learned through an informant that Kennedy was interested in talking about the Worcester incident. Wynkoop and Cashen went to San Rafael and met briefly with Ridgway and then with Kennedy. Kennedy provided them details of the LaBonte robbery and Worcester murder, which the investigators attempted to corroborate.

On December 2, 1999, officers interviewed Kennedy's mother, Renee Williams. She told them that "Milo" (Mooring) was at her house the night of the murder and, while they were watching a TV news report about the killing, she asked Mooring if he was involved. Mooring told her that he shot the man.

Police confronted Mooring the next day. Mooring explained that he was in the wrong place at the wrong time and that, if he told them what happened, he would be incriminating himself.

On December 3, 1999, police interviewed Edwards, who told them he knew nothing about the incident and that he had either been at work that night or with his girlfriend. Officers were unable to confirm his alibis. Three days later, police executed a search warrant on Edwards' residence. They seized two photographs, one of Edwards with Mooring, and one of Edwards with Kennedy. They also seized a black hooded jacket, which matched the description of the jacket worn by the perpetrators.

Officers interviewed Lashonta Bateast, who lived with Mooring's cousin, in May 2000. Bateast told them that a day or two after the shooting, Mooring was at her house with another man. Mooring asked Bateast if she had seen the news about a tourist killing. He said that he shot the victim because he needed money, and that his accomplice went through the victim's pockets. The man with Mooring smirked, and she got the impression that he was Mooring's accomplice. Bateast identified Edwards as the man with Mooring.

Wynkoop had another conversation with Collier on October 18, 2000. A tape of this interview was also played for the jury. This time, Collier claimed that on May 25, 1999, he loaned his Mustang to Kennedy, who was with Mooring and was going to pick

up Edwards. Collier denied that he went along with them to San Francisco, contending that he was instead with his girlfriend and met up with Kennedy only later at Denny's.

### 4. Kennedy's and Edwards' Deals with the Prosecution

Pursuant to a plea bargain, Kennedy pleaded guilty on April 16, 2001, to a felony charge of being an accessory after the fact. He faced a maximum term of three years, but was given a suspended sentence and placed on three years probation with one day in jail, in exchange for giving truthful testimony at the trials of Mooring and Collier. He testified before a grand jury on April 17, 2001.

Later that month, the grand jury indicted Mooring, Collier, and Edwards. Edwards was arrested on the indictment in April 2001. After Edwards provided a statement to a defense investigator, in which he answered questions posed by the prosecutor, he was offered a negotiated plea bargain. On June 25, 2002, Edwards pled guilty to felony grand theft, with the understanding that he would serve no more than four years.

### 5. Evidence of Collier's ATM Robbery

Caiazzo testified to being robbed at an ATM around 4:20 a.m. on June 17, 1999 (approximately three weeks after the Worcester shooting). According to Caiazzo, a man in a Sausalito bar had introduced him to three men, who said they would give him a ride to an ATM so he could withdraw money to purchase drugs from them. He got in their car, and they proceeded to an ATM. After withdrawing some money, Caiazzo saw one of the men—a balding African-American in his early 30's who had been driving the car— approaching with a short-barrel shotgun.[7] The man hit Caiazzo with the butt of the gun, Caiazzo fell, and the man put his foot on Caiazzo's back so that his face was on the ground. Caiazzo gave the man the money, and the robbers drove away.

Although Caiazzo was unable at Collier's trial to identify Collier as the ATM robber, he did identify a photograph of Collier that he had selected from a photographic line-up on September 29, 1999 as the one who "looks most like the driver and man with

---

[7]     The officer responding to the ATM Robbery testified that Caiazzo reported it was a pump action pellet gun.

gun." In court, he pointed out Collier as a "bigger, older version" of the man in the photograph he had selected.

Denise LeBard testified that she was present at an "official proceeding"[8] on February 23, 2000, at which Collier admitted that he was the man depicted in photographs taken by the ATM security camera on the night of the robbery. He maintained, however, that he was holding an ax handle.

A retired firearms examiner testified that he had viewed the ATM photographs, and the object in the hands of the assailant was consistent with a rifle-type weapon and not inconsistent with a .22 caliber Marlin rifle. [The object was not consistent with an axe handle.]

B. DEFENSE CASE

The defense case attacked the credibility of Edwards and Kennedy. Among other things, the defense produced evidence that Kennedy committed a home-invasion robbery in January 2003. In addition, the defense introduced evidence that Edwards was arrested in January 2004 for theft of property from a Sears store, and when stopped in May 2004 he was found to be in possession of a loaded handgun.

The defense also called Lieutenant Ridgway as a witness. Ridgway recounted that he was told by an informant, Prudence Wesson, that she had spoken to Kennedy about the shooting and that he had admitted his involvement. Kennedy told Wesson that he never left the car and had nothing to do with the robbery. Ridgway contacted Inspector Cashen, who asked Ridgway to try to get a statement from Kennedy. Ridgway called Wesson back and arranged to speak to Kennedy at Wesson's residence.

Ridgway surreptitiously recorded his conversation with Kennedy. Kennedy told Ridgway that he did not see the actual shooting of Worcester, but observed Collier remove the victim's wallet from his pants, knock the victim to the ground, kick him, and put his foot on the victim's throat. Kennedy also told Ridgway that Collier asked Mooring why he shot Worcester, that they used Worcester's credit card at Denny's, and that he threw the gun off the Bay Bridge.

---

[8]    The "official proceeding" referenced in the trial was Collier's parole revocation hearing.

Ridgway wrote a report on November 26, 1999, about Kennedy's statement. Among other things, the report indicated that Kennedy displayed signs of deception when he said that he had thrown the murder weapon off the Bay Bridge.

C. VERDICT AND SENTENCE

The jury found Collier guilty of all counts charged against him. It found the robbery special circumstance allegation not to be true, and the arming allegations to be true.

Trial by jury was waived by Collier as to the charged prior convictions, which the court found to be true. Collier's motion for a new trial was denied.

Collier was sentenced to an aggregate term of 13 years plus 51 years to life.

This appeal followed.

II. DISCUSSION

As noted above, Collier contends: (1) the trial court erred in permitting evidence of the armed robbery he committed three weeks after Worcester was killed; (2) the prosecutor withheld material impeachment evidence relating to Kennedy, a key prosecution witness; (3) the court erred in admitting Kennedy's statement to police and testimony because it was the product of coercion and a plea agreement requiring him to testify in a particular way; (4) Wynkoop improperly gave his opinion of Kennedy's truthfulness; (5) the court erred in instructing the jury regarding unjoined perpetrators under CALJIC No. 2.11.5; (6) a photograph of Worcester should not have been admitted; and (7) the court failed to exercise its discretion when it imposed a $10,000 restitution fine against Collier under section 1202.4, subdivision (b)(1). Collier also asserts that the cumulative effect of these errors compels reversal. We address each contention in turn.

A. EVIDENCE OF COLLIER'S SUBSEQUENT ARMED ROBBERY

Collier contends that the court erred in admitting evidence that he perpetrated the armed robbery of Caiazzo at an ATM in June 1999, about three weeks after the shooting of Worcester. He argues that this evidence could only have been improperly used by the jury as negative character evidence that Collier was the type of person who committed armed robberies. We review for abuse of discretion.

12

1. Background

In pretrial hearings, the parties litigated the admissibility of evidence (testimonial and photographic) that Collier had committed the ATM Robbery. The court ruled that the evidence was admissible as to Collier's knowledge and intent, because the ATM Robbery was close in time to the Worcester shooting, a similar weapon (a rifle) was used, it was a "prone-out" robbery in which Collier put his foot on Caiazzo's neck (similar to what was done to Worcester), and the same car was used in both incidents. The court later observed that the evidence was relevant to show Collier's knowledge of firearms and to refute any claim of mistake, accident, or lack of intent.

Before any testimony at trial concerning the ATM Robbery, the court instructed the jury that the evidence was being admitted to show only Collier's intent in the charged crimes, that it could not be used "to prove that defendant is a person of bad character or that he has a disposition to commit crimes," and that it could not be used for any other purpose.

As described *ante* in our summary of the trial evidence, Caiazzo then recounted the armed robbery and confirmed his tentative identification of a photograph of Collier as the assailant. In addition, the prosecutor introduced photographs taken by the ATM security system, and evidence that Collier admitted he was the person depicted in those photographs. A firearms expert testified that the object held by the assailant was consistent with a rifle-type weapon.

In accordance with CALJIC Nos. 2.50, 2.50.1, and 2.50.2, the court again instructed the jury that evidence of the ATM Robbery could be used only to find that Collier had the intent and knowledge necessary for the commission of the charged crimes.

In closing argument, the prosecutor asserted that the ATM photographs "clearly show defendant Collier committing an armed robbery" and pointed out that Collier's car was in the background, Collier initially denied, but later admitted to police, that he was pictured in the ATM photographs, and pointed out that Collier denied he was holding a gun and robbed the man. The prosecutor again referred to the ATM Robbery when

13

discussing aiding and abetting, arguing that Collier, when dropping off Mooring and Edwards in the Marina District at the time of the LaBonte robbery, knew they were going to commit a robbery and had the intent of encouraging or facilitating the commission of the crime. The prosecutor asserted: "That San Rafael robbery is powerful evidence for you of his knowledge and his intent in San Francisco at the end of May when people suffered and died."

Defense counsel argued to the jury that the ATM Robbery was so different from the charged incident that it reflected nothing about his intent. In rebuttal, the prosecutor reasserted his position that the ATM Robbery was "powerful . . . evidence" of what Collier knew three weeks earlier when Mooring and Edwards killed Worcester.

### 2. Law

Evidence of a defendant's character, including evidence of a crime or other bad act not charged in the proceeding, is generally inadmissible to prove the defendant's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) However, Evidence Code section 1101 does not "prohibit[] the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, *intent*, preparation, plan, *knowledge*, identity, absence of mistake or accident . . . other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b), italics added.)

To be admissible under Evidence Code section 1101, subdivision (b), the charged and uncharged crimes must be sufficiently similar to support a rational inference of identity, common design or plan, or, as here, intent. (*People v. Kipp* (1998) 18 Cal.4th 349, 369 (*Kipp*).) A lesser degree of similarity is required to show intent than identity or common plan, because the recurrence of similar conduct tends to negate the possibility that it occurred by accident or inadvertence. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*) [other crimes evidence is admissible to show intent if "the uncharged misconduct [is] sufficiently similar to support the inference that the defendant "'probably harbor[ed] the same intent in each instance" [Citations.]'"]; *People v. Steele* (2002) 27 Cal.4th 1230, 1243-1245 (*Steele*) [evidence of prior murder admissible to show intent in

charged murder in light of the "doctrine of chances": the more often one does something, especially under similar circumstances, the more reasonable it was intended and premeditated].)

In addition, uncharged crime evidence is admissible only if it has "substantial probative value that is not greatly outweighed by the potential that undue prejudice will result from admitting the evidence." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1123 (*Lenart*); see Evid. Code, § 352; see also *People v. Carpenter* (1997) 15 Cal.4th 312, 378-379 ["The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence."] (*Carpenter*).) We review the admission of uncharged crime evidence for an abuse of discretion. (*Kipp, supra*, 18 Cal.4th at p. 369.)

3. Application

The prosecution theory against Collier was that he was guilty of murder on an aiding and abetting theory. The prosecution therefore had to prove that Collier "act[ed] with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560, italics omitted.)

Collier admitted that he was present when the robberies and Worcester murder were committed, and there was no dispute that he did much of the driving of his car, which was used to transport all of the participants to and from the crime scenes. "[M]ere presence at the scene of a crime," however, "is insufficient to establish aider and abettor liability." (*People v. Salgado* (2001) 88 Cal.App.4th 5, 15.) Collier argued that there was insufficient evidence to prove he aided and abetted because he did not personally participate in the crimes or even get out of his car, and he did not know that his companions Mooring and Edwards were committing robberies. Collier's intent and knowledge when he drove Mooring and Edwards to the crime scenes and waited for them was therefore at issue.

15

The intent that Collier displayed at the time of the ATM Robbery was relevant to his intent at the time of the LaBonte and Worcester incidents. The fact that he perpetrated the armed ATM Robbery, with a weapon similar to the one used in the instant offenses, made it more likely that he was harboring a criminal intent to participate in and facilitate armed robberies when he drove Mooring and Edwards to and from the scene of the charged crimes. The point is not that Collier was disposed to commit such acts, but that his obvious intent in perpetrating the armed ATM Robbery suggests he harbored the same intent in another similar circumstance. (See *People v. Robbins* (1988) 45 Cal.3d 867, 879.) The fact that the ATM Robbery occurred after the Worcester shooting is immaterial. (*People v. Balcom* (1994) 7 Cal.4th 414, 425 (*Balcom*) ["The circumstance that the uncharged offense occurred after the charged offense does not lessen its relevance . . . ." (Italics omitted.)].)

In the matter before us, there were sufficient similarities between the ATM Robbery and the charged offenses to admit the evidence as to Collier's intent and knowledge. All three crimes involved: (1) use of Collier's car; (2) use of the same or similar weapon; (3) the robbery of a victim on the street; (4) causing the victim to lie face-down on the ground; and (5) taking money from the victim at gunpoint. In addition, both the ATM Robbery and the LaBonte robbery involved striking the victim in the face with the butt of a rifle, and both the ATM Robbery and the Worcester robbery involved putting a foot on the victim's back.

Collier contends the crimes were not sufficiently similar to be admissible. The events of May 25, 1999, as the prosecutor argued them, involved four men riding around in a car selecting victims who were walking down the street, and then two of them conducting quick, run-up assaults to get their money. In the ATM Robbery, by contrast, there was a period of social contact with the victim and an apparent plan to convince him to withdraw cash from an ATM and then take it. That argument might be well-taken were evidence of the ATM Robbery offered to show a common plan, scheme, or design. However, the least required similarity is needed for admission on the issue of intent. (*Ewoldt, supra*, 7 Cal.4th at p. 402.)

16

Finally, we conclude the probative value of the ATM Robbery was not outweighed, as appellant argues, by its potential prejudicial effect. (See *Lenart, supra*, 32 Cal.4th at p. 1123; Evid. Code, § 352.) Admittedly, in the ATM Robbery Collier was identified as the actual perpetrator, while he was not the actual perpetrator of the LaBonte robbery. However, the ATM Robbery itself was not more egregious or inflammatory than the robbery of LaBonte or the robbery and murder of Worcester. As the trial court noted, Caiazzo survived the attack; Worcester did not. And while the ATM Robbery was violent, the incident was not the type which would inflame the emotions of the jury, nor was there any indication of a danger that the jury would be tempted to convict Collier on the more serious charged offenses to ensure punishment for the uncharged offense. (*Balcom, supra*, 7 Cal.4th at p. 427; *Steele, supra*, 27 Cal.4th at p. 1245.) As the respondent contends, the evidence of the uncharged offense was reliable because there was a photograph of Collier at the crime scene, Caiazzo selected his photograph from a photo lineup (although he could not identify him in court), and Collier ultimately admitted he was the person in the ATM photograph.

We also note that the trial court properly instructed the jury, in accordance with CALJIC No. 2.50, to use the evidence only as it related to Collier's intent, and not as evidence of bad character or predisposition. The court instructed: "Evidence has been introduced for the purpose of showing the defendant committed a crime other than that for which he is on trial. This evidence, if believed, may not be considered by you to prove that [the] defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show the existence of the intent, which is a necessary element of the crime charged, or if it tends to show the defendant had knowledge necessary for the commission of the crime charged. For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all the other evidence in the case. You are not permitted to consider such evidence for any other purpose."

We must assume the jury understood and followed the court's instructions. (*People v. Cline* (1998) 60 Cal.App.4th 1327, 1336.) In addition, the prosecutor

acknowledged in his argument that the evidence could be used only to determine Collier's knowledge and intent, and defense counsel reminded the jury that it could not use the ATM robbery as evidence of criminal propensity.

In the final analysis, the trial court did not abuse its discretion in admitting the evidence of the ATM Robbery.

B. TARDY DISCLOSURE OF RIDGEWAY SUPPLEMENTAL REPORT

At the end of Collier's defense case, the prosecutor disclosed to the defense a report of Lieutenant Ridgeway's interview of Kennedy on November 24, 1999. Collier claims this violated the mandatory disclosure requirements of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). While the prosecution was derelict in not earlier providing this statement, Collier has failed to demonstrate reversible error.

1. Background

While testifying at trial on July 1, 2004, Inspector Wynkoop asserted that Kennedy was taken into custody on November 22, 1999, after the police served a warrant to search his home. Kennedy exercised his right to remain silent. Two days later, Kennedy went to the Marin County Sheriff's Office. Lieutenant Ridgway contacted Inspector Cashen or Wynkoop and said that Kennedy had information about the case. Inspectors Wynkoop and Cashen went to Marin, obtained a brief summary of Kennedy's account from Ridgway, and then met with Kennedy. A videotape of their interview of Kennedy was played for the jury.

On July 21, 2004, the defense was scheduled to call Ridgway as its last witness. The trial court adjourned the proceedings, explaining to the jury that the defense was unable to proceed because the prosecutor had disclosed to the defense a report by Ridgway just the prior evening, contrary to discovery rules that require witness statements and reports be turned over 30 days before trial.

Out of the jury's presence, the court held a hearing in regard to the tardy production of the Ridgway report. At the hearing, Ridgway testified that he had written a "supplemental report" regarding his contact with Kennedy and Inspectors Wynkoop and Cashen in November 1999. The report was entitled "supplemental" because it was

18

written after the case was officially opened. The report states that Ridgway taped a telephone conversation with Prudence Wesson, who had brought Kennedy to Ridgway's attention, and an in-person conversation Ridgway had with Kennedy on November 24, 1999. It further indicates that Ridgway shipped those tapes and his report to the inspectors, and faxed his report to Cashen, on November 29, 1999. However, on June 28, 2004, in a conversation between Ridgway and Assistant District Attorney (ADA) Harry Dorfman, it became clear that Dorfman had not seen the report, so Ridgway faxed it to Dorfman the same day.

Inspector Wynkoop testified at the hearing that he did not recall receiving or seeing the supplemental report before that morning (July 21, 2004). There was no indication in his chronological log that he had received it, although he did receive a Federal Express delivery of the audiotapes. He believed that everything in his file had been turned over to the defense before his contact with the prosecutor about this document that morning.

ADA Dorfman testified that he first became aware of the supplemental report during a conversation with Lieutenant Ridgway on June 28, 2004. Trial was underway and he pinned the report to his bulletin board. On July 20, 2004, he took it down and reviewed it in preparation for Ridgway's testimony. He saw there was no Bates stamp number on it, asked the defense if they had a copy of it, and faxed a copy to defense counsel later that night after defense counsel indicated he was not familiar with the document.

Defense counsel then moved for dismissal with prejudice. Although the audio tapes of the interview with Kennedy were timely produced, counsel contended that the tapes were difficult to understand, and the late-produced Ridgway supplemental report permitted counsel to "examine [Ridgway] in a way that I never would have been able to without this report." Counsel specifically declined to request a mistrial. While not disputing his obligation to provide the report to the defense, the prosecutor asserted that there was great overlap between the Ridgway report and the transcripts of the audiotapes

19

of the interviews with Kennedy, which had already been provided to the defense, and that the delay in providing the report had not prejudiced the defense.

The trial court denied the motion to dismiss, noting that the defense had possessed the audiotapes of the Kennedy interview. Nevertheless, the court considered the withholding of the Ridgway report a serious discovery violation, and indicated that defense counsel could seek a continuance if needed, and could call additional witnesses.

Trial resumed in the jury's presence. On direct examination by the defense, Lieutenant Ridgway testified that he wrote his supplemental report on November 26, 1999, and made a notation that he faxed it to Inspector Cashen on November 29, 1999, but had no independent recollection of doing so. He faxed the report to the prosecutor on June 28, 2004.

After Ridgway's testimony, defense counsel renewed his motion to dismiss, which was again denied. Counsel declined the opportunity for a continuance.

Inspector Wynkoop then took the stand again, this time called by the defense. He testified that he reviewed Ridgway's supplemental report and agreed that the prosecution had a responsibility to turn it over to the defense. He asked Ridgway to send him the audiotapes of his conversations with Kennedy, and he received those tapes on November 30, 1999, but not the supplemental report. He acknowledged that the supplemental report indicated that Kennedy had contradicted himself, that he showed signs of deception regarding the weapon, and agreed that those observations were not contained in the audiotapes.

Prior to deliberations, the court instructed the jury on the failure to timely produce evidence (CALJIC No. 2.28). The court told the jury: "In this case, the People concealed and/or failed to timely disclose the Ridgway supplemental report. The Ridgway supplemental report was not disclosed by the People to the defense until July 21st of 2004. Although the People's concealment and/or failure to timely disclose evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during the trial. The weight and significance of any concealment and/or delayed disclosure are matters for your consideration. However, you should consider

whether the concealed and untimely disclosed evidence was exculpatory, pertains to a fact of importance, something trivial, or to subject matters already established by other credible evidence. Exculpatory evidence is evidence tending to negate the guilt of the accused."

After the jury found Collier guilty, Collier moved for a new trial, contending the delayed production of the Ridgway report deprived him of due process. The motion was denied.

2. Law

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady, supra*, 373 U.S. at p. 87.) A *Brady* violation occurs if (1) the evidence was willfully or inadvertently suppressed by the prosecutor; (2) the evidence was favorable to the accused (exculpatory or impeaching an adverse witness); and (3) the defendant was prejudiced. (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282 (*Strickler*).)

A *delay* in the disclosure of exculpatory evidence warrants reversal only if the delay itself prejudiced the defense. It is the defendant's burden to show that the tardiness of the disclosure was prejudicial, and that a continuance would not have cured the harm. (*People v. Jenkins* (2000) 22 Cal.4th 900, 951 (*Jenkins*) [failure to provide discoverable evidence by time of preliminary hearing not prejudicial where defense had ample opportunity to investigate the basis of the witness's testimony and confront and cross-examine the witness at trial]; *People v. Pinholster* (1992) 1 Cal.4th 865, 941.)

There is no dispute that the prosecutor obtained the Ridgway report by June 28 but did not provide it to the defense until July 20. Although respondent debates whether the Ridgway report was helpful overall to Collier's defense, "respondent agrees that, because some of the report had the potential to be helpful, the prosecutor was obliged to disclose it in a timely fashion." (See *Strickler, supra*, 527 U.S. at p. 282 & fn. 21 [impeachment evidence must be disclosed even if evidence is overall inculpating].)

Nevertheless, the verdict cannot be reversed unless the delay in producing the suppressed report was prejudicial to the defendant—in other words, that there was a reasonable probability that Collier would have obtained a better verdict if the evidence had been disclosed in a timely manner. (See *Strickler, supra,* 527 U.S. at pp. 282, 289-290 [prejudice requires a reasonable probability, based on all of the evidence, that the defendant would have realized a more favorable verdict if the undisclosed evidence had not been suppressed]; *In re Sassounian* (1995) 9 Cal.4th 535, 543-544.)

There is no showing that timely disclosure of the Ridgeway report would have led to a more favorable verdict for Collier, or that a continuance would not have cured the harm.

Collier claims that withholding the Ridgway report precluded effective cross-examination of key prosecution witnesses (Kennedy, Wynkoop, and Cashen). We disagree. Although he was unable to use the Ridgway report in his initial cross-examination of these witnesses, he recalled Inspector Wynkoop, examined him on the report, and was given the opportunity to recall Kennedy and Cashen, but declined. He also declined a continuance that would have permitted the defense to recall other witnesses. Thus, Collier had full opportunity to examine witnesses on any information contained in the late produced report.[9]

Collier next argues that the delay undermined the preparation and presentation of the defense case, and particularly his examination of Ridgway. Essentially, he contends that he did not have enough time to review the Ridgway report before examining Ridgway, and as a result the prosecutor was able on cross-examination under Evidence Code section 356 to read into the record nearly the entire contents of the report, which would have otherwise been inadmissible hearsay. The argument is meritless. As to Collier's claim that he had insufficient time to review the new discovery before

---

[9]    Collier also contends that the prosecutor, by permitting Wynkoop to testify that he went to San Rafael to interview Kennedy in response to contact by an informant, without disclosing that he and Cashen encouraged Ridgway to pursue Kennedy and obtain a statement, presented false testimony. We note, however, that there was evidence that Kennedy initially came to *Ridgway's* attention because of an informant. At any rate, the jury was made aware of the true facts and, therefore, could evaluate for itself whether Wynkoop's testimony was false.

22

examining Ridgway, he was offered the opportunity for a continuance, but chose not to request one. Furthermore, even if defense counsel had been provided the report earlier, or had had more time to decide how to formulate his questions, there is no indication he could have avoided the admission of the balance of the Ridgway report once he elected to use a portion of the report to impeach prosecution witnesses.

Collier also argues that the failure to timely disclose the Ridgway report prejudiced the presentation of his motion in limine to exclude Kennedy's testimony on the grounds that he had been subject to coercion through his interactions with Ridgway, Wynkoop, and Cashen. As further discussed *post*, there is nothing in the report that supported a claim of coercion.

Lastly, Collier argues that the remedies offered by the trial court—a continuance and the opportunity to recall witnesses—were inadequate because the production of the Ridgway report came after the witnesses had been examined and "calling them back to repeat their stories would actually prejudice the defense." Collier fails to show how recalling witnesses would have prejudiced the defense. Contrary to Collier's suggestion, the prosecutor would not have been able to reopen its case in chief (Evid. Code, § 773), and the court was willing to restrict the scope of the prosecutor's cross-examination.

We also observe that the disclosure of the Ridgway report was no "bombshell," as Collier now calls it. His trial counsel had been timely provided the audiotapes of the actual interview of Kennedy, while the report was merely Ridgway's recollection and impressions of what Kennedy said. Although the tapes were purportedly difficult to understand, defense counsel had a copy of the transcript of the tapes and in fact used the transcript to cross-examine Kennedy at trial. According to this transcript, Ridgway *stated that he was going to write a report* about his conversation with Kennedy, so the defense was on notice of the possible existence of the Ridgway report.

Moreover, the Ridgway report did not contain any evidence particularly favorable to Collier. It did indicate that Ridgway believed Kennedy lied about staying in the car during the Worcester robbery and murder (because he was able to describe the shooting incident in detail), and that Kennedy "showed clear signs of deception when telling"

23

Ridgway the gun "had been thrown over the side of the Oakland Bay Bridge." However, there was no indication in the Ridgway report that Kennedy lied about *Collier's* participation, and Ridgway testified that he believed Kennedy's basic account.

The impeachment of Kennedy with the Ridgway report might have reflected adversely on his credibility generally, perhaps bringing into question other portions of his testimony. It was already established by other evidence, however, that Kennedy later admitted he brought and disposed of the rifle, and Kennedy himself admitted at trial that he lied to the grand jury about having the gun that night. Because Kennedy was impeached in this and other ways, it is doubtful the Ridgway report would have had any significant additional effect. (See *U.S. v. Payne* (2nd Cir. 1995) 63 F.3d 1200, 1210.) In any event, the Ridgway report *was* used to impeach Kennedy, and there is no indication that the delay in producing it minimized its effect.

Also minimizing any potential prejudice to Collier was the fact that the trial court gave the appropriate remedial instruction (CALJIC No. 2.28), advising the jury that "the People concealed and/or failed to timely disclose the Ridgway supplemental report" and the "failure to timely disclose evidence was without lawful justification." Defense counsel argued this issue to the jury: "And the concealing of this evidence from us, I mean, viewed in the most charitable light, and the police and the DA have just not done it correctly. I mean, is it just a big mistake? Is that all it is? Because there's evidence that people on the prosecution team have lied here." Defense counsel further argued: "I want to suggest to you that there is a certain dishonesty or incompetence about it . . . . And I'm submitting to you that it is the mishandling of Mr. Kennedy and the mischarging in this case, which is one of the reasons why there should not be a verdict against Mr. Collier."

In the totality of the circumstances, there is no indication that Collier would have obtained a different outcome if the prosecution had timely provided the Ridgeway report to the defense, or that any harm from the delay could not have been cured by simply accepting the continuance offered by the trial court. We do not condone the prosecution's failure to timely provide all appropriate discovery to the defense, but it cannot be said that Collier did not receive a fair trial, or that an earlier introduction of the

report would have put the other evidence in a significantly different light. Collier has failed to establish reversible error.

C. MOTION TO EXCLUDE KENNEDY'S TESTIMONY

Collier's defense counsel filed a pretrial motion to preclude Kennedy from testifying at trial, arguing that Kennedy's pretrial statement to police was the product of coercion, and that because he was testifying at trial pursuant to a plea agreement, his trial testimony was inherently unreliable as well. The trial court denied the motion, noting that the defense could cross-examine Kennedy on these points. Collier contends the trial court erred.

1. Collier's Theory

According to Collier, Ridgway and Inspectors Wynkoop and Cashen coerced Kennedy into making statements that implicated Collier by promising that if Kennedy spoke first he could exonerate himself. He contends that Ridgway "essentially invited Kennedy to describe himself as an innocent bystander in order to convince him to implicate the other suspects," gave Kennedy the opportunity to give himself the least culpable role while implicating others, and suggested he would otherwise be subject to the harsh penalties for murder. Further, Collier urges, Wynkoop and Cashen adopted Kennedy's story, told him he was not a suspect and was not going to be arrested, and questioned him in a way that forced him to adhere to the version of events he provided to Ridgway. Collier's argument distorts the record and is devoid of merit.[10]

2. Standing

To have standing to argue that pretrial statements of a third-party witness were coerced, a defendant must allege a violation of his own rights. (*Jenkins, supra,* 22 Cal.4th at p. 966; *People v. Badgett* (1995) 10 Cal.4th 330, 343 (*Badgett*).) A defendant's due process rights are implicated in this context only when the evidence *at trial* has been the product of coercion. (*Badgett, supra,* at p. 344.) Thus, Collier must

---

[10]    Collier also asserts that Kennedy's statement was involuntary because police ignored Kennedy's counsel's advisement that Kennedy would not talk to police. He provides no argument to support the proposition, however, and we find none in the record.

establish not only that Kennedy's pretrial statement was coerced, but that it affected the reliability of the evidence at trial. (*Id.* at pp. 347-348.)

As mentioned, Collier argues that the alleged coercion of Kennedy's pretrial statement tainted Kennedy's *trial* testimony because his plea agreement effectively required him to testify in accordance with his coerced statement. That is incorrect. Kennedy's plea agreement required only that he testify truthfully. Furthermore, there is no indication that Kennedy *thought* he was required to stick to the facts he had previously given to police. (See *People v. Douglas* (1990) 50 Cal.3d 468.) Indeed, Kennedy testified *contrary* to his statement to police in regard to what happened to the gun, while asserting that he was testifying truthfully at trial and had previously lied. Kennedy also repeatedly stated at Collier's trial that he could no longer remember certain facts, further negating any inference that he believed his testimony had to conform to his allegedly coerced statement.

Collier has failed to establish that he had standing to challenge his conviction based on the purported coercion of Kennedy's statement and trial testimony.

3. Coercion (Improper Promises of Leniency)

"[W]hen a defendant makes a motion to exclude coerced testimony of a third party on due process grounds, the burden of proving improper coercion is upon the defendant." (*Badgett, supra,* 10 Cal.4th at p. 348.)[11]  Collier did not meet this burden.

There was substantial evidence that Kennedy's pretrial statement was not induced by any promise from law enforcement. Inspector Wynkoop testified that when he first interviewed Kennedy, he never promised him anything. He also testified that, before trial, Kennedy was not threatened or harassed or told how to testify. Kennedy's lawyer never complained. Ridgway testified that he made no show of force when he spoke to Kennedy, and Kennedy never told Ridgway he wanted to stop talking or wanted a lawyer.

---

[11]    Collier relies on cases involving coerced statements of a *suspect*, which are involuntary if induced by a promise of benefit or leniency. His reliance is misplaced. As our Supreme Court has admonished, "there is a significant difference in the burden of proof applicable to a claim under the Fifth Amendment and defendants' claim that the testimony of a third party is subject to exclusion as a matter of due process." (*Badgett, supra,* 10 Cal.4th at p. 348.)

Collier contends that there was an improper promise of benefit or leniency because the San Francisco Chief of Police had publicly announced that those who were involved in the incident, but who were not the actual shooters, should come forward or they would be prosecuted equally with the shooters. He claims that Ridgway increased this pressure by telling Kennedy at the start of the interview that police suspected him (because a search warrant of his home had been obtained) and that Kennedy should say on the record that he was not the shooter.

Collier's characterization of the record is incorrect. Actually, it was *Kennedy* who began the interview with Ridgway by volunteering that he was not the one the police wanted, and that they really wanted Mooring. Ridgway's comment—that "[o]bviously someone's talking about something because they've got a search warrant for you"—was a statement of fact, not a threat. Nor was it a threat for Ridgway to tell Kennedy, "it's important now for you to *start clean*," and "at least *if that's what truly happened*" you've protected yourself by putting your version on record. (Italics added.)

Collier also complains that Inspector Cashen reassured Kennedy at the beginning of the interview that they thought Kennedy was telling the truth, he was not a suspect, he was not going to be arrested, and he might need police protection. There is nothing inherently coercive about these statements, however, and Collier has failed to establish that these statements coerced Kennedy into saying something untrue.

Collier further argues that the plea agreement—which required him to testify truthfully—and the fact that Kennedy admitted at trial that he felt lucky to have gotten his deal make his statement and trial testimony coerced. Not so. A cooperation agreement, by which an accomplice is granted immunity or obtains a plea agreement, denies the defendant a fair trial if it is subject to the condition that the accomplice's testimony "substantially conform to an earlier statement given to police" or that "his testimony result in the defendant's conviction." (*People v. Allen* (1986) 42 Cal.3d 1222, 1251-1252.) It is permissible, however, for the agreement to require "only that the witness testify fully and truthfully." (*Id.* at p. 1252.) That is all Kennedy's plea agreement required.

27

Our Supreme Court—in a case on which Collier himself relies—rejected the argument Collier presents here. The court stated: "We have never held, nor has any authority been offered in support of the proposition, that an offer of leniency in return for cooperation with the police renders a third party statement involuntary or eventual trial testimony coerced. On the contrary, in *People v. Allen* [(1986)] 42 Cal.3d 1222, 1252, we held that testimony given under an immunity agreement does not violate the defendant's right to a fair trial, if the grant of immunity is made on condition the witness testifies fully and fairly. More recently, in *People v. Daniels* (1991) 52 Cal.3d 815, 862, we commented that 'we have frequently approved arrangements under which a witness who played a lesser part in the crime testifies for the prosecution in return for a plea to a less [serious] crime, or even total immunity.' In that case, two witnesses helped the defendant escape and hide from the police and could have been charged as accessories. Our conclusion bears emphasis here: 'There is nothing improper in confronting a suspect with the predicament he is in, or with an offer to refrain from prosecuting the suspect if he will cooperate with the police investigation.' (*Id.* at p. 863; see also *Douglas, supra,* 50 Cal.3d at p. 502, fn. 7.) [¶] If an offer of immunity is not considered coercive, then an offer of release from custody in return for cooperation likewise should not render a witness's statement coerced." (*Badgett, supra,* 10 Cal.4th at pp. 354-355.)

The other cases on which Collier relies do not sustain his position. For example, in *People v. Lee* (2002) 95 Cal.App.4th 772, the court found that the police had coerced a statement from a witness when they gave him a polygraph test, lied that the test indicated a 97 percent probability that the witness was the killer, and threatened to charge him with first degree murder if he did not name the defendant as the killer. (*Id.* at pp. 782-785.) In the matter before us, by contrast, the officers did not lie to Kennedy, tell him that he would be charged unless he implicated someone else, or suggest any name they wanted him to give. Unlike the interrogation in *Lee*, the questioning of Kennedy was designed to produce the truth, not merely to produce evidence to support a version of events the police had already decided upon. (See *id.* at p. 786.)

The trial court did not err in denying Collier's motion to preclude Kennedy's testimony and pretrial statement.

### D. LT. RIDGWAY'S TESTIMONY REGARDING KENNEDY'S TRUTHFULNESS

Collier contends that Lieutenant Ridgway improperly vouched at trial for Kennedy's truthfulness during his interview with Ridgway on November 24, 1999. This claim has no merit.

#### 1. Background

During direct examination, defense counsel asked Lieutenant Ridgway questions about his statements in his supplemental report that Kennedy showed signs of deception when he claimed that he had thrown the gun used in the Worcester shooting off of the San Francisco-Oakland Bay Bridge. The inquiry included the following: "Q. And as a result of -- when Mr. Kennedy made that statement to you, did you form any opinions about whether or not he was telling you the truth? [¶] A. No. Actually, I think, at the time, I thought he wasn't telling me the truth. It seemed too convenient. [¶] Q. And let me call your attention to paragraph 36 of your report. [¶] A. Yes, and specifically, in this paragraph, it indicates 'he showed clear signs of deception when telling me that.' [¶] Q. And when you say that Mr. Kennedy showed clear signs of deception in telling you that, what did you base that conclusion on? [¶] You know, I don't have any independent recollection of what they were, but it was clear -- my opinion at the time was that was not the truth, that the gun had not been thrown over the Bay Bridge, or at least not at that time."

The prosecutor then examined Lieutenant Ridgway, eliciting testimony that Kennedy was very forthcoming and opened up to the point Lieutenant Ridgway asked him about the gun. "Q. Kennedy's answers to you [about the gun], were they hedging? Or tell us more about his answers about that gun. [¶] A. Well, up to that question, I thought his -- generally, in our interaction in the backyard, I thought he was very forthcoming and very open, and I'd been doing this for 19 years and I've had specific training in interrogation and interview and physiological symptoms of deception, and I saw none of that present at all. As soon as I asked him about what happened to the gun, I

saw numerous signs that he was being deceptive. It was a clear change in his demeanor from our conversation to that point."

The prosecutor next focused Ridgway on the signs of deception Kennedy displayed when discussing the gun. "Q. Lieutenant, four-and-a-half years later -- I know we are asking you to look back -- but based on your answer, can you give us some details of what Willie Kennedy was doing at the moment he began to talk about the gun that makes you tell us now you saw signs of deception? [¶] A. I can't specifically tell you. I just remember to this day, independent of this report, I remember his demeanor changed dramatically from what it had been in our earlier conversation. [¶] Q. During the early part of the conversation leading up to the discussion of the gun, would Willie Kennedy look you in the eye? [¶] A. Yes. [¶] Q. Would Willie Kennedy -- was he standing or facing during -- standing or sitting during the conversation? [¶] A. We were sitting next to each other. [¶] Q. While the two of you were sitting having the conversation, were there times when he would direct himself to you? [¶] A. Yes. [¶] Q. When he began to show signs of deception on this issue of the gun, did he look away? [¶] A. I wish I could describe for you what it was, but it's been a long time and I didn't not[ice] with specificity what those signs were, but I do independently recall they were significant, and his demeanor was very much different, and it was clear to me that he was having to think about his answers, they weren't coming forward as if he were speaking a fact, but he was actually fabricating information in telling me."

Next, the prosecutor asked Ridgway to compare Kennedy's demeanor earlier in the interview: "Q. Before you got to the topic of the gun where you began to see signs of deception, was your conversation with Willie Kennedy smooth? [¶] A. Very. In fact - - [¶] Q. You'd ask a question, he'd give an answer? [¶] A. Yes."

Defense counsel moved for a mistrial, contending the prosecutor elicited from Ridgway an opinion that Kennedy had not shown deception until the point he started to talk about the gun, and that law enforcement could not vouch for the credibility of a witness. The prosecutor responded that defense counsel had opened the door to the inquiry by asking Ridgway about the portion of the report indicating that Kennedy had

30

shown signs of deception. Defense counsel retorted that he had been disadvantaged by the tardy production of the report. The trial court denied the mistrial motion.

Before jury deliberations, the trial court instructed the jury in accordance with CALJIC No. 2.81, including the following: "Witnesses from law enforcement are not permitted to express an opinion on either the guilt of the accused or the believability of any witness. You will disregard any such testimony. The jury is the exclusive judge of the believability and credibility of the witnesses."

2. Merits

We review the denial of a motion for mistrial for an abuse of discretion. (*Jenkins, supra,* 22 Cal.4th at pp. 985-986.) A mistrial should be granted if the court is advised of prejudice that it believes is incurable by admonition or instruction. (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)

It is improper for an officer to testify at trial about a lay opinion he may have concerning the veracity, or lack of veracity, of information provided by a witness or a defendant. (*People v. Melton* (1988) 44 Cal.3d 713, 744 (*Melton*).) An officer cannot, for example, testify whether a witness was telling the truth. (*People v. Sergill* (1982) 138 Cal.App.3d 34, 39-41.) The fact finder, not the witnesses, must draw the ultimate inference from the evidence. (*Melton, supra,* at p. 744.)

In the matter before us, Ridgway did not draw from the evidence the ultimate inference of truthfulness or deceit; he testified to Kennedy's demeanor and, at one point, volunteered that he thought Kennedy seemed "very forthcoming and very open" before Ridgway asked him what happened to the gun.[12]

In any event, even if it could be said that Wynkoop volunteered an opinion of Kennedy's veracity, defense counsel opened the door to the prosecutor's inquiry. Defense counsel specifically asked Ridgway whether he "form[ed] any opinions about whether or not [Kennedy] was *telling the truth*" (italics added) when he said the gun was

---

[12]    In his reply brief, without citation to the record, Collier asserts: "During redirect examination of Ridgeway about his report about Kennedy's initial statement, the *prosecutor asked his opinion about which portions of the statement were true.*" (Italics added.) This misconstrues the record.

thrown off the Bay Bridge, and further inquired about the signs of deception Kennedy displayed. The prosecutor then followed up, without objection from defense counsel, with questions about those same signs of deception and whether Kennedy displayed them at other points in the interview. When a defendant raises a topic during direct examination, the opposing party has the right to test that topic during cross-examination. (*People v. Wharton* (1991) 53 Cal.3d 522, 595.) Collier has failed to establish reversible error.

## E. Instruction Regarding Unjoined Perpetrators (CALJIC No. 2.11.5)

The trial court instructed the jury pursuant to CALJIC No. 2.11.5, regarding unjoined perpetrators of the same crime.[13] The defense did not object. Collier now contends the instruction was improper, because the unjoined co-perpetrators (Edwards and Kennedy) were prosecution *witnesses*, whose credibility turned in part on their bias or motive arising from their plea bargains. Giving this instruction in the circumstances of this case was error, but harmless.

In *People v. Cornwell* (2005) 37 Cal.4th 50 (*Cornwell*) (cert. den. 126 S.Ct. 1432) our Supreme Court held that CALJIC No. 2.11.5 should not be given when an accomplice testifies, noting that " the instruction might suggest to the jury that it need not consider the factors it otherwise would employ to weigh the credibility of these witnesses, such as the circumstance that the witness has been granted immunity from prosecution in return for his or her testimony." (*Cornwell, supra,* at p. 88.)

Here, Collier argues that the instruction neutralized defense counsel arguments that Kennedy and Edwards's testimony could be rejected if they were biased by their plea bargains with the prosecution. He contends that the effect of the instruction was that the jury was essentially told not to even discuss the effect of all the information they were given about Kennedy's and Edwards' plea bargains.

---

13    "There has been evidence in this case indicating that a person other than the defendant was or may have been involved in the crime for which the defendant is on trial. There may be many reasons why that person is not here on trial. Therefore, *do not discuss or give any consideration as to why the other person is not being prosecuted* in this trial or whether he has been or will be prosecuted. Your sole duty is to decide whether the [P]eople have proved the guilt of the defendant on trial." (Italics added.)

In *Cornwell*, however, the Supreme Court found any error in giving CALJIC No. 2.11.5 to be harmless so long as other instructions adequately directed the jury how to weigh the credibility of witnesses. (*Cornwell*, *supra*, 37 Cal.4th at p. 88.) Those instructions were given here. (CALJIC Nos. 2.01, 2.02, 2.03, 2.04, 2.09, 2.13, 2.20, 2.21.1, 2.21.2, 2.22, 2.23, 2.23.1, 2.27, 2.91 & 2.92.) As in *Cornwell*, the trial judge here also specifically informed the jury to keep in mind any sentencing benefits received by a witness in the jury's evaluation of the witness's credibility. (CALJIC No. 2.20.) (See also *People v. Fonseca* (2003) 105 Cal.App.4th 543, 550 [holding that where the jury receives all otherwise appropriate general instructions regarding witness credibility, there can be no prejudice from jury instruction pursuant to CALJIC No. 2.11.5: "There is no error in giving [the instruction] so long as a reasonable juror, considering the whole of his or her charge, would understand that evidence of criminal activity by a witness not being prosecuted in the current trial should be considered in assessing the witness's credibility."].)

Appellant also cites *People v. Lawley* (2002) 27 Cal.4th 102, 162-163 (*Lawley*), for the proposition that it is error to give CALJIC No. 2.11.5 where an accomplice testifies. *Lawley* involved an earlier version of CALJIC No. 2.11.5, but in any event, the court in *Lawley* actually held that the instruction is proper when given with the other standard instructions. (*Lawley*, *supra*, at p. 162.) The court explained: "When the instruction is given with the full panoply of witness credibility and accomplice instructions, as it was in this case, [jurors] will understand that although the separate prosecution or nonprosecution of coparticipants, and the reasons therefor, may not be considered on the issue of the charged defendant's guilt, a plea bargain or grant of immunity may be considered as evidence of interest or bias in assessing the credibility of prosecution witnesses. [Citation.] Although the instruction should have been clarified or omitted [citations], we cannot agree that giving it amounted to error in this case." (*Lawley*, *supra*, at pp. 162-163.)

In the matter before us, the trial court's instructions, taken as a whole, correctly advised the jury to focus on whether Collier was guilty and to consider, among other

33

things, the potential bias of Kennedy and Edwards arising from their plea bargains. As in *Lawley*, the jury received the "full panoply of witness credibility and accomplice instructions." (*Lawley, supra,* 27 Cal.4th at p. 162.) As in *Cornwell*, the instructions given here as a whole supplied adequate direction concerning the process of evaluating the testimony of the witnesses. The jury could not have believed it was foreclosed from considering any of the evidence regarding Kennedy's and Edwards' pretrial statements and plea bargains. Any error in giving the instruction was therefore harmless.

F. Admission of Victim Worcester's Photograph

Collier contends that the admission of a photograph of Worcester while he was alive violated Collier's rights to due process and a fair trial.

1. Background

Before trial, the prosecutor moved to admit a color "8 x 10" photograph of Worcester and Farley at Farley's wedding. The prosecutor argued that the photograph demonstrated a connection between Worcester and Farley, supporting the inference that Farley knew Worcester, brought him to San Francisco, had dinner together, had drinks together, were walking together, and knew each other. The defense responded that there was no dispute that Farley and Worcester were friends, the photograph was not relevant to a matter at issue in the trial, and it tended to elicit sympathy for the victim. Further, the photograph showed the two men standing close to each other and showed their affection. The trial court recalled the photograph from the *Mooring* trial and confirmed that there were no other people in the picture and, although Worcester and Farley were in wedding clothes, it was not apparent where they were. The court permitted the introduction of the photograph, but not testimony that Worcester served as a best man at Farley's wedding.

At the end of the prosecutor's opening statement, he directed the jury's attention to the photograph and said, "In this photograph to your right is Chris Farley, to your left is Shayne Worcester. Now it's a sad photograph."

Farley testified that Worcester attended high school with him, was one of his best friends, attended his wedding, and was in the Bay Area to attend another friend's surprise

34

birthday party. At the end of the direct examination, Farley identified the photograph of Worcester as a photograph of him with the victim at Farley's wedding, in the following exchange: "Q. . . . Who are the two men in the picture? [¶] A. Shayne and myself. [¶] Q. When was this picture taken? [¶] A. It was taken at my wedding."

2. Law

Our Supreme Court has "repeatedly cautioned against the admission of photographs of murder victims while alive unless the prosecution can establish the relevance of such items." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1230.) Nevertheless, our Supreme Court also directs us to review the admission of such a photograph under the abuse of discretion standard. (*People v. Osband* (1996) 13 Cal.4th 622, 678 (*Osband*).) We first consider whether the photograph was relevant to any material issue, and then consider whether its probative value was outweighed by its prejudicial effect. (*People v. Hendricks* (1987) 43 Cal.3d 584, 594.)

Respondent maintains the photograph was relevant to the relationship between Worcester and Farley, which was important because it indicated to the jury that Farley, the only witness who described the victim's life, habits, and reason for being in San Francisco on the night he was killed, could credibly discuss who Worcester was, why he was in San Francisco, and how he came to be walking with him at the time of the attack. Although the more obvious purpose of the photograph was to put a face to the victim of the charged crimes, it also tended to support the believability of Farley's testimony as to these topics.

The probative value of the photograph, though slight, was not outweighed by its prejudicial effect. Prejudice in this context arises if the photograph "'uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.'" (*People v. Scheid* (1997) 16 Cal.4th 1, 19.) Here, there is no evidence that the photograph had any prejudicial effect.[14] Collier has

---

[14]    According to the trial court in the *Mooring* case—who was also the trial judge in this case—"The photograph shows Farley and Worcester standing next to each other. It is a wedding photo. No children are shown. No other adults are shown. Their expressions are unemotional."

thus failed to establish that the court abused its discretion in admitting the photograph. (*People v. Anderson* (1990) 52 Cal.3d 453, 474 [photograph of victim with her daughter admissible where it would not shock the jury or arouse passion or sympathy]; *People v. Thompson* (1988) 45 Cal.3d 86, 114-115 [photograph of victim showing "an attractive young woman in a party dress and wearing a flower in her hair" was not unduly prejudicial]; *Osband, supra*, 13 Cal.4th at pp. 676-677 [photograph of victim on her birthday, with Christmas presents, was properly admitted even though it brought tears to the eyes of a testifying relative].)

In any event, whether the photograph was admissible on a contested issue or not, any error in the admission of the photograph was clearly harmless. The photograph was not gruesome or inflammatory and it was shown to the jury briefly on two occasions at the beginning of the trial. It would not have been reasonably probable that the outcome would have been more favorable to defendant had the photograph been excluded.

G. RESTITUTION FINE

Section 1202.4, subdivision (b), requires the court to impose a restitution fine unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record. Subdivision (b)(1) of section 1202.4 advises that the fine is "set at the discretion of the court and commensurate with the seriousness of the offense," and provides a minimum and maximum potential fine: where, as here, the defendant has been convicted of a felony, the fine "shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000)." Section 1202.4, subdivision (b)(2) then specifies one way in which the court may exercise its discretion in calculating the fine within those limits: "the court may determine the amount of the fine as the product of two hundred dollars ($200) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."

At sentencing, the court stated: "Pursuant to Penal Code section 1202.4(b)(1), the defendant is ordered to pay a restitution fine to the state restitution fund in the amount of $10,000. Using the statutory formula gives an amount greater than $10,000 for this case,

36

the statutory formula being $200 times the number of years sentenced to prison times the number of counts convicted. But because that statutory formula leads to a greater amount than $10,000, the court is imposing a $10,000 amount here, which is the maximum for this case." Collier did not object.

Collier now argues, however, that the judge's statement does not establish that the court understood its discretion in calculating the restitution amount. To the contrary, Collier posits, the court indicated a belief that it was required to impose a fine of $200 per year of the sentence, when it merely had the discretion to do so. Because the court was not aware of its discretion, Collier insists, it did not properly exercise its discretion. (See *People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.)

1. Waiver

Respondent correctly contends that Collier forfeited this claim by failing to object at sentencing. (*People v. Scott* (1994) 9 Cal.4th 331, 353.) Collier responds that, because the court did not indicate it was making a discretionary ruling, the failure to object to it did not constitute a waiver. He provides no authority for the proposition that waiver or forfeiture arises only where the judge announces that he is making a discretionary ruling. Collier also argues that the issue is preserved because it raises a pure question of law which is presented by undisputed facts, but he does not identify the question of law at stake. His claim is forfeited.

2. Merits

In any event, Collier's claim is unavailing on the merits. The record shows that the trial judge understood and properly exercised its discretion. The court noted that the maximum it could impose was $10,000, which is a limitation found in section 1202.4, subdivision (b)(1). Subdivision (b)(1) is also the subdivision advising that the "restitution fine shall be set at the *discretion* of the court." (§ 1202.4, subd. (b)(1), italics added.) Thus, the court was familiar with the fact that the award was to be in its discretion. Furthermore, there is nothing in the court's statement indicating that it thought it lacked discretion to impose a lesser fine than it did. To the contrary, the

statement is compatible with the conclusion that the court fully understood its discretion, but chose to impose the maximum fine.

Absent sufficient indication to the contrary, it is presumed that the court knows and applies the correct statutory and case law. (*People v. Coddington* (2000) 23 Cal.4th 529, 644.) Section 1202.4 does not state that the trial court must expressly acknowledge its discretion to impose a fine less than the amount obtained under the statutory formula. Collier has failed to establish error.

### H. CUMULATIVE ERROR

Lastly, Collier contends that the cumulative effect of the alleged errors compels reversal. We have rejected all of Collier's assertions of error outright, except as to the use of CALJIC No. 2.11.5 and the admission of the Worcester photograph, which, even if erroneous, were harmless. The aggregate prejudice from those two matters would not, and does not, warrant reversal.

### III. DISPOSITION

The judgment is affirmed.

BRUINIERS, J.*

We concur.

JONES, P. J.

GEMELLO, J.

(A108751)

---

\*      Judge of the Superior Court of Contra Costa County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

EXHIBIT "B"

Court of Appeal, First Appellate District, Div. 5 - No. A108751
**S147017**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

TREMAYNE COLLIER, Defendant and Appellant.

Petition for review DENIED.

SUPREME COURT
F I L E D

DEC 1 3 2006

Frederick K. Ohlrich Clerk

_____
DEPUTY

GEORGE

_____
Chief Justice

EXHIBIT "C"

ENDORSED
F I L E D
San Francisco County Superior Court

JUL 2 3 2007

GORDON PARK-LI, Clerk
BY: ___CARLOS BARRAZA___
Deputy Clerk

1

2

3

4

5       SUPERIOR COURT OF THE STATE OF CALIFORNIA
        FOR THE CITY AND COUNTY OF SAN FRANCISCO

6

                    Department No. 22

7

8   IN THE MATTER OF THE APPLICATION  )
    OF                                )
9                                     )    WRIT NO. 5604
                                      )
10  TREMAYNE COLLIER                  )    SUPERIOR COURT NO. 182125-02
                                      )
11           Petitioner,             )    ORDER
                                      )
12  FOR A WRIT OF HABEAS CORPUS       )
                                      )

13  ─────────────────────────────────

14       On June 7, 2007, Tremayne Collier ("Petitioner") filed a
    Petition for Writ of Habeas Corpus ("Petition").  On July 29, 2004,
15  Petitioner was convicted of one count of felony special
    circumstance murder and two counts of robbery.  He appealed, and on
16  August 30, 2006, the First District Court of Appeal affirmed.  On
    December 13, 2006, the California Supreme Court denied review.

17
         Petitioner seeks habeas relief on the following grounds: (1)
18  there was insufficient evidence to support his conviction; (2) he
    was denied a fair trial because of juror tampering; (3) the
19  prosecutor committed misconduct; (4) his conviction and sentence
    violated the Eighth Amendment; and (5) his appellate counsel
20  rendered ineffective assistance of counsel.

21       Petitioner's failure to raise his first four claims on
    appeal precludes this Court from considering them here.  (In re
22  Miller (1992) 6 Cal.App.4th 873, 881 ["a petition for writ of
    habeas corpus may be denied when a remedy by appeal was
23  available and was not employed . . . even though the alleged
    errors involving factual issues related to an asserted denial of
24  constitutional rights"]; 6 Witkin, Cal. Crim. Law (3d 2000)
    Criminal Writs § 21, p. 541 ["habeas is not a proper remedy to

25

                              1

1  review errors that could have been raised on appeal or by other
   appropriate remedies" and citing cases].)
2

3      Petitioner's fifth claim – that his appellate attorney
   provided ineffective assistance of counsel – also fails.
4  Petitioner alleges that "[a]ppellate counsel failed to raise
   issue one, issue two, issue three (a) and issue four" in his
5  appeal.  (Petition at 31:4-5.)

6      "To establish ineffective assistance of counsel . . . a
   defendant must show that counsel's representation fell below an
7  objective standard of reasonableness under prevailing professional
   norms, and that counsel's deficient performance was prejudicial,
8  i.e., that a reasonable probability exists that, but for counsel's
   failings, the result would have been more favorable to the
9  defendant."  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-
   688; *People v. Waidla* (2000) 22 Cal.4th 690, 718.)
10

11     Petitioner's claim fails because he has not demonstrated
   that his appellate counsel's performance "fell below an
12 objective standard of reasonableness" and that there is a
   reasonable probability that, but for counsel's alleged errors,
13 "the result of the proceeding would have been different."
   (*People v. Ledesma* (1987) 43 Cal.3d 171, 218, citing *Strickland*,
14 *supra,* 466 U.S. at 693-94].)

15     For the foregoing reasons, Petitioner's Petition for Writ of
   Habeas Corpus is DENIED.
16

17 _____          _____
   Date                             Judge of the Superior Court
18

19

20

21

22

23

24

25

2

EXHIBIT "D"

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST APPELLATE DISTRICT
DIVISION FIVE

In re TREMAYNE COLLIER on Habeas
Corpus.

**FILED**

SEP 0 6 2007

Court of Appeal - First App. Dist.
DIANA HERBERT

BY_____ DEPUTY

A118903

San Francisco County No. 18212502

BY THE COURT:*

The petition for writ of habeas corpus is denied. (*In re Clark* (1993) 5 Cal.4th
750, 782-799 [all claims]; *In re Robbins* (1998) 18 Cal.4th 770, 780 [all claims]; *People
v. Duvall* (1995) 9 Cal.4th 464, 474 [all claims]; *In re Lindley* (1947) 29 Cal.2d 709, 723
[Claim I]; *In re Dixon* (1953) 41 Cal.2d 756, 759 [Claims II, III, IV]; *In re Fields* (1990)
51 Cal.3d 1063, 1071 [Claim V]; *In re Swain* (1949) 34 Cal.2d 300, 303-304 [Claims V,
VI].)

SEP 0 6 2007

SIMONS, J.

Date_____                  _____Acting P.J.

* Before Simons, Acting P.J., Gemello, J. and Needham, J.

EXHIBIT "E"

Court of Appeal, First Appellate District, Div. 5 - No. A118903
**S156258**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re TREMAYNE COLLIER on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

OCT 3 1 2007

Frederick K. Ohlrich Clerk

---
Deputy

---
**GEORGE**
Chief Justice

From:
Tremayne J. Collier
V-60930
H.D.S.P. B1-130
P.O.Box 3030
Susanville, CA 96127

~Confidential
legal mail



PRIORITY
MAIL
UNITED STATES POSTAL SERVICE
www.usps.com
Label 107R, February 2006

RECEIVED
NOV 1 6 2007

31

STATE PRISON

To:
United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102-3483