1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MICHELE J. SWANSON, State Bar No. 191193
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5703
     Fax:  (415) 703-1234
8    Email:  Michele.Swanson@doj.ca.gov

9  Attorneys for Respondent

10

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14
   | | |
   | --- | --- |
   | **TREMAYNE J. COLLIER,** | C 07-5964 SI (PR) |
   | Petitioner, | **ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS** |
   | **v.** | |
   | **ANTHONY HEDGPETH, Warden,** | |
   | Respondent. | |

20

21          Respondent provides this answer to the order to show cause why the petition for writ

22  of habeas corpus should not be granted:

23                              **I.**

24                          **CUSTODY**

25          Petitioner Tremayne J. Collier is lawfully in the custody of Anthony Hedgpeth, Warden

26  of Kern Valley State Prison, as a result of a judgment of conviction in San Francisco County

27  Superior Court, case number 182125-02.  A jury found petitioner guilty of first degree murder and

28  two counts of second degree robbery, with firearm enhancements on all counts.  The trial court

sentenced petitioner to 13 years plus 51 years to life in state prison.

## II.

### GENERAL AND SPECIFIC DENIALS

Respondent denies that the state court rulings were based on an unreasonable determination of fact or were contrary to or involved an unreasonable application of clearly established United States Supreme Court precedent.  Respondent specifically denies that: (1) insufficient evidence supports petitioner's convictions and enhancements; (2) the trial court denied petitioner due process by denying his motion to discharge Juror No. 11; (3) the prosecutor committed misconduct by questioning a witness about petitioner's pre-trial incarceration, and by commenting on petitioner's failure to testify during his closing argument; (4) petitioner's sentence is cruel and unusual; (5) trial counsel was ineffective; (6) appellate counsel was ineffective; (7) the admission of evidence of a subsequent robbery committed by petitioner violated due process; (8) the prosecutor's late disclosure of a police report violated petitioner's constitutional rights; (9) the trial court's denial of petitioner's motion to exclude witness testimony violated due process; (10) the prosecutor denied petitioner a fair trial by asking a law enforcement witness to comment on the credibility of a prosecution witness; (11) the trial court's instruction on unjoined perpetrators denied petitioner due process; and (12) the admission of a photograph of the victim while alive violated due process.

## III.

### PROCEDURAL DEFENSES

Petitioner exhausted his claims in state court.  The petition is timely within the meaning of 28 U.S.C. § 2244.

## IV.

### LODGED DOCUMENTS

Respondent has lodged concurrently with this answer the following exhibits: (1) State Court Clerk's Transcript (9 volumes); (2) State Court Reporter's Transcript (18 volumes, organized by volume number); (3) State Court Reporter's Transcript (18 volumes, miscellaneous by date); (4) Opinion of California Court of Appeal; (5) Petition for Review filed in California Supreme Court;

1  (6) Order of California Supreme Court denying review.

2          Dated:  June 25, 2008

3                          Respectfully submitted,

4                          EDMUND G. BROWN JR.
                           Attorney General of the State of California

5                          DANE R. GILLETTE
                           Chief Assistant Attorney General

6                          GERALD A. ENGLER
7                          Senior Assistant Attorney General

                           PEGGY S. RUFFRA
8                          Supervising Deputy Attorney General

9

10                         /s/ Michele J. Swanson
                           MICHELE J. SWANSON
11                         Deputy Attorney General
                           Attorneys for Respondent

12

13      20117845.wpd
14      SF2008400505

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Answer to Petition for Writ of Habeas Corpus                    Collier v. Hedgpeth, Warden
                                                                C 07-5964 SI (PR)

3

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MICHELE J. SWANSON, State Bar No. 191193
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5703
    Fax:  (415) 703-1234
8   Email:  Michele.Swanson@doj.ca.gov

9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13
   | TREMAYNE J. COLLIER, | C 07-5964 SI (PR) |
14 | | |
   | Petitioner, | |
15 | | |
   | v. | |
16 | | |
   | ANTHONY HEDGPETH, Warden, | |
17 | | |
   | Respondent. | |
18

19

20  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO
    PETITION FOR WRIT OF HABEAS CORPUS**

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  MICHELE J. SWANSON, State Bar No. 191193
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5703
    Fax:  (415) 703-1234
8   Email:  Michele.Swanson@doj.ca.gov
   Attorneys for Respondent
9
                    IN THE UNITED STATES DISTRICT COURT
10
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
11
                         SAN FRANCISCO DIVISION
12

13  **TREMAYNE J. COLLIER,**                    C 07-5964 SI (PR)

14                                Petitioner,   **MEMORANDUM OF POINTS**
                                                **AND AUTHORITIES IN**
15          **v.**                              **SUPPORT OF ANSWER TO**
                                                **PETITION FOR WRIT OF**
16  **ANTHONY HEDGPETH, Warden,**              **HABEAS CORPUS**

17                                Respondent.

18

19                         **STATEMENT OF THE CASE**

20         In 2004, a jury found petitioner guilty of first degree murder and two counts of second

21  degree robbery, with firearm enhancements on all counts.[1]   4 CT 961; 5 CT 1070-1074; RT

22

23

24         1.  Co-defendant Daniel Mooring was granted a separate trial, and found guilty of robbery
25  special-circumstance first degree murder, two counts of second degree robbery, assault with a deadly
    weapon, and possession of a firearm by a felon.  He was sentenced to life without the possibility of
26  parole on the murder count.  Mooring currently has a federal habeas petition pending in this Court.
    *See Mooring v. Walker*, No. C 07-5013 SI (pr).  This Court has designated Mooring's and Collier's
27  federal habeas actions as related cases within the meaning of Civil L.R. 3-12.  *See* Mar. 25, 2008
    Order.
28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus    Collier v. Hedgpeth
                                                                                     C 07-5964 SI (PR)

                                         1

[7/29/04] 2843-2846.[2/]  The trial court sentenced petitioner to 13 years plus 51 years to life in state prison.  5 CT 1223-1224, 1235-1238; RT [12/10/04] 15-21.

In 2006, the California Court of Appeal affirmed the judgment of conviction.  Exh. 4. That same year, the California Supreme Court denied a petition for review.  Exhs. 5-6.

In 2007, petitioner filed a series of habeas petitions in the state superior court, court of appeal, and supreme court, all of which were denied.  *See* Exhs. C-E to the Petition.

Petitioner filed the instant federal habeas petition on November 27, 2007.  On February 7, 2008, this Court ordered respondent to show cause why the petition should not be granted.

## STATEMENT OF FACTS

The California Court of Appeal summarized the facts underlying petitioner's crimes as follows:

I. FACTS AND PROCEDURAL HISTORY

This matter arises from the robbery and assault of Ray LaBonte and the robbery and murder of Shayne Worcester in May 1999, involving Collier, Daniel Mooring, Santese Edwards, and Willie Kennedy.[FN1]

FN1. Our opinion in the matter of People v. Mooring (A106400), involving the same incident, was issued on October 3, 2005.

. . . .

. . . .

A. PROSECUTION EVIDENCE IN THE TRIAL OF COLLIER

1. Robbery of LaBonte

Victim LaBonte left his home in San Francisco around 10:00 p.m. on May 25, 1999, carrying $8 in cash.  As he walked towards Alhambra Street, he saw two black males standing in a doorway.  One of them ran behind him.  The other approached from the front, raised a weapon, and told him to "get down."  LaBonte dropped to his knees.  The man in front (purportedly Mooring) aimed a long, black, single-barrel gun at him with two hands and demanded his money and wallet.  LaBonte threw the $8 from his pocket onto

2.  "CT" refers to the State Court Clerk's Transcript, which is contained in Exhibits 1A to 1I filed in support of the Answer.  "RT" refers to the State Court Reporter's Transcript, which is contained in Exhibits 2A to 2R (volumes 1-18), and Exhibits 3A to 3R (miscellaneous by date), filed in support of the Answer.

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus     Collier v. Hedgpeth
C 07-5964 SI (PR)

2

the ground and said he did not have a wallet. The person behind LaBonte (purportedly Edwards) checked LaBonte's back pocket for a wallet and hit him in the back of the head. Mooring then struck LaBonte in his face, probably with the butt of a gun, and LaBonte lost consciousness.

LaBonte recalled that the gunman who approached from the front was about six feet tall and husky. At Mooring's trial he identified this man as Mooring. The other man was lankier and about the same height or a little taller, but he did not see his face. Both assailants had hoods on their heads, wore dark clothing, and were in their mid-20's.

Edwards admitted at trial that he and Mooring were the ones who robbed LaBonte. That evening, Edwards recalled, Collier, Mooring, and Kennedy (also known as "JR") had picked Edwards up in Collier's Mustang. Edwards was wearing a black nylon pullover jacket. Kennedy, wearing a black leather jacket, had a .22-caliber rifle in a bag. Collier, who was driving, wore a black jacket as well.

Collier drove them to Market Street, where Kennedy said he saw someone who had previously robbed him. Kennedy, taking his gun, got out of the car with Collier. Edwards lost sight of them for a short time, heard a man screaming, and then saw Kennedy and Collier returning to the car. Kennedy still had the gun.

After driving to the Marina District, Edwards spotted a man (LaBonte), walking alone, whom they could rob. Collier stopped the car, Edwards and Mooring got out, and Kennedy gave Mooring the .22-caliber rifle. Edwards instructed Collier to meet them at the same location in about three minutes. Collier drove off with Kennedy.

Mooring and Edwards approached LaBonte. Mooring, holding the gun, stood in front of LaBonte, while Edwards circled behind him. After Edwards went through LaBonte's pockets and got his money, Mooring hit LaBonte with the gun. LaBonte let out a gurgling sound and fell to the sidewalk. Mooring and Edwards returned to the drop-off point, where Collier and Kennedy picked them up. Edwards asked Mooring why he hit the victim so hard. By the time of trial, Edwards could not recall Mooring's response.

Kennedy testified to the same effect. On May 25, he recounted, Collier picked him up in Collier's red Mustang. Kennedy, who had his loaded, sawed-off, .22-caliber rifle in a gym bag, was wearing a black leather jacket. Collier wore a black coat. They picked up Edwards, who was also wearing a black coat. Mooring joined them as well.

At some point, Kennedy and Collier got out of the car and tried to rob a man with Kennedy's gun. They then continued on toward the Marina District, discussing "jacking" (robbing) someone. When they got to the Marina District, Kennedy saw a man walking by himself. Someone in the car said, "let's get out and get him." The car stopped, and Edwards and Mooring got out with the sawed-off .22-caliber rifle.

Collier and Kennedy drove around the block and, two or three minutes later, picked up Edwards and Mooring, who still had the gun. Kennedy heard Edwards ask Mooring why he hit the victim so hard. Without denying that he hit the man, Mooring said that "a bullet fell out" of the gun.

San Francisco Police Officer David Garcia testified that he responded to the scene of the LaBonte robbery and found blood on the sidewalk and a .22-caliber slug.

Julia Eyerman testified to her observations on the night of May 25 as well. About 10:00 p.m., she heard loud voices and saw from her window two black men, in dark

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

3

clothing, getting out of a reddish Mustang or similar vehicle in the middle of the street. One of the men was heavier set, and the other was thinner. The car sped off and the men walked out of her view. About 20 minutes later, Eyerman heard a commotion and saw the two men run from around the corner and get into the Mustang. The car drove off. Eyerman later identified photographs of Collier's car as the Mustang she observed that night.

2. Homicide of Worcester

a. *Testimony of Worcester's friend, Farley*

Christopher Farley and Worcester, who was visiting San Francisco, had dinner with a group of friends, went to a bar in the Marina District, and left shortly before midnight on May 25, 1999. They walked towards Farley's apartment on Russian Hill. At the corner of Hyde and Vallejo Streets, Farley noticed two black men dressed in dark clothing, standing against a building as he and Worcester walked by. After Worcester and Farley crossed Hyde Street, the men began yelling and running at them. Farley nudged Worcester and started to run. When he looked back, Farley saw Worcester face down on the ground, with the two assailants standing over him. The men demanded Worcester's money or wallet, and Worcester told them it was in his pocket and to take it. At this point Farley noticed that the assailants were wearing dark, hooded jackets, but he could not see their faces. One or both of the assailants went through Worcester's pockets, and it appeared that one of them had Worcester's wallet in his hand. Farley next saw one of the assailants raise his arm and lean towards Worcester; then he heard two or three popping sounds. The robbers ran off. Farley went to Worcester and saw he was covered in blood.

b. *Other percipient witness testimony*

Christopher Jung lived at the corner of Hyde and Vallejo. Around 12:15 a.m. on May 26, 1999, he heard two "bangs" that sounded like gunshots. He looked outside and saw a dark-red car with a tan or white convertible top, double-parked on Hyde Street. A gangly man over six feet tall with short cropped hair, wearing a black long-sleeved sweatshirt and black pants was standing alone in the middle of the street near the back of the car. After a minute or two, the man got in the passenger side of the car and the car slowly moved away. Jung called 911.

Kristen Grant heard loud voices outside her home near the intersection of Vallejo and Hyde Streets around 12:15 a.m. on May 26. One man loudly said, "you better run, motherfucker." She heard people running, and then she heard a man say something to the effect of "give me your wallet," and another man replying something like "okay, whatever you want, fine." Three gunshots rang out in close succession, and more than one person ran away. When she looked out her window 15 or 30 seconds later, she observed a man (Worcester) lying face down on the sidewalk. Another man (apparently Farley) stood over him and was asking for someone to call 911. She did.

c. *Testimony of accomplice Kennedy*

Kennedy identified Collier and Mooring as the principal perpetrators of the Worcester murder.

According to Kennedy's account, as Collier drove them around San Francisco after the LaBonte robbery, Kennedy, Mooring, Edwards, and Collier discussed robbing somebody else. In particular, Mooring urged them: "let's go riding and see if we can find some more people."

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus        Collier v. Hedgpeth
C 07-5964 SI (PR)

4

Observing two men walking down the street, someone in the car said, "there goes two guys right there." Collier and Mooring, carrying Kennedy's gun, got out of the car, and Kennedy and Edwards drove around the block. Kennedy soon heard 2-3 gun shots. About a minute later, Collier and Mooring, who was still carrying the gun, ran back to the car and jumped in. The four drove off. Mooring said he did not know why he shot the victim, while Collier said that he (Collier) had the victim "pinned down." As they left the scene, Collier threw papers from a wallet out the window.[FN3]

FN3. Worcester's driver's license and other items from his wallet were found near the intersection of Hyde and Lombard streets on the morning of May 26, 1999, and turned in to the police.

The foursome drove to a gas station, where Collier got out and said he was going to pay for the gas with a credit card. They next dropped off Edwards at his house and drove to a Denny's restaurant in Emeryville. There, they ate with one of Kennedy's high school acquaintances (Elena Bishop) and her friends. Collier paid for the food with a credit card.[FN4] Collier later dropped Kennedy and Mooring off at Kennedy's house. Kennedy did not know what happened to his gun.

FN4. Bishop corroborated Kennedy's account at trial, and specifically identified Collier, who she told police had been wearing a black leather coat. In addition, there was evidence that charges were made on Worcester's Visa card at 12:28 a.m. on May 26, 1999, at a gas station in San Francisco, and at 2:05 a.m. at a Denny's Restaurant in Emeryville.

d. *Testimony of accomplice Edwards*

Edwards, like Kennedy, testified that Collier and Mooring were the ones who attacked Worcester and Farley. Edwards explained that, after the LaBonte robbery, they saw two men walking down the street. Edwards said it was Collier's and Kennedy's turn to commit a robbery. When Kennedy declined to participate, Collier got out of the car with Mooring, who had the gun. Edwards and Kennedy stayed in the car.

Not long after, Edwards heard two or three fire-cracker sounds. About half a minute later, Collier and Mooring ran back to the car and got in. Edwards drove off. He asked Mooring what he just did, but Mooring did not respond. At trial, Edwards did not recall Collier saying anything at the time.[FN5] As they drove from the scene, Kennedy threw papers from the wallet out the car window.

FN5. Defense investigator Pamela Olsen testified that she took a statement from Edwards in April 2002, during which Edwards told her that Collier said to Mooring, "You didn't have to do it."

After stopping for gas, Edwards drove Collier, Mooring, and Kennedy to his house and told them to get rid of the gun. Edwards got out of the car, and the other three drove away.

e. *Coroner's testimony*

The coroner determined that Worcester died from multiple gunshots wounds. Two bullets had entered the back of his head and penetrated his brain; both of these wounds were fatal. A third bullet entered his left shoulder. Worcester's wounds were consistent with being shot with a Marlin .22-caliber rifle from three to four feet away while lying face down on the ground.

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus     Collier v. Hedgpeth
C 07-5964 SI (PR)

5

3. <u>Police Investigation</u>

San Francisco homicide Inspectors Edward Wynkoop and Curtis Cashen were assigned to investigate the Worcester case on May 26, 1999. They went to the scene, interviewed several witnesses, and collected evidence. They also learned that the car involved in the shooting matched the description of the car involved in the LaBonte robbery that same night, and that .22-caliber bullets were found at both crime scenes.

In early September 1999, Wynkoop received a tip from a California Highway Patrol officer that a person identified as "Bobbie" had information concerning the involvement of "JR," who was later identified as Kennedy. At a meeting at a San Francisco restaurant on September 8, 1999, "Bobbie" gave Wynkoop a photograph of Mooring and indicated that Edwards and Kennedy were also involved, as was a person named "Tremayne," who was driving a red convertible Mustang. Wynkoop determined from DMV records that Tremayne Collier owned a 1991 Ford.

Later in September 1999, Wynkoop met with the victim of an armed robbery at an ATM in San Rafael in June 1999 (ATM Robbery), about three weeks after the Worcester shooting. The victim, Frank Caiazzo, identified Collier as a suspect in the ATM Robbery by selecting his photograph from a photographic line-up.

On November 22, 1999, police officers executed a search warrant at Collier's home in Richmond. In his bedroom officers found a black down jacket. The police crime lab determined that distinctive gunshot residue particles on both sleeves of the jacket were consistent with a man wearing the jacket while standing over a prone victim, next to a person who shot the victim three times.

Wynkoop spoke with Collier on November 22, 1999, at the Hall of Justice. Their conversation was tape-recorded and played for the jury. In the interview, Collier denied involvement in the Worcester shooting. He claimed that he recognized photographs of Kennedy but not Mooring. He identified pictures of his car, but denied he was the person depicted in photographs taken by the ATM security system at the time of the Caiazzo robbery. He told officers, falsely, that he purchased his red Mustang on May 27, 1999.[FN6] Collier refused to speak to Wynkoop further.

FN6. Rodolfo Gomez, manager of Almaden Auto Sales, testified and produced documents establishing that he sold a 1991 Ford Mustang to Collier on May 11, 1999.

On that same day, Wynkoop interviewed Mooring, who was in custody. Mooring denied involvement. Kennedy refused to speak to Wynkoop and requested a lawyer. Later that afternoon, Kennedy's attorney faxed the officers a letter asserting Kennedy's right to remain silent and his continued assertion of his right to counsel.

On November 24, 1999, however, Cashen was contacted by Sergeant (now Lieutenant) Michael Ridgway of the Marin County Sheriff's Department. Ridgway advised Cashen that he had learned through an informant that Kennedy was interested in talking about the Worcester incident. Wynkoop and Cashen went to San Rafael and met briefly with Ridgway and then with Kennedy. Kennedy provided them details of the LaBonte robbery and Worcester murder, which the investigators attempted to corroborate.

On December 2, 1999, officers interviewed Kennedy's mother, Renee Williams. She told them that "Milo" (Mooring) was at her house the night of the murder and, while they were watching a TV news report about the killing, she asked Mooring if he was involved. Mooring told her that he shot the man.

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

6

1    Police confronted Mooring the next day.  Mooring explained that he was in the
2 wrong place at the wrong time and that, if he told them what happened, he would be
incriminating himself.

3    On December 3, 1999, police interviewed Edwards, who told them he knew nothing
about the incident and that he had either been at work that night or with his girlfriend.
4 Officers were unable to confirm his alibis.  Three days later, police executed a search
warrant on Edwards' residence.  They seized two photographs, one of Edwards with
5 Mooring, and one of Edwards with Kennedy.  They also seized a black hooded jacket,
which matched the description of the jacket worn by the perpetrators.

6
7    Officers interviewed Lashonta Bateast, who lived with Mooring's cousin, in May
2000.  Bateast told them that a day or two after the shooting, Mooring was at her house
with another man.  Mooring asked Bateast if she had seen the news about a tourist killing.
8 He said that he shot the victim because he needed money, and that his accomplice went
through the victim's pockets.  The man with Mooring smirked, and she got the impression
9 that he was Mooring's accomplice.  Bateast identified Edwards as the man with Mooring.

10    Wynkoop had another conversation with Collier on October 18, 2000.  A tape of this
interview was also played for the jury.  This time, Collier claimed that on May 25, 1999,
11 he loaned his Mustang to Kennedy, who was with Mooring and was going to pick up
Edwards.  Collier denied that he went along with them to San Francisco, contending that
12 he was instead with his girlfriend and met up with Kennedy only later at Denny's.

13    4. <u>Kennedy's and Edwards' Deals with the Prosecution</u>

14    Pursuant to a plea bargain, Kennedy pleaded guilty on April 16, 2001, to a felony
charge of being an accessory after the fact.  He faced a maximum term of three years, but
15 was given a suspended sentence and placed on three years probation with one day in jail,
in exchange for giving truthful testimony at the trials of Mooring and Collier. He testified
16 before a grand jury on April 17, 2001.

17    Later that month, the grand jury indicted Mooring, Collier, and Edwards.  Edwards
was arrested on the indictment in April 2001.  After Edwards provided a statement to a
18 defense investigator, in which he answered questions posed by the prosecutor, he was
offered a negotiated plea bargain.  On June 25, 2002, Edwards pled guilty to felony grand
19 theft, with the understanding that he would serve no more than four years.

20    5. <u>Evidence of Collier's ATM Robbery</u>

21    Caiazzo testified to being robbed at an ATM around 4:20 a.m. on June 17, 1999
(approximately three weeks after the Worcester shooting).  According to Caiazzo, a man
22 in a Sausalito bar had introduced him to three men, who said they would give him a ride
to an ATM so he could withdraw money to purchase drugs from them.  He got in their car,
23 and they proceeded to an ATM.  After withdrawing some money, Caiazzo saw one of the
men--a balding African-American in his early 30's who had been driving the
24 car--approaching with a short-barrel shotgun.[FN7]  The man hit Caiazzo with the butt of
the gun, Caiazzo fell, and the man put his foot on Caiazzo's back so that his face was on
25 the ground.  Caiazzo gave the man the money, and the robbers drove away.

26    FN7. The officer responding to the ATM Robbery testified that Caiazzo reported it
was a pump action pellet gun.

27
28    Although Caiazzo was unable at Collier's trial to identify Collier as the ATM robber,

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
                                                                                              C 07-5964 SI (PR)

he did identify a photograph of Collier that he had selected from a photographic line-up on September 29, 1999 as the one who "looks most like the driver and man with gun." In court, he pointed out Collier as a "bigger, older version" of the man in the photograph he had selected.     Denise LeBard testified that she was present at an "official proceeding"[FN8] on February 23, 2000, at which Collier admitted that he was the man depicted in photographs taken by the ATM security camera on the night of the robbery. He maintained, however, that he was holding an ax handle.

FN8. The "official proceeding" referenced in the trial was Collier's parole revocation hearing.

A retired firearms examiner testified that he had viewed the ATM photographs, and the object in the hands of the assailant was consistent with a rifle-type weapon and not inconsistent with a .22 caliber Marlin rifle.  [The object was not consistent with an axe handle.]

B. DEFENSE CASE

The defense case attacked the credibility of Edwards and Kennedy.  Among other things, the defense produced evidence that Kennedy committed a home-invasion robbery in January 2003.  In addition, the defense introduced evidence that Edwards was arrested in January 2004 for theft of property from a Sears store, and when stopped in May 2004 he was found to be in possession of a loaded handgun.

The defense also called Lieutenant Ridgway as a witness.  Ridgway recounted that he was told by an informant, Prudence Wesson, that she had spoken to Kennedy about the shooting and that he had admitted his involvement.  Kennedy told Wesson that he never left the car and had nothing to do with the robbery.  Ridgway contacted Inspector Cashen, who asked Ridgway to try to get a statement from Kennedy.  Ridgway called Wesson back and arranged to speak to Kennedy at Wesson's residence.

Ridgway surreptitiously recorded his conversation with Kennedy.  Kennedy told Ridgway that he did not see the actual shooting of Worcester, but observed Collier remove the victim's wallet from his pants, knock the victim to the ground, kick him, and put his foot on the victim's throat.  Kennedy also told Ridgway that Collier asked Mooring why he shot Worcester, that they used Worcester's credit card at Denny's, and that he threw the gun off the Bay Bridge.

Ridgway wrote a report on November 26, 1999, about Kennedy's statement.  Among other things, the report indicated that Kennedy displayed signs of deception when he said that he had thrown the murder weapon off the Bay Bridge.

Exh. 4 at 2-12.

## STANDARD OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes a "highly deferential" standard for evaluating state court rulings and "demands that state court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  Under the AEDPA, the federal court has no authority to grant

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus                    Collier v. Hedgpeth
                                                                                                       C 07-5964 SI (PR)

8

1    habeas relief unless the state court's ruling was "contrary to, or involved an unreasonable application

2    of," clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  A decision constitutes

3    an unreasonable application of Supreme Court law only if the state court's application of law to the

4    facts is not merely erroneous, but "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 75

5    (2003). Thus, "[o]nly if the evidence is 'too powerful to conclude anything but' the contrary" should

6    the court grant relief.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting

7    *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005)).  The petitioner bears the burden of showing that the

8    state court's decision was unreasonable.  *Visciotti*, 537 U.S. at 25.

9

10    **ARGUMENT**

11    **I.**

12    **SUFFICIENT EVIDENCE SUPPORTS PETITIONER'S MURDER AND
     ROBBERY CONVICTIONS AND GUN ENHANCEMENTS**

13

14    Petitioner argues that his murder and robbery convictions and gun enhancements violate

15    due process because there is insufficient evidence to support the jury's verdicts.  Petition at 6a-6q.

16    Petitioner, however, merely argues his own interpretation of the evidence and the credibility of the

17    witnesses in making his claim.  The jury was free to make reasonable inferences from the evidence

18    and weigh the credibility of the witnesses, and the trial record was sufficient to support its verdict

19    in this case.

20    In deciding a claim of sufficiency of the evidence, the court must determine whether,

21    "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

22    could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v.*

23    *Virginia*, 443 U.S. 307, 319 (1979).  It is the province of the jury to weigh the evidence and

24    determine the credibility of the witnesses, *id.*, and a defendant's mere disagreement with the jury's

25    view of the evidence is not enough to support a claim of insufficient evidence.  Under the AEDPA,

26    the question is whether the state court's application of the *Jackson* standard was objectively

27    unreasonable.  *Juan H. v. Allen*, 408 F.3d 1262, 1274-1275 (9th Cir. 2005).

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus        Collier v. Hedgpeth
C 07-5964 SI (PR)

9

The evidence at trial established that petitioner and his friends drove around San Francisco looking for victims to rob. 2 RT 598, 637; 3 RT 654, 658, 669-670; 4 RT 848-851; 5 RT 951; 6 RT 1209; 9 RT 1539-1546; 11 RT 1724-1725, 1739-1749, 1832-1834; 12 RT 1981, 1998, 2008-2010, 2016. The four young men discussed their plans openly in the car. When they spotted LaBonte walking alone, petitioner stopped the car and let Mooring and Edwards out so they could rob him. 2 RT 522, 600-603; 3 RT 652, 655, 710; 11 RT 1748-1766, 1785-1794; 12 RT 2016-2017, 2020-2021; 13 RT 2037-2041, 2051-2054, 2093-2094. Mooring pointed a gun at LaBonte and demanded his money while Edwards went through his pockets. 2 RT 603-608, 634-635; 11 RT 1765-1772. Mooring then used his gun to hit LaBonte in the face. In the meantime, petitioner circled around the block and picked them up when they were done. 2 RT 608-609; 3 RT 657-659, 662; 8 RT 1341, 1404; 9 RT 1561; 11 RT 1768-1773; 13 RT 2041-2042; *but see* 12 RT 1901. When the foursome later spotted Worcester and Farley walking together, petitioner was the one to get out of the car with Mooring to rob them. 2 RT 522; 3 RT 710; 11 RT 1785-1794; 13 RT 2051-2054. Petitioner and Mooring ran after the two men, and petitioner pinned Worcester facedown on the ground. 3 RT 711-726; 5 RT 927-930. They demanded his money, and, after taking his wallet, Mooring shot him in the head and back, killing him. Petitioner and Mooring then ran back to the car where their friends were waiting and drove away. 2 RT 521, 539-540, 564-567, 585; 3 RT 725-738; 4 RT 812, 822-832, 838; 4 RT 864; 5 RT 931-933; 8 RT 1395-1396; 11 RT 1795-1800, 1822; 12 RT 1941; 13 RT 2056-2059, 2095; 15 RT 2290-2291, 2300, 2309. Petitioner went through Worcester's wallet in the car, and used one of his credit cards to purchase gas and breakfast for his friends. 3 RT 762-763; 5 RT 915-920, 960-981, 996-1010; 6 RT 1085-1089; 11 RT 1801-1806; 13 RT 2060-2069; 15 RT 2291. The evidence therefore shows that petitioner was an accomplice to the robbery of LaBonte and a principal in the robbery-murder of Worcester, both of which involved the use of a gun.

Far from demonstrating a lack of evidence supporting his convictions and enhancements, petitioner merely argues his own view of the evidence. However, the jury was well aware of petitioner's defense—which consisted of an attack on the credibility of Kennedy and Edwards and a denial that he knew his friends were planning to rob people—and necessarily rejected such defense

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

10

in finding him guilty.  In sum, because the jury could draw a reasonable inference from the prosecution's evidence to support the convictions and enhancements, the state court did not unreasonably reject petitioner's insufficient evidence claim.


## II.

### THE TRIAL COURT DID NOT DENY PETITIONER DUE PROCESS BY DENYING HIS MOTION TO DISCHARGE JUROR NO. 11

Petitioner contends that the trial court denied him the right to a fair trial by denying his motion to discharge Juror No. 11 due to her exposure to improper third-party communications.  Petition at 6r-6u.  However, because the alleged third-party misconduct did not result in actual bias, petitioner was not prejudiced by the trial court's denial of his motion.

### A.    Trial Court Proceedings

During trial, Juror No. 11 reported an incident of alleged third-party misconduct to the trial court's clerk.  1 RT 487, 491.  The trial court excused the other jurors for the day and held an in chambers hearing with Juror No. 11, defense counsel, and the prosecutor.  1 RT 487.  Juror No. 11 informed the court of an incident that happened in the hallway of the courthouse as she was walking to the jury assembly room for lunch.  1 RT 488.  As she passed by two men and a woman, she heard the woman say, "'And there's juror number 11, as we speak.'"  1 RT 488-490.  She had never seen the woman or two men before the encounter in the hallway, nor had she seen them since.  1 RT 490-492.  Juror No. 11 explained that she thought the incident was something she ought to report.  1 RT 490-491.  When asked how she felt about what she had heard, Juror No. 11 explained that she felt "a little threatened" by the comment and the tone of the woman's voice.  1 RT 491.

Both sides were given the opportunity to question Juror No. 11.  1 RT 492.  When defense counsel asked if Juror No. 11 had told the other jurors about the incident, she replied, "No."  1 RT 492.  Defense counsel then asked, "Do you feel now there's any reason why you couldn't be fair to both sides?"  1 RT 493.  Juror No. 11 indicated that she did not know whether the people in the hallway were connected to the defense or the prosecution, or if they were trying to make her

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus    Collier v. Hedgpeth
C 07-5964 SI (PR)

11

nervous.  1 RT 493.  When the trial court asked if she could set the incident aside, she replied, "Oh, absolutely."  1 RT 493.  When asked if the incident would affect her ability to be fair, she stated, "No, no, not at all."  1 RT 493.  She stated that she would simply be more cautious, but assured the court that she would be "all right."  1 RT 490, 492-494.  The court asked her to report back immediately if she saw the woman or men again.  1 RT 494.

The next day, defense counsel moved to discharge Juror No. 11 for cause.  2 RT 502-503.  Defense counsel stated that he was concerned by Juror No. 11's remark that she felt threatened by the woman's comment in the hallway.  2 RT 503.  The prosecution argued that Juror No. 11 appeared to be put at ease by the trial court's inquiry, and that the record did not "reflect any disqualification or disability to carry out her duties impartially."  2 RT 504.  The trial court denied the motion, noting that the defense had not made a "sufficient showing of an impairment of [Juror No. 11's] ability to be fair and impartial here, given what has happened."  2 RT 504-505.  However, the court stated that it would question Juror No. 11 again later in the week to make sure that there were no lasting effects from the incident, and noted that the defense could renew its motion at the time if it had any further concerns.  2 RT 505.

At the end of the week, the trial court asked Juror No. 11 if she had any more experiences with the woman and men that had caused her concern.  4 RT 878.  She replied, "Not with regard to that incident."  4 RT 878.  When the court asked what she meant, she explained that two of the managers at her work had made inappropriate comments to her about the trial.  They had both tried to get details out of her about the case itself, but she told them she could not discuss it.  4 RT 881-882.  One of them told her to "'burn him,'" and the other asked her if they should call her "'Hang 'Em High.'"  4 RT 879-880.  She said that while she thought that the comments had been made in jest and not with the intention to pressure her, she did not appreciate them and did not want them to distract her in her duties as a juror.  4 RT 879-880, 884.  She stated, however, that the incidents would not affect her ability to be fair.  4 RT 884.  She indicated that she would talk to them both about it, and tell them that the comments had to stop.  4 RT 886.  The court asked Juror No. 11 to come in early the following Monday so that they could discuss the matter further.  4 RT 888.

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus                Collier v. Hedgpeth
C 07-5964 SI (PR)

12

1    Defense counsel did not renew his motion to discharge Juror No. 11.

2        The following Monday, Juror No. 11 told the court that she felt her concerns had been

3    resolved.  5 RT 905.  She related that she had spoken to both managers, and believed that they would

4    no longer be making any inappropriate comments to her.  5 RT 905-906.  She did not feel that her

5    job was in jeopardy, and felt that she could give her full attention to the trial.  5 RT 906.  She had

6    no concern that the incident would impact her ability to be fair.  5 RT 906.  Both parties declined

7    the court's invitation to question Juror No. 11, 5 RT 906, and defense counsel did not renew his

8    motion to discharge her.

9        **B.    The State Court's Rejection Of Petitioner's Claim Was Not Objectively**

10          **Unreasonable**

11       In *Remmer v. United States*, 347 U.S. 227 (1954), the Supreme Court addressed the issue

12   of unauthorized contact with jurors:

13         In a criminal case, any private communication, contact, or tampering,
      directly or indirectly, with a juror during a trial about the matter pending before

14         the jury is, for obvious reasons, deemed presumptively prejudicial, if not made
      in pursuance of known rules of the court and the instructions and directions of

15         the court made during the trial, with full knowledge of the parties. The
      presumption is not conclusive, but the burden rests heavily upon the

16         Government to establish, after notice to and hearing of the defendant, that such
      contact with the juror was harmless to the defendant.

17

18   *Id.* at 229-230.  In other words, "due process does not require a new trial every time a juror has been

19   placed in a potentially compromising situation."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

20   Rather, the Supreme Court "has long held that the remedy for allegations of juror partiality is a

21   hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215; *see also United*

22   *States v. Angulo*, 4 F.3d 843, 847 (9th Cir.1993) ("[T]he remedy for allegations of jury bias is a

23   hearing, in which the trial court determines the circumstances of what transpired, the impact on the

24   jurors, and whether or not it was prejudicial.")

25       In this case, any claim of prejudice arising from the third-party communications with Juror

26   No. 11 is rebutted by the record.  Here, the trial court explored the alleged misconduct with Juror

27   No. 11 and its impact on her, and gave counsel the opportunity to question her about the incidents.

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus    Collier v. Hedgpeth
    C 07-5964 SI (PR)

13

1   As for the incident in the hallway of the courthouse, while Juror No. 11 did say she felt threatened

2   by the comment and would be more cautious in the future, she also stated that she did not know if

3   the people in the hallway were connected to the defense or the prosecution or if they were trying to

4   make her nervous. She stated without equivocation that she could still be fair. As for the comments

5   made by the managers at work, Juror No. 11 indicated that the problem had been resolved, and that

6   it would not affect her ability to be fair or to pay attention to the trial. Defense counsel himself

7   appeared satisfied that Juror No. 11's ability to be fair had not been compromised, as he did not

8   renew his motion to discharge her after the court conducted its follow-up inquiries with her. The

9   trial court's determination that Juror No. 11 was not biased is a factual finding that is presumed

10  correct and has not been rebutted by clear and convincing evidence. 28 U.S.C. §2254(e)(1); *Patton*

11  *v. Yount*, 467 U.S. 1025, 1038 (1984); *Estrada v. Scribner*, 512 F.3d 1227, 1240 (9th Cir. 2008);

12  *Bonin v. Calderon*, 59 F.3d 815, 840-841 (9th Cir. 1995). Given Juror No. 11's forthrightness and

13  assurances that the incidents would not affect her ability to be fair, petitioner was not prejudiced by

14  the trial court's refusal to discharge her.

15      Petitioner contends that he is entitled to an evidentiary hearing "to determine if Juror 11

16  was discharged or not," and cites *Angulo* in support of his contention. Petition at 6t-6u. *Angulo*,

17  however, is a federal direct appeal case that established only that an evidentiary hearing is necessary

18  to determine if a third-party communication resulted in actual bias, which is what took place in this

19  case. We note that the trial court extensively questioned Juror No. 11 about the details of the two

20  separate incidents, as well as the effect the two incidents had on her ability to continue to serve as

21  a juror. The court also gave both attorneys the option to question Juror No. 11 about the incidents.

22  Under these circumstances, petitioner had every opportunity to explore any effect the alleged third-

23  party misconduct had on Juror No. 11. In any event, as it is clear from the record that Juror No. 11

24  was not discharged, there is no need to conduct an evidentiary hearing on this point. *See* 28 U.S.C.

25  § 2254(e)(2) (limiting basis for obtaining federal evidentiary hearing); *see also Tracey v. Palmateer*,

26  341 F.3d 1037, 1044 (9th Cir. 2003) (Supreme Court authority does not require evidentiary hearing

27  any time juror misconduct comes to light).

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

14

**III.**

**THE PROSECUTOR DID NOT COMMIT MISCONDUCT DURING HIS DIRECT EXAMINATION OF EDWARDS OR DURING HIS CLOSING ARGUMENT**

Petitioner contends that the prosecutor committed misconduct by eliciting testimony from Edwards that petitioner was incarcerated before his trial, as well as commenting on petitioner's failure to testify during his closing argument.  However, as neither of the alleged instances of misconduct denied petitioner a fair trial, his claims fail.

**A.    Trial Court Proceedings**

Both the prosecutor and defense counsel questioned Edwards about the time he spent in custody before reaching a plea agreement with the prosecution.  11 RT 1818-1829, 1871-1877. During the prosecutor's direct examination of Edwards, he questioned him about whether he, petitioner, and Mooring had any conversations about the case while they were in custody.  11 RT 1819-1825.  In addition, both the prosecutor and defense counsel questioned Edwards about an incriminating letter petitioner wrote and handed to Edwards while they were in adjoining cells.  11 RT 1826-1829, 1837-1848; 12 RT 1919-1922.  Defense counsel did not object to the prosecutor's questions referencing petitioner's in-custody status.  *See* 11 RT 1818-1829.

During his closing argument, the prosecutor pointed out that the prosecution's gunshot residue expert was "never challenged," RT [7/27/04] 2740, that there was "no evidence" challenging the fact that Kennedy, Edwards, Mooring, and petitioner were friends, RT [7/27/04] 2747, and that petitioner himself said in October 2000 that there was "no case against" Kennedy, RT [7/28/04] 2810-2811.

**B.    The State Court Did Not Unreasonably Reject Petitioner's Claims Of Prosecutorial Misconduct**

The standard of review for a prosecutorial misconduct claim in the federal habeas context is the narrow one of due process and not the broad exercise of supervisory power.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Cooper v. McGrath*, 314 F.Supp.2d 967, 992 (N.D. Cal. 2004).  A petitioner's due process rights are not violated unless a prosecutor's comments render a

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus    Collier v. Hedgpeth
C 07-5964 SI (PR)

15

1   trial fundamentally unfair. *See id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of

2   due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

3   culpability of the prosecutor"). The standard is the same for claims of improper questioning of a

4   witness by the prosecutor. *See Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998). In considering

5   whether the questioning deprived the petitioner of a fair trial, the witness's testimony should be

6   viewed as a whole to determine the impact of the alleged improper questioning. *See id.* at 934-935.

7          Here, the prosecutor's questioning of Edwards did not deny petitioner a fair trial. The jury

8   was well aware that Edwards was in custody before negotiating his plea bargain, and both the

9   prosecutor and defense counsel questioned him about his time in jail and its impact on his

10  motivation to seek a plea agreement. Moreover, the prosecutor introduced a crucial piece of

11  evidence through Edwards's testimony—an incriminating letter petitioner handed Edwards while

12  they were in adjoining cells. It was therefore impossible to avoid mention of petitioner's pre-trial

13  incarceration in order to explore this line of questioning. *See United States v. Washington*, 462 F.3d

14  1124, 1137 (9th Cir. 2006) (finding a state purpose to mention of the defendant's custodial status).

15  Such references, however, were minimal, and took up only a small portion of the prosecutor's entire

16  direct examination of Edwards. Moreover, defense counsel's failure to object to such references

17  suggests that he did not discern any prejudice arising from the prosecutor's questions. *Id.* Finally,

18  in light of the damning nature of Edwards's testimony as a whole, his few references to petitioner's

19  in-custody status did not so infect the trial with unfairness as to make the resulting convictions a

20  denial of due process.[3]

21          In addition, there is no support for petitioner's contention that the prosecutor committed

22  misconduct during his closing argument. Although it is considered misconduct to comment on a

23  defendant's failure to testify, *Griffin v. California*, 380 U.S. 609, 615 (1965), that is not what

24  occurred in this case. Rather, the prosecutor was merely commenting on the lack of evidence

25

26  _____

27      3.  Petitioner cites *Duran v. Thurman*, 106 F.3d 407 (9th Cir. 1997), in support of his
    argument. However, the opinion is unpublished and may not be cited to this Court pursuant to Ninth

28  Circuit Rule 36-3(c).

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

16

1  challenging the gunshot residue expert's conclusions and the friendship between the four men. *See*

2  *United States v. McChristian*, 47 F.3d 1499, 1507 (9th Cir. 1995) (distinguishing between comments

3  on the state of the evidence from comments on a defendant's failure to testify); *United States v.*

4  *Mayans*, 17 F.3d 1174, 1185-1186 (9th Cir. 1994); *Shumate v. Newland*, 75 F.Supp.2d 1076, 1091

5  (N.D. Cal. 1999).  Moreover, the prosecutor's reference to a statement petitioner made in October

6  2000 was a fair comment on the evidence rather than a comment on petitioner's failure to testify.

7  Accordingly, the prosecutor's closing argument did not deny petitioner a fair trial.

8

9  **IV.**

10  **PETITIONER'S SENTENCE IS NOT CRUEL AND UNUSUAL**

11  Petitioner contends that his sentence violates the Eighth Amendment's prohibition against

12  cruel and unusual punishment.  Petition at 6aa-6bb.  Petitioner's sentence of 13 years plus 51 years

13  to life, however, is not disproportionate to his crimes of murder and robbery.

14  In *Lockyer v. Andrade*, 538 U.S. 63, the Supreme Court held that the only relevant clearly

15  established Supreme Court law on the Eighth Amendment is that a "gross disproportionality

16  principle is applicable to sentences for terms of years."  *Id*. at 72.  Legislatures have "broad

17  discretion to fashion a sentence that fits within the scope of the proportionality principle." *Id.* at 76.

18  While the precise contours of this principle are "unclear," it is applicable "only in the 'exceedingly

19  rare' and 'extreme' case."  *Id*. at 72-73, quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991)

20  (Kennedy, J., concurring).  The Supreme Court concluded that the state court's affirmance of the

21  petitioner's sentence of 50 years to life, which was based on two current convictions for felony petty

22  theft of videotapes with a prior, plus three prior convictions for residential burglary, was not an

23  unreasonable application of the gross disproportionality principle. *Andrade*, 538 U.S. at 73-74.

24  Petitioner contends that he was intoxicated and did not know what was going on at the

25  time of the robberies and murder in this case.  Petition at 6aa.  However, the jury necessarily found

26  that he possessed the requisite intent to commit his crimes when it found him guilty of murder and

27  robbery in this case.  Accordingly, his sentence is not disproportionate to his crimes of murder and

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
                                                                                              C 07-5964 SI (PR)

1    robbery. *See Plascencia v. Alameida*, 467 F.3d 1190, 1204 (9th Cir. 2006) (25-years-to-life sentence

2    for murder enhanced by consecutive 25-years-to-life sentence for a weapon enhancement not cruel

3    and unusual punishment); *Harris v. Wright*, 93 F.3d 581, 583-585 (9th Cir. 1996) (15-year-old

4    defendant's sentence of life without the possibility of parole for murder not cruel and unusual

5    punishment).

6

7                                         **V.**

8                        **TRIAL COUNSEL WAS NOT INEFFECTIVE**

9            Petitioner contends that trial counsel was ineffective for failing to investigate the

10   whereabouts of two potential defense witnesses, Leslie Devlin and Tiyon Ford. Petition at 6cc-6ee.

11   Petitioner asserts that if Devlin had been located, she would have testified that Kennedy told her that

12   he, petitioner, Edwards, and Mooring were all under the influence of drugs at the time of the

13   robberies and murder in this case. Petition at 6cc. Petitioner also asserts that Ford would have

14   testified that petitioner intervened when Kennedy tried to assault Ford before the robbery of

15   LaBonte. Petition at 6dd. Petitioner contends that counsel was also ineffective for failing to call

16   an expert to the stand to testify that petitioner would have been unable to form the intent to commit

17   his crimes due to his intoxication. Petition at 6ee-6gg. Petitioner contends that the outcome of his

18   trial would have been different if each of these witnesses had testified. Petition at 6cc-6gg.

19           In order to prevail on a claim of ineffective assistance of counsel, a defendant must

20   establish that: (1) counsel's performance fell below an objective standard of reasonableness; and (2)

21   there is a reasonable probability that, but for counsel's errors, he would have received a more

22   favorable result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On federal habeas, a

23   petitioner must show that the state court applied *Strickland* to the facts of his case in an objectively

24   unreasonable manner. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam). "[C]ounsel has a

25   duty to make reasonable investigations or to make a reasonable decision that makes particular

26   investigations unnecessary." *Strickland*, 466 U.S. at 691.

27           Petitioner has failed to demonstrate that his counsel was ineffective for failing to locate

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
                                                                                                    C 07-5964 SI (PR)

18

and call Devlin and Ford as defense witnesses. First, we note that counsel did attempt to locate and call both witnesses, but that Devlin left the court's jurisdiction before she could be subpoenaed, and that Ford ignored a subpoena to appear in court. *See* CT 828, 1171. Second, in the absence of declarations by these witnesses demonstrating what they would have said at trial, petitioner cannot meet his burden to affirmatively show prejudice from the failure to call the witnesses. *Allen v. Woodford*, 395 F.3d 979, 1002 n. 2 (9th Cir. 2005) ("the district court correctly disregarded the failure to call [three named witnesses], because Allen failed to make a showing that they would have testified if counsel had pursued them as witnesses"); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (petitioner presented no evidence that alleged alibi witness "actually exists, other than Dows' self-serving affidavit," and could not show that witness would have presented helpful testimony because he failed to present affidavit from witness). Counsel's failure to call these individuals did not therefore fall below an objective standard of reasonableness.

Nor was counsel deficient for failing to call an expert on intoxication. There was no substantial evidence in the case that petitioner was intoxicated at the time of the robberies and murder. Accordingly, there was no basis for calling such an expert.

Finally, petitioner cannot show any prejudice resulting from counsel's performance. Even if Devlin had testified in the manner suggested by petitioner, petitioner would not have received a more favorable verdict given the overwhelming evidence that he knew exactly what was going on around him on the night of the robberies and murder. Further, calling Ford would have only hurt petitioner's case, as the encounter further demonstrated petitioner's awareness of, and participation in, the criminal activities of his friends on the night in question. Finally, failing to call an expert could not have prejudiced petitioner in light of the overwhelming evidence that petitioner was an active participant in the crimes. In sum, no ineffective assistance of counsel is shown.

## VI.

## APPELLATE COUNSEL WAS NOT INEFFECTIVE

Petitioner contends that appellate counsel was ineffective for failing to raise the above five

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus    Collier v. Hedgpeth
C 07-5964 SI (PR)

19

1    issues.  Petition at 6hh.  Counsel, however, was not deficient for failing to raise unmeritorious claims

2    on appeal.

3           The *Strickland* standard applies to claims of ineffective assistance of appellate counsel as

4    well as trial counsel.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  "There can hardly be any question

5    about the importance of having the appellate advocate examine the record with a view to selecting

6    the most promising issues for review.  This has assumed a greater importance in an era when oral

7    argument is strictly limited in most courts—often to as little as 15 minutes—and when page limits

8    on briefs are widely imposed."  *Jones v. Barnes*, 463 U.S. 745, 752-753 (1983).  "Experienced

9    advocates since time beyond memory have emphasized the importance of winnowing out weaker

10   arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."

11   *Id.* at 751-752; *accord, Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) ("the weeding out of

12   weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy").  Thus,

13   "it is still possible to bring a *Strickland* claim based on [appellate] counsel's failure to raise a

14   particular claim, but it is difficult to demonstrate that counsel was incompetent."  *Smith v. Robbins*,

15   528 U.S. 259, 288 (2000).

16          Petitioner claims that appellate counsel should have raised additional arguments relating

17   to the sufficiency of the evidence, failure to discharge a juror, prosecutorial misconduct, cruel and

18   unusual punishment, and ineffective assistance of trial counsel.  However, as shown above, because

19   each of these claims lack merit, petitioner's claim of ineffectiveness on the part of appellate counsel

20   necessarily fails as well.  *See Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) (the failure to

21   raise untenable claims on appeal does not constitute ineffectiveness).

22

23                                          **VII.**

24   **THE ADMISSION OF EVIDENCE OF A SUBSEQUENT ATM
     ROBBERY COMMITTED BY PETITIONER DID NOT VIOLATE DUE**
25   **PROCESS**

26          Petitioner contends that the trial court violated his right to due process by admitting

27   evidence of the ATM robbery.  Petition at 6ii-6oo.  He argues that there were no permissible

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus        Collier v. Hedgpeth
                                                                                              C 07-5964 SI (PR)

                                            20

1   inferences to be drawn from such evidence, and that it constituted improper character evidence.

2   Petition at 6ii-6oo.  However, because the evidence was probative of petitioner's knowledge and

3   intent, its admission did not violate due process.

4       **A.   Trial Court Proceedings**

5           Before trial, the prosecutor filed a motion in limine seeking to introduce evidence that

6   petitioner committed the ATM robbery three weeks after the robbery and killing of Worcester.  1

7   CT 199-201; 2 CT 277-278.  The court found several similarities between the ATM robbery and

8   Worcester robbery-murder, and ruled that the ATM robbery was admissible to show petitioner's

9   knowledge and intent with regard to the charged crimes.  The court also ruled that the evidence was

10  relevant to show petitioner's knowledge of firearms and to refute any claim of mistake, accident, or

11  lack of intent.  RT [6/2/04] 126-127, 134.

12          Right before jurors heard testimony regarding the ATM robbery, the court instructed them

13  that the evidence was being admitted only to show petitioner's intent as to the charged crimes.  The

14  court cautioned jurors that they could not use the evidence "to prove that defendant is a person of

15  bad character or that he has a disposition to commit crimes" or "for any other purpose."  9 RT 1458.

16          Caiazzo testified about the armed robbery at the ATM, and confirmed that he had

17  previously identified petitioner from a photographic lineup as his assailant.  9 RT 1463-1474, 1476-

18  1478.  In addition to Caiazzo's testimony, the prosecutor introduced photographs taken by the ATM

19  camera during the robbery, petitioner's admission that one of the photographs was of him and

20  another was of his car, and expert testimony that the object being held by the assailant was

21  consistent with a rifle.  9 RT 1469, 1472-1474, 1476-1478, 1552-1554; 11 RT 1698-1700.

22          At the close of evidence, the court again instructed the jury that evidence of the ATM

23  robbery could only be used to show that petitioner had the knowledge and intent necessary for the

24  charged crimes and for no other purpose.  RT [7/27/04] 2671-2672, 2677; 4 CT 977, 992.

25          In closing argument, the prosecutor asserted that the jury could use the evidence of the

26  ATM robbery to "answer the question what [petitioner's] knowledge was and what his intent was."

27  The prosecutor then read the trial court's instruction regarding the limited purpose for which the

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

21

evidence was admitted, and urged the jury to "use that [ATM] robbery three weeks later exactly the way Her Honor's law tells you you can." The prosecutor went on to argue that the "armed robbery three weeks later tells you that when he's dropping off Mooring and Edwards in the Marina and they get LaBonte, that he knows what their purpose is, and he intends for that robbery to go down." RT [7/27/04] 2738-2739.

Defense counsel argued that the ATM robbery was so different from the charged incident that it reflected nothing about petitioner's intent. He also emphasized to jurors the court's instruction that they could not use such evidence to infer that petitioner was a bad person. RT [7/28/04] 2790-2791.

In rebuttal, the prosecutor argued that the ATM robbery was "good evidence" that "in all circumstances, those four men in that little . . . car, they spoke with each other, they know what was going down, from start to finish . . . ." "The man who committed an armed robbery three weeks later knows that robberies are going down in his presence. The man who committed an armed robbery three weeks later intends, including all the rest of the evidence, to participate in the armed robberies that are part of our case." RT [7/28/04] 2814.

### B. California Court Of Appeal Opinion

The California Court of Appeal noted that the "prosecution theory against Collier was that he was guilty of murder on an aiding and abetting theory," and that the "prosecution therefore had to prove that Collier 'act[ed] with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'" Exh. 4 at 15. The appellate court further noted that the defense theory was "that there was insufficient evidence to prove he aided and abetted because he did not personally participate in the crimes or even get out of his car, and he did not know that his companions Mooring and Edwards were committing robberies." *Id.* at 15. The court concluded that petitioner's "intent and knowledge when he drove Mooring and Edwards to the crime scenes and waited for them was therefore at issue." *Id.* at 15.

The court found that the intent petitioner displayed during the ATM robbery was relevant

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus                    Collier v. Hedgpeth
C 07-5964 SI (PR)

22

1    to his intent during the LaBonte and Worcester incidents. *Id.* at 16. "The point is not that Collier

2    was disposed to commit such acts, but that his obvious intent in perpetrating the armed ATM

3    Robbery suggests he harbored the same intent in another similar circumstance." *Id.* at 16. The court

4    additionally found sufficient similarities between the ATM robbery and the charged crimes to admit

5    the evidence as to petitioner's intent and knowledge. *Id.* at 16.

6           The court also ruled that the probative value of such evidence was not outweighed by its

7    potential prejudicial effect. *Id.* at 17. As the court noted, "the ATM Robbery itself was not more

8    egregious or inflammatory than the robbery of LaBonte or the robbery and murder of Worcester."

9    *Id.* at 17. Nor was the ATM robbery the type of incident that would inflame the emotions of the

10   jurors, or cause them to be tempted to convict petitioner to ensure his punishment for the uncharged

11   offense. *Id.* at 17. The court further noted that the evidence of the ATM robbery was reliable. *Id.*

12   at 17.

13          Finally, the court observed that the trial court properly instructed the jury "to use the

14   evidence only as it related to [petitioner's] intent, and not as evidence of bad character or

15   predisposition." *Id.* at 17. The court noted, "We must assume the jury understood and followed the

16   court's instructions." *Id.* at 17. In addition, the court noted that both the prosecutor and defense

17   counsel emphasized the court's instruction to the jury. *Id.* at 17-18. On this record, the court found

18   no abuse of discretion in admitting the evidence. *Id.* at 18.

19          **C.    The California Court Of Appeal's Decision Did Not Constitute An Unreasonable Application Of Supreme Court Law**

20

21          The admission of evidence violates due process "[o]nly if there are no permissible

22   inferences the jury may draw from the evidence . . . . Even then, the evidence must 'be of such

23   character as necessarily prevents a fair trial.'" *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.

24   1991). In other words, even if evidence is not clearly probative, its admission does not violate due

25   process unless the evidence was so prejudicial as to render the trial fundamentally unfair. *Romano*

26   *v. Oklahoma*, 512 U.S. 1, 12-13 (1994). The admission of other crime evidence in particular does

27   not violate due process when the trial court gives a limiting instruction and retains its discretion to

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus        Collier v. Hedgpeth
C 07-5964 SI (PR)

23

1   limit or forbid the admission of particularly prejudicial evidence.  *Spencer v. Texas*, 385 U.S. 554,

2   561 (1967).

3           Petitioner has failed to demonstrate how the admission of the ATM robbery violated his

4   due process rights.  As the California Court of Appeal found, the intent petitioner displayed during

5   the robbery of Caiazzo "made it more likely that he was harboring a criminal intent to participate

6   in and facilitate armed robberies when he drove Mooring and Edwards to and from the scene of the

7   charged crimes."  The evidence was therefore probative of a material issue in the case—petitioner's

8   knowledge and intent in the charged crimes.  As the jury could draw a permissible inference from

9   such evidence, its admission did not violate due process.  *Jammal*, 926 F.2d at 920.

10          Additionally, before admitting such evidence, the trial court determined that its probative

11  value was not outweighed by its potential prejudicial effect.  Also, both before the evidence was

12  admitted and again at the end of trial, the court instructed the jury that it could consider such

13  evidence only as it related to petitioner's knowledge and intent, and not as evidence of bad character

14  or predisposition.  Given this exercise of discretion and limiting instructions by the trial court, the

15  admission of evidence of the ATM robbery did not violate due process.  *Spencer*, 385 U.S. at 561;

16  *Williams v. Stewart*, 441 F.3d 1030, 1040 (9th Cir. 2006).

17          Even assuming such evidence was not clearly probative of any issue in the case, it was not

18  so prejudicial as to deny petitioner a fair trial.  As the Court of Appeal found, the evidence of the

19  ATM robbery was not more egregious or inflammatory than the LaBonte robbery or Worcester

20  robbery-murder.   In addition, because of the ATM photograph of petitioner, the victim's

21  identification of petitioner from a photographic lineup, and petitioner's admission that he was the

22  person in the ATM photograph, such evidence had an adequate degree of reliability, and reduced

23  any danger of the jury convicting petitioner simply to punish him for the ATM robbery.  Because

24  the ATM robbery was not so prejudicial as to render the trial fundamentally unfair, petitioner was

25  not denied due process.  *Romano*, 512 U.S. at 12-13.  For these same reasons, the admission of the

26  ATM robbery did not have a substantial or injurious effect on the verdict.  *Fry v. Pliler*, 127 S. Ct.

27  2321, 2328 (2007).

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
                                                                                    C 07-5964 SI (PR)

24

**VIII.**

**THE PROSECUTOR'S LATE DISCLOSURE OF A POLICE REPORT
DID NOT VIOLATE PETITIONER'S CONSTITUTIONAL RIGHTS**

Petitioner next claims that the prosecutor violated the mandatory disclosure requirements set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to timely provide petitioner with a report written by Lieutenant Ridgway, which summarized his audiotaped interview with Kennedy. Petition at 6pp-6uu. Petitioner further contends that the late disclosure of the report violated his right to the effective representation of counsel, his right to cross-examination, and his right to a fair trial. Petition at 6pp-6uu. However, because defense counsel was able to introduce the report into evidence and question witnesses about it, petitioner was not prejudiced by the prosecution's failure to timely disclose the report.

**A. Trial Court Proceedings**

While testifying at trial on July 1, 2004, San Francisco Inspector Wynkoop testified that on November 22, 1999, Kennedy was taken into custody after the police served a warrant to search his home. 8 RT 1355. Kennedy exercised his right to remain silent. 8 RT 1359-1360. Two days later, Kennedy went into the Marin County Sheriff's office and spoke with Lieutenant Ridgway. 8 RT 1361. Lieutenant Ridgway contacted Inspector Wynkoop and told him that Kennedy had information about the case. 8 RT 1364. Inspectors Wynkoop and Cashen went to Marin. Lieutenant Ridgway gave the detectives a brief summary of Kennedy's account, and then they met with Kennedy. 8 RT 1364, 1367-1368. A videotape of their interview with Kennedy was played for the jury. 8 RT 1371, 1376.

On July 21, 2004, the defense was scheduled to call its last witness, Lieutenant Ridgway, when the trial court excused the jurors for the day. 17 RT 2478. The court explained to the jury that the night before, the prosecutor had given the defense a report written by Lieutenant Ridgway, despite discovery rules requiring that witness statements and reports be turned over 30 days before trial. 17 RT 2478. The court noted that the defense was therefore unable to proceed at that time. 17 RT 2478.

Out of the jury's presence, the trial court held a hearing regarding the late disclosure of

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus     Collier v. Hedgpeth
C 07-5964 SI (PR)

25

1    the report.  Lieutenant Ridgway testified that he had written a supplemental report regarding his

2    contact with Kennedy and Inspectors Wynkoop and Cashen.  17 RT 2481-2482.  On November 29,

3    1999, he mailed the report and audiotapes of his conversation with Kennedy to Inspectors Wynkoop

4    and Cashen, and additionally faxed the report to Inspector Cashen.  17 RT 2482-2483.  However,

5    on June 28, 2004, in a conversation between Lieutenant Ridgway and Assistant District Attorney

6    Harry Dorfman, it became apparent that Dorfman had not seen the report, so Lieutenant Ridgway

7    faxed it to Dorfman the same day.  17 RT 2484.

8         Inspector Wynkoop testified that he had no recollection of receiving or seeing the

9    supplemental report before that morning.  17 RT 2491-2492.  There was no indication in his

10   chronological log that he had received the supplemental report.  17 RT 2493-2494.  He did receive

11   a Federal Express delivery of the audiotapes, but there was no mention of the report.  17 RT 2494-

12   2495.  Before he had learned about the report from the prosecutor that morning, he had believed that

13   everything in his file had been turned over to the defense.  17 RT 2492.

14        Assistant District Attorney Jerry Coleman testified that he handled the case before it was

15   turned over to Dorfman.  He never saw the supplemental report and he never spoke to Lieutenant

16   Ridgway.  17 RT 2499-2500, 2507.

17        Dorfman testified that he first became aware of the supplemental report during the

18   conversation with Lieutenant Ridgway on June 28, 2004.  17 RT 2513.  On July 20, 2004, he

19   reviewed it in preparation for Ridgway's testimony.  He realized that there was no Bates stamp

20   number on it, and contacted the defense to see if they had a copy of it.  He faxed a copy to defense

21   counsel later that night after defense counsel indicated he was not familiar with the document.  17

22   RT 2514.

23        At the end of the hearing, the court recessed for the afternoon so that defense counsel

24   could have adequate time to prepare for Ridgway's examination the next day.  17 RT 2515-2516.

25   The next morning, defense counsel moved for dismissal with prejudice.  18 RT 2522-2523.

26   Although defense counsel acknowledged that the audiotapes and transcripts of Ridgway's interview

27   with Kennedy were timely produced, he argued that the tapes were difficult to understand, and that

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus        Collier v. Hedgpeth
C 07-5964 SI (PR)

26

1 the supplemental report allowed him to examine Ridgway "in a way that I never would have been
2 able to without this report."  18 RT 2522-2523.

3          While not disputing his obligation to disclose the report to the defense, the prosecutor
4 asserted that there was "great overlap" between the report and transcripts of the audiotapes, which
5 had already been timely disclosed to the defense.  The prosecutor argued that any delay in providing
6 the report had not therefore prejudiced the defense, and that dismissal was unwarranted.  18 RT
7 2526-2528.

8          The trial court denied the motion to dismiss, noting that the prosecutor had produced the
9 audiotapes of the interview to the defense in a timely fashion.  Nonetheless, the court made it clear
10 that it considered the late disclosure of the report a serious discovery violation.  It therefore gave the
11 defense the option of seeking a continuance and calling additional witnesses.  18 RT 2528-2529.

12          Trial then resumed in the jury's presence.  On direct examination by the defense,
13 Lieutenant Ridgway testified that he wrote his supplemental report on November 26, 1999, and
14 made a notation that he faxed it to Inspector Cashen on November 29, 1999.  However, he did not
15 have an independent recollection of having done so.  He faxed the report to the prosecutor on June
16 28, 2004.  18 RT 2554, 2587.

17          After Lieutenant Ridgway's testimony, defense counsel renewed his motion to dismiss,
18 which was again denied.  Counsel declined the court's offer of a continuance to recall other
19 witnesses.  18 RT 2591-2593, 2595.

20          On direct examination by the defense, Inspector Wynkoop testified that he had reviewed
21 Lieutenant Ridgway's supplemental report, and agreed that the prosecution had a responsibility to
22 turn the report over to the defense.  He asked Lieutenant Ridgway to send him the audiotapes of his
23 conversations with Kennedy, and he received those tapes on November 30, 1999.  However, he
24 never received a copy of the report.  He acknowledged that the report indicated that Kennedy
25 contradicted himself, showed signs of deception regarding the weapon, and agreed that those
26 observations were not contained in the audiotapes.  18 RT 2597-2601.

27          Before deliberations, the trial court instructed the jury pursuant to CALJIC No. 2.28

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

27

1  (Failure To Timely Produce Evidence).  After explaining the disclosure requirements under state

2  law, the court told the jury:

3  >  In this case, the People concealed and/or failed to timely disclose the
Ridg[e]way supplemental report.  The Ridg[e]way supplemental report was not

4  >  disclosed by the People to the defense until July 21st of 2004.  Although the
People's concealment and/or failure to timely disclose evidence was without

5  >  lawful justification, the Court has, under the law, permitted the production of
this evidence during the trial.  The weight and significance of any concealment

6  >  and/or delayed disclosure are matters for your consideration.  However, you
should consider whether the concealed and untimely disclosed evidence

7  >  pertains to a fact of importance, something trivial, or subject matters already
established by other credible evidence.  Exculpatory evidence is evidence

8  >  tending to negate the guilt of the accused.

9  RT [7/27/04] 2676-2677; 4 CT 991.

10  >  After the jury found petitioner guilty, he moved for a new trial, arguing that the late

11  disclosure of the Ridgway report deprived him of due process.  The motion was denied.  RT

12  [11/19/04] 12-48.

13  >  **B.    California Court Of Appeal Opinion**

14  >  The California Court of Appeal noted that, "A *delay* in the disclosure of exculpatory

15  evidence warrants reversal only if the delay itself prejudiced the defense.  It is the defendant's

16  burden to show that the tardiness of the disclosure was prejudicial, and that a continuance would not

17  have cured the harm."  Exh. 4 at 21.  To show prejudice, the defendant must show a "reasonable

18  probability" that he "would have obtained a better verdict if the evidence had been disclosed in a

19  timely manner."  *Id.* at 22.  The court concluded that there was no showing that timely disclosure

20  of the report would have led to a more favorable verdict, or that a continuance would not have cured

21  the harm.  *Id.*

22  >  The court rejected petitioner's claim that the late disclosure of the report precluded him

23  from effectively cross-examining key prosecution witnesses.  *Id.*  The court noted that while the

24  defense was unable to use the report in its initial cross-examination of the prosecution witnesses, the

25  defense recalled Inspector Wynkoop and questioned him about the report.  *Id.*  Moreover, the

26  defense was given the option of requesting a continuance and recalling other prosecution witnesses,

27  but declined both offers.  *Id.*  The court concluded that petitioner had a "full opportunity to examine

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

28

1 | witnesses" about the report. *Id.*

2 |      The court also rejected petitioner's claim that the delayed disclosure undermined the

3 | preparation and presentation of the defense case, particularly the examination of Ridgway. *Id.* The

4 | court again noted that petitioner was given the option of requesting a continuance, but declined. *Id.*

5 | at 22-23.

6 |      The court also found that the late disclosure of the report was not prejudicial because the

7 | defense had the audiotapes and transcripts of the interview; the report did not contain any evidence

8 | particularly favorable to petitioner; and the report provided little additional impeachment value. *Id.*

9 | at 23-24.

10 |      Finally, the court found that the court's remedial instruction, combined with defense

11 | counsel's closing argument calling into question the credibility of the prosecution, minimized any

12 | potential prejudice. *Id.* at 24.

13 |      In sum, the court concluded that "there is no indication that Collier would have obtained

14 | a different outcome if the prosecution had timely provided the Ridgway report to the defense, or that

15 | any harm from the delay could not have been cured by simply accepting the continuance offered by

16 | the trial court." *Id.* While the court noted that it did not "condone the prosecution's failure to timely

17 | provide all appropriate discovery to the defense," it also noted that "it cannot be said that Collier did

18 | not receive a fair trial, or that an earlier introduction of the report would have put the other evidence

19 | in a significantly different light." *Id.* at 24-25.

20 |     **C.  The California Court Of Appeal Reasonably Concluded That The Late Disclosure Of The Report Did Not Prejudice Petitioner**

21 |

22 |      In *Brady v. Maryland*, 373 U.S. at 87, the United States Supreme Court held "that the

23 | suppression by the prosecution of evidence favorable to an accused . . . violates due process where

24 | the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith

25 | of the prosecution." "There are three components of a true *Brady* violation: The evidence at issue

26 | must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that

27 | evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

28 |

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus     Collier v. Hedgpeth
C 07-5964 SI (PR)

29

1    must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999) (footnote omitted).

2          The prosecutor must disclose "exculpatory and impeachment information no later than the

3    point at which a reasonable probability will exist that the outcome would have been different if an

4    earlier disclosure had been made." *United States v. Coppa*, 267 F.3d 132, 143 (2d Cir. 2001); *see

5    also United States v. Agurs*, 427 U.S. 97, 107-108 (1976).   Prejudice requires a reasonable

6    probability, based on all of the evidence, that the defendant would have realized a more favorable

7    verdict if the evidence had been disclosed in a more timely fashion.  *Id.*; *Strickler*, 527 U.S. at 282,

8    289-290.

9          Here, it is not reasonably probable petitioner would have received a more favorable verdict

10   had the report been disclosed in a more timely manner.  Petitioner contends that he was "unable to

11   effectively cross-examine key prosecution witnesses" without the report.   Petition at 6rr.   In

12   particular, petition claims that he was "unable to explore Wynkoop's misrepresentation about how

13   he came into contact with Kennedy initially."  Petition at 6rr-6ss.  However, while petitioner did not

14   have the report of Ridgway's interview with Kennedy during the prosecution's case-in-chief, he did

15   have the actual audiotape and transcript of the interview.  *See United States v. Prior*, 546 F.2d 1254,

16   1259 (5th Cir. 1977) (prosecutor is not required to furnish defendant with information he already

17   has or could obtain with reasonable diligence).  Moreover, after the report was turned over to him,

18   the trial court gave him the option of recalling the prosecution's witnesses to cross-examine them

19   about it.  While petitioner recalled Ridgway and Wynkoop and questioned them about the report,

20   he chose not to recall any other prosecution witnesses.  Given that petitioner actually questioned

21   Ridgway and Wynkoop about the report, and deemed it unnecessary to recall any other prosecution

22   witnesses on the subject, he cannot now claim he was prejudiced by the late disclosure of the report.

23   Further, petitioner's recall of Ridgway and Wynkoop undermines any claim that recalling other

24   prosecution witnesses would have prejudiced him.  *See* Petition at 6tt-6uu.

25          Nor was the "preparation and effective presentation of the defense case . . . impeded" by

26   late disclosure of the report.  Petition at 6ss-6tt.  Again, petitioner was in possession of the best

27   evidence of the interview—the audiotape and transcript—from the outset of trial.  Ridgway's report,

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus        Collier v. Hedgpeth
                                                                                            C 07-5964 SI (PR)

30

1  which merely summarized the interview, could not have therefore impacted the defense case in any

2  significant way.  Nor could it have affected the trial court's decision to allow Kennedy's testimony

3  at trial.  *See* Petition at 6tt.  Moreover, once the report was turned over to the defense, the trial court

4  gave counsel the option of requesting a continuance and recalling the prosecution witnesses.

5  Petitioner, however, declined the offer to continue the trial, and proceeded to question Ridgway and

6  Wynkoop about the report.  Accordingly, petitioner's claim that he did not have time to prepare for

7  his questioning of Ridgway is disingenuous.

8       In sum, the California Court of Appeal reasonably concluded that petitioner suffered no

9  prejudice as a result of the prosecutor's failure to timely disclose the report.

10

11                                    **IX.**

12  **THE TRIAL COURT'S DENIAL OF PETITIONER'S MOTION TO
    EXCLUDE KENNEDY'S TESTIMONY DID NOT VIOLATE DUE**

13  **PROCESS**

14       Petitioner contends that the police used improper promises of leniency to coerce Kennedy

15  into making statements which were detrimental to petitioner's penal interests.  Petition at 6vv-66aaa.

16  He also contends that Kennedy was coerced to testify at trial in conformity with those statements

17  pursuant to a plea agreement.  Petition at 6vv-6aaa.  Petitioner argues that because Kennedy's

18  statements and testimony were coerced by the prosecution, the trial court violated his right to a fair

19  trial by denying his motion to exclude Kennedy's trial testimony.  Petition at 6vv-6aaa.  The record,

20  however, does not support petitioner's claims of coercion.  His due process claim therefore fails.

21  **A.   Trial Court Proceedings**

22       Petitioner filed a pretrial motion to exclude Kennedy from testifying at trial.  3 CT 565-

23  572.  Petitioner argued that Kennedy's statement to the police was coerced, and that his trial

24  testimony would be similarly coerced because his plea agreement effectively required him to testify

25  in accordance with the coerced statement.  3 CT 565.

26       The trial court held a hearing on the motion, in which defense counsel questioned

27  Inspector Wynkoop about Kennedy's statement to the police.  Wynkoop denied that Kennedy was

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
                                                                                                C 07-5964 SI (PR)

31

1  coerced into making his statement.  RT [6/1/04] 65-96.  At the conclusion of the hearing, the trial

2  court denied the motion, observing that the defense could cross-examine Kennedy on these points.

3  RT [6/1/04] 95-96.

4      **B.    California Court Of Appeal Opinion**

5          The California Court of Appeal rejected petitioner's argument that the police coerced

6  Kennedy's statement by promising that if he spoke first, he could exonerate himself.  The court

7  found that petitioner's argument "distorts the record and is devoid of merit."  Exh. 4 at 25.

8          Next, the court found that petitioner had no standing to challenge Kennedy's statement

9  to the police.  The court noted that to have standing to challenge the voluntariness of a third party's

10  statement, a defendant must allege a violation of his own rights.  To establish a due process violation

11  in this context, a defendant must show not only that the third party's pretrial statement was coerced,

12  "but that it affected the reliability of the evidence at trial."  The court concluded that petitioner could

13  not make such a showing because Kennedy's plea agreement required only that he testified

14  truthfully, there was no indication that Kennedy thought he had to testify in conformance with his

15  statement, and the record revealed various instances in which Kennedy testified contrary to his

16  statement to the police.  *Id.* at 25-26.

17          As for the denial of petitioner's motion to exclude Kennedy's testimony, the court found

18  that "[t]here was substantial evidence that Kennedy's pretrial statement was not induced by any

19  promise from law enforcement."  *Id.* at 26.  In addition, the court rejected petitioner's argument that

20  the plea agreement forced Kennedy to testify in accordance with his statement to the police, noting

21  that the agreement called only for Kennedy to testify truthfully.  *Id.* at 27.  Finally, the court found

22  no support for petitioner's argument that an offer of leniency in return for cooperation with the

23  police renders a third party statement and trial testimony the product of coercion.  *Id.* at 28.  The

24  court concluded that the trial court did not err in denying petitioner's motion to exclude Kennedy's

25  testimony and statement to the police.  *Id.* at 29.

26      **C.    The California Court Of Appeal's Opinion Was Not Objectively Unreasonable**

27          The United States Supreme Court has held that a defendant does not have standing to

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

1    assert a violation of a third party's constitutional rights. *See Rakas v. Illinois*, 439 U.S. 128, 139-140

2    (1978); *Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2004). Accordingly, the state court's

3    conclusion that petitioner did not have standing to challenge the voluntariness of Kennedy's

4    statement to the police was not contrary to clearly established law.

5           As for the admission of Kennedy's testimony at trial, petitioner must show that its

6    admission rendered the trial so fundamentally unfair as to violate due process. *Williams*, 384 F.3d

7    at 593. The question is "whether the post-arrest coercion of a government witness so tainted that

8    witness's trial testimony as to render the testimony's admission a violation of the defendant's right

9    to due process." *Id.* at 594.

10          First, the state court found no evidence in the record to suggest that Kennedy's statement

11   to the police was coerced. The court additionally rejected the argument that an offer of leniency in

12   return for cooperation with the police renders a third party statement the product of coercion. Such

13   conclusion was not objectively unreasonable. "An interrogating agent's suggestion that a suspect's

14   cooperation with the government will have a positive effect on the suspect's possible sentence is not

15   an improper inducement that causes the suspect's later testimony for the government to be

16   involuntary." *Williams*, 384 F.3d at 594; *Morris v. Woodford*, 273 F.3d 826, 835-836 (9th Cir.

17   2001).

18          Second, the state court found no evidence that Kennedy was forced to testify in accordance

19   with his statement to the police. As the court noted, the plea agreement merely required Kennedy

20   to testify truthfully, not in conformance with his previous statement to the police. Additionally, the

21   court pointed out that there was no evidence Kennedy thought he had to testify in accordance with

22   his statement, and in fact, there were several instances in which he testified inconsistently with his

23   statement to the police. The state court's conclusion was not therefore objectively unreasonable.

24   *See Williams*, 384 F.3d at 596 (finding no due process violation where the evidence did not suggest

25   that the witness's testimony was false or that the police instructed him on what to say).

26          Moreover, we note that petitioner had the opportunity to cross-examine Kennedy about

27   the veracity of his statements. Further, the jury learned that Kennedy received a plea agreement in

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
                                                                                             C 07-5964 SI (PR)

1    exchange for testifying truthfully at trial.  The jury was therefore able to assess Kennedy's

2    credibility for itself.  *See United States v. Mattison*, 437 F.2d 84, 85 (9th Cir. 1970) (there was no

3    violation of due process when the witness, who was previously illegally interrogated, was subject

4    to cross-examination at trial through which the jury could assess the witness's credibility).  Finally,

5    we note that any coercion present at the time Kennedy gave his statement to the police would have

6    dissipated by the time he testified at trial.  *See Williams*, 384 F.3d at 595 (coercive atmosphere of

7    interrogation had dissipated with the passage of time).  Accordingly, the state court did not

8    unreasonably reject petitioner's due process claim.

9

10                                                X.

11   **THE PROSECUTOR PROPERLY CROSS-EXAMINED SERGEANT
     RIDGWAY ABOUT KENNEDY'S DEMEANOR AFTER DEFENSE**

12   **COUNSEL ASKED HIM TO DESCRIBE KENNEDY'S SIGNS OF
     DECEPTION ON DIRECT EXAMINATION**

13

14       Petitioner next contends that Lieutenant Ridgway improperly vouched for Kennedy's

15   truthfulness when being cross-examined by the prosecutor at trial, thus violating his right to a fair

16   trial.  Petition at 6bbb-6eee.  The trial record, however, shows that Lieutenant Ridgway did not offer

17   any opinion on Kennedy's veracity.  In any event, petitioner cannot make out a constitutional claim

18   because he opened the door to such questioning by the prosecutor by asking Lieutenant Ridgway

19   questions about Kennedy's signs of deception during the interview.

20       **A.    Trial Court Proceedings**

21       During direct examination, defense counsel asked Lieutenant Ridgway several questions

22   regarding his statements in the supplemental report that Kennedy showed signs of deception when

23   the lieutenant asked him about the murder weapon.  18 RT 2552-2553.  On cross-examination, the

24   prosecutor elicited testimony that Kennedy was very forthcoming and open up until the point

25   Lieutenant Ridgway asked him about the gun.  18 RT 2573-2574.  Petitioner moved for a mistrial,

26   arguing that Lieutenant Ridgway had impermissibly vouched for Kennedy's credibility.  18 RT

27   2575.  The trial court denied the motion, finding that defense counsel had opened the door to the

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
                                                                                                                C 07-5964 SI (PR)

                                                34

1   prosecutor's inquiry by questioning Lieutenant Ridgway about Kennedy's signs of deception.  18

2   RT 2581-2582.

3        Before jury deliberations, the trial court instructed the jury in accordance with CALJIC

4   No. 2.81, which includes the following passage: "Witnesses from law enforcement are not permitted

5   to express an opinion on either the guilt of the accused or the believability of any witness.  You will

6   disregard any such testimony.  The jury is the exclusive judge of the believability and credibility of

7   the witnesses."  RT [7/27/04] 2680-2681; 4 CT 1003.

8        **B.   California Court Of Appeal Opinion**

9        The California Court of Appeal noted that it is improper for an officer to testify about a

10  witness's veracity or lack thereof. Exh. 4 at 31.  However, in the matter before it, the court found

11  that "Ridgway did not draw from the evidence the ultimate inference of truthfulness or deceit; he

12  testified to Kennedy's demeanor and, at one point, volunteered that he thought Kennedy seemed

13  "very forthcoming and very open" before Ridgway asked him what happened to the gun." *Id.*  The

14  court further found that "[i]n any event, even if it could be said that [Ridgway] volunteered an

15  opinion of Kennedy's veracity, defense counsel opened the door to the prosecutor's inquiry." *Id.*

16  The court noted, "Defense counsel specifically asked Ridgway whether he 'form[ed] any opinions

17  about whether or not [Kennedy] was *telling the truth*' (italics added) when he said the gun was

18  thrown off the Bay Bridge, and further inquired about the signs of deception Kennedy displayed."

19  *Id.* at 31-32.  The court observed that the prosecutor merely followed up on those questions during

20  cross-examination, without any objection from defense counsel. *Id.* at 32.  The court concluded that

21  there was no error because "[w]hen a defendant raises a topic during direct examination, the

22  opposing party has the right to test that topic during cross-examination." *Id.*

23       **C.   The State Court's Determination Was Not Unreasonable**

24       In this case, petitioner must show that the admission of Lieutenant Ridgway's testimony

25  regarding Kennedy's demeanor during the interview rendered his trial so fundamentally unfair as

26  to violate due process. *Jammal v. Van de Kamp*, 926 F.2d at 920.  Petitioner, however, has failed

27  to make such a showing in this case.

28

1    First, the state court reasonably concluded from the record that Lieutenant Ridgway did

2    not express an opinion about Kennedy's veracity, but merely commented on his demeanor during

3    the interview.  Second, even if Lieutenant Ridgway did express such an opinion, the state court

4    reasonably concluded that defense counsel opened the door to such opinion on direct examination

5    by asking Lieutenant Ridgway about Kennedy's signs of deception during the interview.  Third, we

6    note that Lieutenant Ridgway's report independently established that Kennedy began to lie only

7    when he was asked about the gun, thus making Lieutenant Ridgway's testimony merely cumulative

8    on this point.  Finally, the trial court's instruction to the jury mitigated any possible prejudice arising

9    from Lieutenant Ridgway's testimony.  In sum, petitioner cannot show that Lieutenant Ridgway's

10   testimony rendered his trial so fundamentally unfair that it denied him due process.  Accordingly,

11   the state court's decision was not contrary to, or an unreasonable application of, clearly established

12   federal law.

13

14                                    **XI.**

15   **THE   TRIAL   COURT'S   INSTRUCTION   ON   UNJOINED**
     **PERPETRATORS DID NOT DENY PETITIONER DUE PROCESS**
16

17   Petitioner contends that the trial court erred in instructing the jury not to give any

18   consideration as to why other perpetrators of the crime were not on trial.  Petition at 6fff-6ggg.

19   Petitioner contends that the court's instruction on unjoined perpetrators conflicted with other

20   instructions and the arguments of defense counsel which told the jury it could disregard Kennedy's

21   and Edward's testimony if it found they were biased because of their plea bargains with the

22   prosecution.  Petition at 6fff-6ggg.  Petitioner, however, fails to state a federal constitutional claim.

23   In any event, petitioner cannot show any prejudice arising from the court's instruction.

24   **A.   Trial Court Proceedings**

25   The trial court instructed the jury pursuant to CALJIC No. 2.11.5, regarding unjoined

26   perpetrators of the same crime:

27       There has been evidence in this case indicating that a person other than the defendant was
         or may have been involved in the crime for which the defendant is on trial.  There may be
28

---

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
                                                                                             C 07-5964 SI (PR)

1  many reasons why that person is not here on trial.  Therefore, do not discuss or give any
2  consideration as to why the other person is not being prosecuted in this trial or whether
   he has been or will be prosecuted.  Your sole duty is to decide whether the People have
3  proved the guilt of the defendant on trial.

4  The defense did not object to the instruction.  RT [7/27/04] 2672; 4 CT 980; *see also* 18 RT 2618,

5  2629-2630.

6  **B.    California Court Of Appeal Opinion**

7          The California Court of Appeal found that giving the instruction under the circumstances

8  of this case was error, but that the error was harmless.  Exh. 4 at 32.  The court noted that other

9  instructions given by the trial court adequately informed the jury how to weigh the credibility of

10  witnesses.  *Id.* at 33.  The court further noted that the trial court specifically instructed the jury to

11  consider any sentencing benefit received by a witness in evaluating that witness's credibility.  *Id.*

12  The court concluded as follows:

13          In the matter before us, the trial court's instructions, taken as a whole,
        correctly advised the jury to focus on whether Collier was guilty and to
14      consider, among other things, the potential bias of Kennedy and Edwards
        arising from their plea bargains.  [T]he jury received the 'full panoply of
15      witness credibility and accomplice instructions.' [Citation omitted.]  [T]he
        instructions given here as a whole supplied adequate direction concerning the
16      process of evaluating the testimony of the witnesses.  The jury could not have
        believed it was foreclosed from considering any of the evidence regarding
17      Kennedy's and Edward's pretrial statements and plea bargains.  Any error in
        giving the instruction was therefore harmless.

18

19  *Id.* at 33-34.

20  **C.    Petitioner Does Not Raise A Federal Constitutional Claim**

21          As in his state court filings, petitioner raises only a state law challenge to the trial court's

22  instruction in the instant case.  Respondent submits that this claim does not present a cognizable

23  federal question, and does not therefore warrant federal habeas relief.

24          A state prisoner may obtain federal habeas relief only on the ground that he is in custody

25  in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Estelle*

26  *v. McGuire*, 502 U.S. 62, 68 (1991); *Engle v. Isaac*, 456 U.S. 107, 119 (1982).  Federal habeas

27  review of state court rulings is correspondingly narrow in scope.  A federal court has no power to

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
                                                                                                    C 07-5964 SI (PR)

37

1    "reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 68.  Here,

2    petitioner argues only that the challenged instruction was erroneous under the California Supreme

3    Court's decision in *People v. Cornwell*, 37 Cal. 4th 50 (2005).  Petitioner fails to allege that the

4    instruction denied him a federal constitutional right.  Further, the California Court of Appeal found

5    only that state law error occurred.  *See* Exh. 4 at 32-33 (citing *Cornwell*, 37 Cal.4th at 88, which

6    expressly found that erroneously giving CALJIC No. 2.11.5 did not amount to federal constitutional

7    error).  The mere fact that the instruction was incorrect under state law is not a basis for federal

8    habeas relief. *Estelle v. McGuire*, 502 U.S. at 71-72; *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)

9    (per curiam) (erroneous instruction did not violate due process); *see Fetterly v. Paskett,* 15 F.3d

10    1472, 1479-1480 (9th Cir. 1994) ("the demonstration of an error under state law does not ipso facto

11    equate to the demonstration of a denial of due process under the Constitution").  Accordingly,

12    petitioner's claim is not cognizable on federal habeas review, and does not warrant federal habeas

13    relief.  28 U.S.C. § 2254(a).

14    **D.    Even If Construed As A Federal Due Process Claim, The California Court Of Appeal's Opinion Is Not Contrary To Clearly Established Supreme Court Law**

15

16    Even if petitioner has adequately pleaded a federal due process challenge to the

17    instruction, his claim lacks merit.  An instruction violates due process if there is a "reasonable

18    likelihood that the jury has applied the challenged instruction in a way that prevents the

19    consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).

20    As the state appellate court found, even if the trial court erred in giving this instruction under state

21    law, the jury was not misled given the instructions as a whole.  Here, the jury was specifically

22    instructed regarding witness bias, interest, or other motive.  It was also instructed that accomplice

23    testimony should be viewed with distrust, examined with care and caution, and corroborated.  In

24    light of the trial court's instructions read as a whole, there is no reasonable likelihood that the jury

25    understood CALJIC No. 2.11.5 to bar consideration of Kennedy's and Edwards's motives for

26    testifying.  *See Allen v. Woodford*, 395 F.3d at 996 (given the instructions as a whole, CALJIC No.

27    2.11.5 did not violate due process).  In addition, defense counsel argued that the jury should reject

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus                Collier v. Hedgpeth
C 07-5964 SI (PR)

38

1   Kennedy's and Edwards's testimony.  RT [7/28/04] 2759-2783.  The arguments of counsel may

2   clarify ambiguous instructions.  *See McNeil*, 541 U.S. at 438.  The state court's decision was not

3   therefore objectively unreasonable.  For the same reasons, any constitutional error was harmless.

4   *See Fry v. Pliler*, 127 S.Ct. at 2328.

5

6                                               **XII.**

7        **THE ADMISSION OF A PHOTOGRAPH OF THE VICTIM WHILE
         ALIVE DID NOT VIOLATE DUE PROCESS**

8

9            Petitioner next claims the admission of a photograph of murder victim Worcester while

10  alive violated his right to due process and a fair trial.  Petition at 6hhh-6kkk.  However, because the

11  photograph was probative of Farley's relationship with Worcester as well as his credibility, its

12  admission did not violate due process.

13       **A.   Trial Court Proceedings**

14           Before trial, the prosecutor moved to admit a color "8 x 10" photograph of Worcester and

15  Farley at Farley's wedding.  2 CT 279.  The prosecutor argued that the photograph was probative

16  of Farley's close relationship to Worcester.  RT [6/3/04] 191.  Defense counsel argued that there was

17  no dispute the two men were friends, and that the photograph would only elicit sympathy from the

18  jury.  RT [6/3/04] 192-193.  The trial court recalled the photograph from Mooring's trial and

19  confirmed that there were no other people in the picture and, although the two men were in wedding

20  clothes, it was not apparent where they were.  RT [6/3/04] 194.  The trial court ruled that the

21  prosecutor could introduce the photograph, but not testimony that Worcester served as a best man

22  at Farley's wedding.  RT [6/3/04] 202-203.

23           At the end of the prosecutor's opening statement, he directed the jury's attention to the

24  photograph and said, "In this photograph to your right is Chris Farley, to your left is Shayne

25  Worcester.  Now it's a sad photograph.  Thank you."  1 RT 429.

26           At the end of his direct examination of Farley, the prosecutor asked:

27           Q.  Who are the two men in the picture?
             A.  Shayne and Myself.

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
                                                                                             C 07-5964 SI (PR)

1      Q.  When was this picture taken?
2      A.  It was taken at my wedding.
3 RT 764.

**B.    California Court Of Appeal Opinion**

The Court of Appeal determined that the photograph was relevant to show that Farley and the victim were close friends, and tended to support the believability of Farley's testimony concerning the victim.  Exh. 4 at 35.  The court also found that the probative value of the photograph was not outweighed by any prejudicial effect.  *Id.*  Finally, the court found admission of the photograph "clearly harmless" given that the "photograph was not gruesome or inflammatory and it was shown to the jury briefly on two occasions at the beginning of the trial."  *Id.* at 36.

**C.    The Court Of Appeal Reasonably Concluded That The Photograph Had Probative Value And Was Not Prejudicial**

As noted above, the admission of evidence violates due process "[o]nly if there are no permissible inferences the jury may draw from the evidence . . . . Even then, the evidence must 'be of such character as necessarily prevents a fair trial.'"  *Jammal v. Van de Kamp*, 926 F.2d at 920.  Accordingly, even if evidence is not clearly probative, its admission does not violate due process unless the evidence was so prejudicial as to render the trial fundamentally unfair.  *Romano v. Oklahoma*, 512 U.S. at 12-13.

The state appellate court reasonably concluded that the photograph of Farley and Worcester was relevant to show that they were close friends, and tended to bolster Farley's credibility regarding the victim.  Accordingly, because the jury could draw a permissible inference from the photograph, its admission did not violate due process.  *Jammal*, 926 F.2d at 920.

However, even if the photograph was not probative, its admission did not prejudice petitioner.  *Romano*, 512 U.S. at 12-13.  The photograph itself was not inflammatory, and was only shown to the jury briefly on two occasions at the beginning of trial.  Therefore, the photograph was not "of such character" as necessarily prevented a fair trial.  *Jammal*, 926 F.2d at 920.  For these same reasons, the photograph did not have a substantial or injurious effect on the verdict.  *Fry v. Pliler*, 127 S. Ct. at 2328; *Plascencia v. Alameida*, 467 F.3d at 1203 (finding the admission of

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

40

1 | several premortem photographs of the victim with her children did not have a substantial and

2 | injurious effect on the verdict).

3 | **CONCLUSION**

4 | Accordingly, respondent respectfully requests that the petition for writ of habeas corpus

5 | be denied.

6 | Dated:  June 25, 2008

7 | Respectfully submitted,

8 | EDMUND G. BROWN JR.
Attorney General of the State of California

9 | DANE R. GILLETTE
Chief Assistant Attorney General

10 | GERALD A. ENGLER
Senior Assistant Attorney General

11 |

12 | PEGGY S. RUFFRA
Supervising Deputy Attorney General

13 |

14 | /s/  Michele J. Swanson
MICHELE J. SWANSON
Deputy Attorney General

15 |

16 | Attorneys for Respondent

17 | 20118049.wpd
SF2008400505

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus

Collier v. Hedgpeth
C 07-5964 SI (PR)

**TABLE OF CONTENTS**

Page

STATEMENT OF THE CASE ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 2

STANDARD OF REVIEW ...................................................................................... 8

ARGUMENT ........................................................................................................... 9

I.      SUFFICIENT EVIDENCE SUPPORTS PETITIONER'S MURDER AND ROBBERY CONVICTIONS AND GUN ENHANCEMENTS ..................................................................................... 9

II.     THE TRIAL COURT DID NOT DENY PETITIONER DUE PROCESS BY DENYING HIS MOTION TO DISCHARGE JUROR NO. 11 ............................................................................................... 11

      A.   Trial Court Proceedings ...................................................................... 11

      B.   The State Court's Rejection Of Petitioner's Claim Was Not Objectively Unreasonable ..................................................................... 13

III.   THE PROSECUTOR DID NOT COMMIT MISCONDUCT DURING HIS DIRECT EXAMINATION OF EDWARDS OR DURING HIS CLOSING ARGUMENT .................................................... 15

      A.   Trial Court Proceedings ...................................................................... 15

      B.   The State Court Did Not Unreasonably Reject Petitioner's Claims Of Prosecutorial Misconduct .......................................................... 15

IV.   PETITIONER'S SENTENCE IS NOT CRUEL AND UNUSUAL ............. 17

V.    TRIAL COUNSEL WAS NOT INEFFECTIVE ......................................... 18

VI.   APPELLATE COUNSEL WAS NOT INEFFECTIVE ............................. 19

VII.  THE ADMISSION OF EVIDENCE OF A SUBSEQUENT ATM ROBBERY COMMITTED BY PETITIONER DID NOT VIOLATE DUE PROCESS ........................................................................ 20

      A.   Trial Court Proceedings ...................................................................... 21

      B.   California Court Of Appeal Opinion .................................................. 22

      C.   The California Court Of Appeal's Decision Did Not Constitute An Unreasonable Application Of Supreme Court Law ...................... 23

VIII. THE PROSECUTOR'S LATE DISCLOSURE OF A POLICE REPORT DID NOT VIOLATE PETITIONER'S CONSTITUTIONAL RIGHTS ................................................................. 25

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

i

**TABLE OF CONTENTS**  (continued)

Page

A.  Trial Court Proceedings ............................................................... 25

B.  California Court Of Appeal Opinion ............................................ 28

C.  The California Court Of Appeal Reasonably Concluded That The Late Disclosure Of The Report Did Not Prejudice Petitioner ............ 29

**IX.  THE TRIAL COURT'S DENIAL OF PETITIONER'S MOTION TO EXCLUDE KENNEDY'S TESTIMONY DID NOT VIOLATE DUE PROCESS** ...................................................................... 31

A.  Trial Court Proceedings ............................................................... 31

B.  California Court Of Appeal Opinion ............................................ 32

C.  The California Court Of Appeal's Opinion Was Not Objectively Unreasonable ................................................................................ 32

**X.  THE PROSECUTOR PROPERLY CROSS-EXAMINED SERGEANT RIDGWAY ABOUT KENNEDY'S DEMEANOR AFTER DEFENSE COUNSEL ASKED HIM TO DESCRIBE KENNEDY'S SIGNS OF DECEPTION ON DIRECT EXAMINATION** ............................................................................ 34

A.  Trial Court Proceedings ............................................................... 34

B.  California Court Of Appeal Opinion ............................................ 35

C.  The State Court's Determination Was Not Unreasonable ........... 35

**XI.  THE TRIAL COURT'S INSTRUCTION ON UNJOINED PERPETRATORS DID NOT DENY PETITIONER DUE PROCESS** ...................................................................................... 36

A.  Trial Court Proceedings ............................................................... 36

B.  California Court Of Appeal Opinion ............................................ 37

C.  Petitioner Does Not Raise A Federal Constitutional Claim ........ 37

D.  Even If Construed As A Federal Due Process Claim, The California Court Of Appeal's Opinion Is Not Contrary To Clearly Established Supreme Court Law ....................................................................... 38

**XII.  THE ADMISSION OF A PHOTOGRAPH OF THE VICTIM WHILE ALIVE DID NOT VIOLATE DUE PROCESS** ............ 39

A.  Trial Court Proceedings ............................................................... 39

B.  California Court Of Appeal Opinion ............................................ 40

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus     Collier v. Hedgpeth
C 07-5964 SI (PR)

ii

## TABLE OF CONTENTS  (continued)

C.    The Court Of Appeal Reasonably Concluded That The Photograph Had
Probative Value And Was Not Prejudicial                                                40

CONCLUSION                                                                                            41

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

iii

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Allen v. Woodford*
395 F.3d 979 (9th Cir. 2005)                                           19, 38

5

*Bonin v. Calderon*
6    59 F.3d 815 (9th Cir. 1995)                                           14

7    *Boyde v. California*
494 U.S. 370 (1990)                                                    38

8

*Brady v. Maryland*
9    373 U.S. 83 (1963)                                              25, 29, 30

10    *Cooper v. McGrath*
314 F.Supp.2d 967 (N.D. Cal. 2004)                                     15

11

*Darden v. Wainwright*
12    477 U.S. 168 (1986)                                                 15

13    *Dows v. Wood*
211 F.3d 480 (9th Cir. 2000)                                           19

14

*Duran v. Thurman*
15    106 F.3d 407 (9th Cir. 1997)                                        16

16    *Edwards v. Lamarque*
475 F.3d 1121 (9th Cir. 2007)                                           9

17

*Engle v. Isaac*
18    456 U.S. 107 (1982)                                                 37

19    *Estelle v. McGuire*
502 U.S. 62 (1991)                                                     37

20

*Estrada v. Scribner*
21    512 F.3d 1227 (9th Cir. 2008)                                       14

22    *Evitts v. Lucey*
469 U.S. 387 (1985)                                                    20

23

*Fetterly v. Paskett*
24    15 F.3d 1472 (9th Cir. 1994)                                        38

25    *Fry v. Pliler*
127 S. Ct. 2321 (2007)                                          24, 39, 40

26

*Griffin v. California*
27    380 U.S. 609 (1965)                                                 16

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus     Collier v. Hedgpeth
C 07-5964 SI (PR)

iv

**TABLE OF AUTHORITIES** **(continued)**

1

2

3

Page

*Harmelin v. Michigan*
501 U.S. 957 (1991)                                                                      17

4

*Harris v. Wright*
93 F.3d 581 (9th Cir. 1996)                                                              18

5

6

*Jackson v. Virginia*
443 U.S. 307 (1979)                                                                       9

7

*Jammal v. Van de Kamp*
926 F.2d 918 (9th Cir. 1991)                                                  23, 24, 35, 40

8

9

*Jones v. Barnes*
463 U.S. 745 (1983)                                                                      20

10

*Juan H. v. Allen*
408 F.3d 1262 (9th Cir. 2005)                                                             9

11

12

*Lockyer v. Andrade*
538 U.S. 63 (2003)                                                                     9, 17

13

*Middleton v. McNeil*
541 U.S. 433 (2004)                                                                      38

14

15

*Miller v. Keeney*
882 F.2d 1428 (9th Cir. 1989)                                                            20

16

*Miller-El v. Dretke*
545 U.S. 231 (2005)                                                                       9

17

18

*Morris v. Woodford*
273 F.3d 826 (9th Cir. 2001)                                                             33

19

*Ortiz v. Stewart*
149 F.3d 923 (9th Cir. 1998)                                                             16

20

21

*Patton v. Yount*
467 U.S. 1025 (1984)                                                                     14

22

*People v. Cornwell*
37 Cal. 4th 50 (2005)                                                                    38

23

24

*Plascencia v. Alameida*
467 F.3d 1190 (9th Cir. 2006)                                                         17, 40

25

*Rakas v. Illinois*
439 U.S. 128 (1978)                                                                      33

26

27

*Romano v. Oklahoma*
512 U.S. 1 (1994)                                                                 23, 24, 40

28

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus                    Collier v. Hedgpeth
C 07-5964 SI (PR)

v

**TABLE OF AUTHORITIES** (continued)

Page

*Shumate v. Newland*
75 F.Supp.2d 1076 (N.D. Cal. 1999) .......................................... 17

*Smith v. Phillips*
455 U.S. 209 (1982) ...................................................... 13, 16

*Smith v. Robbins*
528 U.S. 259 (2000) .......................................................... 20

*Spencer v. Texas*
385 U.S. 554 (1967) ...................................................... 23, 24

*Strickland v. Washington*
466 U.S. 668 (1984) ...................................................... 18, 20

*Strickler v. Greene*
527 U.S. 263 (1999) .......................................................... 30

*Tracey v. Palmateer*
341 F.3d 1037 (9th Cir. 2003) ............................................... 14

*Turner v. Calderon*
281 F.3d 851 (9th Cir. 2002) ................................................ 20

*United States v. Agurs*
427 U.S. 97 (1976) .......................................................... 30

*United States v. Angulo*
4 F.3d 843 (9th Cir.1993) ................................................ 13, 14

*United States v. Coppa*
267 F.3d 132 (2d Cir. 2001) ................................................ 30

*United States v. Mattison*
437 F.2d 84 (9th Cir. 1970) ................................................ 34

*United States v. Mayans*
17 F.3d 1174 (9th Cir. 1994) ............................................... 17

*United States v. McChristian*
47 F.3d 1499 (9th Cir. 1995) ............................................... 17

*United States v. Prior*
546 F.2d 1254 (5th Cir. 1977) .............................................. 30

*United States v. Washington*
462 F.3d 1124 (9th Cir. 2006) .............................................. 16

*Williams v. Stewart*
441 F.3d 1030 (9th Cir. 2006) .............................................. 24

**TABLE OF AUTHORITIES  (continued)**

Page

*Williams v. Woodford*
384 F.3d 567 (9th Cir. 2004)                                                              33

*Woodford v. Visciotti*
537 U.S. 19 (2002)                                                                        8, 9

*Yarborough v. Gentry*
540 U.S. 1 (2003)                                                                          18

**Statutes**

United States Code, Title 28
   § 2254(a)                                                            37, 38
   § 2254(d)(1)                                                              9
   § 2254(e)(1)                                                             14
   § 2254(e)(2)                                                             14

**Court Rules**

Ninth Circuit
   rule 36-3(c)                                                             16

**Other Authorities**

Antiterrorism and Effective Death Penalty Act of 1996                                    8, 9

CALJIC
   No. 2.11.5                                                            36, 38
   No. 2.28                                                                 27
   No. 2.81                                                                 35

Memo. of Pts. and Auths. in Support of Answer to Petition for Writ of Habeas Corpus          Collier v. Hedgpeth
C 07-5964 SI (PR)

vii

## <u>DECLARATION OF SERVICE BY U.S. MAIL</u>

Case Name:     **Collier v. Hedgpeth, Warden**

No.:     **C 07-5964  SI (pr)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004.

On <u>June 25, 2008</u>, I served the attached **ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at San Francisco, California, addressed as follows:

Tremayne Collier
V-60930
Kern Valley State Prison
P.O. Box 5102  B3-130
Delano, CA  93216

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on June 25, 2008, at San Francisco, California.

| D. Desuyo | /s/   D. Desuyo |
|:---:|:---:|
| Declarant | Signature |

20118565.wpd