Tremayne Collier V-60930
KVSP B3-206
P.O. BOX 5102
Delano, CA 93216

Pro se

FILED

08 JUL -3 PM 1: 31

RICHARD W. WILKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TREMAYNE COLLIER,<br><br>                    Petitioner,<br><br>vs.<br><br>Anthony Hedgpeth (WARDEN)<br>                    Respondent. | REQUEST FOR PERMISSION TO FILE<br>A 86-PAGES TRAVERSE<br>#C07-5964 SI (PR) |

   Petitioner, TREMAYNE COLLIER, is requesting permission to
file a 86-pages traverse because he has 12 issues and 13 subissues.
Plus the statement of the case and the statement of facts consists
of 26 pages.  Without the above, petitioner cannot properly
presents his case before this Court.

   Petitioner is aware that under Local Rule 7-2(b) a traverse
has to be filed on 25 pages.

   Petitioner prays that this Honorable Court grant his requested
permission to file a 86-pages traverse.

DATED: June 30th, 2008

TREMAYNE COLLIER

                    Pro se

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

TREMAYNE COLLIER
_____

**PLAINTIFF or PETITIONER**

v.

Anthony Hedgpeth (WARDEN)                    **Case Number:**
_____                    C-07-5964 SI (PR)

**Defendant or Respondent**

# PROOF OF SERVICE

Tremayne Collier
_____

I hereby certify that on June 30th , 200 8 , I served a copy

of the attached REQUEST FOR PERMISSION TO FILE A 86 PAGES , by placing a copy in

a postage paid envelope TRAVERSE addressed to the person(s) hereinafter listed, by depositing said envelope

in the United States Mail at KERN VALLEY STATE PRISON:


Attorney General Office
455 Golden Gate Ave. Suite 11000
San Francisco, CA 94102-7004



I declare under penalty of perjury that the foregoing is true and correct.

_____
TREMAYNE COLLIER

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11

12   TREMAYNE J. COLLIER,              No. C 07-5964 SI PR

13                    Petitioner,      **Traverse**

14   v.

15   ANTHONY HEDGPETH, Warden,

16                    Respondent.

17

18

19

20

21

22

23

24

25                                     Tremayne J. Collier
                                       V-60930
26                                     Kern Valley State Prison
                                       P.O.Box 5102 B3-130
27                                     Delano, CA 93216

28                                     Pro se


                    **"EVIDENTIARY HEARING REQUESTED"**

1

## TABLE OF CONTENTS

2
PAGE

3    STATEMENT OF THE CASE................................. 2

4    STATEMENT OF FACTS................................... 5

5       I.  PETITIONER'S CONVICTIONS OF FIRST DEGREE
            MURDER, THE GUN, AND THE TWO ROBBERIES
6           WERE BASED ON INSUFFICIENT EVIDENCE............ 27

7      II.  PETITIONER WAS DENIED A FAIR TRIAL BECAUSE
            JUROR 11, MS. 674749 WAS TAMPERED.............. 35
8
     III.  THE PROSECUTION COMMITTED MISCONDUCT
9          BY ELICITING FROM WITNESS THAT
           PETITIONER WAS INCARCERATED BEFORE
10         AND DURING HIS TRIAL........................... 42

11      A.  Comment on Petitioner Failure to Testify....... 44

12     IV.  PETITIONER'S CONVICTIONS AND SENTENCES
            VIOLATED THE EIGHT AMENDMENT................... 47
13
      V.  TRIAL COUNSEL RENDERED INEFFECTIVE
14          ASSISTANCE BY FAILING TO INVESTIGATE........... 49

15      A.  Failure to Obtain an Expert.................... 51

16     VI.  APPELLATE COUNSEL RENDERED
            INEFFECTIVE ASSISTANCE......................... 53
17
     VII.  THE COURT VIOLATED PETITIONER'S DUE PROCESS
18         RIGHTS WHEN IT PERMITTED THE PROSECUTION TO
           INTRODUCE OTHER CRIMES EVIDENCE WHICH HAD
19         NO TENDENCY IN REASON TO ESTABLISH INTENT
           OR KNOWLEDGE................................... 54
20
        1.  This Evidence Did Not Meet the Ewoldt
21          Standards on the Theories on Which it
            was Admitted................................... 56
22
        2.  The Evidence Was Inadmissible under Evidence
23          Code section 352............................... 59

24   VIII.  THE PROSECUTOR'S LATE DISCLOSURE OF A
            POLICE MEMORANDUM RELATING TO THE FIRST
25          STATEMENT BY AN IMPORTANT PROSECUTION
            WITNESS DEPRIVED PETITIONER OF HIS
26          ABILITY TO PREPARE AND ADEQUATELY CROSS-
            EXAMINE IN VIOLATION OF THE SIXTH AND
27          FOURTEENTH AMENDMENTS.......................... 60
28

i

# TABLE OF CONTENTS

PAGE

1.  The Prosecution Has a Statutory and
    Constitutional Duty to Turn over All
    Potentially Exculpatory Evidence to
    the Defense in a Timely Fashion................. 62

2.  The Failure to Provide Timely Discovery
    Prejudiced Petitioner's Rights to
    Effective Representation, Impeded His
    Rights to Cross Examine Adverse Witnesses
    and Denied Him a Fair Trial..................... 63

IX. KENNEDY'S STATEMENT TO POLICE AND TESTIMONY
    WAS THE PRODUCT OF COERCION AND A PLEA
    AGREEMENT REQUIRING HIM TO TESTIFY IN A
    PARTICULAR WAY.................................. 67

1.  A Defendant Has Standing to Object to the
    Testimony of a Third Party that Has Been
    Obtained by Coercive Interrogation Techniques
    and Other Prosecution Tactics which Raise
    Questions about the Reliability of the
    Statement...................................... 68

2.  Kennedy's Statement Was the Product of
    Improper Promises of Leniency.................. 71

3.  The Plea Agreement Conditioned on Kennedy's
    Truthful Testimony Should Be Considered as
    a Factor in Determining Whether Kennedy's
    Statement was Coerced.......................... 75

X.  RIDGEWAY GAVE AN IMPROPER OPINION OF KENNEDY'S
    TRUTHFULNESS AND VIOLATED PETITIONER'S RIGHT TO
    A FAIR TRIAL IN VIOLATION OF THE FOURTEENTH
    AMENDMENT...................................... 76

1.  A Lay Witness Cannot Give an Opinion
    about Witness Credibility...................... 77

XI. IT WAS REVERSIBLE ERROR TO INSTRUCT THE JURY
    WITH CALJIC NO. 2.11.5......................... 80

1.  Because These Witnesses Were So Crucial to the
    Prosecution Case this Improper Instruction
    Cannot Be Held Harmless........................ 80

XII. THE ADMISSION OF A PHOTOGRA OF THE VICTIM AT
    WITNESS FARLEY'S WEDDING VIOLATED PETITIONER'S
    FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS
    AND A FAIR TRIAL............................... 82

ii

1

## TABLE OF CONTENTS

2

PAGE

3    1.  This Photograph Was Patently Irrelevant
        and Prejudicial.................................. 83

4    2.  the Admission of this Evidence Was Prejudicial.... 85

5        CONCLUSION....................................... 86

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | TABLE OF AUTHORITIES

2 | CASES                                                        PAGE

3 | Mike v. Borg 947 F.2d 353 (9th Cir. 1991)                    27

4 | Tamapua v. Shimoda 796 F.2d 261 (9th Cir. 1986)             27,28

5 | Jackson v. Virginia 443 U.S. 307 (1979)                      27

6 | Rogers v. Richmond 365 U.S. 534 (1951)                       27

7 | Dowd v. U.S. ex rel Cook 340 U.S. 206 (1951)                 27

8 | In re Bonner 151 U.S. 242 (1894)                             27

9 | In re Winship (1970) 397 U.S. 358                            28

10 | Thompson v. Louisville 362 U.S. 199 (1960)                  28

11 | Wilcox v. Ford 813 F.2d 1140 (11th Cir. 1987)               32

12 | United States v. Gafyczk 847 F.2d 685 (11th Cir.1988)32

13 | United States v. Ruiz 462 F.3d 1082 (9th Cir. 2006)         32

14 | U.S. v. Equivel-Ortega (No. 05-30355 (9th Cir.
15 | D.A.R. 6412 Wednesday, May 9, 2007)                      32,33,34

16 | U.S. v. Sanchez-Mata 925 F.2d 1166 (9th Cir. 1991)        32,33

17 | United States v. Ramos 467 F.2d 624 (9th Cir. 1973)        33

18 | United States v. Lopez 477 F.3d 1110 (9th Cir. 2007) 33

19 | U.S. v. Vasquez-Chan 978 F.2d 546 (9th Cir. 1992)          33

20 | United States v. Delgado 357 F.3d 1061 (9th Cir.2004)33

21 | U.S. v. Herrera-Gonzalez 263 F.3d 1092 (9th Cir.2001)34

22 | U.S. v. Estrada-Macias 218 F.3d 1064 (9th Cir. 2000) 34

23 | United States v. Angulo 4 F.3d 843 (9th Cir. 1993)       37, 40

24 | Towsend v. Sain 372 U.S. 293 (1963)                         38

25 | Keeney v. Tamayo-Reyes 405 U.S. 1 (1992)                    38

26 | Lawson v. Borg 60 F.3d 608 (9th Cir. 1995)                  39

27 | United States v. Smith 26 F.3d 739 (7th Cir. 1994)         39

28 | United States v. Davis 15 F.3d 1393 (7th Cir. 1994)       39,40

iv

1

# TABLE OF AUTHORITIES

| | CASES | PAGE |
|---|---|---|
| 2 | | |
| 3 | Remmer v. United States 347 U.S. 227 (1954) | 40 |
| 4 | United States v. Sanders 962 F.2d 660 (7th Cir. 1990) | 40 |
| 5 | Duran v. Thurman 106 F.3d 407 (9th Cir. 1997) | 44 |
| 6 | United States v. Cotnam 88 F.3d 487 (7th Cir. 1996) | 45,46 |
| 7 | Lockyer v. Andrade 538 U.S. 63 (2003) | 47 |
| 8 | Edwing v. California 538 U.S. 11 (2003) | 47 |
| 9 | Reyes v. Brown 399 F.3d 964 (9th Cir. 2005) | 48 |
| 10 | Lambright v. Schriro (No. 04-99010 9th Cir. DAR 6713) | 50,51 |
| 11 | Thompson v. Calderon 122 F.3d 28 (9th Cir. 1997) | 52 |
| 12 | Smith v. Robbins 528 U.S. 259 (2000) | 53 |
| 13 | Strickland v. Washington 466 U.S. 668 (1984) | 53 |
| 14 | Murray v. Carrier 477 U.S. 478 (1986) | 53 |
| 15 | Ellis v. Hargett 303 F.3d 1183 (10th Cir. 2002) | 53 |
| 16 | People v. Tapia (1994) 25 Cal.App.4th 984 | 56 |
| 17 | People v. Thompson (1980) 27 Cal. 303 | 56 |
| 18 | Kincade v. Sparkman 175 F.3d 444 (6th Cir. 1999) | 56 |
| 19 | McKinney v. Rees 993 F.2d 1378 (9th Cir. 1993) | 57 |
| 20 | Gideon v. Wainwright 372 U.S. 335 (1963) | 57 |
| 21 | Alcala v. Woodford 334 F.3d 862 (9th Cir. 2003) | 57 |
| 22 | Olivarez v. McKinney 510 U.S. 1020 (1993) | 57 |
| 23 | People v. Ewoldt (1994) 7 Cal.4th 380 | 57 |
| 24 | People v. Kidd (1998) 18 Cal.4th 349 | 57 |
| 25 | People v. Robbins (1988) 45 Cal.3d 867 | 58 |
| 26 | Ulster County v. Allen (1979) 442 U.S. 140 | 59 |
| 27 | United States v. Myers 550 F.2d 1036 (5th Cir. 1977) | 59 |
| 28 | People v. DeRango (1981) 115 Cal.App.3d 583 | 59 |

v

1

## TABLE OF AUTHORITIES

2

| CASES | PAGE |
|---|---|
| People v. Brown (1993) 17 Cal.App.4th 1389 | 60,66 |
| People v. Carpenter (1997) 15 Cal.4th 312 | 60 |
| Brady v. Maryland (1963) 373 U.S. 83 | 61,62 |
| Kiles v. Whitley (1995) 514 U.S. 419 | 62,66 |
| People v. Earp (1999) 20 Cal.4th 826 | 62 |
| Napue v. Illinois (1959) 360 U.S. 264 | 64 |
| In re Hall (1981) 30 Ca.3d 408 | 64 |
| In re Wright (1978) 78 Cal.App.3d 788 | 64 |
| United States v. Bagley (1985) 473 U.S. 667 | 66 |
| In re Williams (1994) 7 Cal.4th 572 | 66 |
| People v. Bohannon (2000) 82 Cal.App.4th 798 | 66 |
| Donnelly v. DeChristoforo (1974) 416 U.S. 637 | 68 |
| In re J. Clyde K. 192 Cal.App.3d 710 (1987) | 69,71 |
| Alderman v. United States (1969) 394 U.S. 165 | 69 |
| Bradford v. Johnson 354 F.Supp. 1331 (E.D.Mich 1972) | 70 |
| Lisenda v. California (1941) 314 U.S. 219 | 70 |
| U.S. v. ex rel. Cunningham v. DeRoberts 719 F.2d 892 (7th Cir. 1983) | 70 |
| Lafrance v. Bohlinger 499 F.2d 29 (1st Cir. 1974) | 70,71 |
| United States v. Tingle 658 F.2d 1332 (9th Cir. 1981) | 71 |
| People v. Sultana (1988) 204 Cal.App.3d 511 | 71 |
| In re Walker (1974) 10 Cal.3d 764 | 71 |
| People v. Lee (2002) 95 Cal.App.4th 772 | 71,75 |
| People v. Vasila (1995) 38 Cal.App.4th 865 | 71,75 |
| People v. Cahill (1994) 22 Cal.App.4th 296 | 72 |
| People v. Medina (1974) 41 Cal.App. 438 | 75 |

1

<div align="center">TABLE OF AUTHORITIES</div>

2   CASES   PAGE

3   People v. Allen (1996) 42 Cal.3d 1222   75

4   People v. Medina (1974) 41 Cal.App.3d 438   75

5   Moran v. Burbine (1986) 475 U.S. 412   75

6   People v. Melton (1988) 44 Cal.3d 713   77

7   People v. Sergill (1982) 138 Cal.App.3d 34   77

8   People v. Cornwell (2005) 37 Cal.4th 50   80

9   People v. Crittenden (1994) 9 Cal.4th 83   83

10   Estelle v. McGuire (1991) 502 U.S. 62   84

11   People v. Anderson (1990) 52 Cal.3d 453   83

12   Chapman v. California (1967) 386 U.S. 18   85

13   People v. Holt (1984) 37 Cal.3d 436   85

14   United States v. Frederick 78 F.3d 1370 (9th Cir. 1995) 85

15   UNITED STATES CONSTITUTION

16   Fifth Amendment   passim

17   Sixth Amendment   passim

18   Eight Amendment   passim

19   Fourteenth Amendment   passim

20   STATUTES

21   California Evidence Code section 210   59,77

22   California Evidence Code section 352   passim

23   California Evidence Code section 356   65

24   California Evidence Code section 702   77

25   California Evidence Code section 801   77

26   California Evidence Code section 805   77

27   Text and Other

28   Caljic No. 2.11.5.   80

<div align="center">vii</div>

1   Tremayne J. Collier
  V-60930
2   Kern Valley State Prison
  P.O.Box 5102-B3-130
3   Delano, CA 93216

4   Pro se

5

6

7                    UNITED STATES DICTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9

10   TREMAYNE J. COLLIER,        |  No. C 07-5964 SI (PR)

11              Petitioner,   |  **Traverse**

12   v.                            |

13   ANTHONY HEDGPETH, Warden,     |

14              Respondent.   |

15

16     Petitioner, Tremayne J. Collier, by this traverse, denies

17   the allegations of Respondent's Answer to the petition for writ

18   of habeas corpus and alleged as follows:

19     1.  Petitioner is presently incarcerated by the State of

20   California pursuant to a judgment of a California state court;

21     2.  Petitioner's incarceration is unlawful;

22     3.  Petitioner is entitled to discharge from his present

23   incarceration;

24     4.  Petitioner is entitled to an evidentiary hearing;

25     5.  This traverse is based on the records and files in this

26   case and the attached memorandum of points and authorities.

27

28

                                1

1    STATEMENT OF THE CASE

2        By an indictment returned by the San Francisco grand jury

3    on April 24, 2001, petitioner and co-defendant Daniel Mooring and

4    Santese Edwards were charged as follows:

5        count 1: Murder of Shayne Worcester (§187) which was

6        committed during a robbery (§190.2, subd. (a)(17)(A));

7        count 2: Robbery of Worcester (§212.5);

8        count 3: Robbery of Ray LaBonte (§212.5)

9    Mooring was charged in two counts as the sole defendant as follows:

10       count 4: assault with a firearm of LaBonte. (§245(a)(2);

11       count 5: felon in possession of a firearm. (§12021, subd.

12       (A)(1).)

13       As to counts 1 through 3, it was alleged that Mooring persona-

14   lly used a firearm (§12022.53, subd. (d)) and that a principal

15   was armed as to petitioner and Edwards (§12022.)  In addition, it

16   was alleged as to counts 3 and 4 that Mooring personally inflicted

17   great bodily injury on LaBonte.  One strike prior and one prior

18   were alleged as to petitioner.  (CT 4-9.)

19       On May 7, 2001, petitioner was arraigned.  He pled not guilty

20   and denied all enhancement allegations.  (CT 33.)

21       On June 16, 2002, Mooring's motion for separate trials

22   (CT 137-198) was granted.  (CT 227.)  On July 11, 2002, the

23   prosecutor asked that petitioner be tried first but the court

24   ordered that Mooring would be tried first.  (CT 243.)  According

25   to the brief filed by Mooring in the court of appeal, his trial

26   occurred between October 21, 2003 and January 15, 2004, when

27   Mooring was convicted on all counts, but the personal use of a

28   firearm and personal infliction of great bodily injury allegations

2

1 | were found not true. (Mooring CT 662, 819-32.)

2 | On July 9, 2002, petitioner's trial was set for January 24,
3 | 2003. (CT 41-59.)

4 | On September 18, 2002, petitioner filed a motion to set
5 | aside the indictment (§995) and a common law motion to dismiss.
6 | (CT 61-98.) It was continued for hearing to January 16, 2003
7 | and was denied. (CT 132-36.)

8 | On June 13, 2003, the prosecutor filed a motion in limine to
9 | admit against petitioner a robbery which occurred on June 17,
10 | 1999, one month after the charged crimes. (CT 199-226.)

11 | On June 27, 2003, the defense filed a motion to compel
12 | disclosure of confidential informants. (CT 228-237.) This
13 | motion was denied on July 11, 2003 after a hearing, a portion of
14 | which occurred in camera. (CT 243.)

15 | Petitioner's case was continued many times until April, 2004,
16 | when a motion to amend the indictment to add prior conviction
17 | allegations was filed by the prosecutor. (CT 260-266.) The
18 | amended indictment was filed on April 29, 2004. (CT 268-269.)

19 | On May 26, 2004, the prosecutor filed in limine montions
20 | (CT 275-284) and the defense filed its trial memorandum and
21 | numerous pretrial motions. (CT 285-731, 743-831.)

22 | Jury trial began on May 27 with motion hearings which
23 | continued, in conjunction with jury selection to June 17. (CT 732-
24 | 33, 832-35, 866, 875-76, 880.) The evidentiary portion of trial
25 | began on June 21 and continued to July 29, for a total of 31
26 | court days. (CT 881, 902-906, 908-909, 916-917, 927-34, 956-61,
27 | 1070.) Jury deliberations began on July 28 and were completed
28 | on July 29 when the jury returned guilty verdicts on all three

3

1    counts.  It found the principal armed allegation to be true, but
2    found the special circumstances allegation not true.  (CT 1071-
3    1074.)

4        On August 2, petitioner's priors were found true in a court
5    trial.  (CT 1071.)

6        The defense filed a new trial motion (CT 1093-1176) which
7    was denied after hearing on November 19.  (CT 1178.)

8        On December 10, petitioner was sentenced to a term of 13
9    years plus 51 years to life, calculated as follows: principle
10   term was count three  for which the court imposed the 3 year
11   middle term, double under the three strikes law, plus consecutive
12   terms of 5 years under section 667(a), and one year each under
13   section 667.5 and 12022.  The court stayed a 4 year term on
14   count two under section 654.  The court imposed a consecutive
15   term of 25 years to life on count one doubled under the three
16   strikes law plus one year for the 12022 enhancement.  The court
17   imposed a $10,000 restitution fine under section 1202.4, a
18   similar restitution fine was stayed under section 1202.45 and
19   the court imposed victim restitution on the LaBonte count in the
20   amount of $3750 and retained jurisdiction to impose victim
21   restitution as to Worcester under section 1202.4(a)(3)(b).  (CT
22   1224-1238.)

23       On December 13, 2004, a timely notice of appeal was filed.
24   (CT 1239-1241.)

25
26
27
28

4

## STATEMENT OF FACTS

1

2  Prosecution Case

3  Count 3 - Robbery of Ray LaBonte-

4  On May 25, 1999, Ray LaBonte lived in the Marina District
5  of San Francisco. (RT 598-99.) Between 9:30 and 10:00 p.m. he
6  went out to Chestnut Street to return a movie and to get something
7  to eat. He was alone. He had $8 in his pocket. (RT 599-600.)

8  As he approached Alhambra Street he saw two black men standing
9  in a doorway. As he walked past they approached him. One of
10  them had his shirt open and exposed a weapon. He raised the
11  weapon and ran to LaBonte's back while the other approached his
12  front, pointed a gun at him and told him to get down. (RT 603-5.)
13  LaBonte went to his knees and tried to cooperate so he would not
14  aggravate the situation. (RT 605-06.) The man in front demanded
15  his money and his wallet. He was holding a long gun with two
16  hands and aiming it at him. (RT 607.) LaBonte pulled his money
17  from his pocket and threw it on the ground. He told the man
18  he did not have a wallet and held up his hands. (RT 697-08.)
19  He was then grabbed from behind and someone reached into his
20  back pocket as though he was looking for a wallet. He felt
21  something touching the back of his head and then he was hit in
22  the face, probably with the butt of a gun and he became uncons-
23  cious. (RT 697-09.) When he regained consciousness the men
24  were gone. (RT 611.)

25  LaBonte required extensive medical treatment for injuries.
26  his jaw was fractured and it was wired shit for six weeks. It
27  had a metal plate inserted and a screw on top. He required
28  plastic surgery for his ear that night. (RT 618-21.)

5

1    The gunman was about six feet tall and husky. The other man
2    was about the same height or a little taller. Both men had hoods
3    on their heads and wore dark clothing. They were in their
4    mid-20's. (RT 612-615.) LaBonte was shown several photo lineups
5    over the course of many months. At Mooring's trial, he identi-
6    fied him as the gunman. (RT 634-36, 1404.) He was unable to
7    identify the second man because he did not see his face. He
8    could only state that he was taller and thinner. (RT 638.)
9    Edwards admitted his involvement in that robbery. (RT 1404.)

10    Julia Eyerman lived in an apartment on Cervantes. (RT 648.)
11    About 10:00 she heard loud voices and looked out her window.
12    She saw a car stopped in the middle of the street and two black
13    men getting out the passenger side. The men wore dark clothing.
14    One was heavier set and the other was thin. (RT 651-53.) The
15    car was a reddish burgundy midsized car with a lighter color
16    vinyl top. (RT 654.)

17    After the car sped off, the men walked west on Alhambra,
18    turned on Mallorca and went out of her view. (RT 655.) About
19    20 minutes later she heard a commotion again and saw the same
20    car, a Mustang. The two men had seen earlier ran around the
21    corner yelling, "Hey man" and jumped into the car. (RT 657-60.)
22    The car drove off and turned south on Filmore. (RT 662.)

23    Eyerman called the police the next morning after watching
24    the news and she eventually identified photos of the car. (RT 667-
25    72, People's Exhibit 42-45.)

26    Officer Garcia responded to the scene and located blood on
27    the sidewalk and found a .22 caliber slug nearby. (RT 683-89.)
28    **Counts 1-2, Murder and Robbery of Shayne Worcester**

6

1   |    Chris Farley was a friend of Worcester from high school.
2   | Worcester was in San Francisco on May 25, 1999, visiting him and
3   | to attend a birthday party for another friend.  (RT 691-93.)
4   | Worcester **was** planning to go back home to Maine the next day and
5   | a group of eight friends went out for dinner.  (RT 695.) They
6   | ate and met friends at a bar in the Marina.  (RT 699-701.)  Then
7   | Worcester and Farley left to walk back to Farley's apartment in
8   | Russian Hill.  (RT 703-05.)

9   |    It was close to midnight as they were walking up the hill on
10  | Vallejo.  At the corner of Hyde, they passed two men who were
11  | dressed in dark clothes from head to toe and were leaning against
12  | the wall.  (RT 710-12.)  He and Worcester crossed Hyde Street
13  | and started up the hill on Vallejo when they heard yelling and
14  | a commotion from behind them.  Farley glanced back and saw the
15  | two men running toward    them.  (RT 715.) He nudget Worcester
16  | to signify let's go and Farley ran up Vallejo.  (RT 718-19.)
17  | Farley stopped running when he heard more yelling and realized
18  | the men were not closing in on him.  He got behind a parked car
19  | and looked down the hill to see Worcester on his stomach on the
20  | ground and two men standing over him.  (RT 719, 724-26.)  He
21  | heard the men demand money and Worcester told them it was in his
22  | pocket and told them to take it.  (RT 727.)  They went through
23  | Worcester's pockets and Farley saw his wallet in one of the men's
24  | hands.  (RT 732.)  Worcester made no gestures and said nothing
25  | except to tell them where his money was.  (RT 732-33.)  After the
26  | men took the wallet one of the men leaned in toward Worcester,
27  | and arm came up and Farley heard three popping sounds.  The
28  | men straightened up and ran away on Vallejo and turned north on

7

1    Hyde.   (RT 733-38.)

2         After the men were gone Farley went to Worcester who was

3    still on the ground.  His shirt was covered with blood and he was

4    not responsive.  (RT 738-39.)  A man leaned out an apartment

5    window that he was calling 911.  (RT 740.)  Farley stayed until

6    the ambulance came and talked with police officers at the scene

7    for about 3 hours.  (RT 740-43, 747.)

8         Farley did not see the face of either man because they were

9    wearing nylon jackets[1] with hoods.  He described the jackets as

10   like shells than down.  (RT 728.)  He noted that one man was

11   about two inches taller than the other and  the height range

12   was somewhere between five feet ten and six feet two.  (RT 717.)

13   When Farley observed petitioner in court he stated that he was

14   the same age and race as the man but that he was heavier.  (RT

15   757.)  When he observed People's Exhibit 53, a photo of petitioner

16   from the time of the crime, he stated that the middle man looked

17   like petitioner only he had a smaller build.  (RT 758.)

18        Kristen Grant lived in a second floor apartment on the corner

19   of Vallejo and Hyde.  (RT 924-25.)  About 12:15 she heard voices

20   in the intersection.  A man was saying, "You better run, mother

21   fucker."  Then she heard running.  (RT 926-30.)  When the foots-

22   teps stopped she heard someone demand wallet and another man said,

24        1.  In spite of this description, Farley identified two black
     down jackets (People's exhibits 51 and 52) as being similar to
25   those worn by the men.  He admitted they did not match his discrip-
     tion but testified that he could not rule out that they were what
26   the men were wearing.  (RT 752-55, 789-93.)  At Mooring's trial
     he testified that exhibit 51 was reasonably consistent with the
27   jackets he saw but that he was not sure if it was the same.   The
     jackets he saw were not bulky.  (RT 810-11.)  Inspector Cashen
28   testified that witness Jung said the perpetrators were wearing

8

1  "Ok, whatever you want, fine." (RT 931.) Then she heard three

2  gunshots very close together and more running. She looked outside

3  and saw a man lying face down on the sidewalk. Another man was

4  standing above him, asking for someone to call 911. She did not

5  see anyone running away. (RT 932-35, 946.)

6  Christopher Jung lived on the second floor of a building on

7  the corner of Hyde and Vallejo. (RT 818-19.) He heard something

8  that sounded like gunshots and looked outside to see a car double

9  parked at the northeast corner of the intersection, pointing

10  north towards Hyde. A man was standing in the middle of the

11  street near the back of the driver's side of the car. He was

12  by himself. (RT 824-28.) The man was about 6 feet tall and was

13  gangly. (RT 829.) He was dressed in black sweatpants and a

14  black long sleeved sweat shirt. His hair was short cropped and

15  he was definitely not bald. He looked young and athletic.

16  (RT 829, 844.) The car was dark reddish color with an off white

17  top. It was a Mustang or another American car and he thought

18  it was a convertible with its top up. (RT 827-28.) He believed

19  that petitioner's car (People's exhibit 44-45) was similar but

20  not identical. (RT 836-38.) After a minute or so the man went

21  to the passenger side, got into the car and it moved off slowly.

22  (RT 832, 838.)

23  The 911 call came in at 12:17 a.m. (RT 871.) When officers

24  responded to the scene they observed Farley flagging them down.

25  He was very excited and said that his friend had been shot.

26  _____

27  sweatshirts; that LaBonte testified they ere wearing sip up
   suit type jackets and that Farley said they were windbreakers
28  (RT 1666-7.)

9

1  They saw Worcester lying face down on the sidewalk. He was not
2  moving and was making no sounds. (RT 863-64.) Farley told them
3  the shooters were two black men about six feet tall and the
4  description was broadcast. (RT 866.) After the crime scene was
5  secured officers began looking for suspects. (RT 874.)

6      About an hour after the shooting, officers took Farley and
7  Jung to view a suspect near Aquatic Park about 10 blocks away.
8  Farley did not think he was the man. (RT 748-50.) Jung told
9  police he was 80% sure he possibly was the man he saw. (RT 843.)
10 This man was Thomas Anderson. (RT 1196-97.)

11     Worcester's cause of death was multiple gunshots causing blood
12 loss and damage to the neurological system. (RT 559-60.) Two
13 bullets entered in the back to the head and penetrated the brain
14 damaging vital portions of the brain. Neither of these wounds
15 was survivable. A third shot entered the left shoulder, and was
16 also potentially lethal. (RT 560-61, 568.) The wounds were
17 shot from a distance. (RT 573, 585.) They were consistent with
18 the victim having been lying on his stomach on the ground when
19 shot. (RT 566, 585.)

20     The bullets recovered could have been shot from a Marlin bolt
21 action rifle with .22 ammunition. (RT 581.)

22 **Investigation**

23     Homicide Inspector Edward Wynkoop and his partner Curtis
24 Cashen were assigned to investigate the Worcester case on May 26.
25 (RT 1178-80.) They went to the scene and interviewed several
26 witnesses. They recovered cards and other papers belonging to
27 Worcester which had been found at Taylor and Lombard (RT 914-20)
28 and at Lombard & Hyde earlier that morning. (RT 1083-1087,

10

1  People's exhibits 48A-B-C.)

2      Charges were as made on Worcester's Visa card at 12:28 a.m.
3  on May 26, 1999, at a Shell Station at 800 Turk Street in San
4  Francisco.  (RT 998-1001, 1008.)  It was used again at 2:05 a.m.
5  at the Danny's Restaurant in Emeryville.   (RT 995-97.)

6      The inspectors learned of a robbery in the Marina that had
7  similarities, including matching descriptions of a car and .22
8  caliber bullets found at both scenes.  (RT 1187-8, 1302-4.)
9  Within the first day of the investigation he determined that the
10  cases were related.  (RT 1302.)  It was a very high profile case
11  with a lot of media coverage.  (RT 1304-5.)  He believed there
12  were two to three suspects, including one who might have stayed
13  in the car.  (RT 1189-90.)  He also looked into other robberies
14  with a similar MO.  (RT 1191.)  On June 4, he showed Ray LaBonte
15  a photo lineup (People's exhibit 31.)  He selected a photograph
16  of Aaron Mills had been identified as a possible suspect because
17  he had committed a series of robberies.  (RT 1193-94.)  However,
18  further investigation convinced him that Mills had not been
19  involved.  (RT 1194.)  Wynkoop followed up on 91 leads (RT 1194),
20  yet from May until the end of August they developed nothing
21  significant.  (RT 1199-1200, 1306, 1310.)  On September 2, 1999,
22  he learned of an informant identified as Bobbie from CHP officer
23  Tom Plume.  He reported that she knew who was involved and gave
24  him the name "JR" who was associated with Tam High School in
25  Mill Valley.  (RT 1310-11.)  Wynkoop learned that the a student
26  known as JR was Willie Kennedy.  (RT 1200-2.)  Kennedy had a
27  criminal record for attempted robbery and firearm and drug
28  possession.  (RT 1313.)

ii

1    On September 8, Wynkoop met Bobbie at a restaurant in San
2    Francisco.  (RT 1203-5.)  She indicated she was interested in
3    obtaining the $28,000 reward offered in the case.  (RT 1336,
4    1346-9.)  She gave him a torn photo of Daniel Mooring (People's
5    exhibit 93, RT 1207.)  She told him that his nickname was Milo
6    and that he hung out on Market Street.  She informed them that
7    he was in custody on crack and gun charges.  This information was
8    corroborated.  (RT 1314-5.)  She told them the driver was Tremayne
9    (no last name was provided) and that he had a red convertible
10   Mustang, and that the other two involved were Santese and Kennedy.
11   She told them all the men were on drugs when the incident occurred.
12   (RT 1209, 1315.)
13   Wynkoop found DMV records indicating that Tremayne Collier
14   petitioner had a 1991 Ford.  (RT 1208.)  He also developed as a
15   suspect Paul Tremaine Davis who owned a Porsche.  On September
16   17, LaBonte identified Davis' photo in a lineup.  (RT 1209-12.)
17   LaBonte did not select Kennedy or Mooring in other lineups and
18   he was not shown a photo of petitioner at that time.  (RT 1212-14.)
19   On September 29, 1999, Wynkoop met with Frank Caiazzo in
20   San Anselmo.  (RT 1214.)  He selected petitioner's photo from a
21   lineup as a suspect in a June 19, 1999 robbery.  (RT 1241-44.)
22   On November 22, 1999, SFPD executed search warrants at the
23   homes of Kennedy in San Rafael, Paul Tremaine Davis in Marin City
24   and petitioner in Richmond.  (RT 1247.)  Mooring's home was not
25   searched that day.  (RT 1248.)
26   In petitioner's bedroom officers found a black down jacket,
27   People's exhibit 51.  (RT 850-54, 951-53, 2193-98.)  The jacket
28   was examined by the SF crime lab in October, 2000, for traces of

12

1   blood and gunshot residue? (RT 1588, 1606-11.)

2   Wynkoop spoke with petitioner on November 22 at the homicide

3   detail at the Hall of Justice. (RT 1248.) Petitioner came to

4   the office with his parents without an appointment. He was not

5   under arrest and after they spoke he was allowed to leave. (RT

6   1249-50, 1258.) Their conversation was recorded and played for

7   the jury. (RT 1252, People's exhibit 100 [CT 1342-68].) Petitio-

8   ner denied involvement. (RT 1362.) Petitioner provided a DNA

9   sample because a cigarette butt found at crime scene had been

10  examined and testable DNA had been found. (RT 1259-60.) They

11  showed him photos and petitioner told the officer he recognized

12  Kennedy and Paul Davis but not Mooring. (RT 1253-56.) Petitioner

13  identified Photos of his car, but denied that he was the person

14  depicted in the ATM photos. (RT 1256-7.) He told officers he

15  purchased the car on May 27. (CT 1351.)

16  Wynkoop had another conversation with petitioner on October

17  18, 2000. A tape of this interrogation was played for the jury.

18

19  2. No evidence of blood was found. (RT 1612.) Distinctive
    GSR particles were found on both sleeves. (RT 1614.) This
20  was consistent with a man wearing the jacket standing over a
    prone victim next to person who shot the victim three times.
21  (RT 1615-16.) However, because the testing occurred at least
    six months after the shooting it was "pretty hard to associate"
22  the particles with this crime and a date of deposit could not
    be determined. (RT 1632-34.)

23

24  DNA sample were taken from all 4 suspects in the case and
    they were all eliminated. (RT 1616-23.)
25
    Rodolfo Gomez testified and produced documents establishing
26  that he sold a car to Tremayne Collier on May 11, 1999, but
    he was unable to identify him in court. (RT 1831-1836.)
27

28

13

1  (RT 1286-7, CT 1369-1403 People's exhibit 103.)  He told the
2  officers he loaned his Mustang to Kennedy on May 25, 1999.  He
3  was with Mooring and said he was going into San Francisco to pick
4  up Santese.  He was supposed to return the car within an hour.
5  (RT 1288-9.)  Petitioner did not go along to San Francisco, but
6  was with his girlfriend Erica Delgado.  (RT 1289-90.)  He met up
7  with Kennedy at Denny's later and Kennedy ran into a girl he knew
8  from school.  (RT 1291.)  Petitioner told them he could solve
9  the case for them.  (RT 1291.)  He also stated that he had not
10  killed anyone.  (RT 1301.)

11      Wynkoop also spoke to Mooring who was in custody on November
12  22.  (RT 1261-62.)  He denied involvement.  (RT 1322, 1362.)  On
13  December 3, Mooring told the officers he was in trouble and that
14  he wished he had never met those guys.  He told them he was in
15  the wrong place at the wrong time and that if he told them what
16  happened he would be incriminating himself.  (RT 1413-6.)

17      Kennedy refused to speak  and asked for counsel after his
18  residence was searched on November 22.  (RT 1322, 1360.)  Later
19  that afternoon, Kennedy's attorney faxed the officers a letter
20  asserting Kennedy's right to remain silent and his continued
21  assertion of his right to counsel.  (RT 1365-6.)  However, Wynkoop
22  was contacted on November 24, by Sergeant Ridgway from the Marin
23  Sheriff's Department who told him that Kennedy has spoken to
24  informant and was interested in talking to them.  (RT 1264.)
25  Wynkoop and Cashen went to San Rafael and met with Ridgway and
26  them with Kennedy.  After they spoke to him he drove with them to
27  San Francisco but he was not placed under arrest.  (RT 1265-67.)
28  They drove around in the Marina, went to Hyde and Vallejo

14

1  and then to Golden Gate and Laguna.  (RT 1268-9.)  Kennedy's
2  statement was the first time the officers received any significant
3  detail about the crimes.  They began looking for corroboration
4  of this story, even though they did not think everything Kennedy
5  told then was true.  (RT 2463-65.)

6  On November 29, they went to the Sony Metreon where Santese
7  Edwards worked.  They ran a computer check to locate his residence
8  at Golden Gate.  (RT 1271-2, 1397-8.)

9  On December 2, they interviewed Kennedy's mother Renee
10  Williams.  She told them that Milo was at her house the night
11  of the murder and while they were watching a TV news report
12  about the killing she asked him if he was involved.  Milo admitted
13  he shot the man.  (RT 1395.)

14  On December 3, they interviewed Edwards who told them he
15  knew nothing about the incident and that he had been at work
16  that night or else with his girlfriend.  Officers were unable to
17  confirm his alibi.  (RT 1401-3.)

18  On December 6, 1999, the officers served a search warrant
19  on Edwards' residence.  (RT 1273.)  They seazed two photos, one
20  of Mooring and Edwards (People's exhibit 101) and one  of Kennedy
21  and Edwards (People's exhibit 102.)  They also seazed a black
22  jacket.  (People's exhibit 52) which matched the description of
23  that worn by the perpetrators.  (RT 1273-6, 1293.)

24  In May, 2000, officers went to the home of Lashonta Bateast
25  who lived with Mooring's cousin.  (RT 1417-19, 2294-95.)
26  Mooring had been staying there and officers saw him in the
27  residence that day.  (RT 1420, 1427, 2310.)  Bateast told them
28  that a day or two after the shooting, Mooring was at her house

15

1  with another man.  Mooring asked Bateast if she had seen the
2  news about a tourist killing and then stated that the other guy
3  went through his pockets and that Mooring shot him because he
4  needed money.  The other man was laughing while Mooring talked.
5  She got the impression that he was the man Mooring was referring
6  to.  (RT 1422-26, 2300-1.)  Bateast had not identified petitioner's
7  photo as the man with Mooring.  (RT 1428, 2306-07.)  She identi-
8  fied a photo of Edwards as this man.  (RT 1422-3, 2455.)

9      Charges were not filed against Mooring, Edwards and petitioner
10  until April 2001.  Kennedy's case was resolved by a plea on the
11  day he testified before the grand jury in April, 2001.  He pled
12  guilty to Penal Code section 32 with credit for 1 day time served
13  and a chance to have the charge reduced to a misdemeanor if he
14  successfully completed probation.  (RT 1374-5.)  Kennedy was
15  arrested in January, 2003 for a home invasion robbery with a
16  firearm which occurred in Marin County.  (RT 1377-80.)

17      Edwards eventually pled guilty and agreed to become a prosecu-
18  tion witness.  (RT 1407.)

19  **Testimony of Participants Santese Edwards and Willie Kennedy**

20      Edwards testified that he met Mooring in 1998 and through
21  him met Kennedy and petitioner.  (RT 1702-07, 1713-14.)  Kennedy
22  had known petitioner his whole life.  (RT 1977.)  In May, 1999
23  petitioner had a red mustang convertible.  (RT 1717-18, 1981.)
24  Petitioner and Kennedy lived near each other in Richmond.  (RT
25  1980.)  They used drugs which Kennedy provided.  (RT 1982-3.)
26  Kennedy met Edwards and Mooring in 1998 through Leslie Duvlin,
27  a prostitute with whom Kennedy had a relationship.  (RT 1983-86,
28  1989-90.)

16

1    On May 25, Edwards was at his girlfriend's house in Daly City
2  when he got a phone call from Kennedy about getting together.
3  He was picked up at his grandmother's house on Golden Gate by
4  the three other men in petitioner's car.  (RT 1707, 1730-39 2009.)
5  Edwards was wearing a black nylon pullover jacket.  (RT 1738.)
6  Petitioner was wearing a black jacket and Kennedy was wearing a
7  black leather jacket.  (RT 1754-56, 2016.)

8    Kennedy brought his gun in a gym bag.  (RT 2010, 2015.)
9  Edwards saw Kennedy holding the bag which contained a .22 rifle.
10  He had seen the rifle seen in Kennedy's possession in the past.
11  It was raggedy and broken down.  (RT 1721-26, 1740-42, 1996-99,
12  2015.)

13    Edwards denied that the men used any drugs or alcohol that
14  night[3].  (RT 1747, 1757, 1765, 1783.)  Kennedy did not recall
15  whether they used or not.  (RT 2013, 2046-48.)

16    Edwards testified that they went to Market Street, where
17  Kenney saw someone who had tried to rob him.  Kennedy and petitio-
18  ner got out of the car, with Kennedy taking the gun.  Edwards
19  lost sight of them for a short time and then heard a guy screaming.
20  The two came running back.  Kennedy still had the gun.  (RT 1750-
21  53.)  Kennedy initially denied they stopped on Market Street
22  (RT 2045), but later admitted that he and petitioner had contact
23  with a man before the Marina incident and that they were trying
24  to rob him.  (RT 2093-95.)

25    When they got back in the car the men headed toward the Marina.

26

27    3. He previously stated that the men smoked some weed and did
some coke to bolster their courage.  (RT 2289.)

28
17

1   Edwards did not recall any discussion of what they were going to
2   do there[4]  (RT 1757.)  Kennedy admitted that they discussed
3   jacking someone.  (RT 2019.)  kennedy was holding the gun.  (RT
4   1757-60.)  They saw a man walking by himself.  Edwards got out
5   of the car and told petitioner to drive around the corner and
6   meet them in the same spot in three minutes.  Kennedy gave the
7   gun to Mooring who joined Edwards.  (RT 1761-64, 2020, 2038-41.)
8   Petitioner and Kennedy drove off.  (RT 1766, 2021.)

9       Edwards and Mooring ran toward the man, with Mooring holding
10  the gun.  Mooring stood in front of him and Edwards was in back.
11  They went through the man's pockets.  Neither of them spoke to
12  the man.  (RT 1766-68.)  After getting his money Edwards backed
13  up and saw Mooring hit the man with  the gun.  (RT 1768-69.)
14  The man fell to the ground.

15      The car returned about 3-4 minutes later.  (RT 1774, 2042.)
16  After they got in Edwards asked Mooring why he hit the man so
17  hard.  (RT 1775-77.)  Kennedy recalled that Mooring told them
18  that when he hit the man a bullet fell out of the gun.  (RT 2044.)

19      After stopping briefly on Mission and 7th (RT 1777-79, 1783,
20  2047), they drove to Nob Hill.  (RT 1786.)  They saw two men
21  walking down the street and Edwards thought it was petitioner
22  and Kennedy's turn to rob them, but Kennedy didn't want to
23  participate so Mooring went with petitioner.  (RT 1790-92, 1801,
24  2052-54.)  Mooring had the gun and he and petitioner went toward
25  the men.  (RT 1793-94, 2054.)  Not long after they left the

26      4.  The prosecutor attempted unsuccessfully to refresh his
     memory with a previous statement that the other three were talking
27   about robbing someone downtown, but that Edwards was not worried
     because he knew he would not participate.  (RT 1759.)
28

18

1 | they heard two or three shots right after each other.  (RT 1794-95.)
2 | Within a half minute the other two ran back to the car.  Mooring
3 | still had the gun.  (RT 1979-99, 2057-58.)  They asked Mooring
4 | what he did.  Mooring said he did not know why he shot the man[5].
5 | (RT 1799-1800, 2058-59.)  Edwards did not recall petitioner saying
6 | anything.[6]  (RT 1801.)  As they drove someone was throwing papers
7 | from the wallet out the car window.  Edwards thought it was
8 | Kennedy but Kennedy denied doing it and told the grand jury it
9 | was petitioner.  (RT 1801-2, 2060-61, 2291.)

10 | They drove to the gas station at Turk and Franklin and bought
11 | gas.  Kennedy testified at the grand jury that petitioner paid
12 | with a credit card from the wallet.  (RT 2062-3.)  Edwards then
13 | drove to his house and left the others.  He told them to get rid
14 | of the gun.  (RT 1804-6, 2063.)  The next day Edwards watched
15 | the news with his girlfriend and this was the first time he heard
16 | that someone had been killed.  (RT 1806-7.)

17 | Kennedy testified that the other three men drove across the
18 | bridge and went to Denny's in Emeryville where he saw a high
19 | school friend Elena Bishop.  They ate with her and her friends
20 | and petitioner paid for the food with a credit card.  (RT 2065-69.)
21 | Bishop corroborated his account.  (RT 962-87.)  She identified
22 | petitioner who she told police had been wearing a black leather
23 | coat.  (RT 982, 985.)  She described the men as laughing and
24 | joking around.  (RT 979.)  The men looked like they had come from
25 | a club and they did not seem to have just had a traumatic experien-
26 |

27 | ----
5.  He previously stated that Mooring told them the shooting was an accident and that he looked shocked and remorseful.  (RT 2290.)
28 | 6.  He previously stated that petitioner told Mooring he didn't

19

1  ce.  (RT 987-88.)

2  Kennedy testified that after they left Denny's petitioner

3  dropped Kennedy and Mooring off at Kennedy's house.  The next

4  morning Kennedy heard about the robbery on TV and that a man had

5  been shot in the head three times.  (RT 2070-73.)  Kennedy

6  testified that he did not know what happened to the gun or where

7  it was when petitioner dropped him off. He claimed he did not

8  recall what he did with it.  (RT 2073-74.)  Kennedy did recall

9  seeing or speaking to Edwards or Mooring after May 26, or how

10  often he saw petitioner after the incident.  (RT 2078-79.)

11  **Kennedy's and Edwards' Deals with the Prosecution**

12  Prudence Wesson  contacted Marin Sheriff Sgt Ridgway on

13  November 24 and arranged for Kennedy to talk to him.  (RT 2083.)

14  Kennedy and Ridgway and then Wynkoop and Cashen some of what he

15  knew, and gave more information over time.  (RT 2083-86.)  Kennedy

16  eventually testified before the grand jury but first he got a

17  plea deal in which he was able to plead guilty to a felony

18  charge of accessory.  (RT 2089, 2235.)  He was sentenced to

19  probation with one day in jail in exchange for giving truthful

20  testimony at Mooring's trial as well as petitioner's.  (RT 2089-

21  2091, 2250.)  Deputy District Attorney Jerry Coleman testified

22  that this plea was kept secret and that Kennedy pled and was

23  sentenced on the same day to protect the secrecy of the grand

24  jury proceedings and to protect Kennedy.  (RT 2238-41.)  The

25  prosecutor agreed that after Kennedy had discharged his duties

26  under the plea agreement he would not object to reducing the

27

28  have  to do it. (RT 2291.)

1  charge to a misdemeanor. (RT 2247.)  Even if Kennedy did not
2  meet the terms of his agreement, he could only be sentenced for
3  up to three years in prison.  (RT 2249.)  He entered the witness
4  protection program, received living expenses and went to Hawiia.
5  (RT 2090-91, 2165, 2241.)

6      In January, 2003, Kennedy committed a home invasion robbery
7  in Marin County and later pled guilty to a residential robbery
8  charge for which he received probation.  (RT 2092.)  In 1998, he
9  was arrested in possession of a loaded handgun with the serial
10 numbers shaved off.  (RT 2092, 2099.)  Kennedy was also arrested
11 in 1994 for attempted robbery of a bank and in 1997 he was pulled
12 over and found in possession of a stolen cell phone.  (RT 2097-
13 98.)  At the time he testified he was on 5 years probation.
14 (RT 2111.)

15 Edwards lost touch with the others and did not know about
16 the investigation or that the other men's houses had been searched
17 by police. (RT 1811.)  On December 6 when the police searched
18 his house they took a jacket, People exhibit 52.  He had not
19 loaned that jacket to anyone of the other men and neither he
20 or petitioner was wearing it on May 26.  (RT 1814-15.)  Edwards
21 was arrested in April, 2001.  (RT 1818-20.)  In early 2002,
22 petitioner gave Edwards a letter, People's exhibit 71.[7] (RT 1826-
23 27.)  It purported to described the events of the evening and
24 Edwards testified that much of what was contained in it was not
25 true.  (RT 1837-46.)

26 Edwards held the letter for a month or two and then he gave

28 7.  The content of the letter is contained in CT 1291-96.

21

1 | it to his lawyer to use it to obtain benefit for him in the case.
2 | (RT 1846-7.)  After he provided a lengthy statement to defense
3 | investigator Pamela Olsen in which he answeared questions posed
4 | by the District Attorney, he was offered a negotiated plea bargain.
5 | (RT 2276-83, 2286.)  On June 25, 2002, Edwards pled guilty to
6 | grand theft in which a principal was  armed,   for which he could
7 | receive a maximum 4 year sentence.  (RT 1848-9.)  He remain in
8 | custody until January 10, 2003.  After that he mostly lived out
9 | of the county and the prosecution briefly paid some of his expenses.
10 | (RT 1850.)

11 |    In May, 2004, two cases against Edwards in San Joaquin County
12 | were resolved by plea.  He pled guilty to misdemeanor counts
13 | of carrying a concealed weapon  and grand theft for which he
14 | served a total of 40 days in county jail.  No information about
15 | any San Francisco cases were presented to the San Joaquin officials
16 | before this deal was arranged.  This case  was disposed of in a
17 | typical way for San Joaquin County for a defendant with a minor
18 | criminal record.  (RT 2218-20.)

19 | **Other Crimes Evidence -ATM Robbery of June 19**

20 |    Frank Caiazzo testified that he was robbed at an ATM machine
21 | in Terra Linda about 4:30 a.m. on June 17, 1999.  (RT 1459-60.)
22 | He met a man in a bar in Sausalito who told him he could get
23 | drugs for him.  They went in a cab to a Marin City apartment
24 | where they stayed for about an hour.  (RT 1461-2.)  There he was
25 | introduced to three men who said they would give him a ride to
26 | Terra Linda to withdraw money to purchase the drugs. They wanted
27 | $100 for the drugs and a ride.  (RT 1462-3.)  He got in the car
28 | with three men and they drove to the ATM.  (RT 1463-6.)

22

1     He got out to get the money at the bank and after he withdrew.
2   it he saw the driver coming toward him with a short barrel
3   shotgun[8]. (RT 1467.) He described the driver as an African-
4   American man in his early 30's who was taller and wider and balding.
5   (RT 1464-5.) Caiazzo put his hand up and the man hit him with
6   the back of the gun. He fell and the man put his foot on his
7   back so that his face was on the ground. He gave the driver the
8   money and he took it and left. The man had not said anything to
9   him but simply left and drove off. The other men did not leave
10   the car during the entire incident. (RT 1467-71.)

11     Caiazzo was unable to identify petitioner in court. He did
12   identify a photograph that he had selected from a line up on
13   September 29, and described it as a younger version of petitioner.
14   (RT 1476-8.)

15     The prosecutor introduced photos taken by the ATM security
16   camera, People's exhibit 96-99 and 106-118. (RT 1487-92.) Retired
17   Firearms Examiner Coddington viewed the ATM photos and testified
18   that the object he saw in the hands of the man depicted in
19   People's exhibit 98. He opined that the man was not holding a
20   revolver and that the object was not inconsistent with a semiauto-
21   matic handgun and was more likely a rifle type weapon. He could
22   not determine the likely caliber of the weapon from the photograph.
23   The object was not inconsistent with a ax handle. (RT 1551-54.)

24     Denise Lebard testified that she was present on February
25   23, 2000 at an official proceeding where petitioner admitted he
26   was the man shown in the ATM photos. He stated that he was holding
27   an ax handle. (RT 1697-1700.)

28     The defense case focused on the lack of credibility of the

23

1   only two witnesses who described the events -- the participants
2   Edwards and Kennedy.

3       A complaint was filed on April 17, 2001, naming Kennedy in
4   relation to the instance case. (RT 2343-47.) When the case
5   went to court it was discharged and the complaint was not filed.
6   The docket from Department 10 showed that the case was dropped
7   and that no criminal prosecution went forward and makes no indica-
8   tion that any proceedings involving Kennedy occurred that day in
9   Department 22. (RT 2347-50.)

10      On January 9, 2003, at 4:22 a.m. officers responded to a
11  report of a home invasion robbery. They learned that several
12  armed suspects had entered the house and stolen property. The
13  apartment was ransacked. (RT 2406-09.) A car matching the
14  description of the suspect vehicle was stopped and Kennedy was
15  one of the occupants. The victims identified the men in the car.
16  (RT 2410-11.) Stolen property and two handguns were found in the
17  car and Kennedy had a BB pistol in his pocket. (RT 2413-2415.)
18  Kennedy was identified as the man who ordered one of the residents
19  out of the shower at gunpoint and who threatened him. (RT 2412.)
20  Kennedy was wearing a black puff jacket. (RT 2415.)

21      Kennedy's commitment offense was a home invasion robbery which
22  is a rare type of crime in Marin County and is seen as a serious
23  felony. (RT 2329.) The department eventually recommended probation
24  for Kennedy after reviewing the information they had about his
25  background. They gave a great deal of weight to the fact that
26  they believed Kennedy had only one misdemeanor conviction as a
27  juvenile and to his severe learning disabilities. (RT 2330-31.)
28  His criminal history did not show any convictions from San

1   Francisco.  (RT 2335.)  Kennedy wrote a letter asking for a second
2   chance and stating that he had never engaged in this type of
3   criminal conduct before.  (RT 2330.)  All 4 participants eventually
4   received probation with 9 month county jail sentences.  (RT 2333.)

5       Kennedy had been detained in possession of a fully loaded
6   Lorcin .380 handgun with the serial number removed in Marin City
7   in 1998.  (RT 2338-42.)

8       Agent Ahern investigated a tip regarding Donald Miller who
9   was reported to have arrived at a party and announced that he
10  had  popped a white boy.  (RT 2357.)  Miller was a black male in
11  his 20's and was tall and thin. They conducted significant inves-
12  tigation, including surveillance during June and July, 1999.  He
13  was seen in a burgandy Buick Skylark during this time.  He
14  concluded in January, 2000 that Miller was not a viable suspect.
15  (RT 2358-63.)

16      Edwards was arrested in Stockton in January 2004, for theft
17  of almost $1,000 of property from a Sears store.  He refused to
18  make a statement to police who checked his records and found an
19  outstanding warrant.  (RT 2419-22, 2437-39.)

20      Edwards was stopped by Stockton PD again in May, 2004, for
21  a minor traffic violation.  A misdemeanor warrant was discovered
22  and his car was impounded.  Edwards was in possession of a loaded
23  Beretta handgun.  The officer ran his criminal hostory and it
24  came back negative.  He told officers he had the gun because he
25  lived in a dangerous neighborhood.  (RT 2424-35.)

26      Michael Ridgway testified about the initial statement he took
27  from Kennedy on November 24.  He was contacted by Prudence Wesson[9]
28  8.  Wesson had pending cases in Marin.  Ridgway talked to the

25

1  and informed that she had spoken to Kennedy about this case and
2  that he had admitted his involvement.  He told her he never left
3  the car and he claimed that he had nothing to do with the robbery.
4  (RT 2538-42.)  Ridgway contacted Cashen who told him that Kennedy
5  had refused to speak to them and who asked Ridgway to try to get
6  a statement from Kennedy.  (RT 2542-44.)  Ridgway called Wesson
7  back and arranged to speak to Kennedy at her residence.  (RT 2547-
8  49.)  He surreptitiously recorded  their conversation.  (RT 2561.)
9  Kennedy told him he did not see the actual shooting, but later
10  told him he saw petitioner remove the victim's wallet from his
11  pants, that he saw knock the victim down to the ground and kick
12  him and put his foot on his throat.  (RT 2550-51.)  Kennedy told
13  him that petitioner asked Mooring why he shot the man.  (RT 2565.)
14  Kennedy told him they used the victim's credit card at Denny's.
15  (RT 2552.)  He said he threw the gun off the Bay Bridge.  (RT 2552.)
16  He did not believe all of kennedy's statements and wrote in his
17  report that he displayed "clear signs of deception" when he began
18  talking about the gun.  (RT 2553, 2573.)  He also inquired about
19  the second robbery which Cashen had told him about.  (RT 2553.)

28  prosecutor for her and they were resolved.  (RT 2554-55.)

26

I.

PETITIONER'S CONVICTIONS OF FIRST DEGREE
MURDER, THE GUN, AND THE TWO ROBBERIES
WERE BASED ON INSUFFICIENT EVIDENCE.

The standard of review for addressing the sufficient of the evidence to support a conviction is the same on habeas corpus review as it is on direct appeal.  Mike v. Borg, 947 F.2d 353, 356 n.5 (9th Cir. 1991); See also Jackson v. Virginia, 443 U.S. 307, 309, 99 S.ct. 2781, 2783, 61 L.Ed.2d 560 (1979) (quoting Tamapua v. Shimoda, 796 f.2d 261,263 (9th Cir. 1986).

Reasonable doubt is defined in California Penal Code § 1096 as follows:

"It is not a mere possible doubt; because everything
relating to human affairs . . . is open to some
possible or imaginary doubt.  It is that state
of the case, which, after the entire comparison
and consideration of all the evidence, leaves the
minds of jurors in that condition that they . . .
cannot say they feel an abiding conviction . . .
of the truth of the charge."

In 1894 . . . the court interpreted the predecessor of 28 U.S.C. § 2243 as vesting federal courts "with the largest power to control and direct the form of judgment to be entered in cases brought up before it on Habeas Corpus."  Rogers v. Richmond, 365 U.S. 534, 549 (1951); Dowd v. United States ex rel Cook, 340 U.S. 206, 210 (1951); In re Bonner, 151 U.S. 242, 261-62 (1894).

Proof beyond a reasonable doubt is required to establish

27

1 | guilt of criminal charge. <u>In re Winship</u>,(1970) 397 U.S. 358,
2 | 362, 90 S.Ct. 1068, 25 L.Ed.2d 368.

3 |     Proof of which conviction is based must meet higher standard
4 | than that required for indictment to be constitutionally adequate;
5 | it must support finding beyond a reasonble doubt of every element
6 | of offense. <u>Tamapua v. Shimoda</u>, 796 F.2d 261 (9th Cir. 1986).

7 |     Sufficiency of evidence to convict is a fundamental concerns
8 | of the Due Process Clause. See <u>In re Winship</u>, supra, 397 U.S.
9 | 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); <u>Thompson v. Louisville</u>,
10 | 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (quoting <u>Tamapua</u>
11 | <u>v. Shimoda</u>, supra, 796 F.2d at 263.

12 |     In the present case, Ms. Prudence Wesson contacted Marin
13 | Sheriff Sergeant Ridgway on November 24 and arranged for Kennedy
14 | to talk to him. (RT 2083.) Kennedy and Ridgway and then
15 | Wynkoop and Cashen some of what he knew, and gave more information
16 | over time. (RT 2083-86.) Kennedy eventually testified before
17 | the grand jury but first he got a plea deal in which he was
18 | able to plead guilty to a felony charge of accessory. (RT 2089-
19 | 2235.) He was sentenced to probation with one day in jail in
20 | exchnge for giving truthful testimony at Mooring's trial as well
21 | as petitioner's. (RT 2089-2091, 2250.) Deputy District Attorney
22 | Jerry Coleman testified that this plea was kept secret and that
23 | Kennedy pled and was sentenced on the same day to protect the
24 | secrecy of the grand jury proceedings and to protect Kennedy.
25 | (RT 2238-41.) The prosecutor agreed that after Kennedy had
26 | discharged his duties under the plea agreement he would not
27 | object to reducing the charge to a misdemeanor. (RT 2247.)
28 | Even if Kennedy did not meet the terms of his agreement, he

1  could only be sentenced for up to three years in prison.  (RT

2  2249.)  He entered the witness protection program, received

3  living expenses and went to Hawiia.  (RT 2090-91, 2165, 2241.)

4      In January 2003, Kennedy committed a home invasion robbery

5  in Marin County and later pled guilty to a residential robbery

6  charge for which he received probation.  (RT 2092.)  In 1998,

7  he was arrested in possession of a loaded handgun with the serial

8  numbers shaved off.  (RT 2092, 2099.)  Kennedy was also arrested

9  in 1994 for attempted robbery of a bank and in 1977 he was

10  pulled over and found in possession of a stolen cell phone.

11  (RT 2097-98.)  At the time he testified he was on five years

12  probation.  (RT 2111.)

13      Santese Edwards lost touch with the other and did not know

14  about the investigation or that the other men's houses had been

15  searched by police.  (RT 1811.)  On December 6 when the police

16  searched his house they took a jacket, People Exhibit 52.  He

17  had not loaned that jacket to anyone of the other men and neither

18  he or petitioner was wearing it on may 26.  (RT 1814-15.)

19  Edwards was arrested in April 2001.  (RT 1818-20.)  In early

20  2002, petitioner gave Edwards a letter, People's Exhibit 71.

21  (RT 1826-27.)  It purported to described the events of the

22  evening and Edwards testified that much of what was contained

23  in it was not true.  (RT 1837-46.)

24      Edwards held the letter for a month or two and then he gave

25  it to his lawyer to use it to obtain benefit for him in the case.

26  (RT 1846-1847.)  After he provided a lengthy statement to defense

27  investigator Pamela Olsen in which he answered questions posed

28  by the District Attorney, he was offered a negotiated plea

29

1  bargain.  (RT 2276-83, 2286.)  On June 25, 2002, Edwards pled
2  guilty to grand theft in which a principal was armed, for which
3  he could receive a maximum 4 year sentence.  (RT 1848-49.)  He
4  remain in custody until January 10, 2003.  After that he mostly
5  lived out of the county and the prosecution briefly paid some
6  of his expenses.  (RT 1850.)

7     In May 2004, two cases against Edwards in San Joaquin County
8  were resolved by plea.  He pled guilty to misdemeanor counts of
9  carrying a concealed weapon and grand theft for which he served
10 a total of 40 days in county jail.  No information about any
11 San Francisco cases were presented to the San Joaquin officials
12 before this deal was arranged.  This case was disposed of in a
13 typical way for San Joaquin County for a defendant with a minor
14 criminal record.  (RT 2218-20.)

15    Edwards testified that petitioner and Mooring got out of the
16 car when Mr. Shayne Worcester was killed and robbed.  (RT 1793-
17 1794, 2054.)  However, Mr. Mooring told Mrs. Lashonta Bateast
18 that he and Santese Edwards killed Mr. shayne Worcester because
19 he needed the money.  (RT 2309.)  Mrs. Bateast testified that
20 Defendant's Exhibit BB is a photo of Mooring and Santese Edwards
21 who was the other person who was on the couch when Mooring was
22 telling her that he and the man on the couch was with him when
23 Mr. Worcester was killed and robbed.  (RT 2314.)

24    Mrs. Lashonta Bateast testified during petitioner's trial,
25 that the man who was sat on the couch when Mooring was telling
26 her  that he killed Mr. Worcester was not in the courtroom.  (RT
27 2307.)

28       Also Mrs. Leslie Devlin (A.K.A. "Bobby" or  "tip # 89")

30

could have provided testimony that Kennedy told her, "that he was with Milo (Mooring) when Milo shot the dude and Collier was in the car." It should be noted that Mrs. Duvlin did not testify in this case because trail counsel failed to subpoena her.

Teon Ford would have provided testimony that he personally saw Mooring, Kennedy, Edwards, and petitioner on Market Street on two separate occacions during the night in question. He was aware that Kennedy had a gun and intended to harm him, but petitioner stepped in and prevented anything from happening. Petitioner also advised Ford to leave the area because of Kennedy's intentions. Ford's testimony would have provided proof that petitioner never joined any type of conspiracy to rob people. It should be noted that when petitioner told Mr. Ford the above, he had consumed heroin, cocaine, marijuana, and alcohol. Mr. Ford never testified on petitioner's trial because trial counsel failed to subpoena him.

In the present case, the jury found not true the special circumstances to wit: that the murder of Mr. Shayne Worcester occurred while he was robbed under California Penal Code § 190.2 (17)(A). The finding of the jury contradict the entired verdict against petitioner. See (RT 2843-2844.)

Santese Edwards told Miss Pamela Olsen that he drove the car to the Marina. (RT 1937.) Edwards also told Miss Olsen that he smoke weed and had done coke in the car which bolstered his courage. (RT 1938.) Edwards drove the car all the time because petitioner could not drive because he was too drugged to drive.

Willie Kennedy received from the Witness Protection Program

1   about $10,000.  Before Kennedy was in the program, he was a drug
2   dealer.  After Kennedy did not receive any more help from the
3   Witness Protection Program, he started selling drugs again.
4   (RT 2145.)

5       When Shayne Worcester was killed, petitioner was in the
6   car sleeping because he was under the influence of heroin,
7   cocaine, marijuana, and alcohol.  Petitioner was convicted based
8   on the testimony of Santese Edwards and Willie Kennedy.  These
9   men's  testimony is "so incredible, so contrary to the teachings
10  of human experience, so completely at odds with ordinary common
11  sense, that no reasonable person would believe it beyond reasona-
12  ble doubt."  See Wilcox v. Ford, 813 F.2d 1140, 1146 (11th Cir.
13  1987); United States v. Gafyczk, (11th Cir. 1988) 847 F.2d 685,
14  693.

15      The sufficiency of the evidence to support a conviction is
16  reviewed de novo.  United States v. Ruiz, 462 F.3d 1082, 1087-88
17  (9th Cir. 2006).  Viewing the evidence in the light most favora-
18  ble to the government, we must determine whether any rational
19  jury could have found Esquivel guilty of each element of the
20  crime beyond a reasonable doubt.  Id., at 1088.

21      Passenger's emotional outburst and presence in van contai-
22  ning drugs does not establish participation in conspiracy.
23  U.S. v. Esquivel-Ortega, (No. 05-30355 9th Cir.) D.A.R. 6412
24  Wednesday, May 9, 2007.

25      "[I]t is 'well established that a passenger may not be
26  convicted unless there is evidence connecting him with the
27  contraband, other than his presence in the vehicle.  United States
28  v. Sanchez-Mata, 925 F.2d 1166, 1169 (9th Cir. 1991) (quoting

32

1 | United States v. Ramos, 467 F.2d 624-625 (9th Cir. 1973).

2 |     The United States Court of Appeals for the Ninth Circuit
3 | indicated:  We reversed the conviction for possession with intent
4 | to distribute because the only evidence of possession was his
5 | presence as a passenger in the car, which we hold was insufficient
6 | to sustain the conviction.   United States v. Sanchez-Mata, supra,
7 | 925 F.2d at 1169; United States v. Esquivel-Ortega, supra, (No. 05-
8 | 30355 Ninth Cir.)  D.A.R. 6412, 6414.

9 |     Esquivel's mere presence in a vehicle in which drugs were
10 | later found clearly is insufficient to establish his knowledge
11 | of the drugs.   See United States v. Sanchez-Mata, 925 F.2d 1166,
12 | 1169, see also United States v. Lopez, 477 F.3d 1110, 1113 (9th
13 | Cir. 2007) ("Mere proximity to drugs does not establish knowing
14 | possession.")  quoting United States v. Esquivel-Ortega, (No. 05-
15 | 30355 Ninth Cir.)

16 |     "When there is an innocent explanation for a defendant's
17 | conduct as well as one that suggested that the defendant was
18 | engaged in wrongdoing, the Government must produce evidence that
19 | would allow a rational jury to conclude beyond a reasonable doubt
20 | that the latter explanation is the correct one."  United States
21 | v. Vasquez-Chan, 978 F.2d 546, 549 (9th Cir. 1992); see also
22 | United States v. Delgado, 357 F.3d 1061, 1068 (9th Cir. 2004)
23 | quoting United States v. Esquivel-Ortega, supra, (No. 05-30355
24 | Ninth Cir.) D.A.R. at 6414.  In the present case, petitioner was
25 | sleeping in the car due to the heroin, cocaine, marijuana, and
26 | alcohol that he had taken before Mr. Shayne Worcester was shot
27 | by Mooring.  Petitioner did not know what Edwards, Kennedy, and
28 | Mooring were doing in the car because he was sleeping in the car.

33

1  Petitioner never got out of the car before or immediately Mr.
2  Shayne Worcester was shot by Mr. Mooring.

3      "It is not a crime to be acquainted with criminals or to be
4  physically present when they are committing crimes." United
5  States v. Esquivel-Ortega, supra, (No. 05-30355 Ninth Circuit.)
6  D.A.R. at 6415; United States v. Herrera-Gonzalez, 263 F.3d 1092,
7  1095 (9th Cir. 2001); see also United States v. Estrada-Macias,
8  218 F.3d 1064, 1066 (9th Cir. 2000) (quoting with approval a
9  jury instruction requiring the government to prove that "in
10 addition to being present or knowing about the crime, the
11 defendants knowingly associate themselves with the crime in
12 some way as participants -- persons who wanted the crime to be co-
13 mitted not  as mere espectator.") the government's evidence
14 against petitioner was the testimony of Edwards and Kennedy.
15 These people lied to save their skins.  Like indicated above,
16 petitioner did not know what Mooring, Edwards, and Kennedy were
17 doing in the car because he was sleeping due to the consumption
18 of heroin, cocaine, marijuana, and alcohol.  Petitioner never
19 got out of the car when Mr. Worcester was killed.  Therefore,
20 the first degree murder, the gun, and the two counts of robbery
21 convictions and sentences need to be reversed because no evidence
22 prove them.

23
24
25
26
27
28

34

II.

PETITIONER WAS DENIED A FAIR TRIAL BECAUSE JUROR
11, MS. 674749 WAS **TAMPERED.**

The judge and Juror 11, Ms. 674749 had the following exchanges:

The Court:  Good afternoon. We  are in Chambers with juror number 11, Ms. 674749.  Ms. 674749, my clerk brought to my attention at, I think at the lunch hour, if I recall correctly, a concern that you expressed to him about an exchange that happened to you in the hallway of the Hall of justice today, and I'd like to ask if you could tell us, please, what was it that you experienced so we can know that.

Juror:  It was not an exchange that I experienced, it was just something that somebody had said that I felt -- that said as we passed each other in the Hallway that I felt was directed to me.

The Court:  And what was that?

Juror:  Her words were  "And there's juror number 11, as we speak."

The Court:  And was this one person or several people who were together, or was the scenario and where did it occur?

Juror:  It occurred on the third floor as I got off the elevator, and then there's s short hallway and then there's the main hallway.

The Court:  Were you going back to the jury assembly room?

Juror:  Yes, exactly.  I was going to have my lunch there.

The Court:  Okay.

Juror:  And it was shortly after turning the corner in the main hallway, and there was a small group of people.  Initially there was a young man that, because of the way I was turning and

35

1    where he was standing, we looked right at each other, and then

2    there were two other people that appeared to be -- it seemed

3    like he was kind of waiting for them and they were moving up

4    from the hallway.  This would have been right near the women's

5    restroom there.

6        The Court:  Okay.

7        Juror:  And there was this fellow that appeared to be young,

8    youngish, to me, and a woman I had no idea what her age might

9    be, but she was quite tall, and there was another person and

10   oh, I wan't looking at anybody except the guy, because -- just

11   because of the way we were moving.  And she was walking and I

12   passed her and passed quite close to each other, and she made

13   the remark very clearly.

14       The Court:  What race was this woman?

15       Juror:  Black.  (RT 487, 488, 489.)

16       The Court:  What was the race of the two men or the two

17   other persons?

18       Juror:  One I don't know.  And the one that appeared to me

19   to be the young one, the first person of this group that I saw,

20   looked to me also to be black.  (RT 490.)

21       The Court:  How, if at all, did you feel affected by this,

22   what you heard?

23       Juror:  Well, I was a little startled, and then after it

24   kind of sunk in.  I thought:  Well, that's something I should

25   report; could be important.  **And I did feel a little bit of**

26   **threat.  I did feel a little threatened.  It was in the tone**

27   **of her voice.**

28       The Court:  How would you describe the tone of voice,

36

1 | if you could.

2 | Juror:  Threatened, but not overtly and not directly.  And
3 | like she didn't stop and confront me, it was just in passing,
4 | sort of like she just wanted me to hear this.  And I thought:
5 | well, you know, it seems strange.  It could be a coincidence,
6 | but it would be a pretty strange concidence.  (RT 491.)

7 | Juror 11, Ms. 674749 indicated that she did not tell the
8 | other jurors what happened.  (RT 492.)

9 | Juror 11 said that she was going to be a little cautious,
10 | on the way home.  (RT 493.)

11 | Arthur Wachtel (Defense Counsel) moved for the discharging
12 | of juror 11.  (RT 502, 504.)

13 | Trial counsel's motion to discharge juror 11 was denied
14 | without prejudice.  (RT 505.)

15 | After the verdict was rendered, juror 11 said that the
16 | finding of guilty of petitioner was her true and correct verdict.
17 | (RT 2848.)

18 | The record is silent about juror 11 been discharging.

19 | In United States v. Angulo, 4 F.3d 843 (9th Cir. 1993) (alle-
20 | gation of jury tampering requires evidentiary hearing)  During
21 | the course of the trial, a juror received a strange phone call
22 | at home in which the caller told the juror, "I know where you
23 | live."  The next day, the juror asked if any fellow jurors had
24 | received similar calls, then brought the matter to the attention
25 | of the judge.  The judge interviewed her in chambers, without
26 | the attorneys, and excused her when she told him the call had
27 | scared her, and could affect her ability to deliberate.  The
28 | other jurors were given no explanation of the juror's sudden

37

1  absence, were not questioned regarding bias, not were they given
2  a curative instruction.  Court held that the trial court abused
3  its discretion in failing to hold a hearing under the facts
4  presented.  There was a clear possibility that the remaining
5  jurors may have believed defendants were responsible for the
6  threat to the juror, and the judge should have examined them on
7  this.

8      Juror 11 not only was biased by the comments of the black
9  people she encountered.  Juror 11 also was prejudiced toward
10 petitioner because her boss encouraged her directly or indirectly
11 to convict petitioner,  for example, juror 11 told   to the judge
12 that her boss told her, "burn him" as soon she entered in the
13 room where she worked.  (RT 879.)  Juror 11 said that she was
14 confused.  (Ibid.)  Juror 11, Ms, 674749 supervisor  said
15 to juror 11, while she was in her cubicle, "Well, shall we call
16 you 'hang 'Em High'?  Juror 674749 said, "What?" and she repeated,
17 "shall we call you 'Hang 'Em High'?"  (RT 880.)

18     The matter of juror 11, Ms. 674749 was conducted in a side bar
19 conference but not reported.  (RT 885.)

20     Under the standard announced in Townsend v. Sain, 372 U.S.
21 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) overruled on other
22 grounds by Keeney v. Tamayo-Reyes, 405 U.S. 1; 112 S.Ct. 1715,
23 118 L.Ed.2d 318 (1992), the magistrate judge properly ordered
24 an evidentiary hearing on the issue of Juror misconduct.  "Where
25 the facts are in dispute, the federal court in habeas corpus
26 must hold an evidentiary hearing if the applicant did not
27 receive a full and fair evidentiary hearing ia a State court,
28 either at the time of the trial or in a collateral proceeding."

38

<u>Id</u>., at 313, 83 S.Ct. at 757.   Quoting <u>Lawson v. Borg</u>, 60 F.3d 608,

611 (9th Cir. 1995)

In <u>Lawson v. Borg</u>, supra, 60 F.3d 608 (9th Cir. 1995), the

United States Court of Appeals for the Ninth Circuit indicated:

Federal habeas corpus petitioner challenged murder conviction,

on grounds that juror misconduct violated petitioner's Sixth

Amendment rights.   Magistrate Judge conducted an evidentiary

hearing and the U.S. District Court for the Eastern District

of California K. Karlton, Chief Judge granted writ.   Warden of

State Prison appealed.   The Court of Appeals Schroeder, Circuit

Judge, held that: (1) federal evidentiary hearing was required

on juror misconduct allegations, and (2) jury exposure to

extrinsic evidence of petitioner's reputation for violence was

prejudicial.   Affirmed.

In <u>United States v. Smith</u>, 26 F.3d 739 (7th Cir. 1994).

Juror's statement to other jurors that she had a visitor on

night before she was excused from jury, together with another

juror's expression of concern for her safety, required further

inquiry by trial judge beyond merely interrogating excused

juror.   Vacated and remanded.

The United States Court of Appeals for the Seven Circuit

indicated in <u>United States v. Smith</u>, supra, 26 F.3d at 758.

"If there is a reasonable possibility that a jury's verdict

has been affected by material not properly admitted as evidennce,

the criminal defendant is entitled to a new trial."   <u>U.S. v.</u>

<u>Davis</u>, 15 F.3d 1393, 1412 (7th Cir. 1994), and "Where a bribe

or threat to a juror was communicated to other jurors, the

trial judge must fully examine the effect of the threat on the

1    ramaining jurors." United States v. Angulo, 4 F.3d 843, 847
2    (9th Cir. 1993).   The Ninth Circuit recently held that in such
3    cases, without a hearing, a district court does not have the
4    essential facts to properly evaluate a defendant's motion for
5    a mistrial.   Regardless or whether the defendant not requested
6    a hearing.   Id., at 848. While we are not prepared to embrace
7    the Ninth Circuit's rule absolutely, district courts in this
8    circuit will rarely have sufficient grounds for straying from
9    it.

10       In fact, the Ninth Circuit's rule is a cousin, if not a
11   sibling, of our own.   "Once the defendant has made a sufficient
12   showing that a juror was or wasn't tainted." Davis, 15 F.3d at
13   1412 (emphasis in original), citing Remmer v. United States,
14   347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed.2d 654 (1954)
15   ("Remmer I, 347 U.S. 227, 74 S.Ct. 450; U.S. v. Sanders, 962
16   F.2d 660, 671 (7th Cir. 1990).   The trial court's obligation
17   arises not only from the defendant's right to a fair trial, but
18   also from "proper concern for protecting and preserving the
19   integrity of our jury system," Remmer v. United States, supra,
20   350 U.S. 377,381 76 S.Ct. 425, 428, 100 L.Ed.2d 435 (1956) ("
21   Remmer II"), a systemic interest.   See also Id., ("It is the
22   law's objective to guard jealously the sanctity of the jury's
23   right to operate as freely as possibly from outside unauthorized
24   intrusions purposefully made") (emphasis added)  Id., at 758.

25       In the present case, Juror # 11 indicated that she was a
26   little threated when she heard the comments of the black people.
27   (RT 491.)   Moreover, Juror #11 indicated that she was going to
28   cautious on the way home.   (RT 493.)

1    The boss of juror #11 is from the same State as the victim
2  was.  (Maine)  Juror #11 indicated that her boss told her burn him.
3  And hang 'Em High.  (RT 879-880.)  The boss of juror #11 told her
4  the above because Juror #11 talked about the case.  Common sense
5  dictated that the boss of Juror #11 had knowledged that Juror #11
6  was serving as a juror in a first degree murder case.  When the
7  boss of Juror #11 said burn him and hang 'Em High, to juror #11,
8  the boss knew that juror #11 was resolving a serious case, and
9  that means that juror #11 talked with the boss about the case.
10  Based on the above cases and facts, AN EVIDENTIARY HEARING IS
11  REQUESTED.  After it, the convictions on all charges should be
12  reversed.

41

III.

**THE PROSECUTOR COMMITTED MISCONDUCT
BY ELICITING FROM WITNESS THAT
PETITIONER WAS INCARCERATED BEFORE
AND DURING HIS TRIAL.**

On direct examination of Mr. Santese Edwards, the prosecution

asked him the following questions:

Q:   When you went to the gym while in custody, did you have

a chance to speak with Tremayne Collier?

A:   No.   (RT 1820.)

Q:   While you were in custody, did you talk with Mr. Collier

about your case?

A:   Only when we were in the holding cells.

Q:   What conversation did you have with Tremayne Collier?

When you say "in the holding cell," What are we talking about?

A:   Where they have us before we come into court.

Q:   When you were waiting for a court appearance, sometimes

would Mr. Collier be with you in the holding cell?

A:   Yes.

Q:   When you and Mr. Collier where waiting in the holding cell

for a court appearance, was Mr. Mooring with you?

A:   Sometimes yes.

Q:   Sometimes when the three of you were together in the holding

cell, would the three of you talk about your case?

A:   I'm sure we did.

Q:   Do you remember specific conversations when the three of

you were in the holding cell waiting to go to court?

A:   No, I don't.

Q:   Was there ever a time when just you and Mr. Collier were

1  in a holding cell waiting to go to court and Mr. Mooring was not

2  present?

3    A:  Yes.

4    Q:  When just you and collier were in a holding cell, would the

5  two of you have words about your case?

6    A:  Yes.

7    Q:  What would you and Collier say?  What did you and Collier

8  say in the holding cell when Mooring was not present about your

9  case?

10    A:  I don't remember.

11    Q:  What was your feeling toward Mr. Collier while you were

12  in custody together?

13    A:  None.

14    Q:  In early 2002, Mr. Edwards, were you still in custody for

15  this case?

16    A:  Yes, I was.

17    Q:  Was Mr. Collier still in custody for this case?

18    A:  Yes, he was.

19    Q:  Sometimes in early 2002, were you in a holding cell waiting

20  for a court appearance with Tremayne Collier?

21    A:  Yes, I was.

22    Q:  Did Mr. Collier, while you were in the holding cell together,

23  give you something?

24    A:  Yes.

25    Q:  What did he give you?

26    A:  A letter.

27    Q:  Where were you when he gave it to you?

28    A:  In the holding cell.  (RT 1821,1824, 1825, 1826, 1827, 1837.)

43

1  | In the final statement the prosecutor told the jury that
2  | petitioner wrote the letter when he was in jail. (2748,2750-51,2845.)

3  | In Duran v. Thurman, 106 F.3d 407 (9th Cir. 1997), the United
4  | States Court of Appeals for the Ninth Circuit indicated, Duran
5  | argues that these questions and statement by the prosecutor
6  | constituted prosecutorial misconduct in that they informed the
7  | jury that Duran was incarcerated prior to trial and created an
8  | inference that Duran was probably guilty of the offense or was
9  | a violent person who needed to be incarcerated. We agree and
10 | hold that the prosecution's reference to Duran's incarceration
11 | constituted prosecutorial misconduct. Id. at 407.

12 | Petitioner's right under the Sixth Amendment to the United
13 | States Constitution had been violated. Therefore his conviction
14 | should be reversed. Because the prosecution informed the jury
15 | that petitioner was incarcerated before and during his trial.

16 |

17 | A.  Comment on Petitioner Failure to Testify.

18 | During the prosecution's closing statement, he indicated
19 | the following:

20 | Pam Hofsass, the gun shot residue expert, testify, never
21 | challenge.  Unique GSR on his right  sleeve. (RT 2740.)

22 | The four men knew each other well before May 25 and 26 you
23 | know that.  There is no evidence to challenge that.  (RT 2747.)

24 | This is not Dorfman's incompetent fabrication.  I'm looking
25 | at what the fedendant had to say and making an argument to you.
26 | (RT 2811.)

27 | When the Prosecution said (1) never challenge; (2) there is no
28 | evidence to challenge that and (3) I'm looking at what the defen-

44

1. dant had to say and making an argument to you. The prosecution
2. told the jury that petitioner failed to testify.

3. In United States v. Cotnam, 88 F.3d 487, 493 (7th Cir. 1996),
4. the United States Court of Appeals for the Seventh Circuit indi-
5. cated. During the government's closing argument, various state-
6. ments were made by the prosecutor that Zadurski now challenges
7. as being unconstitutional commentary on his failure to testify.
8. The prosecutor twice referred to the government's case generally
9. as "uncontroverted" and four times referred specifically to the
10. testimony of David Martin as "uncontroverted." In particular,
11. the prosecutor urged the jury to find Martin credible because
12. his testimony was uncontroverted. He stated, "Now, the defendant
13. will argue that Martin is not credible, although the evidence
14. I just discussed is basically uncontroverted." The prosecutor
15. also referred to the specific detail of Martin's testimony and
16. stated:  "Those are specifics that only a credible witness
17. could give. Again uncontroverted Mr. Martin on [the] specific
18. of the conspiracy?"

19. Trial counsel requested  a mistrial because the prosecution
20. elicited from Lieutenant Michael Ridgway an opinion that Mr.
21. Kennedy had shown no deception at all up until the point of
22. time Mr. Kennedy started to talk about the gun, and I think
23. it's Horbook Law that neither the prosecutor nor law enforcement
24. can vouch for the credibility of the witness. He is a start
25. witness in the case and, on that basis, I'm going to move for
26. a mistrial.  (RT 2575-2576.)

27. The Court read some part that Lieutenant Ridgway said, and
28. it indicated, "looked like vouching for Willie Kennedy."

45

1   (RT 2579.)   However, the court denied the motion for a mistrial.

2   (RT 2582.)

3        Trial counsel indicated that the prosecution had violated the

4   discovered rules and now that Lieutenant Ridgway testified, the

5   prosecutor is taking advantage of the situation.   (RT 2580.)

6        The prosecution in his closing argument repeatedly vouched

7   for the strength of the government's case.   United States v. Cotnam,

8   supra, 88 F.3d at 493.

9        ·Petitioner's conviction should be reversed, because his right

10  under the Sixth Amendment to the United States Constitution had

11  been violated.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

46

IV.

**PETITIONER'S CONVICTION AND SENTENCES
VIOLATED THE EIGHT AMENDMENT.**

1
2
3

4  Mr. Santese Edwards was driving the car on May 25, and in the
5  early hour of May 26, 1999, because petitioner could not drive
6  his car due to the fact that he was sleeping in the car because
7  he was under the influence of marijuana, heroine, cocaine, and
8  alcohol. Petitioner did not know what Edwards, Kennedy, and
9  Mooring were doing in the car.  Petitioner did not know the
10  intention of his friends before Mr. Shayne Worcester was shot
11  by Mr. Mooring.  Petitioner's mind was impaired due to the drugs.
12  Mr. Edwards admitted to Miss Pam Olsen that the foursome smoked
13  weed and snorted cocaine before Mr. Worcester was killed.  See
14  (RT 1938.)  During the trial, Edwards and Kennedy said that
15  petitioner got out of the car with Mr. Daniel Mooring and killed
16  Mr. Worcester.  Is true that Mooring killed Mr. Worcester, but
17  petitioner was in the car at that moment sleeping and just
18  enjoying his drugs.  Thus, petitioner did not have the capacity
19  to participate in an aiding and abetting and in a conspiracy
20  to the killing of Mr. Worcester.

21  In Lockyer v. Andrade, 538 U.S. 63, 123 S.CT. 1166, 155 L.Ed.
22  2d 144 (2003), Edwing v. California, 538 U.S. 11, 123 S.Ct. 1179,
23  155 L.Ed.2d 108 (2003), the United States Supreme Court indicated
24  that it allowed for the remote possibility of finding a statutory
25  punishment unconstitutional when it is "grossly disproportionate."
26  Andrade, 538 U.S. at 73, 123 S.Ct. 1166; see also Edwing, U.S. at
27  23, 123 S.Ct. 1179 (noting that the Eight Amendment contains a
28  norrow "proportionality principle that applies to noncapital

47

sentencing")  (internal quotations and citations omitted).  Thus,
Court did not elaborate what types of violations this exception
might encompass, but warned that "it is applicable 'only in the
exceedingly rare and extreme case.'"  (quoting Reyes v. Brown,
399 F.3d 964, 970 (9th Cir. 2005).

Petitioner was convicted for first degree murder, use of gun,
and two counts of robberies.  He was sentenced to 51 years to
life for the murder and use of gun.  For the two counts of
robbery, petitioner was convicted to 13 years determinate sentence.
For the reasons stated supra, petitioner's convictions and
sentences violated the Eight Amendment prohibition on cruel and
unusual punishment.  His conviction should be reversed.

On 09/02/99, Inspectors Edward Wynkoop and Cashen were
informed by CHP Tom Plume that Miss Leslie Duvlin, A.K.A. "Bobby"
told him (Plume) that Willie Kennedy told her (Miss Duvlin) that
he was with the shooter when the crime occurred.  The crime that
Mr. Kennedy told Miss Duvlin is the shooting of Mr. Worcester.

Miss Lashonta Bateast stated on direct examination that
Daniel Mooring told her that he and his homeboy (Mr. Santese
Edwards) did the shooting when Mr. Shayne Worcester was killed.
(RT 134.)  Miss Bateast asked Mr. Mooring why he shot at the
tourist, and he said that he did it because he needed the money.
(RT 136.)  Inspector Wynkoop showed Miss Bateast a photograph that
appeared as Defendant's VV.  (RT 1423.)  Bateast said that Santese
Edwards was on the couch with Mooring when Mooring said to her
that he killed the tourist.  (RT 1423.)  Miss Bateast said that
when Mooring was telling her that he killed the tourist, Santese
Edwards was laughing.  (RT 1423.)  Reversal is warranted.

48

V.

## TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE

1

2

3

4     Trial counsel rendered ineffective assistance by failing to

5 investigate the whereabout of Miss Leslie Duvlin. If trial counsel

6 would have contact Miss Duvlin, she would have testified that

7 she had knowledge that when the Ray Labonte's robbery and the

8 shooting of Shayne Worcester occurred, Willie Kenedy, Santese

9 Edwards, Daniel Mooring, and Tremayne Collier were under the

10 influence of marijuana, cocaine, alcohol, and heroin. See (CT 769-

11 784, 829.)

12     Inspector Edward Wynkoop filed an affidavit, in it he indica-

13 ted that Miss Leslie Ann Duvlin  told him that Kennedy told her

14 that when the robbery of Ray Labonte, and Shayne Worcester's

15 shooting and robbery occurred, all the suspects were under the

16 influence of marijuana and cocaine.  (CT 769, 784, 829.)

17     Miss Leslie Ann Duvlin  also indicated that Kennedy told her

18 that Santese Edwards was the driver during the two incidents.

19 (CT 810-811, 815-816.)  Miss Duvlin  also said to the Inspectors

20 that Santese Edwards was the driver, JR was in the front seat,

21 Collier and Mooring were in the back seat.  (Id.)

22     Mr. Dorfman (the Prosecution) indicated, "At this point,

23 defendant's knowledge, intent and mental state are the major

24 trial issues.  (CT 735-736.) The testimony of Miss Duvlin was

25 vital in this case.  And the result of the trial would have been

26 different if trial counsel would have looked and placed Miss

27 Duvlin in front of the twelve persons of the jury.  Petitioner

28 was prejudiced by the acts of trial counsels.

1     The other person that trial counsel failed to contact was

2 Mr. Tiron Ford.  Mr. Ford filed an affidavit and said, that

3 Tremayne Collier told him, to "get out of there" because Willie

4 Kennedy was looking for him.  (CT 1174-1175.)  The jury did not

5 learn what  Mr· Ford said in the affidavit because trial counsel

6 failed to contact him.  The records also show that Mr. Ford

7 was accosted by Willie Kennedy, and Mr. Collier prevented that

8 Kennedy harmed Mr. Ford.  (CT 1171.)  That occurred before Mr.

9 Ray Labonte was robbed

10     On May 25, 26, 1999, the foursome went to a strip club on

11 Market Street called "Crazy Horse."  The foursome hunged outside

12 of the club for a while and snorted cocaine and smoked weed.

13 Collier snorted heroin.  The other did not used heroin because

14 they did not like.  In sure, petitioner smoked, marijuana, snorted

15 co aine, and heroin.  Petitioner had used water to disolve the

16 heroin.  Petitioner barely heard that Daniel Mooring said that

17 he was going to look for cocaine because it ran out.  Petitioner's

18 state of mind was clouded due to the heroin he ingested.  Petitio-

19 ner did not know what was taking place in the car.  Petitioner

20 barely remember that shadows were leaving and entered in the

21 car.  Petitioner barely felt that the car was stopping and

22 moving.  Willie Kennedy told Lieutenant Michael Ridgway that

23 petitioner was driving erratic.  (CT 584.)  Kennedy said that

24 because Collier was driving erratic, Santese Edwards took the

25 driving duties.  The reason petitioner was driving erratic, was

26 because he was under the above mentioned drugs.  Petitioner did

27 not drive erratic because he did not know the area.

28     In Lambright v. Schriro, (No. 04-99010 Ninth Circuit ) D.A.R.

50

1  6713, Tuesday, May 15, 2007,  the United States court of Appeals
2  for the Ninth Circuit stated:  Attorney's failure to adequately
3  investigate and present mitigating evidence during capital
4  sentencing phase amounted to ineffective assistance of counsel.

5  **EVIDENTIARY HEARING REQUESTED.**  Petitioner's conviction should
6  be reversed because his right under the Sixth Amendment to the
7  United States Constitution has been violated.

8

9  ### A. Failure to Obtain an Expert

10  There is no doubt that petitioner was under the influence of
11  alcohol, marijuana and  heroin when the Ray Labonte's robbery
12  took place and when Mr. Shayne Worcester was killed and robbed.
13  At those times, petitioner's mind was cl uded, and/or petitioner
14  was almost asleep.  An expert would have told the jury that
15  petitioner would not have the capacity to aiding  and  abetting
16  and conspiring  with Willie Kennedy, Daniel Mooring and Willie
17  Kennedy to commit the robberies and the killing in this case.
18  Petitioner's state of mind was not capable to aiding and abetting,
19  and conspiring  with the above threesome.  The expert would have
20  helped the jury to properly determined this case.

21  Miss Pamela Olsen was the investigator of Dougls R. Schmidt.
22  Mr. Schmidt was the trial counsel for Santese Edwards.  Mr. Edwards
23  told Miss Olsen the followings:  After the attempted robbery
24  downtown, he drove the mustang around for about 30 minutes with
25  no destination in mind.  Collier was in the front passenger seat
26  and Mooring and Kennedy were in the back.  There was never any
27  discussion per se about where they were going or what they were
28  doing.  Noone said they did not want to be involved, no one objected

51

1   objected.   They drove by a man in the Marina, circled the block.
2   he and Mooring got out, and Collier  assumed the driver's posi-
3   tion.   Santese Edwards stated he was a little nevous, **but they**
4   **had smoked weed and done some coke in the car which bolstered**
5   **his courage.   (CT 1655.)**

6      Is interesting when Edwards said that, "There was never  any
7   discussion per se about where they were going or what they were
8   doing.   No one said they did not want to be involved." Petitioner
9   was incapacitated to objected what the other men were about to
10  do due to the consumption of alcohol, marijuana, and heroin.

11     Miss Leslie Ann Duvlin said that Willie Kennedy told her
12  that he and the other companions  were under the influence of
13  alcohol, marijuana and heroin when the robberies and the killing
14  took place.   (CT 769, 784, 829.)

15     The records had ample evidence that petitioner's mind was
16  clouded when the robberies and killing occurred.   Trial counsels
17  were ineffective by failing to obtain an expert.

18     In Thompson v. Calderon, 122 F.3d 28 (9th Cir. 1997) (cert.
19  granted).   (Counsel's ineffectiveness results  in new trial)
20  In an eleventh hour writ of habeas corpus in a capital case, the
21  Court of Appeals vacated a rape conviction, a rape special
22  circumstance allegation, and the death penalty.   The court based
23  its ruling partially on the finding of ineffective assistance
24  of trial counsel.   Counsel had failed to investigate, develop,
25  and present evidence rebutting the state's forensic evidence
26  of rape.   Counsel chose to fight the rape charge solely on the
27  basis that the co-defendant had committed a rape, and ignored
28  evidence that no rape ever occurred.   Second, counsel failed

1  to adequate impeach a jail-house informant by bringing up his

2  extensive history as an informant, the numerous favors he had

3  received from law enforcement, and his reputation among law

4  enforcement as being unreliable and a con artist.

5      **EVIDENTIARY HEARING REQUESTED.**  Petitioner's conviction should

6  be reversed because it violated the Sixth Amendment to the United

7  States Constitution.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

VI.

2

**APPELLATE COUNSEL RENDERED
INEFFECTIVE ASSISTANCE**

3

4       Appellate counsel was ineffective by failing to raising the

5  above issues and subissues.  If this  Court rules that any of

6  the above issues or subissues have merits, then it should rule

7  that appellate counsel rendered ineffective assistance by failing

8  to raising the meritorious issue or subissue that this Court

9  might rule that have merits.

10      Under Smith v. Robbins, 528 U.S. 259 (2000); Strickland v.

11 Washington, 466 U.S. 668 (1984), Appellate counsel was ineffective.

12      A showing that a defendant received ineffective assistance

13 of counsel will establish cause excusing a procedural default.

14 Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 379

15 (1986) quoting Ellis v. Hargett, 303 F.3d 1183, 1186 (10th Cir.

16 2002.

17      Petitioner's conviction should be reversed because his Sixth

18 and Fourteenth Amendments had been violated.

19

20

21

22

23

24

25

26

27

28

53A

1

VII.

2

3

4

THE COURT VIOLATED PETITIONER'S DUE PROCESS
RIGHTS WHEN IT PERMITTED THE PROSECUTION TO
INTRODUCE OTHER CRIMES EVIDENCE WHICH HAD
NO TENDENCY IN REASON TO ESTABLISH INTENT
OR KNOWLEDGE.

5

6

7

8

9

10

Over defense objection after extensive pretrial litigation,
the court admitted evidence of a robbery at an ATM which
occurred in Marin County three weeks after the charged crimes,
at an ATM in San Rafael. The prosecution theory of admissibility
under California Evidence code section 1101 changed during this
litigation.

11

12

13

14

15

16

17

The defense argued that the later robbery was not sufficien-
tly similar to be admissible as common scheme evidence; that
petitioner's conduct over a month later did not have a tendency
to prove his knowledge and intent on the night in question,
and that the evidence was overly prejudicial under California
Evidence Code section 352 because of the likely that the jury
would simply use it as evidence of petitioner's violence nature.

18

19

20

21

22

23

The court rejected some of the prosecution's theories
of admissibility, but admitted the evidence to prove intent
and knowledge to support the theory that petitioner aided and
abetted these robberies and the resulting homicide; to show
knowledge of firearms and to refute any claim of absence of
lack of intent, mistake or accident.

24

25

26

27

28

Prior to the testimony of the victim of the ATM robbery,
the court instructed the jury that the evidence of the five
prosecution witnesses on this issue was being admitted only to
show petitioner's intent in the charged crimes and not as
evidence of his character. (RT 1458.)

54

Caiazzo was unable to identify petitioner in court but identified a photograph he had selected from a lineup several months after the incident. (RT 1476-1478.)  The prosecutor introduced photographs taken by the bank security system.  (RT 1490-1491.)  The prosecution also introduced testimony that petitioner had admitted during an "official proceeding" that he was the man in the photographs but that he was holding an ax handle.  (RT 1697-1700.)  Caiazzo had informed officers that night that the man had a pellet gun.  (RT 1479, 1486.)  A fire-arms expert testified that the item the assailant was holding in the photos could be a rifle, but was also consistent with an ax handle.  (RT 1551-1554.)

The court instructed the jury with CALJIC Nos. 2.50, permitting them to consider this evidence on intent or knowledge necessary for the commission of the crime charged, 2.50.1 and 2.50.2.  (CT 992-994, RT 2677-2678.)

The prosecutor relied on this evidence several times during his argument to the jury urging them to use it to find that this other crimes evidence proved that petitioner knew what his friends would do on the night of the robberies in this case and intended for them to do it.

Petitioner argued below that this evidence was improperly admitted because it was irrelevant to the issues on which it was admitted and could only have been used by the jury as character evidence. He argued that this was only explanation for how the jury could infer that the act of June 19 proved anything about petitioner's intent and knowledge on the earlier date.

55

1
2
3
4
5
6

The Court of Appeal found sufficient similarities between the crimes to make the ATM robbery relevant on the issue of intent because, it held, the fact that petitioner perpetrated the ATM robbery with a similar weapon "made it more likely that he was harboring a criminal intent to participate in and facili-tate armed robberies" on the night in question.  (Slip op., 15-16.)

7
8
9
10
11
12

Petitioner submits that this Court should reverse his convic-tion to protect the due process rights of a defendant to be tried only upon relevant evidence and not on evidence such as this which impugned his character so powerfully that even the court's limiting instruction would not have protected him from improper consideration of such powerfully prejudicial evidence.

13
14

1.   This Evidence Did Not Meet the Ewoldt Standards
     on the Theories on Which it was Admitted.

15
16
17
18
19
20
21
22
23
24
25
26

California Evidence Code section 1101, subdivision (a) prohibits the use of prior bad acts of a defendant to prove his propensity to commit the charged crime.  However, "Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity.' [Citations.]" (People v. Tapia, (1994) 25 Cal.App.4th 984, 1020.)  To be relevant, the evidence must tend to prove either an ultimate fact or an intermediate fact from which the ultimate fact may be presumed or inferred.  (People v. Thompson, (1980) 27 Cal.3d 303, 315.)

27
28

In Kincade v. Sparkman, 175 F.3d 444 (6th Cir. 1999) Prose-cution said to jury that defendant committed other robberies

56

1 | in the county.  Case reversed.

2 |     The admission of prejudicial other crimes with low probative
3 | value may violate state law and also deny the defendant due
4 | process if it is particularly emotionally charged.  See McKinney
5 | v. Rees, (9th Cir. 1993) 993 F.2d 1378.  McKinney claims, as he
6 | did in the Court of Appeal of the State of California, that his
7 | constitutional right to a fundamentally fair trial as guaranteed
8 | by the Due Process Clause of the Fourteenth Amendment was violated.
9 | See Gideon v. Wainwright, 372 U.S. 335, 342, 83 S.Ct. 792, 795,
10 | 9 L.Ed.2d 799 (1963).  (quoting McKinney v. Rees, supra, 993 F.3d
11 | at 1380.) McKinney sought habeas corpus relief on grounds that
12 | inadmissible other acts evidence deprived him of a fair trial.

13 |     The admission of irrelevant character evidence, from which
14 | a jury can draw no permissible inferences, "amounted to constitu-
15 | tional error. . ." Alcala v. Woodford, 334 F.3d 862, 887-888
16 | (9th Cir. 2003); McKinney v. Rees, 993 F.2d 1378 (9th Cir.), cert
17 | denied, sub nom Olivarez v. McKinney, 510 U.S. 1020 (1993).

18 |     The controlling case on the requirements for admitting
19 | evidence under 1101(b) is People v. Ewoldt, (1994) 7 Cal.4th 380.

20 |         To be relevant on the issue of intent, the uncharged
21 |         offense must be "sufficiently similar [to the charged
22 |         offenses] to support the inference that the defendant
23 |         " 'probably harbor[ed] the same intent in each
24 |         instance.' (People v. Kipp, (1998) 18 Cal.4th 349,
25 |         371.)

26 | (Id. at 403.)  A lesser degree of similarity is required when
27 | prior bad acts are offered to show intent or motive than when
28 | offered to show identity or common plan.  However, even when

1   offered for intent or motive, the conduct of the prior bad act
2   must be sufficiently similar to show the same intent in the
3   charged crime.  (People v. Robbins, (1988) 45 Cal.3d 867, 880.)

4       Petitioner submits that the Court of Appeal analysis about
5   the similarities of these crimes fails to follow the standards
6   of Ewoldt and Robbins.  Aside from the fact that both events
7   involved a robbery, nothing about what petitioner did on June 19
8   proved his intent on May 25-26.  The charged events, as the
9   prosecutor argued them, involved four men riding around in a car
10  selecting victims who were walking down the street at random and
11  conducting quick, run up assaults to get their money.  The
12  assailant acted in pairs with one of them holding a gun and they
13  acted fast and then ran away.  It was not alleged in the instant
14  crimes that petitioner was one of the assailants in the first
15  incident nor that he was armed in the second incident in which
16  Mooring shot Worcester.

17      In contrast, the June 19 incident involved a lengthy period
18  of social contact with the victim, who met the men at a bar,
19  went to a party with them, and agreed to accompany them in their
20  car to get money and them to purchase drugs.  There was only one
21  armed assailant and an apparent plan to convince the victim to
22  withdraw cash from an ATM and then to take it as soon as it was
23  withdrawn.  This was thus a more planned attack and one that
24  took a great deal more time than the street robberies charged
25  in this case.  The use of photos of the ATM incident combined
26  with the expert opinion about the item the assailant was holdind
27  caused additional prejudice, particularly when the prosecutor
28  asked if the item in the photograph could have been the weapon

58

1  used in this case.  (CT 1340, People's Exhibit number 98.) This
2  was highly prejudicial evidence, based on innuendo to establish
3  propensity for violence and robbery.

4      It is a fundamental principle of due process that only
5  relevant evidence is admissible in a criminal trial.  Ulster
6  County v. Allen, (1979) 442 U.S. 140.) The evidence admitted
7  must have a "tendency in reason to prove or disprove any disputed
8  fact that is of consequence to the determination of the action."
9  (California Evidence Code § 210.) "A concomitant of the presump-
10 tion of innocence is that a defendant must be tried for what
11 he did, not for who he is." (United States v. Myers, 550 F.2d
12 1036, 1044 (5th Cir. 1977).

13 2.   The Evidence Was Inadmissible under Evidence Code
14      section 352.

15     If the court finds other crimes evidence relevant on any
16 theory, it must also balance its probative value against the
17 danger "of undue prejudice, of confusing the issues, or of
18 misleading the jury." (California Evidence Code § 352.)
19 Admissibility of such evidence is committed to the sound
20 discretion of the trial judge, whose decision will not be reversed
21 on appeal absent clear abuse of discretion.  (People v. DeRango,
22 (1981) 115 Cal.App.3d 583, 590.)

23     The admissibility of other-crimes evidence depends on
24     three principal factors: (1) the materiality of the
25     fact sought to be proved or disproved; (2) the tendency
26     of the uncharged crime to prove or disprove the material
27     fact; and (3) the existence of any rule or policy
28     requiring the exclusion of relevant evidence e.g.,

59

1    Evidence Code section 352. [Citations.]

2  (People v. Brown, (1993) 17 Cal.App.4th 1389, 1395; see also

3  People v. Carpenter, (1997) 15 Cal.4th 312, 378-379.)

4    The Court of Appeal's analysis finding no error under

5  sention 352 misapplied these standards and held that simply

6  because the ATM robbery was not more egregious than those involved

7  in the charged case. It pointed out that the victim did not die

8  and that even though it was violent it would not inflame the

9  jury's passions. Petitioner disputes this logic in that the

10  photos and Caiazzo's testimony described a frightening attack,

11  with a weapon. The prosecutor tried to connect to the murder of

12  Worcester shortly after the charged crimes. This was inflammatory

13  evidence and the fact that there were photos produced did not

14  diminish the prejudice but rather increased it as a plain matter

15  of common sense.

16    This Court should reverse the conviction to make clear the

17  proper analysis under Ewoldt and 352 so that defendant in this

18  state are not deprived of their federal constitutional right

19  to a fair trial (14th Amend.) based solely on relevant evidence

20  and not on prejudicial and inflammatory evidence casting suspi-

21  cions on the defendant's character. Inter alia, On 6/17/99,

22  Mr. Francis Caiazzo told Officer McDonald that he was robbed by

23  a man that was driving a black 2-door sports car, similar to an

24  Eclipse, but not an Eclipse. Mr. Caiazzo told Officer McDonald

25  that he smoked marijuana and had drank alcohol prior the robbery.

26  On 9/29/99, Inspectors Edward Wynkoop and Cashen interviewed

27  Caiazzo. He told the inspectors that he was like 50% sure

28  that petitioner robbed him on 6/16/99, at the ATM. Mr. Caiazzo

1  viewed a Photo spread containing a DMV photo of Tremayne Collier.
2  Of the six in the spread, he selected Collier as the subject
3  that  looked most like the robbery subject that had hit him in
4  the face with the butt of what appeared to be some sort of sawed
5  off firearm.  On 6/17/99, Mr. Caiazzo did not identified the
6  man who robbed him.  Mr. Caiazzo never said to any police that
7  the robber was driving a Mustang which is the car that petitioner
8  had on 6/16/99.  Officer Michael Miller of the (San Rafael Police
9  Department) asked to Deputy Commissioner Trottum if Mr. Caiazzo
10 can show where the party was conducted when he met petitioner.  Mr.
11 Caiazzo told Commissioner Trottum that he did not remember the
12 location of the party where he met petitioner.  The reason that
13 Mr. Caiazzo did not remember where the party was is because he
14 knows that petitioner did not rob him on 6/16/99.  Mr. Caiazzo
15 could not say what kind of car the robber was driving because
16 he knows that petitioner did not rob him.  Again, Caiazzo said
17 that the robber drove a black 2-door sports car, similar to an
18 Eclipse, but not an Eclipse.  He said that on 6/17/99.  But on
19 9/29/99, he told the inspectors that a photo of petitioner looked
20 like him, Caiazzo was 50% sure that the man in  one of the six
21 photos was petitioner.  The only conclusion that can be inferred is
22 that the photos shown to Mr. Caiazzo were suggested to him by the
23 Inspectors Wynkoop and Cashen.

24     The alleged robbery was introduced into evidence during the
25 trial of petitioner just to tainted the jury.  It shouldn't have be
26 admitted in the trial because petitioner was not charged or convic-
27 ted with it.  This robbery before the eyes of the jury, was very
28 prejudicial to petitioner's case.  Reversal is required.

60A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VIII.

THE PROSECUTOR'S LATE DISCLOSURE OF A POLICE
MEMORANDUM RELATING TO THE FIRST STATEMENT
BY AN IMPORTANT PROSECUTION WITNESS DEPRIVED
PETITIONER OF HIS ABILITY TO PREPARE AND
ADEQUATELY CROSS EXAMINE IN VIOLATION OF THE
SIXTH AND FOURTEENTH AMENDMENTS.

On the morning of July 21, the day the last defense witnesses were scheduled to testify, the parties disclosed to the court that the night before the prosecution had turned over to the defense a memorandum prepared by Lt. Ridgeway in November, 1999. After an evidentiary hearing, the information from which is discussed by the Court of Appeal (Slip op., 18-20), court found that there had been a serious discovery violation but denied the defense request to dismiss the case for prosecutorial miscon-- duct. The court denied the motion noting that the defense had the tapes of the statement referred to in this report and informed the defense that the matter could be addressed in instructions.

The defense renewed his objection during trial and in a new trial motion but he was denied.

Petitioner argued below that the failure to disclose this report until the last day of the defense case and after defense counsel had cross examined Kennedy was a violation of Brady v. Maryland, (1963) 373 U.S. 83 and denied petitioner's Sixth and Fourteenth Amendments rights to confront and cross examine witnesses and to a fair trial.

The Court of Appeal held that, "While the prosecution was derelict in not earlier providing this statement, Collier has failed to demonstrate reversible error." (Slip op., 18.)

61

1  Petitioner submits that this court should reverse the conviction
2  because the court's below analysis and application of well
3  established principles adopted by the United States Supreme Court
4  over 40 years ago were misapplied by the trial, court of appeal,and
5  by the California Supreme Court.

6  1.    The Prosecution Has a Statutory and a Constitutional
7        Duty to Turn over All Potentially Exculpatory
8        Evidence to the Defense in a Timely Fashion.

9        The prosecution has a duty under the Fourteenth Amendment's
10 due process clause to disclose evidence to a criminal defendant
11 when the evidence is

12     "both favorable to the defendant and material on
13     either guilt or punishment.  Evidence is 'favorable'
14     if it hurts the prosecution or helps the defense.
15     Evidence is 'material' only if there is a reasonable
16     probability that, had [it] been disclosed to the
17     defense, the result . . . would have been different."
18 (People v. Earp, (1999) 20 Cal.4th 826, 866 [internal citations
19 omitted]; see also Brady v. Maryland, (1963) 373 U.S. 83; Kiles v.
20 Whitley, (1995) 514 U.S. 419.)

21     During the appeal process, Respondent has conceded that the
22 prosecutor violated his obligations under Brady by failing to
23 immediately provide it to defense counsel upon becoming aware
24 of the report during trial.  (Slip op., 21.)  Because of this
25 concesion this court should reverse the conviction.  Petitioner
26 submits that the respondent and the Court of Appeal set forth
27 such a high standard in a case of egregious failure to provide
28 discovery that does not comport with federal constitutional

62

1    standards.

2    2.    The Failure to Provide Timely Discovery Prejudiced

3          Petitioner's Rights to Effective Representation,

4          Impeded His Right to Cross Examine Adverse Witnesses

5          and Denied Him a Fair Trial.

6          Ridgeway's most significant role in this investigation was

7    to conduct the first interview with Willie Kennedy, who was the

8    primary prosecution witness at the grand jury proceeding and at

9    both Mooring's and Collier's trials.  His undisclosed memorandum

10   contained numerous important observations of Kennedy's demeanor

11   and apparent lack of credibility, as well as additional substantive

12   facts that were available in any other discovery, including that

13   Ridgeway had a significant role in getting Kennedy to talk to

14   San Francisco Police, and observations of Kennedy's demeanor and

15   credibility.  The defense argued that this information was

16   "significant exculpatory evidence" especially because Ridgeway

17   stated that Kennedy was lying about his own role in the offenses.

18   The report also enabled the defense to better understand a poor

19   quality tape and added significant detail that was otherwise

20   unavailable about what was said by Kennedy to Ridgeway in his

21   earliest description of the incident.  (See CT 1104-1105.)

22         The defense new trial motion outlined numerous way in which

23   the defense had been prejudiced, including:

24         (1)  being unable to effectively cross-examine key prosecu-

25   tion witnesses, particularly as to the theory of the case as

26   presented by Kennedy and adopted by SFPD and exacerbated by the

27   refusal to provide the defense with a correct address to explore

28   Inspector Wynkoop's misrepresentation about how he came into

                                   63

1 | contact with Kennedy initially.  While Wynkoop testified that he
2 | went to San Rafael in response to contact by an informant,
3 | Ridgeway's report indicated that in reality Wynkoop and Cashen
4 | actively encouraged Ridgeway to pursue Kennedy and to obtain
5 | a statement.  It is a due process violation for a prosecutor to
6 | knowingly use perjured testimony to obtain a conviction. (Napue v.
7 | Illinois, (1959) 360 U.S. 264, 269.)  Under California penal
8 | Code section 1473, however, it is not necessary to establish
9 | that the false testimony was perjurious, or that the prosecution
10 | knew of its falsity in order to obtain relief by a writ of
11 | habeas corpus.  (In re Hall (1981) 30 Cal.3d 408, 424 [reversing
12 | murder conviction where the identification testimony of eyewitness
13 | was proved to be incorrect, although unintentionally so]; In re
14 | Wright, (1978) 78 Cal.App.3d 788, 809 at fn 5.

15 | (3)  preparation and effective presentation of the defense
16 | case was impeded by failure to disclose the report.  During the
17 | direct examination of Ridgeway, counsel's questioning was narrowly
18 | tailored to explore the way in which Kennedy had come forward,
19 | Ridgeway's observations about his demeanor  and the specific
20 | instances in which Kennedy appeared  to be lying.  Defense counsel
21 | argued that he had insufficient time to review the new discovery
22 | prior to examining Ridgeway - an "unfriendly" witness for the
23 | defense.  Defense counsel argued that he was unable to determine
24 | how best to examine Ridgeway on the contents of the document
25 | without "opening the door" to the introduction of otherwise
26 | inadmissible hearsay.  The prosecutor took advantage of the
27 | ill-timed disclosure and used his cross-examination as an
28 | opportunity to read into the record nearly the entire contents

1   of the memorandum, which would have otherwise been inadmissible
2   hearsay.

3        Ridgeway had been extremely uncooperative in his direct
4   testimony but throughout his cross-examination, he went out of
5   his way to inject irrelevant, inadmissible statements into the
6   record that would support the prosecution's case.   Under the
7   guise of California Evidence code section 356, the prosecutor
8   elicited through Ridgeway, in the heart of the defense case,
9   an entire recitation of the prosecution theory of the case,
10  and also asked Ridgeway questions concerning Kennedy's apparent
11  veracity during other points in the interview.   (RT 2573-74.)
12  Ridgeway attempted to vouch for Kennedy, citing his own training
13  and experience as having taught him to recognize when people
14  tell him the truth.   (See Argument IV, post.)

15       (4)  that the failure to disclose the memorandum precluded
16  the proper resolution of Collier's motion in limine to exclude
17  Kennedy's testimony on the grounds that he had been subject to
18  coercion through his interactions with Ridgeway, Wynkoop and
19  Cashen.   The suppressed memorandum would have provided substan-
20  tial support for the claim that Kennedy's statements were
21  coerced through state action.

22       (5)  that the remedy offered by the court at trial - a
23  continuance and the opportunity to recall the effected witnesses
24  was inadequate to correct the prejudice because the late discove-
25  ry came after the witnesses had been examined and cross examined
26  and that calling them back to repeat their stories would
27  actually prejudice the defense.

28       "To prevail on a contention made on appeal from a

65

1    judgment of conviction on the grounds of the pretrial
2    discovery right of a defendant, the defendant must
3    establish that the information not disclosed was
4    exculpatory and that there is a reasonable probability
5    that, had the evidence been disclosed . . ., the
6    result of the proceedings would have been different."
7    (Kyles v. Whitley, supra, 514 U.S. 419, 433-434.
8    quoting from United States v. Bagley, (1985) 473
9    U.S. 667, 682, 685; In re Brown, (1998)  17 Cal.4th
10   873, 886-887.)  Evidence is material in the context
11   of review of a discovery violation postconviction
12   if "the favorable evidence could reasonably be taken
13   to put the whole case in such a different light as
14   to undermine confidence in the verdict." (Kyles v.
15   Whitley, supra, at p. 435.)  Postrial, under Brady
16   and its progeny, we apply the "reasonable probability
17   of different outcome" test.  Such a "reasonable
18   probability" exists where it is probable that the
19   discovery violation is sufficient to undermine
20   confidence in the outcome.  (Kyles v. Whitley,
21   supra, at pp. 434-435; accord, In re Brown, supra,
22   at pp. 886-887; In re Williams, (1994) 7 Cal.4th 572,
23   611-612.)

24   (People v. Bohannon, (2000) 82 Cal.App.4th 798, 805-806.)
25      Because the California Court of Appeal, and the Supreme
26   Court of California failed to Properly apply federal standards
27   for discovery of exculpatory material and the degree of prejudice
28   that must be shown, this court should reverse the conviction.

IX.

### KENNEDY'S STATEMENT TO POLICE AND TESTIMONY WAS THE PRODUCT OF COERCION AND A PLEA AGREEMENT REQUIRING HIM TO TESTIFY IN A PARTICULAR WAY.

Defense counsel filed a pretrial motion to exclude the testimony of Kennedy because it was coerced by impermissible inducements, and because plea offers and agreements made to him were conditioned upon his testimony being consistent with his involuntary statement. Therefore, his testimony was unreliable and its introduction would violate petitioner's Fourteenth Amendment right to a fair trial.

After a 402 hearing on the issue of voluntariness, the defense argued that the officers made promises of leniency, first when Ridgeway essentially invited Kennedy to describe himself as an innocent bystander in order to convince him to implicate the other suspects. Their questioning was conducted in such a way as to force Kennedy to adhere to the version of events he provided to Ridgeway, despite the fact that the statement was not entirely truthful. Kennedy told the officers that the robberies were a product of Mooring and petitioner's independent thinking and that he had no knowledge what was going to occur. He lied that the others brought the gun. (RT 82.) On April 16, 2001, Kennedy pled guilty to violating California Penal Code § 32 in exchange for his testimony against the others. (RT 85.) Wynkoop learned, when Kennedy testified to the grand jury, that Kennedy was the person who brought the gun. (RT 86-87.) Wynkoop also learned prior to Mooring's trial, that Kennedy had been arrested for a house invasion robbery. No repercussions

67

1    resulted from this in terms of his probationary status.    (RT 87-
2    88.)

3         The court ruled that Kennedy's statement was voluntary and
4    his testimony was admitted against petitioner at trial.

5         Petitioner argued below that he had standing to challenge
6    this testimony and the violation of Kennedy's rights because
7    introduction of coerced testimony violated his due process rights.

8         The Court of Appeal found that petitioner had no standing
9    because Kennedy's testimony was not coerced and because he did
10   testify in a way that showed that he believed that he had to
11   testify in a particular fashion.    The conviction should be
12   reversed to correct errors of constitutional interpretation and
13   to protect petitioner right to a fair trial and due process.

14   1.   A Defendant Has Standing to Object to the Testimony
15        of a Third Party that Has Been Obtained by Coercive
16        Interrogation Techniques and Other Prosecution
17        Tactics which Raise Questions about the Reliability
18        of the Statement.

19        It is well settled that the admission of evidence which
20   renders a trial fundamentally unfair warrants a new trial.
21   (Donnelly v. DeChristoforo, (1974) 416 U.S. 637.)    The admission
22   at trial of improperly obtained statements which results in a
23   fundamentally unfair trial violates a defendant's due process
24   right to a fair trial.    (See Wilcox v. Ford, (11th Cir. 1987)
25   813 F.2d 1140, 1148-1149, and cases cited therein.)

26   ───────────
27        9.   At trial Kennedy admitted that he brought the gun but
     continued to claim that he did not know why he brought it and that
     there was no plan to commit crimes, although he later admitted
28   that this testimony was also untruthful.

1    In In re J. Clyde K. 192 Cal.App.3d 710, 237 Cal.Rptr. 550

2    (1987).  Two juveniles were found guilty of burglary and petty

3    theft and placed on probation by the Superior Court, City and

4    County of San Francisco, Frank C. Hart, J., and Juveniles

5    appealed.  The Court of Appeal First Appellate District, Rouse,

6    acting P.J., held that police officer's statements to juveniles

7    were coercive in nature, rendering juveniles's confession, and

8    fruits of confession, inadmissible at trial of other youths for

9    burglary and petty theft.  Reversed.

10    The Court of Appeal First Appellate District indicated that

11    the minors may seek exclusion of the confession and tainted

12    fruits on the basis of an involuntary confession by another.

13    Id., at pa 552.

14    The minors contend that Raymond's confession was unlawfully

15    obtained.  Id., at p. 553.

16    California Constitution Article I, section 28, (d), the

17    First Appellate District concluded that section 28(d) did not

18    nullify the law which permits a defendant to attack another's

19    coerced confession and to exclude the confession and evidence

20    gathered as a result thereof.  Id., at p. 553.

21    Today is November 27, 2007, until now petitioner found that

22    the United States Supreme Court has never ruled on the issue of

23    a third party's right to challenge the voluntariness of another's

24    confession on due process grounds.  However, several lower

25    federal courts have recognized an analogous right premised upon

26    a defendant's due process right to a fair trial.  Alderman v.

27    United States, (1969) 394 U.S. 165, 171-176, 89 S.Ct. 961, 965-

28    968, 22 L.Ed.2d 176.  Quoting In re J. Clyde K, 237 Cal.Rptr. at

69

1    p. 555.

2    In Bradford v. Johnson, 354 F.Supp. 1331, (E.D.Mich. 1972)

3    the court held that the defendant was denied the right to a

4    fair trial guaranteed under the Fourteenth Amendment.  When his

5    conviction was obtained by the use of a coerced confession by

6    a witness.  " 'as applied to a criminal trial, denial of due

7    process is the failure to observe that fundamental fairness

8    essential to the very concept of justice. . . . Such unfairness

9    exists when a coerced confession is used as a means of obtaining

10   a verdict of guilt.'"  Id., at pp. 1337-1338.  quoting Lisenda v.

11   California, (1941) 314 U.S. 219, 236-237, 62 S.Ct. 280, 290,

12   86 L.Ed.2d 166.

13   In United States v. ex rel. Cunningham v. DeRoberts, 719

14   F.2d 892, 897, (7th Cir. 1983), the court acknowledged that

15   "a  violation of another's fifth Amendment rights may rise to

16   the level of a violation of [defendant's] own right to a fair

17   trial," but concluded that no such violation had occurred where

18   the confession was determined to be voluntary.

19   In Lafrance v. Bohlinger, 499 F.2d 29 (1st Cir. 1974)

20   (cert denied) 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674), the

21   court prohibited the use of an allegedly coerced statement by

22   a witness even for impeachment purposes [192 Cal.App.3d 720]

23   Until a determination had been made as to the voluntariness of

24   the statement.  More importantly, the court denied that a

25   defendant's exclusionary right was in fact premised upon a

26   vicarious assertion of the constitutional right of another.

27   "since our decision is promised upon the rational, that use of

28   coerced testimony entails a violation of the defendant's due

70

1    process right to a fair trial, there is no standing problem.

2    Lafrance is not complaining of the purported denial of Brown's

3    constitutional rights, but only of his own." Id., at p. 35.

4        In sum, federal law supports the position adopted by the

5    California Courts that a defendant may challenge the voluntariness

6    of another's allegedly coerced confession and the fruits thereof.

7    In re J. Clyde K. 237 Cal.Rptr. at p. 555.

8        Petitioner's conviction should be reversed.  Petitioner

9    requests AN EVIDENTIARY HEARING for the determination if the

10   statement of Kennedy was voluntary or not.

11   2.   Kennedy's Statement Was the Product of Improper

12        Promises of Leniency.

13       In United States v. Tingle, 658 F.2d 1332 (9th Cir. 1981)

14   The United States Court of Appeals for the Ninth Circuit indicated,

15   (Threats and promises make confession involuntary)  Defendant

16   confessed to crime after F.B.I. agent threatened her with not

17   seeing her child for a long time if she did not cooperate,

18   warning her of the long-term imprisonment that could be imposed,

19   and promising lenient treatment and early release if she

20   cooperate.  Court held that this psychological coercion resulted

21   in an involuntary confession.

22       A statement by a witness or a suspect is involuntary if

23   induced, among other things, by any promise of benefit or

24   leniency, whether express or implied.  (People v. Sultana, (1988)

25   204 Cal.App.3d 511, 522; In re Walker, (1974) 10 Cal.3d 764, 777;

26   People v. Lee, (2002) 95 Cal.App.4th 772, 781.)  The type of

27   promise of leniency/threat of prosecution (see People v. Vasila,

28   (1995) 38 Cal.App.4th 865 [recognizing that these types of

71

1    coercion are often flip sides of a coin used in interrogation and
2    coercion] involved in this case began when the chief of police
3    made the distinction between the guilt of "persons who were
4    involved in the incident who may not have been involved in the
5    actual shooting," encouraging them to "separate yourself from
6    the killers.  If not, we will press on and make sure you are
7    prosecuted equally."  This is a clear promise of leniency and
8    a material misstatement of the law in that the four individuals
9    in the car clearly could have been equally guilty as conspirators
10   or aiders and abettors.  (However, petitioner cannot be an aider
11   and abettor, or a conspirator because when Worcester was shot
12   by Mooring, Petitioner was in the car asleep due to the heroin,
13   cocaine, marijuana, and alcohol that he had consumed.)  (See
14   People v. Cahill, (1994) 22 Cal.App.4th 296, 314-15; People v.
15   Thompson, (1990) 50 Cal.3d 134, 169.)

16       In People v. Underwood, supra, the parties agreed that a
17   witness statement of the defendant's 17 year old cousin implica-
18   ting the defendant as the perpetrator of a rape, robbery and
19   kidnapping had been coerced by threats to charge him with the
20   crimes of which his cousin was the primary suspect.  The court
21   noted that along with the threats the witness was young and had
22   been detained as a potential accomplice.  While this is somewhat
23   different from Kennedy at the time he spoke with Ridgeway, he
24   was also young and clearly knew he was a suspect having had his
25   house searched pursuant to a warrant.  He was thus susceptible
26   to the implied and direct promises of leniency, combined with
27   the threat to pursue anyone who did not cooperate as a full
28   suspect, made by both  the police chief and the officers, as was

72

1  made clear by his initial reaction to the officers as well as
2  Wesson's descriptions of his concerns which caused him to seek
3  to stay with her to avoid the San Francisco Police.  (See Ridgeway
4  memo, page 1-2.)

5      In People v. Lee, supra, 95 Cal.App.4th 772, the court
6  found that the police had coerced a statement from witness
7  Saxon when they gave him a polygraph and then threatened to
8  charge him with first degree murder if he did not implicate the
9  other suspect.  Although in this case the officers did not tell
10  Kennedy whose name they wanted him to give, they did make clear
11  that it should be one of the other suspects if he wanted the
12  benefit of not being charged with murder, especially considering
13  the police chief's comments early in the investigation.  In
14  addition, it appears that Kennedy knew whose houses had been
15  searched at the same time as his, thus making clear whom the
16  police suspected to have been involved.

17      Ridgeway increased the pressure when he immediately told
18  Kennedy at the beginning of their conversation that they suspec-
19  ted him because they got a search warrant and he should tell
20  them what happened to get on the record that he was not the
21  shooter, "It's important for you to start clean [inaudible,
22  designated IA]...and then at least if that's what truly
23  happened them you're as [IA] it's on your record and it's not
24  a matter of someone else coming along...".  (CT 575-76.)  This
25  was not as express a promise as the Chief of Police's statement,
26  but it clearly played on the same sentiment, and he concluded
27  his interview with reassurance that Kennedy had done the right
28  thing by telling him the story.  (CT 587.)

73

1    After Ridgeway contacted SFPD and they came to interview
2    Kennedy again, Cashen began by reassuring him that "what you
3    said and uh we think that's you know very accurate very much the
4    truth. . . we don't think of you as a suspect in this matter. . ."
5    and assured him that he was not going to be arrested.  (CT 591.)
6    Kennedy was so relieved that he offered to "tell you anything -
7    anything you want to know."  (CT 591.)  He clearly understands
8    what is expected if he wants to maintain his status as not being
9    a suspect.  When Kennedy said that this relieved a lot pressure
10   on him and on his mom, the officer said, "It's hard enough on
11   yourself and you involve your mom and your other relatives plus
12   the fact that you've got a... a pretty good life going for you
13   here."  (CT 591.)  At the end of the conversation the officers
14   also made an implied threat to Kennedy that they were concerned
15   about his safety from the others even though he stated that he
16   was not worried about them.  (CT 603-604.)  They implied that
17   he may need them to protect him when they revealed the information
18   he shared.  This was another type of promise - to keep him safe.
19   (CT 604-605.)

20   An improper promise of leniency renders a statement involun-
21   tary when, given all the circumstances, the promise was a
22   motivating factor in the giving of the statement.  (People v.
23   Vasila, supra, 38 Cal.App.4th at 874.)  Petitioner submits that
24   Kennedy's reaction when the officer told him that he was not
25   a suspect shows that his understanding that if he spoke to them
26   and gave information on his collegues, he would not be prosecuted
27   was a clear motivator, as his relief at their comments establi-
28   shes.

74

1    3.   The Plea Agreement Conditioned on Kennedy's
2         Truthful Testimony Should Be Considered as
3         a Factor in Determining whether Kennedy's
4         Statement was Coerced.

5         A cooperation agreement that requires a witness to testify
6    consistently with a previous statement to police is deemed
7    coercive and testimony produced by such an agreement is subject
8    to exclusion from evidence. (People v. Allen, (1996) 42 Cal.3d
9    1222, 1251-52.) Further, a "defendant is denied a fair trial
10   if the prosecution's case depends substantially upon accomplice
11   testimony and the accomlice witness is placed, either by the
12   prosecution or the court, under a strong compulsion to testify
13   in a particular fashion." (People v. Medina, (1974) 41 Cal.App.
14   438, 455; see also People v. Allen, supra, 42 Cal.3d at 1251-
15   1252.)

16        Even if the cooperation agreement was worded to comply
17   with Allen, the reality of the agreement and the clear understan-
18   ding that Kennedy took away from the interviews should be
19   viewed as a factor in determining the voluntariness of his trial
20   testimony, the voluntariness of which should be viewed in the
21   totality of the circumstances. (Moran v. Burbine, (1986) 475
22   U.S. 412, 421.) This Court should reverse the conviction to
23   correct the Court of Appeal and the Supreme Court of California
24   misinterpretation of federal constitutional principles relating
25   to coerced testimony and to protect petitioner's due process
26   rights.

27

28

75

1

X.

2

3

4

5

6

**RIDGEWAY GAVE AN IMPROPER OPINION OF KENNEDY'S TRUTHFULNESS AND VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL IN VIOLATION OF THE FOURTEENTH AMENDMENT.**

7

8

9

10

Ridgeway testified on cross examination by the prosecutor that as soon as he asked Kennedy questions about the gun he saw signs of deception and clear changes in Kennedy's demeanor.   The defense objected that this was improper.

11

12

13

14

15

16

17

18

Appellant argued below that because Kennedy was a star prosecution witness and his credibility was a central issue, a police officer's vouching for the credibility of portions of his story violated established rules of evidence and was prejudicial thus violating appellant's right to a fair trial, even though the jury was instructed that "Witnesses from law enforcement are not permitted to express an opinion on either the guilt of the accused of the believability of any witness. You will disregard any such testimony." (CT 1003, RT 2680.)  They were not informed that this instruction related to Ridgeway's statements.

19

20

21

22

23

24

The Court of Appeal held that Ridegway had not drawn "an ultimate inference of untruthfulness, and then held that because the defense had raised the topic the prosecutor was entitled to go into this matter. This court should grant review to make clear that testimony expressing an opinion about credibility it not proper and when it supports the credibility of such a crucial witness, its admission violates a defendant's right to a fair trial.

25

26

27

28

76

**1.    A Lay Witness Cannot Give an Opinion about Witness Credibility**

It is improper for an officer to testify at trial about an opinion he may have concerning the veracity, or lack of veracity, of particular information provided by a witness or a defendant. (*People v. Melton* (1988) 44 Cal.3d 713, 744.) This court has stated clearly, "Lay opinion about the veracity of particular statements by another is inadmissible on that issue." (*Ibid.*) There are important reasons behind the well established rule that lay opinion about credibility is not admissible:

> With limited exceptions, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence. Qualified experts may express opinions on issues beyond common understanding (Evid. Code, §§ 702, 801, 805), but *lay views on veracity do not meet the standards for admission of expert testimony.* . . . [A] lay opinion about the veracity of particular statements does not constitute properly founded character or reputation evidence (Evid. Code, § 780, subd. (e)), nor does it bear on any of the other matters listed by statute as most commonly affecting credibility ( *id.*, § 780, subds. (a)-(k)). Thus, such an opinion has no "tendency in reason" to disprove the veracity of the statements. (*Id.*, §§ 210, 350.)

(*Ibid.*, citing *People v. Sergill* (1982) 138 Cal.App.3d 34, 39-41.)

In *Sergill*, the trial court permitted two police officers to give their opinions that the victim was telling the truth when she reported being molested by the defendant. The conviction was reversed because this evidence was improper and highly prejudicial.   The Court of Appeal found that police officers are not experts qualified to give opinions on the veracity of witnesses, and because it could not be said that "the veracity of those who report crimes to the police is a matter sufficiently beyond common experience to require the testimony of an expert." (*Ibid.*)

77

1      The same analysis must be used in this case. By focusing on the point

2  at which Ridgeway suspected Kennedy's statement became untruthful, the

3  prosecutor essentially had him testify that he believed that what Kennedy

4  said before that portion of the interview was the truth. The statements he

5  vouched for included Kennedy's claim that the police already had the one

6  they wanted (RT 2549), that appellant removed the wallet, knocked the

7  victim to the ground and kicked him, (although he did note that this

8  contradicted Kennedy's claim that he was driving around when the

9  robbery/killing occurred (RT 2550-51), and that appellant used the credit

10  card at Denny's. (RT 1552.)

11      When the prosecutor asked about Kennedy's statement about the gun,

12  Ridge way replied that "Well, up to that question, I thought his – generally

13  in our interaction in the backyard, I thought he was very forthcoming and

14  very open, and I'd been doing this for 19 years and I've had specific

15  training in interrogation and interview and physiological symptoms of

16  deception and I saw none of that present at all. As soon as I asked him about

17  what happened to the gun, I saw numerous signs that he was being

18  deceptive. It was a clear change in his demeanor from our conversation to

19  that point." (RT 2573.)

20      The obvious impression that this gave as to the credibility of

21  Kennedy's earlier statements which clearly implicated appellant in support

22  of the prosecution theory cannot be ignored. Further, by informing the jury

23  that he had extensive training in how to judge credibility, yet not

24  remembering any of the particular signs that he actually observed, his

25  opinion became basically immune to cross examination, while the aura of his

26  expertise and Kennedy' s straightforwardness were enhanced. This was

27

28                                78

1   especially important to the prosecutor's  theory because of the miserable
2   performance of Kennedy on the witness stand, his sweetheart deal with the
3   prosecution and his criminal conduct after the deal for which he suffered no
4   consequences.  By allowing a police officer to describe him as credible and
5   forthright in his first statement before some of these other problems arose,
6   the testimony gave him an unfair aura of credibility which a general
7   instruction that was not given until the end of the trial could not cure.
8   Appellant's   right to a fair trial and was denied because of Kennedy's
9   central place in the prosecutor's case.

10      Review should be granted to ensure that in trial courts police officers
11  are prohibited from giving improper opinions such as that offered herein and
12  thus defendant's rights to a proper jury determination of witness credibility
13  is ensured.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    79

XI.

**IT WAS REVERSIBLE ERROR TO INSTRUCT THE JURY WITH CALJIC NO. 2.11.5.**

The jury was instructed improperly with CALJIC No. 2.11.5 which informs the jury that is it not to "discuss or give any consideration" why persons other than the defendant who may have been involved in the crime are not being prosecuted along with the defendant.(CT 980, RT 2672, emphasis added.)

Appellant argued below that this instruction was improper under well established law because unjoined perpetrators – Kennedy and Edwards – were prosecution witnesses who testified in exchange for extremely favorable plea bargains. Further, the error was prejudicial because their testimony was the only testimony which described the conduct of each of the individuals and which placed appellant at the scene of the Worcester

The Court of Appeal agreed that the instruction was improper under this court's holding in *People v. Cornwell* (2005) 37 Cal.4th 50, 88, but found it harmless because the instructions as a whole adequately advised the jury how to judge witness credibility. (Slip op., 32-33.) Appellant submits that review should be granted so that the propr use of CALJIC No. 2.11.5 is guaranteed by re-analyzing the harmless error approach from *Cornwell* regarding conflicting instructions.

1.   **Because These Witnesses Were So Crucial to the Prosecution Case this Improper Instruction Cannot Be Held Harmless.**

The import of this instruction is that the jury was told essentially not to even discuss the effect of all the information they were given about these

80

1  two witnesses' plea bargains. This is especially so in that the version of the
2  instruction given at trial, which occurred in June 2004, was an older version
3  which did not include the recommended new language adopted by the 2004
4  revisions. These revisions substituted the language "speculate or guess" in
5  place of "discuss or give any consideration to." While the new language
6  more clearly focuses the jury on the proper restriction on the consideration
7  of the evidence, appellant's jury was told not to give any consideration as
8  to why these men were not prosecuted

9      In *People v. Williams, supra,* 16 Cal.4th at 226, this Court held that
10  even though the instruction was improperly given it was harmless because
11  the witnesses referred to were not "the mainstays of the prosecution case
12  which depended, in the first instance on eyewitness testimony..." The exact
13  opposite is the case herein.

14      When conflicting instructions are given, a reviewing court "must
15  determine 'what a reasonable juror could have understood the charge as
16  meaning' [Citation.] While the initial focus is on the specific instruction
17  challenged [citation], we must also review the instructions as a whole to see
18  if the entire charge delivered a correct interpretation of the law. [Citation.]'
19  " (*People v. Cox, supra,* 53 Cal.3d at p. 667.)" (*People v. Fonseca, supra,* 105
20  Cal.App.4th at 549.; see also *Francis v. Franklin* (1985) 471 U.S. 307.)

21      The Court of Appeal focused only on the other instructions given and
22  did not analyze the crucial nature of these witnesses' testimony to the
23  prosecution case. The instruction directly steered the jury away from the
24  many relevant aspects of the plea bargains obtained that were so integral to
25  the defense attack on their credibility. Review should be granted.

26
27
28

81

1

2

XII.

3

**THE ADMISSION OF A PHOTOGRAPH OF THE VICTIM AT WITNESS FARLEY'S WEDDING VIOLATED APPELLANT'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL**

4

5

6

7    Over defense objection, the court allowed the prosecutor to admit into
8    evidence an 8x10 inch color photograph of Worcester taken at witness
9    Farley's  wedding. The photo showed the two men standing close to each
10    other and clearly showed their affection.  The prosecutor argued that the
11    photo was admissible to prove there was a connection between witness
12    Farley and Worcester and because they were together throughout the
13    incident.    The defense argued that there was no relevance to that
14    relationship, that it was not contested by the defense and that the only real
15    point of the photograph would be to elicit sympathy, especially because it
16    was not a neutral photograph but it was taken at a wedding and that such a
17    setting would elicit a reaction from jurors. The court ruled that while the
18    photograph could come in, it should not be mentioned that Worcester was
19    Farley's best man.

20    Appellant argued below that the photograph had no tendency to prove
21    any material facts and was likely to invoke sympathy and prejudice the
22    defendant, it was inadmissible under clearly established law.  He also argued
23    that its admission violated appellant's  rights to due process and a fair trial
24    by encouraging the jury to react from sympathy rather than the evidence.
25    The Court of Appeal held that any error was harmless, even though it
26    recognized that it had slight probative value. This court should grant review

27

28                                    82

1  to enforce the clear rule that such photos are inadmissible when not probative
2  of a material issue and to set forth th proper standard for determining
3  prejudice when such evidence implicates a defendant's federal due precess
4  rights.

5  **1.    This Photograph Was Patently Irrelevant and Prejudicial.**

6  It is a fundamental aspect of due process that a conviction may only
7  be obtained based upon relevant evidence. (*Ulster County v. Allen, supra,*
8  442 U.S. 140.) California law also is clear that only relevant evidence is
9  admissible. (Evid. Code §350.) A trial court has no discretion to admit
10 irrelevant evidence. *(People v. Crittenden* (1994) 9 Cal.4th 83, 132; *People*
11 *v. Babbitt* (1988) 45 Cal.3d 660, 681.)

12 Live photographs of the victim in a homicide case have a strong
13 potential for causing prejudice, and must be closely scrutinizes for relevance.
14 It is well established that it is error to admit photographs of the victim alive
15 where they are irrelevant to any "contested issue in the case" (*People v.*
16 *Anderson* (1990) 52 Cal.3d 453, 474.)

17 The photograph of Worcester at Farley's wedding was not relevant
18 to any contested issue. As the Court of Appeal recognized, "the more
19 obvious purpose of the photograph was to put a face to the victim of the
20 charged crimes, it also tended to support the believability of Farley's
21 testimony" describing the night in question. (Slip op., 35.) The Court of
22 Appeal makes this statement without any analysis and appellant submits that
23 it cannot stand up to review. A photograph adds nothing to the uncontested
24 testimony that Farley had known Worcester his whole life and that
25 Worcester was in San Francisco to visit him and other childhood friends. If
26 anything, this photo makes the tragedy sadder and thus was inflammatory

27

28

83

1  without adding anything to the prosecution's evidence.

2      Whether these man had known each other for years was completely
3  irrelevant to the issues at trial. In admitting the photograph the trial court
4  did not state the reasons she found it relevant, and the Court of Appeal
5  determination that a photograph somehow made Farley's testimony more
6  credible is unexplained and illogical. The first test required for the admission
7  of any evidence is relevance. Without relevance to a material issue the
8  evidence should not have come in at all. Further, even if the prosecutor had
9  articulated a credible theory of relevance, the evidence should be excluded
10  if it is unduly prejudicial or inflammatory. The trial court leapfrogged over
11  the relevancy determination and thereby erred.

12      Since the photograph was irrelevant, and the only inference it could
13  raise was that the jury should sympathize with the victim, or conversely,
14  entertain antipathy towards appellant, the admission of the photographs
15  violated appellant's Fifth and Fourteenth Amendment rights to due process
16  and a fundamentally fair trial. Admission of evidence against a criminal
17  defendant that raises no permissible inferences, but which is highly
18  prejudicial, violates federal due process. (*Estelle v. McGuire,* (1991) 502
19  U.S. 62 [state law errors that render a trial fundamentally unfair violate
20  federal due process]; *McKinney v. Rees, (*9th Cir. 1993) 993 F.2d 1378
21  [admission of wholly irrelevant and highly prejudicial evidence violates
22  defendant's federal due process rights]; *Lesko v. Owens* (3rd Cir.1989) 881
23  F.2d 44, 52 [constitutional error in admitting evidence whose inflammatory
24  nature "plainly exceeds its evidentiary worth"]; compare *Hoxsie v. Kerby*
25  (1997) 108 F.3d 1239, 1242, quoting *Donnelly v. DeChristoforo* (1974) 416
26  U.S. 637, 643 [admission of photographs did not so infect the trial as to violate
27  federal due process because the photographs were relevant and admissible].)

28      84

1    **2. The Admission of this Evidence Was Prejudicial**

2        Because the admission of wholly irrelevant but prejudicial evidence
3    violates federal due process, review for prejudice is under *Chapman v.*
4    *California* (1967) 386 U.S. 18. Reversal is required unless the prosecution
5    can show the error to be harmless beyond a reasonable doubt. The insertion
6    of sympathy such as would be caused by this photograph into this case was
7    extremely prejudicial.   The primary prosecution witnesses were two
8    accomplices who had a substantial motive to lie to protect themselves, who
9    had sweetheart deals to avoid essentially any real consequences for their own
10   participation in this incident and who had both shown themselves to be law
11   breakers and thus unworthy of belief in the years between the plea deals they
12   worked out and their testimony.

13       This was one of many errors which combined to deprive appellant of
14   a fair trial and a reliable verdict. (See e.g., *People v. Holt* (1984) 37 Cal.3d
15   436; *United States v. Frederick* (9th Cir. 1995) 78 F.3d 1370 [reversed for
16   cumulative error, announcing that "[where [] there are a number of errors
17   at trial, 'a balkanized, issue-by-issue harmless error review' is far less
18   effective than analyzing the overall effect of all the errors in the context of
19   the evidence introduced at trial"].)

20       This court should grant review to clarify the rules governing the
21   admission of victim photographs and to ensure that murder verdicts are
22   obtained on the basis of relevant and admissible evidence and not out of
23   sympathy and emotional reactions to irrelevant photographs.

24

25

26

27

28
                                        85

Content:

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

TREMAYNE J. COLLIER

### PLAINTIFF or PETITIONER

v.

**Case Number:** C 07-5964 SI (PR)

ANTHONY HEDGPETH, Warden,

### Defendant or Respondent

## PROOF OF SERVICE

Tremayne Collier

I hereby certify that on June 30th , 20 08 , I served a copy
of the attached ___TRAVERSE___ , by placing a copy in
a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope
in the United States Mail at ___K.V.S.P.___ :

> Antorney General
> State of California
> 455 Golden Gate Avenue #11000
> San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct.

Tremayne Coll

mayne Collier # V60450
m Valley State Prison
2. Box 5102 B3-206
fano, Ca. 93216

Kern Valley State Prison,
Facility B, Building 3

Office of the Clerk
United States District Court
Northern District of California
450 Golden Gate avenue
San Francisco, Ca. 94102

Legal Mail